JUDGE PAULEY

11 CV 5459

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RETIREMENT BOARD OF THE POLICEMEN'S ANNUITY AND BENEFIT FUND OF THE CITY OF CHICAGO (on Behalf of Itself and Similarly Situated Certificate Holders), | Civil Action No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| - against- | AUG 05 2011 |
| THE BANK OF NEW YORK MELLON (as Trustee Under Various Pooling and Servicing Agreements), | U.S.D.C. S.D.N.Y. CASHIERS |
| Defendant. | **JURY TRIAL DEMANDED** |

## SUMMARY OF THE ACTION

1.     Plaintiff Retirement Board of the Policemen's Annuity and Benefit Fund of the City of Chicago ("Plaintiff") brings this class action against Defendant Bank of New York Mellon ("BNY Mellon") in its capacity as the trustee for covered trusts in which Plaintiff invested and 530 covered trusts (the "Covered Trusts") that own residential mortgage loans that were bundled together and sold to investors as Countrywide mortgage backed certificates (the "Countrywide Certificates").  Plaintiff purchased and currently owns Countrywide Certificates and, along with other similarly situated investors (collectively, the "Certificate holders"), was the beneficiary to the mortgage loans that were owned by the Covered Trusts, and additional covered trusts.  A list of the 530 covered trusts is attached to this Complaint as Exhibit A.  A list of the covered trusts in which Plaintiff invested is attached as Exhibit B.

2.     As the trustee for the Covered Trusts, BNY Mellon owed the Certificate holders certain contractual and fiduciary duties, as well as duties required under the federal Trust

Indenture Act of 1939 (the "TIA"), 15 U.S.C. §77aaa, *et seq.*, with respect to the mortgage loans owned by the Covered Trusts. These duties were spelled out in governing agreements, generally identified as Pooling and Servicing Agreements ("PSA") for the Covered Trusts, which were incorporated by reference into the Certificates BNY Mellon signed. A copy of a representative PSA, which contained provisions substantially similar to all other PSA's and governing agreements for the Covered Trusts (hereinafter referred to as the "PSA"), is attached to this Complaint as Exhibit C, and is incorporated by reference into this Complaint as if set forth fully herein.

3.      The PSA provided in Section 2.01 ("Conveyance of Mortgage Loans") that all the rights, title and interest in the mortgage loans owned by the Covered Trusts were to be conveyed to BNY Mellon, as the trustee for the Covered Trusts, for the benefit of the Certificate holders. (PSA, Section 2.01(b)). This included the full ownership rights to the mortgage loans, the right under the PSA to require Countrywide Home Loans, Inc. ("Countrywide") to cure irregularities in the mortgage loan files and breaches of any of the representations and warranties in the PSA, including the right to force Countrywide to repurchase or substitute any of the non-conforming mortgage loans in the Covered Trusts. *Id.*

4.      To ensure that the rights, title and interest in the mortgage loans were perfected and properly conveyed to BNY Mellon, the PSA provided in Section 2.02 ("Acceptance by Trustee of Mortgage Loans") that BNY Mellon had a duty to:

- take physical possession of the mortgage loan file and all of the key documents for each of the mortgage loans included in the Covered Trusts for the Countrywide Certificates (PSA, Section 2.01(c));

- review each of the mortgage loan files for each of the mortgage loans in the covered trusts to ensure that the key documents for the loan were included in the files and were not defective or incomplete, and ensure that the loans had been endorsed and assigned over to BNY Mellon (PSA, Section 2.02(a));

- create a "Document Exception Report" identifying those mortgage loans where the loan files for the loan contained documents that were missing, defective or incomplete and/or had not been endorsed and/or assigned over to BNY Mellon as the trustee for the Covered Trusts (PSA, Section 2.02(b)); and

- complete "Final Certification of the Trustee" certifying that BNY Mellon had taken physical possession and reviewed all of the loan files for each of the mortgage loans in the covered trusts and that – other than the mortgage loans listed on the "Document Exception Report" – there were no missing, incomplete or defective documents in the loan files for the mortgage loans in the Covered Trusts (PSA, Section 2.02(b)).

5.      BNY Mellon's contractual and fiduciary duty to take physical possession of the key documents in the mortgage loan file, such as the original mortgage note, original recorded mortgage and security instrument for the mortgage loan, and then review the mortgage loan file to ensure that there were no missing, defective or incomplete documents in the file was of critical importance to Certificate holders for two reasons.

6.      **First**, if certain key documents in the loan files, such as the original mortgage note or the security instrument for the mortgage loan, were not properly transferred and endorsed over to BNY Mellon in its capacity as trustee for the Covered Trusts, then the Covered Trusts would not have any legal ownership interest in the mortgage loans and would have no right to receive mortgage payments on the loan and would have no enforceable right to foreclose on the loan in the event that it went into default.  This is why the PSA required BNY Mellon to take physical possession of the mortgage loan files and review them to make sure that there were no missing, incomplete or defective documents in the loan file.

7.      **Second**, the PSA required Countrywide to provide the missing documentation for the improperly documented loans and, if it could not do so, repurchase or substitute another loan for those mortgage loans that had contained missing, defective, incomplete and/or non-conforming documentation.  (PSA, Section 2.02(a)).  However, Countrywide's obligation to

repurchase and/or substitute mortgage loans based on an improper document mortgage file expired 540 days after the date when the Countrywide Certificates were securitized. *Id*. Thus, if BNY Mellon failed to identify the improperly documented mortgage loans on the "Document Exception Report" (either because BNY Mellon had failed to take physical possession of the key documents in the loan file, or had failed to review the loan files to ensure that the key documents were not missing, defective or incomplete), then these loans remained in the Covered Trusts, and the Certificate holders could potentially lose their contractual right to force Countrywide to repurchase and/or substitute a new loan for the improperly documented loan.

8.     In fact, this is the reason why the PSA required BNY Mellon to create a "Document Exception Report" and a "Final Certification of the Trustee." Under the PSA, BNY Mellon was required to identify those loan files that contained missing or incomplete documentation in the "Document Exception Report." BNY Mellon was also required to certify in the "Final Certification of the Trustee" that it had taken physical possession of the mortgage loan files, had reviewed all of the loan files for the mortgage loans in the Covered Trusts and those files – other than those listed on the "Document Exception Report" – contained complete and accurate documentation and had been properly endorsed and assigned over to BNY Mellon as trustee for the Covered Trusts.

9.     As described more fully below, BNY Mellon, however, systematically disregarded its contractual and fiduciary duties to take physical possession of the key documents in the mortgage loan files, review the loan files to ensure that there were no missing, defective or incomplete documents in the file and/or enforce its rights on behalf of Certificate holders to ensure that loans with irregularities were removed from the mortgage pools supporting the Certificates. BNY Mellon systematically failed to identify improperly documented loans on the

"Document Exception Report," made false statements in the "Final Certification of the Trustee," and/or failed to ensure that defective loans were removed from the mortgage pools.  For example, in a pleading filed by the New York Attorney General (the "NYAG") to intervene to object to a settlement proposed by BNY Mellon, the NYAG reported that even when BNY Mellon generated exception reports identifying that "great numbers of files are incomplete and improperly documented," the deficiencies were not corrected or disclosed to Certificate holders.

10.     The best evidence of these deficiencies is the testimony of Linda DeMartini, who worked for Countrywide for over ten years and was the operational team leader of Countrywide's Litigation Management Department.  Ms. DeMartini testified in a case where a homeowner was arguing that BNY Mellon had never taken physical possession of the original mortgage note for the mortgage loan and, therefore, did not have the right to foreclose on the mortgage loan.

11.     Ms. DeMartini testified that, in her extensive career in the mortgage loan servicing business of Countrywide, "I had to know about everything . . . ."  She then testified that it was Countrywide's standard business practice to retain possession of the original mortgage note and other physical documents for the mortgage loans, rather than deliver them to BNY Mellon as trustee for the covered trusts:

> Q.     ***Ms. DeMartini, is it generally the custom to – for your investor [i.e., the covered trust] to hold the documents?***
>
> A.     ***No.  They would stay with us [Countrywide] as the servicer.***
>
> Q.     And are documents ever transferred to the investor?
>
> A.     If we service-release them they would be transferred to whomever we're service-releasing them to.
>
> Q.     So I believe you testified Countrywide was the originator of this loan?

A.      Yes.

Q.      So Countrywide had possession of the documents from the outset?

A.      Yes.

Q.      And subsequently did Countrywide transfer these documents by assignment or an allonge?

A.      Yes.

Q.      And –

A.      *Well, transferred the rights, yes, transferred the ownership, not the physical documents.*

Q.      *So the physical documents were retained within the corporate entity Countrywide or Bank of America?*

A.      *Correct.*

Q.      *Okay.   And would you say that this is standard operating procedure in the mortgage banking business?*

A.      *Yes.   It would be normal – normal course of business as the reason that we are the servicer, as we're the ones that are doing all the servicing, and that would include retaining the documents.*

[Emphasis added.]

12.     In response to questioning by U.S. Bankruptcy Court for the District of New Jersey, Chief Bankruptcy Judge Judith H. Wizmur, Ms. DeMartini again testified that "I do know that it is our [Countrywide's] normal course of action with the loans that we service that we are the ones that retain the – that we retain those documents."  Then, in response to the Court's question whether the documents are "ever moved to follow the transfer of ownership," DeMartini testified that "it is not customary for them [Countrywide] to move them."

13.    At a subsequent hearing in September 2009, Countrywide's counsel stated that: "[A]lthough . . . the UCC and the Master Servicing Agreement apparently requires that, procedure seems to indicate that they don't physically move documents from place to place because of the fear of loss and the trouble involved and the people handling them.   They basically execute the necessary documents and retain them as long as servicing's retained.   The documents only leave when servicing is released."

14.    Based on the evidence quoted above, Judge Wizmur held in November 2010 that BNY Mellon, as trustee for the covered trusts, could not enforce the mortgage loan for two reasons:   "First, under New Jersey's Uniform Commercial Code ("UCC") provisions, the fact that the owner of the note, the Bank of New York, never had possession of the note, is fatal to its enforcement.   Second, upon the sale of the note and mortgage to the Bank of New York, the fact that the note was not properly endorsed to the new owner also defeats the enforceability of the note." *Kemp v. Countrywide Home Loans, Inc.,* No. 08-18700-JHW, Slip. Op., at 10-11 (Bkrtcy. D.N.J. Nov. 16, 2010).   Judge Wizmur further held that Countrywide also could not enforce the mortgage loan, because as an agent for the owner of the note, Countrywide had no more authority to enforce the note than its principal, BNY Mellon.   *Id.* at 21.

15.    DeMartini's testimony has been corroborated by a joint report issued by the Federal Reserve, the FDIC, the Office of Thrift Supervision, and the Office of the Comptroller. These federal regulators reviewed a sampling of the mortgage loan files belonging to 14 mortgage loan servicers that had signed consent orders with the federal regulators in April 2011. Bank of America – which services the mortgage loans in the covered trusts for the Countrywide Certificates following its merger with Countrywide in 2008 – was one of the mortgage servicers

included in the review.  The regulators' findings were included in an April 2011 report entitled "Interagency Review of Foreclosure Policies and Practices."

16.     In the report, the regulators stated: "The Federal Reserve System, the Office of the Comptroller (OCC), the Federal Deposit Insurance Corporation (FDIC), and the Office of Thrift Supervision (OTS), referred to as the agencies, conducted on-site reviews of foreclosure processing at 14 federally regulated mortgage servicers during the fourth quarter of 2010." Significantly, in the report, the regulators stated that:  "The reviews . . . showed that ***servicers possessed original notes and mortgages***."  Report, at 3 (emphasis added).  The regulators further noted that its review of the mortgage servicers' loan files showed that there may be "***disputes over note ownership or authority to foreclose.***"  Report, at 6 (emphasis added).  The regulators also noted "***concerns about the prevalence of irregularities in the documentation of ownership [that] may cause uncertainties for investors of securitized mortgages***."  *Id.* (emphasis added). This report supports DeMartini's testimony that it was standard industry practice for loan servicers to retain possession of the original mortgage notes and related mortgage files, rather than transfer them to BNY Mellon to follow the transfer of ownership.

17.     BNY Mellon's failure to take physical possession of the key mortgage loan documents, and its failure to review the loan files for missing documents or irregularities, and then assure that identified irregularities were corrected, was not a mere technicality, as explained by Georgetown Law School Professor Adam Levitin in his testimony before the House Financial Services Committee in November 2010.   Professor Levitin described in detail what the implications would be if a trustee such as BNY Mellon failed to take physical possession of the key documents in the loan file:

> If mortgages were not properly transferred in the securitization process, then mortgage-backed securities would in fact not be

backed by any mortgages whatsoever.  The chain of title concerns stem from transactions that make assumptions about the resolution of unsettled law.  If those legal issues are resolved differently, then there would be a failure of the transfer of mortgages into securitization trusts.

*      *      *

Recently, arguments have been raised in foreclosure litigation about whether the notes and mortgages were in fact properly transferred to the securitization trusts.  This is a critical issue because the trust has standing to foreclose if, and only if it is the mortgagee.  If the notes and mortgages were not transferred to the trust, then the trust lacks standing to foreclose.

*      *      *

If the notes and mortgagees were not properly transferred to the trusts, then the mortgage-backed securities that the investors' purchased were in fact non-mortgage-backed securities.  In such a case, investors would have a claim for the rescission of the MBS, meaning that the securitization would be unwound, with investors receiving back their original payments at par (possibly with interest at the judgment rate).  Rescission would mean that the securitization sponsor would have the notes and mortgages on its books, meaning that the losses not the loans would be the securitization sponsor's, not the MBS investors.

18.    New York Assistant Attorney General Amir Weinberg confirmed in his affirmation that BNY Mellon, in fact, had significantly harmed investors in the Covered Trusts by failing to perform its responsibilities with respect to the mortgage loan files under the PSA, stating:

The ultimate failure of Countrywide to transfer complete mortgage loan documentation to the Trusts hampered the Trusts' ability to foreclose on delinquent mortgages, thereby impairing the value of the notes secured by those mortgages.

19.    In sum, there is reliable evidence showing that Countrywide routinely did not transfer the original mortgage notes and related loan documents to BNY Mellon in its capacity as trustee for the Covered Trusts.  BNY Mellon had a contractual and fiduciary duty as the

9

trustee of the Covered Trusts to take physical possession of the mortgage loans, to review the loan files, to identify improperly documented loans on the "Document Exception Report," and to certify that the remaining loan files for the mortgage loans in the Covered Trusts contained complete and accurate documentation and to ensure that the mortgage loan notes and collateral had been properly endorsed and assigned over to BNY Mellon as the trustee for the Covered Trusts.  In addition, once there were events of default and/or the rights of Certificate holders to full and timely payment of their principal and interest was impaired, BNY Mellon had the duty to act as a prudent person to exercise all of its powers under the PSA to protect Certificate holders.  By failing to perform these duties, BNY Mellon has caused Certificate holders to suffer billions of dollars in damages and has created considerable uncertainty regarding the Certificate holders' ownership interest in the mortgage loans contained in the Covered Trusts for the Countrywide Certificates.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, for violations of the TIA, and pursuant to 28 U.S.C. §1332(d).

21.     Venue is proper in this District as BNY Mellon has its principal place of business in this District, transacted and does transact business in this District and many of the acts and omissions giving rise to Plaintiff's claims occurred in this District.

## PARTIES

22.     Plaintiff Retirement Board of the Policemen's Annuity and Benefit Fund of the City of Chicago ("Plaintiff" or the "Chicago Policemen's Fund") is a pension fund with the mission of providing retirement benefits to the members of the Chicago Police Department and their spouses.  The Chicago Policemen's Fund relies heavily upon the performance of its

investments to fund benefits.  It purchased and holds Countrywide Certificates as provided in Exhibit B.

23.     Defendant BNY Mellon is a bank organized under the laws of the State of New York, having its principal place of business at One Wall Street, New York, New York, 10286.  It served as the trustee for the Covered Trusts.  For each of these covered trusts BNY Mellon signed certificates incorporating the PSA.  As the trustee for the Covered Trusts, BNY Mellon owed the Certificate holders certain statutory, contractual and fiduciary duties with respect to the mortgage loans owned by the Covered Trusts, which it violated.

## FACTUAL ALLEGATIONS

A.     **The Securitization Process for the Countrywide Certificates**

24.     The vast majority of residential mortgage loans that Countrywide underwrote and originated between 2004 and 2008 were resold to investors in the secondary market, either through whole loan sales or through mortgage backed security securitizations.  Mortgage securitizations involve the conversion of illiquid whole loans into bond-like instruments that trade in capital markets.  Mortgage loan "pass-through" securities entitle the investor to payments from pools of mortgage loans.  Accordingly, the value of a mortgage backed security depends primarily on the underlying mortgage borrowers' ability to make principal and interest payments and, secondarily, on the adequacy of the collateral in the event of default.  If the loans underlying a Certificate suffer defaults and delinquencies in excess of the assumptions built into the payment structure, or the underlying properties cannot be sold at sufficient value following default, Certificate holders suffer greater than expected losses.

25.     The first step in creating each of the Certificates for the Covered Trusts was the acquisition by the "Depositor" of the inventory of residential mortgage loans from the "Seller."

11

Countrywide Home Loans, Inc. served as the "Seller" of the inventory of mortgage loans for all the Covered Trusts.  Countrywide Home Loans originated all of the underlying loans that were sold to the Covered Trusts, or combined loans it originated with loans acquired from other mortgagee originators in exchange for cash.  Then, the Depositors for the Covered Trusts, after acquiring the loans from Countrywide Home Loans, transferred, or deposited, the loans into a "covered trust."

26.    The Depositors securitized the pool of mortgage loans in the Covered Trusts so that the rights to the cash flows from the loans could be sold to the Certificate holders.  The securitization transactions were structured such that the risk of loss was divided among different levels of investment, or "tranches."  Tranches consist of multiple series of related mortgage backed securities offered as part of the same offering, each with a different level of risk and reward, including different levels of credit enhancement.  One form of credit enhancement is overcollateralization, which means that the total principal balance of the mortgage loan in the pool for a securitization exceeds the aggregate amount of securities issued and sold in the securitization.  Another example of credit enhancement is excess interest, which means that the amount of interest collected on the mortgage loans underlying a securitization for each payment period is expected to be greater than the interest distributable on the Certificates and fees and expenses payable by the covered trust for that period.

27.    Excess interest may be applied both to absorb any interest shortfalls and to pay principal on the Certificates to the extent needed to maintain the required level of overcollateralization.  Both of these credit enhancements serve to protect Certificate holders against loss to varying degrees.  Any losses on the underlying loans – whether due to default, delinquency, or otherwise – are generally applied in reverse order of seniority.

28. Because these tranches have different claims on the common cash flow generated by the pool of mortgages, credit rating agencies assign different ratings to them and issuers can price them differently. The most senior tranches of the Certificates received "AAA credit ratings or their equivalent from the three leading ratings agencies, which indicated the lowest risk and highest quality.

29. Once the mortgage loans were transferred to the Covered Trusts and the tranches were established, the Covered Trusts passed securities – the "Certificates" – back to the Depositors, who became the issuers of the Certificates. The Depositors then passed the Certificates to Countrywide Securities and one or more other underwriters, who in turn offered the Certificates to investors in exchange for cash that was then passed back to the Depositors, minus any fees owed to the underwriters. Following the sale of the Certificates, Countrywide Home Loan Servicing LP was responsible for the collection of borrower payments, which were then sent to BNY Mellon as trustee for the Covered Trusts so that they could be distributed to the Certificate holders in accordance with the tranche structure.

**B.  BNY Mellon's Role as Trustee for the Covered Trusts**

**1.  The Duties and Obligations Set Forth in the PSA**

30. BNY Mellon's duties and obligations as the trustee for the Covered Trusts are spelled out in the PSA, or similar governing agreements. The PSA is the operative agreement that governs the parties' respective rights and responsibilities in connection with the Covered Trusts. BNY Mellon entered into the PSA with: (1) Countrywide Home Loans, Inc., in its capacity as the "Seller" of the mortgage loans, (2) the "Depositor" of the loans; and (3) Countrywide Home Loan Servicing LP as the servicer for the mortgage loans. The PSA was

incorporated into the Certificates signed by BNY Mellon, and the Plaintiff and the Class have contract rights under the PSA.

31. The PSA provides in its "Preliminary Statement" that "The Depositor is the owner of the Trust Fund that is hereby conveyed to the Trustee [BNY Mellon] in return for the Certificates." The PSA defines "Trust Fund" as: "The corpus of the trust created hereunder consisting of . . . the Mortgage Loans and all interest and principal received on or with respect thereto . . . ." The PSA defines "Mortgage Loans" as "the mortgage loans as from time to time are transferred and assigned to the Trustee [BNY Mellon] pursuant to the provisions hereof and any Supplemental Transfer Agreement, and that are held as a part of the Trust Fund."

> ### a. The Conveyance of the Mortgage Loans to BNY Mellon and the Duty to Take Physical Possession of the Mortgage Loans

32. The PSA sets forth a two-step process for conveying the mortgage loans to the covered trusts. First, Countrywide Home Loans, acting as the Seller of the mortgage loans, conveyed the loans to the Depositor for the Covered Trusts. Second, the Depositor conveyed the mortgage loan to BNY Mellon in its capacity as the trustee for the Covered Trusts to hold the mortgage loans for the benefit of the Certificate holders. This two-step process is set forth in Section 2.01 ("Conveyance of Mortgage Loans"), which provides in relevant part:

> (a) ***Each Seller, concurrently with the execution and delivery hereof, hereby sells, transfers, assigns, sets over and otherwise conveys to the Depositor, without recourse, all its respective right, title and interest in and to the related Initial Mortgage Loans, including all interest and principal received or receivable by such Seller, on or with respect to the applicable Initial Mortgage Loans after the Initial Cut-off Date*** . . . . On or prior to the Closing Date, Countrywide shall deliver to the Depositor or, at the Depositor's direction, to the Trustee or other designee of the Depositor, the Mortgage File for each Mortgage Loan listed in the Mortgage Loan Schedule . . . .

(b)   Immediately upon the conveyance of the Initial Mortgage Loans referred to in clause (a), *the Depositor sells, transfers, assigns, sets over and otherwise conveys to the Trustee for the benefit of the Certificate holders, without recourse, all the right, title and interest of the Depositor in and to the Trust Fund together with the Depositor's right to require each Seller to cure any breach of a representation or warranty made herein by such Seller or to repurchase or substitute for any affected Mortgage Loan in accordance herewith*.

33.     In addition, Section 2.02 of the PSA ("Acceptance by Trustee of the Mortgage Loans") provides that BNY Mellon is required to take physical possession of the mortgage loans and the accompanying loan files for the exclusive use and benefit of all current and future Certificate holders.  It provides:

(a) The Trustee *acknowledges receipt of the documents identified in the Initial Certification in the form annexed hereto as Exhibit F-1 and declares that it holds and will hold such documents and the other documents delivered to it constituting the Mortgage Files, and that it holds or will hold such other assets as are included in the Trust Fund, in trust for the exclusive use and benefit of all present and future Certificate holders*.  The Trustee acknowledges that it will maintain possession of the Mortgage Notes in the State of California, unless otherwise permitted by the Rating Agencies.

[Emphasis added.]

34.     Section 2.01(c) of the PSA also specifically sets forth the operative documents that must be contained in the mortgage loan file for the mortgage loans that are conveyed to BNY Mellon.  It provides:

(c)   In connection with the transfer and assignment set forth in clause (b) above, *the Depositor has delivered or caused to be delivered to the Trustee . . . for the benefit of the Certificate holders the following documents or instruments with respect to each Mortgage Loan so assigned*:

(i) (A) the *original Mortgage Note endorsed* by manual or facsimile signature in blank in the following form: "Pay to the order of _____ without recourse," *with all intervening endorsements showing a complete chain of endorsement*

15

*from the originator to the Person endorsing the Mortgage Note* . . . or

(B) with respect to any Lost Mortgage Note, a lost note affidavit from Countrywide stating that the original Mortgage Note was lost or destroyed, together with a copy of such Mortgage Note;

(ii) except as provided below and for each Mortgage Loan that is not a MERS Mortgage Loan, *the original recorded Mortgage or a copy of such Mortgage certified by Countrywide as being a true and complete copy of the Mortgage* . . . and in the case of each MERS Mortgage Loan, the original Mortgage, noting the presence of the MIN of the Mortgage Loans and either language indicating that the Mortgage Loan is a MOM Loan if the Mortgage Loan is a MOM Loan or if the Mortgage Loan was not a MOM Loan at origination, the original Mortgage and the assignment thereof to MERS, with evidence of recording indicated thereon, or a copy of the Mortgage certified by the public recording office in which such Mortgage has been recorded;

(iii) in the case of each Mortgage Loan that is not a MERS Mortgage Loan, *a duly executed assignment of the Mortgage (which may be included in a blanket assignment or assignments), together with, except as provided below, all interim recorded assignments of such mortgage (each such assignment, when duly and validly complete, to be in recordable form and sufficient to effect the assignment of and transfer to the assignee thereof, under the Mortgage to which the assignment relates);* provided that, if the related Mortgage ahs not been returned from the applicable public recording office, such assignment of the Mortgage may exclude the information to be provided by the recording office . . . .;

(iv) the original or copies of each assumption, modification, written assurance or substitute agreement, if any;

(v) except as provided below, *the original or duplicate original lender's title policy or a printout of the electronic equivalent and all riders thereto*; and

*     *     *

> In addition, in connection with the assignment of any MERS Mortgage Loan, each Seller agrees that it will cause, at the Trustee's expense, the MERS ® System to indicate that the Mortgage Loans sold by such Seller to the Depositor have been assigned by the Seller to the Trustee in accordance with this Agreement . . . for the benefit of the Certificate holders by including . . . in such computer files the information required by the MERS ® System to identify the series of the Certificate issued in connection with such Mortgage Loans.

[Emphasis added.]

35.     BNY Mellon is required by the PSA to take physical possession of these key documents in the loan files – *e.g.*, the original mortgage note with complete chain of endorsement from the originator to the BNY Mellon as trustee, the original recorded mortgage, the duly executed assignment of mortgage, the lender's title policy, etc. – in order to transfer the ownership rights to the mortgage loans from Countrywide Home Loans to the Covered Trusts. This was one of BNY Mellon's key contractual and fiduciary obligations under the PSA.

### b. The Duty to Review the Loan Files and Identify Files Where the Documentation Was Missing, Defective or Incomplete

36.     BNY Mellon also had a contractual and fiduciary obligation under the PSA to review each of the loan files for the mortgage loans and certify that the documentation for each of the loans was accurate and complete.  Specifically, the PSA sets forth a three-step process whereby BNY Mellon was required to:

(1)     prepare and sign an "Initial Mortgage Certification" acknowledging that it had received and reviewed the loan files for each of the mortgage loans in the covered trust and attaching (a) a "Mortgage Loan Schedule" identifying the specific mortgage loans where the documentation for the loan was complete and accurate; and (b) a "Schedule A" identifying the mortgage loans where the documentation was missing, defective or incomplete;

(2)     prepare and sign a "Delay Delivery Mortgage Loan Certification" certifying that the documentation problems with the mortgage loans listed on the "Schedule A" to the "Initial Mortgage Certification" had since been cured and attaching a

"Schedule B" identifying the mortgage loans for which the documentation problems had not been cured; and

(3)     prepare and sign a "Final Certification of Trustee" listing the specific mortgage loans where the loan files were accurate and complete and attaching a "Document Exception Report" listing the mortgage loans in the Covered Trusts for which there remained incomplete or inaccurate documentation, thereby triggering Countrywide's obligation to either repurchase or replace the mortgage loan.

### i.     The "Initial Mortgage Certification"

37.     The first step in the certification process was the preparation of the "Initial Mortgage Certification."   In the Initial Mortgage Certification, BNY Mellon was required to acknowledge that it had received and reviewed the two key documents for the mortgage loan: (1) the original mortgage note with a complete chain of endorsements from the originator to BNY Mellon as the trustee for the Covered Trusts; and (2) a duly executed assignment of mortgage.

38.     BNY Mellon was then required to attach to the certification a "Mortgage Loan Schedule" identifying those loans for which it had obtained the original mortgage note with endorsements and a duly executed assignment of mortgage, and a "Schedule A" identifying the mortgage loans for which it had not obtained the original mortgage note with endorsements or the assignment of mortgage.   This is spelled out in Section 2.02 of the PSA, which provides:

> The Trustee agrees to execute and deliver on the Closing Date to the Depositor, the Master Servicer and Countrywide . . . an Initial Certification in the form annexed hereto as Exhibit F-1.  ***Based on its review and examination, and only as to the documents identified in such Initial Certification, the Trustee acknowledges that such documents appear regular on their face and relate to such Initial Mortgage Loan***.

[Emphasis added.]

39.     Exhibit F-1 sets forth the "Form of Initial Certification."   It provides:

Gentlemen:

In accordance with Section 2.02 of the above-captioned Pooling and Servicing Agreement (the "Pooling and Servicing Agreement"), *the undersigned, as Trustee, hereby certifies that, as to each Initial Mortgage Loan listed in the Mortgage Loan Schedule (other than any Initial Mortgage Loan paid in full or listed on the attached schedule) it has received*:

*(i) (a) the original Mortgage Note endorsed in the following form: "Pay to the order of _____, without recourse" or (b) with respect to any Lost Mortgage Note, a lost note affidavit from Countrywide stating that the original Mortgage Note was lost or destroyed; and*

*(ii) a duly executed assignment of the Mortgage (which may be included in a blanket assignment or assignments).*

*Based on its review and examination and only as to the foregoing documents, such documents appear regular on their face and related to such Mortgage Loan.*

The Trustee has made no independent examination of any documents contained in each Mortgage File beyond the review specifically required in the Pooling and Servicing Agreement.

The Trustee make no representations as to: (i) the validity, legality, sufficiency, enforceability or genuineness of any of the documents contained in each Mortgage File of any of the Initial Mortgage Loans identified on the Mortgage Loan Schedule, or (ii) the collectability, insurability, effectiveness or suitability of any such Initial Mortgage Loan.

Capitalized words and phrases used herein shall have the respective meanings assigned to them in the Pooling and Servicing Agreement.

THE BANK OF NEW YORK,
as Trustee

[Emphasis added.]

### ii.    The "Delay Delivery Certification"

40.    The second step in the certification process was the preparation of the "Delay Delivery Certification."   The purpose of the "Delay Delivery Certification" was two-fold:

(1) BNY Mellon was required to specifically identify those loans listed on the Schedule A to the Initial Mortgage Loan Certification for which Countrywide had provided a complete and accurate loan file; and (2) BNY Mellon was required to provide a Schedule B to the "Delay Delivery Certification" specifically identifying those loans for which Countrywide was unable to provide proper documentation. This is spelled out in Section 2.02 of the PSA , which provides: "On or about the thirtieth (30th) day after the Closing Date, the Trustee shall deliver to the Depositor, the Master Servicer and Countrywide . . . a Delay Delivery Certification with respect to the Initial Mortgage Loans in the form annexed hereto as Exhibit G-1, with any applicable exceptions noted thereon." Exhibit G-1 contains the "Form Delay Delivery Certification."

      **iii.**        **The "Final Certification" and "Document Exception Report"**

41.      The third and final step in the certification process was the creation of the "Final Certification of the Trustee" and the "Document Exception Report." BNY Mellon's obligation to prepare the "Final Certification of Trustee" and "Document Exception Report" was spelled out in Section 2.02 of the PSA, which provided: "Not later than 90 days after the Closing Date, the Trustee shall deliver to the Depositor, the Master Servicer and Countrywide . . . a Final Certification with respect to the Initial Mortgage Loans in the form annexed hereto as Exhibit H-1, with any applicable exceptions noted thereon."

42.      The "Form of Final Certification of the Trustee," which was attached to the PSA as Exhibit H-1, provided:

> Gentlemen:
>
> In accordance with Section 2.02 of the above-captioned Pooling and Servicing Agreement (the "Pooling and Servicing Agreement"), *the undersigned, as Trustee, hereby certifies that a to each Initial Mortgage Loan listed in the Mortgage Loan Schedule (other than any Initial Mortgage Loan paid in full or*

*listed on the attached Document Exception Report) it has received*:

(i)  *the original Mortgage Note, endorsed by Countrywide or the originator of such Mortgage Loan*, without recourse in the following form: "Pay to the order of ___ without recourse," *with all intervening endorsements that show a complete chain of endorsement from the originator to Countrywide*, or, if the original Mortgage Note has been lost or destroyed and not replaced, an original lost note affidavit from Countrywide, stating that the original Mortgage Note was lost or destroyed, together with a copy of the related Mortgage Note;

(ii) in the case of each Initial Mortgage Loan that is not a MERS Mortgage Loan, *the original recorded Mortgage*, [and in the case of each Initial Mortgage Loan that is a MERS Mortgage Loan, *the original Mortgage*, noting thereon the presence of the MIN of the Mortgage Loan and language indicating that the Mortgage Loan is a MOM Loan if the Mortgage Loan is a MOM Loan, with evidence of recording indicated thereon, or a copy of the Mortgage certified by the public recording office in which such Mortgage has been recorded];

(iii) in the case of each Initial Mortgage Loan that is not a MERS Mortgage Loan, *a duly executed assignment of the Mortgage to "The Bank of New York, as trustee* under the Pooling and Servicing Agreement dated as of [month] 1, 2004, without recourse," or, in the case of each Initial Mortgage Loan with respect to property located in the State of California that is not a MERS Mortgage Loan, a duly executed assignment of the Mortgage in blank (each such assignment, when duly and validly completed, to be in recordable form and sufficient to effect the assignment of and transfer to the assignee thereof, under the Mortgage to which such assignment relates);

(iv) *the original recorded assignment or assignments of the Mortgage together with all interim recorded assignments of such Mortgage* [(noting the presence of a MIN in the case of each Initial Mortgage Loan that is a MERS Mortgage Loan)];

(v) the original or copies of each assumption, modification, written assurance or substitution agreement, if any, with evidence of recording thereon if recordation thereof is permissible under applicable law; and

(vi) *the original or duplicate original lender's title policy* or a printout of the electronic equivalent and all riders thereto or, in the event such original title policy has not been received from the insurer, any one of an original title binder, an original preliminary title report or an original title commitment, or a copy thereof certified by the title company, with the original policy of title insurance to be delivered within one year of the Closing Date.

In the event that in connection with any Initial Mortgage Loan that is not a MERS Mortgage Loan Countrywide cannot deliver the original recorded Mortgage or all interim recorded assignments of the Mortgage satisfying the requirements of clause (ii), (iii) or (iv), as applicable, the Trustee has received, in lieu thereof, a true and complete copy of such Mortgage and/or such assignment or assignments of the Mortgage, as applicable, each certified by Countrywide, the applicable title company, escrow agent or attorney, or the originator of such Initial Mortgage Loan, as the case may be, to be a true and complete copy of the original Mortgage or assignment of Mortgage submitted for recording.

*Based on its review and examination and only as to the foregoing documents, (i) such documents appear regular on their face and related to such Initial Mortgage Loan, and (ii) the information set forth in items (i), (iv), (v), (vi), (viii), (xi) and (xiv) of the definition of the "Mortgage Loan Schedule" in Article I of the Pooling and Servicing Agreement accurately reflects information set forth in the Mortgage File*.

The Trustee has made no independent examination of any documents contained in each Mortgage File beyond the review specifically required in the above-referenced Pooling and Servicing Agreement.  The Trustee makes no representations as to: (i) the validity, legality, sufficiency, enforceability or genuineness of any of the documents contained in each Mortgage File of any of the Initial Mortgage Loans identified on the [Mortgage Loan Schedule][Loan Number and Borrower Identification Mortgage Loan Schedule] or (ii) the collectability, insurability, effectiveness or suitability of any such Initial Mortgage Loan.

Capitalized words and phrases used herein shall have the respective meanings assigned to them in the Pooling and Servicing Agreement.

THE BANK OF NEW YORK,
as Trustee

[Emphasis added.]

43.     The "Final Certification of Trustee" and the "Document Exception Report" are the two key certifications that BNY Mellon was required to prepare for the Covered Trusts ,because in these documents BNY Mellon certified that there was full and complete loan documentation in accordance with the requirements of the PSA for those loans specifically identified on the "Mortgage Loan Schedule," and further certified that it had not obtained complete documentation for those loans identified on the "Document Exception Report," which triggered Countrywide's obligation to repurchase or substitute new loans for these loans.  This is set forth in Section 2.02 of the PSA, which provides:

> *If, in the course of such review, the Trustee finds any document constituting a part of a Mortgage File which does not meet the requirements of Section 2.01, the Trustee shall list such as an exception in the Final Certification*; provided, however, that the Trustee shall not make any determination as to whether (i) any endorsement is sufficient to transfer all right, title and interest of the party so endorsing, as noteholder or assignee thereof, in and to the Mortgage Note or (ii) any assignment is in recordable form or is sufficient to effect the assignment of and transfer to the assignee thereof under the mortgage to which the assignment relates. *Countrywide . . . shall promptly correct or cure such defect within 90 days from the date it was so notified of such defect and, if Countrywide does not correct or cure such defect within such period, Countrywide shall . . . either (a) substitute for the related Mortgage Loan a Substitute Mortgage Loan, which substitution shall be accomplished in the manner and subject to the conditions set forth in Section 2.03, or (b) purchase such Mortgage Loan from the Trustee within 90 days from the date Countrywide . . . was notified of such defect in writing at the Purchase Price of such Mortgage Loan; provided, however, that in no event shall such substitution or purchase occur more than 540 days form the Closing Date . . . .*

[Emphasis added.]

44.     Importantly, BNY Mellon was required to identify the loans for which Countrywide provided incomplete or inaccurate documentation within 540 days of the Closing Date.  After that date, BNY Mellon could potentially lose its right to force Countrywide to

purchase or substitute new loans for mortgage loans in the Covered Trusts that contained missing, inaccurate or defective documentation. However, the NYAG, in its pleading filed in BNY Mellon's action to approve a settlement, reported that deficiencies remained in the mortgage loan files even though BNY Mellon had generated exception reports for mortgage pools "identifying great numbers of files that are incomplete and improperly documented."

### c. BNY Mellon Is Liable for Negligence When Performing Its Duties

45.    BNY Mellon's additional contractual and fiduciary duties when serving as trustee for the Covered Trusts were set forth in Section 8.01 ("Duties of the Trustee") and Section 8.02 ("Certain Matters Affecting the Trustee."). Section 8.01 provided in relevant part:

> ***No provision of this Agreement shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act or its own willful misconduct***; provided, however, that:
>
> (i) unless an Event of Default known to the Trustee shall have occurred and be continuing, the duties and obligations of the Trustee shall be determined solely by the express provisions of this Agreement, the Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Agreement, no implied covenants or obligations shall be read into this Agreement against the Trustee and the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Trustee and conforming to the requirements of this Agreement which it believed in good faith to be genuine and to have been duly executed by the proper authorities respecting any matters arising hereunder;
>
> (ii) the Trustee shall not be liable for an error of judgment made in good faith by a Responsible Officer or Responsible Officers of the Trustee, unless ***it shall be finally proven that the Trustee was negligent in ascertaining the pertinent facts***;

[Emphasis added.]

46.    Section 8.01 makes it clear that BNY Mellon can be held liable for its own negligence in failing to perform its ministerial duties, including its responsibility to take physical

possession of the operative documents for the mortgage loans in the covered trusts, for failing to identify those mortgage loans for which there was missing, defective or incomplete documentation on the "Document Exception Report" attached to the "Final Certification of the Trustee," and for making negligent misrepresentations in the "Initial Mortgage Certification," the "Delay Document Certification, the "Final Certification of the Trustee," and all schedules and attachments thereto.  These are duties that BNY Mellon was required to perform under the PSA, and BNY Mellon can be held liable for its own negligence when performing these duties on behalf of the Certificate holders.

47.    In addition, once there was an event of default as defined under the PSA or a failure to pay principal or interest on the certificates as due, under the TIA, the PSA and the New York Real Property Law ("RPL"), BNY Mellon had the duties of a prudent person to protect the interests of Certificate holders through the exercise of all its powers under the PSA.

**C.    BNY Mellon Breached Its Contractual and Fiduciary Duties Under the PSA**

**1.    BNY Mellon Failed to Take Possession of Key Mortgage Loan Documents**

48.    BNY Mellon breached its contractual and fiduciary duties under the PSA, and its obligations under the TIA – first and foremost – by failing to take physical possession of the operative documents for each of the mortgage loans in the Covered Trusts.  Indeed, there is substantial evidence showing that BNY Mellon's standard practice was to allow Countrywide, as the servicer for the mortgage loans in the Covered Trusts, to retain physical possession of the original mortgage note for the mortgage loans and the companying loan file.  One need only look to the testimony of Linda DeMartini, who worked for Countrywide for over ten years and was the operational team leader of Countrywide's Litigation Management Department, to see that this is the case.

49.     Ms. DeMartini testified that, in her extensive career in the mortgage loan servicing business of Countrywide, "I had to know about everything . . . ." She then testified that it was Countrywide's standard business practice to retain possession of the original mortgage note and other physical documents for the mortgage loans, rather than deliver them to BNY Mellon as trustee for the Covered Trusts:

> Q.     **Ms. DeMartini, is it generally the custom to – for your investor [i.e., the covered trust] to hold the documents?**
>
> A.     **No.  They would stay with us [Countrywide] as the servicer.**
>
> Q.     And are documents ever transferred to the investor?
>
> A.     If we service-release them they would be transferred to whomever we're service-releasing them to.
>
> Q.     So I believe you testified Countrywide was the originator of this loan?
>
> A.     Yes.
>
> Q.     So Countrywide had possession of the documents from the outset?
>
> A.     Yes.
>
> Q.     And subsequently did Countrywide transfer these documents by assignment or an allonge?
>
> A.     Yes.
>
> Q.     And –
>
> A.     **Well, transferred the rights, yes, transferred the ownership, not the physical documents.**
>
> Q.     **So the physical documents were retained within the corporate entity Countrywide or Bank of America?**
>
> A.     **Correct.**

Q.      *Okay.   And would you say that this is standard operating procedure in the mortgage banking business?*

A.      *Yes.  It would be normal – normal course of business as the reason that we are the servicer, as we're the ones that are doing all the servicing, and that would include retaining the documents.*

50.     In response to questioning by Chief Bankruptcy Judge Judith H. Wizmur, Ms. DeMartini again testified that "I do know that it is our [Countrywide's] normal course of action with the loans that we service that we are the ones that retain the – that we retain those documents."  Then, in response to the Court's question whether the documents are "ever moved to follow the transfer of ownership," DeMartini testified that "it is not customary for them [Countrywide] to move them."

51.     At a subsequent hearing in September 2009, Countrywide's counsel stated that: "[A]lthough . . . the UCC and the Master Servicing Agreement apparently requires that, procedure seems to indicate that they don't physically move documents from place to place because of the fear of loss and the trouble involved and the people handling them.  They basically execute the necessary documents and retain them as long as servicing's retained.   The documents only leave when servicing is released."

52.     Based on the evidence quoted above, Judge Wizmur held in November 2010 that BNY Mellon, as trustee for the Covered Trusts, could not enforce the mortgage loan for two reasons: "First, under New Jersey's Uniform Commercial Code ("UCC") provisions, the fact that the owner of the note, the Bank of New York, never had possession of the note, is fatal to its enforcement.  Second, upon the sale of the note and mortgage to the Bank of New York, the fact that the note was not properly indorsed to the new owner also defeats the enforceability of the note." *Kemp v. Countrywide Home Loans, Inc.,* No. 08-18700-JHW, Slip. Op., at 10-11.  Judge

Wizmur further held that Countrywide also could not enforce the mortgage loan, because as an agent for the owner of the note, Countrywide had no more authority to enforce the note than its principal, BNY Mellon.  *Id.* at 21.

53.     DeMartini's testimony has been corroborated by a joint report issued by the Federal Reserve, the FDIC, the Office of Thrift Supervision and the Office of the Comptroller. These federal regulators reviewed a sampling of the mortgage loan files belonging to 14 mortgage loan servicers that had signed consent orders with the federal regulators in April 2011. Bank of America – which services the mortgage loans in the covered trusts for the Countrywide Certificates following its merger with Countrywide in 2008 – was one of the mortgage servicers included in the review.  The regulators' findings were included in an April 2011 report entitled "Interagency Review of Foreclosure Policies and Practices."

54.     In the report, the regulators stated: "The Federal Reserve System, the Office of the Comptroller (OCC), the Federal Deposit Insurance Corporation (FDIC), and the Office of Thrift Supervision (OTS), referred to as the agencies, conducted on-site reviews of foreclosure processing at 14 federally regulated mortgage servicers during the fourth quarter of 2010." Significantly, in the report, the regulators stated that:  "The reviews . . . showed that *servicers possessed original notes and mortgages*."  Report, at 3 (emphasis added).  The regulators further noted that its review of the mortgage servicers' loan files showed that there may be "*disputes over note ownership or authority to foreclose*."  Report, at 6 (emphasis added).  The regulators also noted "*concerns about the prevalence of irregularities in the documentation of ownership [that] may cause uncertainties for investors of securitized mortgages*."  *Id.* (emphasis added). This report supports DeMartini's testimony that it was standard industry practice for loan

servicers to retain possession of the original mortgage notes and related mortgage files, rather than transfer them to BNY Mellon to follow the transfer of ownership.

55.     And finally, the NYAG reported in documents recently filed in BNY Mellon's settlement action, that BNY Mellon had failed to ensure the proper transfer of loans from Countrywide to the Trusts, and that this "failure of Countrywide to transfer complete mortgage loan documentation to the trusts hampered the trusts' ability to foreclose on delinquent mortgages thereby impairing the value of the notes secured by those mortgages."

### 2.     BNY Mellon Was Negligent When Reviewing Loan Files for Missing, Incomplete and Defective Documentation

56.     BNY Mellon also breached its contractual and fiduciary duties under the PSA, and was grossly negligent, when reviewing the loan files for missing, incomplete and defective documentation.  Indeed, if it was Countrywide's standard operating procedure not to move the physical documents for the mortgage loans from Countrywide to BNY Mellon, then BNY Mellon should have listed those documents on the Schedule A to the "Initial Mortgage Certification," the Schedule B to the "Delay Delivery Certification," and on the "Document Exception Report" to the "Final Certification of the Trustee," which triggered Countrywide's contractual obligation to either cure the documentation problems by transferring the complete loan file with the original documents to BNY Mellon, or, alternatively, repurchase or substitute another loan for the improperly documented loan.

57.     The fact that the original mortgage note was missing from the loan file, or the fact that there was a missing link in the chain of endorsements from the originator to BNY Mellon, or the fact that there was no duly executed assignment of the mortgage to BNY Mellon, or the fact that the original lender's title policy was missing would have been obvious to a reasonably competent trustee performing his ministerial duties with due care.  By failing to identify these

obvious defects to the documentation of the loan file, or requiring that they be corrected, BNY Mellon was grossly negligent and breached the contractual and fiduciary duties that it owed to the Certificate holders.

**3.     BNY Mellon Made Negligent Misrepresentations in the "Final Certification of the Trustee"**

58.     BNY Mellon is also liable for negligently making false representations in the "Initial Mortgage Certificate," the "Delay Delivery Certification," the "Final Certification of the Trustee," the "Document Exception Report," and all exhibits thereto.  BNY Mellon owed a duty of full and candid disclosure to the Certificate holders both by virtue of its status as the trustee for the Covered Trusts and holder of the mortgage loans for the benefit of the Certificate holders, and by virtue of its superior access to and knowledge of the documents contained in the loan files for the mortgage loans.  As the NYAG recently asserted in its pleading against BNY Mellon, BNY Mellon misled "trust investors to believe that: (1) Countrywide had delivered to BNYM [BNY Mellon] complete and adequate mortgage files relating to hundreds of thousands of mortgages held by the Trusts; (2) BNYM had, in fact, confirmed the completeness and adequacy of those mortgage files."

59.     Despite the duty of full disclosure, BNY Mellon made the following negligent misrepresentations with respect to the loan files for the mortgage loans:

- **In the "Initial Mortgage Certification"** – BNY Mellon negligently represented that it had received the original mortgage note or a lost mortgage note affidavit from Countrywide for each of the mortgage loans, and a duly executed assignment of the mortgage.  These representations and certifications were false because it was Countrywide's standard operating procedure to retain possession of the original mortgage note and executed assignment of the mortgage, and in many instances these documents were never transferred to BNY Mellon.

- **In the "Delay Delivery Certification"** – BNY Mellon negligently represented that it had received the original mortgage note *with all intervening endorsements that showed a complete chain of endorsement from the originator to Countrywide* or a lost mortgage note affidavit from Countrywide for each of the mortgage loans that had previously been listed on Schedule A to the "Initial Mortgage Certification," as well as a duly executed assignment of mortgage for each loan that was not a MERS loan, the original recorded mortgage for each loan that was not a MERS loan, the original mortgage for those loans that were MERS loans, the original recorded assignment or assignment of the mortgage together will all interim recorded assignments, and the original or duplicate original lender's title policy.  These representations and certifications were false because it was Countrywide's standard operating procedure to retain possession of the original mortgage note and executed assignment of the mortgage, as well as the other documents in the mortgage loan file, and in many instances these documents were never transferred to BNY Mellon.

- **In the "Final Certification of Trustee" and the "Document Exception Report"** – BNY Mellon negligently represented that it had received the original mortgage note *with all intervening endorsements that showed a complete chain of endorsement from the originator to Countrywide* or a lost mortgage note affidavit from Countrywide for each of the mortgage loans that had previously been listed on Schedule A to the "Initial Mortgage Certification," as well as a duly executed assignment of mortgage for each loan that was not a MERS loan, the original recorded mortgage for each loan that was not a MERS loan, the original mortgage for those loans that were MERS loans, the original recorded assignment or assignment of the mortgage together with all interim recorded assignments, and the original or duplicate original lender's title policy.  These representations and certifications were false because it was Countrywide's standard operating procedure to retain possession of the original mortgage note and executed assignment of the mortgage, as well as the other documents in the mortgage loan file, and in many instances these documents were never transferred to BNY Mellon.  In addition, mortgage loans that contained missing, incomplete and/or defective documentation were never listed on the "Document Exception Report."

**D.**    **Section 10.08 ("Limitation of Rights of Certificate holders") Is Not Applicable**

60.    Section 10.08 ("Limitation of Rights of Certificate holders") provides certain limitations on the rights of Certificate holders.  It is not, however, applicable to this lawsuit.  Section 10.08 provides:

> No Certificate holder shall have any right by virtue or by availing itself of any provisions of this Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Agreement, unless such Holder previously shall have given to the Trustee a written notice of an Event of Default and of the continuance thereof, as therein provided, ***and unless the Holders of Certificates evidencing not less than 25% of the Voting Rights evidenced by the Certificates shall also have made <u>written request to the Trustee to institute such action, suit or proceeding in its own name as Trustee hereunder</u> and shall have offered to the Trustee such reasonable indemnity as it may require against the costs, expenses, and liabilities to be incurred therein or thereby, and the Trustee, for 60 days after its receipt of such notice, request and offer of indemnity shall have neglected or refused to institute any such action, suit or proceeding***; it being understood and intended, and being expressly covenanted by each Certificate holder with every other Certificate holder and the Trustee, that no one or more Holders of Certificates shall have any right in any manner whatever by virtue or by availing itself or themselves of any provisions of this Agreement to affect, disturb or prejudice the rights of the Holders of any other of the Certificates, or to obtain or seek to obtain priority over or preference to any other such Holder or to enforce any right under this Agreement, except in the manner herein provided and for the common benefit of all Certificate holders.

[Emphasis added.]

61.    Section 10.08 is not applicable to this lawsuit because, under the TIA and New York law, "no action" clauses such as this one do not apply to actions by certificate holders against trustees for their own wrongdoing.  This is not a situation where the Certificate holders are demanding that BNY Mellon initiate a suit in its own name to enforce the rights and obligations under the PSA.  Rather, this is an instance where the Certificate holders are bringing an action ***against*** BNY Mellon for breaching its statutory, contractual and fiduciary obligations

32

under the PSA, and for acting with gross negligence and making negligent misrepresentations when performing its duties under the PSA.  Because this is not an "action, suit or proceeding" that BNY Mellon is capable of bringing in its own name as trustee under the PSA, Section 10.08 does not apply and does not bar Plaintiff from proceeding with this lawsuit.

**E.     BNY Mellon's Conduct Has Caused Certificate holders to Suffer Billions of Dollars in Damages**

62.     BNY Mellon's breaches of its contractual and fiduciary duties, along with its negligence and negligent misrepresentations, have caused the Certificate holders to suffer billions of dollars in damages.  Indeed, Georgetown University Law Center Professor Adam J. Levitin, when testifying before the House Financial Services Committee in November 2010, described in detail what the implications would be if a trustee such as BNY Mellon failed to take physical possession of the key documents in the loan file:

> If mortgages were not properly transferred in the securitization process, then mortgage-backed securities would in fact not be backed by any mortgages whatsoever.  The chain of title concerns stem from transactions that make assumptions about the resolution of unsettled law.  If those legal issues are resolved differently, then there would be a failure of the transfer of mortgages into securitization trusts.

> *     *     *

> Recently, arguments have been raised in foreclosure litigation about whether the notes and mortgages were in fact properly transferred to the securitization trusts.  This is a critical issue because the trust has standing to foreclose if, and only if it is the mortgagee.  If the notes and mortgages were not transferred to the trust, then the trust lacks standing to foreclose.

> *     *     *

> If the notes and mortgagees were not properly transferred to the trusts, then the mortgage-backed securities that the investors' purchased were in fact non-mortgage-backed securities.  In such a case, investors would have a claim for the rescission of the MBS, meaning that the securitization would be unwound, with investors

receiving back their original payments at par (possibly with interest at the judgment rate). Rescission would mean that the securitization sponsor would have the notes and mortgages on its books, meaning that the losses not the loans would be the securitization sponsor's, not the MBS investors.

63.     The NYAG similarly reported that BNY Mellon's failure to assure the transfer of complete mortgage loan files had hampered the Covered Trusts' ability to foreclose and impaired the value of their collateral.

64.     BNY Mellon's failure to take possession of the operative documents for each of the mortgage loans in the Covered Trusts, and its failure and/or negligence when reviewing the loan files for missing, defective or incomplete documentation may mean that the Covered Trusts lack any real ownership interest in the mortgage loans, and have no legal right to payments on the loans and lack the ability to foreclose on the loans in the event that the loans go into default. In addition, BNY Mellon's failure to disclose these problems to Plaintiff before Countrywide suffered its financial reversals has harmed Plaintiff's ability to effectively enforce its rights against other parties to the PSA. In sum, BNY Mellon's breaches of its duties, its gross negligence and negligent misrepresentations and omissions have resulted in Certificate holders being sold non-mortgage backed securities, *i.e.*, collateral which does not support collection of amounts due under the Certificates. The total nominal value of the Countrywide Certificates is over $420 billion. Clearly, Certificate holders have been significantly damaged through the loss of value of their Certificates resulting from BNY Mellon's negligence and related misconduct.

## CLASS ACTION ALLEGATIONS

65.     Plaintiff brings this action as a class action on behalf of a class consisting of all current and former investors who acquired the Countrywide Certificates for the Covered Trusts (the "Class"). Excluded from the Class are Defendants, members of their immediate families

and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

66.     The members of the Class are so numerous that joinder of all members is impractical.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained though appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by BNY Mellon and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

67.     Plaintiff's claims are typical of the claims of the members of the Class as they all purchased Certificates based upon contracts substantially in the same form as the PSA in Exhibit C, and BNY Mellon's misconduct was substantially the same with respect to all persons investing in the Covered Trusts, and all members suffered similar harm as a result.  Thus, all members of the Class are similarly affected by BNY Mellon's statutory, contractual and fiduciary breaches, negligence and negligent misrepresentations that are complained of herein.

68.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and mortgage backed securities litigation.

69.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether BNY Mellon breached its contractual and fiduciary duties to Certificate holders under the PSA by systemically:

- o (i) failing to take physical possession of the operative documents for the mortgage loans in the covered trusts for the Countrywide Certificates;

- o (ii) failing to properly review the loan files for the mortgage loans to identify mortgage loans for which there was missing, defective or incomplete documentation;

- o (iii) making false statements in the standard "Form of Certification of Trustee" that was attached to the PSA; and

- o (iv) failing to list mortgage loans with incomplete or improper documentation on the "Document Exception List" that BNY Mellon was required to attach to the "Final Certification of Trustee."

- whether BNY Mellon was negligent and routinely made negligent misrepresentations, and omitted required information, in the form certifications attached to the PSA when carrying out its duties and obligations under the PSA;

- whether it was Countrywide's standard practice to retain possession of the operative documents for the mortgage loans in the Covered Trusts – including the original mortgage note, the recorded mortgage, the security instrument for the mortgage loan, and the loan files for the mortgage loans – rather than transfer these documents to BNY Mellon as the trustee;

- whether Countrywide's failure to transfer the operative documents for the mortgage loans in the Covered Trusts to BNY Mellon impaired the Covered Trusts' ownership interest in the mortgage loans; and

- whether and to what extent that members of the Class have suffered damages as a result of BNY Mellon's breach of its statutory, contractual and fiduciary duties and the proper measure of damages.

70.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable.  There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (Violation of the Trust Indenture Act of 1939, 53 Stat. 1171)

71.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

72.     Congress enacted the Trust Indenture Act of 1939 ("TIA"), 53 Stat. 1171, 15 U.S.C. § 77aaa, *et seq.*, to ensure, among other things, that investors in certificates, bonds, and similar instruments, have adequate rights against, and receive adequate performance from, the responsible trustees.  15 U.S.C. § 77bbb.  The PSA underlying and establishing each of the covered trusts is an "indenture", and BNY Mellon is an "indenture trustee", under the TIA.  15 U.S.C. § 77aaa(7), (10).  Moreover, the TIA applies to the PSA, and the related certificates.  15 U.S.C. § 77ddd(a)(1).  BNY Mellon violated multiple provisions of the TIA.

73.     First, the TIA requires that, prior to an event of default under the indenture, the indenture trustee shall be liable for any duties specifically set out in the indenture.  15 U.S.C. § 77ooo(a)(1).  As set forth above, BNY Mellon failed to comply, in good faith, with numerous duties specifically assigned to it by the PSA, including, the duty:

        (a)     to take possession of the operative mortgage loan documents, including the original mortgage note, the original recorded mortgage, the security instrument for the mortgage, and the loan file for the benefit of the Certificate holders;

        (b)     to take all necessary steps to perfect the ownership rights in the mortgage notes and collateral for the Covered Trusts, and to ensure that other parties to the PSA performed their responsibilities to permit these rights to be perfected;

(c)      to review the loan files to ensure that the mortgage loans were properly documented and that there were no missing, incomplete or defective documents in the loan files, and where documents were missing, incomplete and defective to take reasonable acts to cause the other parties to the PSA to correct these mortgage loan irregularities;

(d)      to review the endorsements to the original mortgage note to ensure that there was a complete chain of endorsements from Countrywide or the originator to BNY Mellon as trustee for the Covered Trusts, and where endorsements were missing, to take reasonable acts to ensure that the endorsements were obtained from other parties to the PSA;

(e)      to review the loan file to ensure that there was a duly executed assignment of mortgage for each of the mortgage loans in the Covered Trusts, and where assignments were missing to take reasonable acts to ensure that the necessary assignments were obtained by or from other parties to the PSA;

(f)      to truthfully certify in the "Initial Mortgage Certification," the "Delay Delivery Certification" and the "Final Certification of Trustee" that BNY Mellon had reviewed the loan files for each of the mortgage loans and found the files to contain complete and accurate documents in accordance with Section 2.01 of the PSA; and

(g)      to identify those mortgage loans for which there were missing, defective and/or incomplete documentation on the "Document Exception List" that BNY Mellon was required to attach to the "Final Certification of Trustee," and where defective and/or incomplete documentation was identified to take reasonable acts to ensure that the irregularities were corrected by other parties to the PSA.

By failing to comply with these specific duties, BNY Mellon violated the TIA.

74.     Second, the TIA requires that, in the event of default under the indenture, the indenture trustee must provide notice to the certificate holders within ninety days.  15 U.S.C. § 77ooo(b).  The PSA defines an "Event of Default" to include:

> any failure by the Master Servicer to observe or perform in any material respect any other of the covenants or agreements on the part of the Master Servicer contained in this Agreement. . . which failure materially affects the rights of Certificateholders, that failure continues unremedied for a period of 60 days after the date on which written notice of such failure shall have been given to the Master Servicer by the Trustee.

§ 7.01(ii).  The Master Servicer materially breached numerous covenants and agreements it made in the PSA.[1]  For example, the PSA required that "the Master Servicer shall transmit to the Trustee as required by this Agreement all documents and instruments in respect of a Mortgage Loan coming into the possession of the Master Servicer from time to time."  § 3.13.  Additionally, the Master Servicer materially breached the PSA by, among, other things, failing:

(a)     to notify the Trustee and others of breaches of the representations and warranties that applied to the mortgages in the covered trusts;

(b)     to maintain accurate and adequate loan and collateral files in a manner consistent with prudent mortgage servicing standards;

(c)     to demand the that deficient mortgage records be cured;

(d)     to avoid unnecessary servicing fees and overcharging for its services; and

(e)     to place the interests of the Certificate Holders' before its own interests.

75.     As set forth above, the Master Servicer systematically retained possession of the mortgage files, and by doing so, undermined the ability to collect on the mortgage loans in the Covered Trusts, including through the foreclosure on underlying mortgages that went into default.

---

[1] As set forth above, entities controlled by Countrywide and Bank of America have served as the Master Servicer of the Covered Trusts.  The misconduct of each of those entities was substantially the same, and constituted Events of Default.

76.     BNY Mellon gave the Master Servicer notice of that default through the detailed exception reports it provided to the Master Servicer, which listed the deficiencies in the mortgage files.  Those exception reports also demonstrated that, as required by the PSA, "a Responsible Officer of the Trustee shall have received written notice" of the default, and therefore knew of the default.  § 8.03(viii).  BNY Mellon had additional written notices of defaults, including foreclosure actions brought on its own behalf, and, more recently, widespread news coverage of foreclosure fraud.  Given the importance of this and other defaults which impaired the rights of Certificate holders to collect their full principal and interest and which reduced the value of the Certificates, BNY Mellon had a duty of full disclosure to Certificate holders.  Accordingly, BNY Mellon's failure to notify the Certificate Holders of the events of default violated the TIA.

77.     Third, the TIA requires that, in the event of default, the indenture trustee must exercise such of the rights and powers vested in it by the indenture, and must use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.  15 U.S.C. § 77ooo(c).  As set forth above, after the events of default, BNY Mellon failed to exercise its rights under the PSA:

(a)     to cure any breaches of the representations and warranties in the PSA;

(b)     to force the repurchase or substitution any of the non-conforming mortgage loans in the covered trusts;

(c)     to cure any deficiencies in the mortgage files; and

(d)     to even take possession of the mortgage files, among other things.

With the number of delinquent and defaulting mortgages in the Covered Trusts increasing, as a result, *inter alia*, of the events of default, the Certificate Holders only could have been protected

from the resulting losses through the exercise of those rights.  Indeed, those rights were designed

to limit the number of delinquent and defaulting mortgages in the Covered Trusts.  Thus no

prudent man would have refused to exercise them.  But BNY Mellon inexplicably refused to do

so, and thereby violated the TIA.

78.     Fourth, the TIA states that, notwithstanding any other provision of the indenture,

the right of any holder of any indenture security to receive payment of the principal and interest

on the indenture security, on or after the respective due dates, shall not be impaired or affected

without the holder's consent.[2]  15 U.S.C. § 77ppp(b).  As set forth above, by failing to take

possession of the mortgage files, and failing to cause their irregularities to be corrected by other

parties to the PSA, BNY Mellon impaired the Certificate Holders' ability to collect payments

due them under the PSA.  Moreover, after the events of default, BNY Mellon's failure to, among

other things, exercise its rights to force the repurchase or substitution of any non-conforming

loans also impaired the Certificate Holders' ability to collect payments due them.  By creating

such impairments, BNY Mellon violated the TIA, and caused losses to Plaintiff and the Class in

connection with their ability to fully collect the principal and interest due under the Certificates

and through the reduction in the value of the Certificates.

79.     BNY Mellon is liable to Plaintiff for damages incurred as a result of its violations

of the TIA.

---

[2] This section also provides that, notwithstanding any other provision of the indenture, the right of any holder of any indenture security to institute suit for the enforcement of any such payment on or after the respective due dates shall not be impaired or affected without the holder's consent.  15 U.S.C. § 77ppp(b).

## SECOND CAUSE OF ACTION

### (Breach of Contract)

80.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

81.     As set forth in detail above, the Certificates signed by BNY Mellon incorporated the PSA.  Under these contracts, BNY Mellon owed the Certificate holders a duty to perform certain ministerial acts in good faith and with due care as set forth in the PSA, including, without limitation:

(a)     to take possession of the operative mortgage loan documents, including the original mortgage note, the original recorded mortgage, the security instrument for the mortgage, and the loan file for the benefit of the Certificate holders;

(b)     to take all necessary steps to perfect the ownership rights in the mortgage notes and collateral for the covered trusts, and to ensure that other parties to the PSA performed their responsibilities to permit these rights to be perfected;

(c)     to review the loan files to ensure that the mortgage loans were properly documented and that there were no missing, incomplete or defective documents in the loan files, and where documents were missing, incomplete and defective to take reasonable acts to cause the other parties to the PSA to correct these mortgage loan irregularities;

(d)     to review the endorsements to the original mortgage note to ensure that there was a complete chain of endorsements from Countrywide or the originator to BNY Mellon as trustee for the Covered Trusts, and where endorsements were missing, to take

reasonable acts to ensure that the endorsements were obtained by or from other parties to the PSA;

(e)   to review the loan file to ensure that there was a duly executed assignment of mortgage for each of the mortgage loans in the Covered Trusts, and where assignments were missing to take reasonable acts to ensure that the necessary assignments were obtained by or from other parties to the PSA;

(f)   to truthfully certify in the "Initial Mortgage Certification," the "Delay Delivery Certification" and the "Final Certification of Trustee" that BNY Mellon had reviewed the loan files for each of the mortgage loans and found the files to contain complete and accurate documents in accordance with Section 2.01 of the PSA; and

(g)   to identify those mortgage loans for which there were missing, defective and/or incomplete documentation on the "Document Exception List" that BNY Mellon was required to attach to the "Final Certification of Trustee," and where defective and/or incomplete documentation was identified to take reasonable acts to ensure that the irregularities were corrected by other parties to the PSA.

82.   In addition, under the PSA as deemed modified by the TIA and/or the New York Real Property Law §126, once an event of default as defined in the PSA occurred or mortgagors defaulted on their mortgage loans such that the recovery of Certificate holders' principal and interest became impaired, BNY Mellon had the obligations to exercise all rights and powers vested in it by the PSA, and to use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

83.     As set forth in detail above, BNY Mellon breached its contractual obligations to the Certificate holders by one or more of the following acts, among other conduct to be proven at trial:

(a)     failing, in good faith, to perform its ministerial duties of taking possession of the operative mortgage loan documents, including the original mortgage note, the original recorded mortgage, the security instrument for the mortgage, and the loan file for the benefit of the Certificate holders;

(b)     failing, in good faith, to perform its ministerial duties of taking the necessary steps to perfect the ownership rights of the Covered Grusts to the mortgage loans in the covered trusts;

(c)     failing, in good faith, to perform its ministerial duties of reviewing the loan files and ensuring that the mortgage loans were properly documented and that there were no missing, incomplete or defective documents in the loan files;

(d)     failing, in good faith, to perform its ministerial duties of reviewing the endorsements to the original mortgage note and ensuring that there was a complete chain of endorsements from Countrywide or the originator to BNY Mellon as trustee for the Covered Trusts;

(e)     failing, in good faith, to perform its ministerial duties of reviewing the loan file and ensuring that there was a duly executed assignment of mortgage for each of the mortgage loans in the Covered Trusts;

(f)     failing, in good faith, to truthfully certify in the "Initial Mortgage Certification," the "Delay Delivery Certification" and the "Final Certification of Trustee" that BNY Mellon had reviewed the loan files for each of the mortgage loans and found

the files to contain complete and accurate documents in accordance with Section 2.01 of the PSA; and

      (g)    failing, in good faith, to perform its ministerial duties and identify those mortgage loans for which there were missing, defective and/or incomplete documentation on the "Document Exception List" that BNY Mellon was required to attach to the "Final Certification of Trustee," and then to take reasonable steps to cause the irregularities to be corrected.

84.    BNY Mellon's breach of its ministerial duties set forth in the PSA as described above, reduced collections of the mortgage loans in the Covered Trusts in the collateral in the pools of loans supporting the Certificates, and caused Plaintiff's losses on its Certificates, and diminished their value.

85.    BNY Mellon's failure, in good faith and with due care, to exercise its rights and powers under the PSA after there were events of default and Plaintiff's ability to collect its full principal and interest became impaired also breached the PSA and caused Plaintiff's losses.

86.    BNY Mellon is liable to Plaintiff for the losses it suffered as a direct result of BNY Mellon's failure to perform its contractual obligations under the PSA.

## THIRD CAUSE OF ACTION

### (Breach of Fiduciary Duty)

87.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

88.    As set forth in detail above, BNY Mellon owed the Certificate holders a fiduciary duty to act, in good faith, and with due care, and undivided loyalty, when performing the ministerial obligations set forth in the PSA, and to exercise all powers under the PSA once an

event of default occurred or payments to Certificate holders became impaired.  These obligations included, without limitation, duties:

(a)  to take possession of the operative mortgage loan documents, including the original mortgage note, the original recorded mortgage, the security instrument for the mortgage, and the loan file for the benefit of the Certificate holders;

(b)  to take all necessary steps to perfect the ownership rights in the mortgage notes and collateral for the Covered Trusts, and to ensure that other parties to the PSA performed their responsibilities to permit these rights to be perfected;

(c)  to review the loan files to ensure that the mortgage loans were properly documented and that there were no missing, incomplete or defective documents in the loan files, and where documents were missing, incomplete and defective to take reasonable acts to cause the other parties to the PSA to correct these mortgage loan irregularities;

(d)  to review the endorsements to the original mortgage note to ensure that there was a complete chain of endorsements from Countrywide or the originator to BNY Mellon as trustee for the Covered Trusts, and where endorsements were missing, to take reasonable acts to ensure that the endorsements were obtained by or from other parties to the PSA;

(e)  to review the loan file to ensure that there was a duly executed assignment of mortgage for each of the mortgage loans in the Covered Trusts, and where assignments were missing to take reasonable acts to ensure that the necessary assignments were obtained by or from other parties to the PSA;

(f)      to truthfully certify in the "Initial Mortgage Certification," the "Delay Delivery Certification" and the "Final Certification of Trustee" that BNY Mellon had reviewed the loan files for each of the mortgage loans and found the files to contain complete and accurate documents in accordance with Section 2.01 of the PSA;

(g)      to identify those mortgage loans for which there were missing, defective and/or incomplete documentation on the "Document Exception List" that BNY Mellon was required to attach to the "Final Certification of Trustee," and where defective and/or incomplete documentation was identified to take reasonable acts to ensure that the irregularities were corrected by other parties to the PSA;

(h)      to cure any breaches of the representations and warranties in the PSA; and

(i)      to force the repurchase or substitution of any of the non-conforming mortgage loans in the covered trusts.

89.      As set forth in detail above, BNY Mellon breached its fiduciary obligations by failing to perform these obligations.

90.      The violations by BNY Mellon of its fiduciary obligations impaired Certificate holders' ability to fully collect the principal and interest due on their Certificates and caused losses in the value of Plaintiff's Certificates.

**FOURTH CAUSE OF ACTION**

**(Negligence and Gross Negligence)**

91.      Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

92.      As set forth in detail above, BNY Mellon owed the Certificate holders duties under the PSA, and as trustee for the Covered Trusts, to act in good faith, with undivided loyalty

and with due care when performing its contractual obligations under the PSA.  As described above, BNY Mellon performed or failed to perform its responsibilities in a grossly inadequate and negligent manner.

93.     BNY Mellon's negligence and gross negligence impaired Certificate holders' ability to fully collect the principal and interest due on their Certificates and caused losses in the value of Plaintiff's Certificates.

## FIFTH CAUSE OF ACTION

### (Negligent Misrepresentations and Omissions)

94.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

95.     This is a claim for negligent misrepresentation against BNY Mellon.  As BNY Mellon served, in its capacity as trustee for more than 500 covered trusts for the Countrywide Certificates, it had access to and, in fact, had unique and special knowledge about the mortgage loans in the Covered Trusts and the loan files for those loans.  In particular, BNY Mellon had unique and special knowledge regarding: (i) whether the operative documents for the mortgage loans had been transferred to BNY Mellon, and its interests perfected, for the benefit of Certificate holders in the Covered Trusts; (ii) whether the loan files contained missing, defective or incomplete information; (iii) whether the improperly documented loans were identified on the "Document Exceptions List" attached to the "Final Certification of Trustee," and whether the irregularities remained uncorrected; and (iv) whether the statements contained in the "Initial Mortgagee Certification," the "Delay Document Certification" and the "Final Certification of Trustee" were accurate.

96.     Because Plaintiff and the Class could not evaluate the loan files for the mortgage loans underlying the Certificates, and because Plaintiff and the Class could not examine whether those files contained complete and accurate documentation for the mortgage loans, they were heavily reliant on BNY Mellon's unique and special knowledge regarding the mortgage loans and the loan files when determining whether or not to make each investment of Certificates, and whether or not to demand that BNY Mellon exercise its powers under the PSA to require the other parties to the PSA to satisfy their obligations, including to repurchase or substitute the defective loans.  Plaintiff and the Class were entirely reliant on BNY Mellon to provide accurate information regarding the loans and loan files with respect to these matters.

97.     Plaintiff and the Class necessarily relied on BNY Mellon's unique and special knowledge regarding the mortgage loans and loan files for those loans in the covered trusts when determining whether to invest in the Certificates, or to timely exercise their rights to require parties to the PSA to perform their obligations.  BNY Mellon's status as the trustee for the Covered Trusts, coupled with its unique and special knowledge about the underlying loans and the loan files, created a special relationship of trust, confidence, and dependence between BNY Mellon and the Plaintiff and the Class.

98.     BNY Mellon, in the exercise of due care, should have been aware that Plaintiff and the Class relied on its unique and special expertise and experience and depended upon BNY Mellon for accurate and truthful information.  BNY Mellon also knew that the facts regarding the mortgage loans and the loan files were exclusively within its knowledge.

99.     Based on its expertise, superior knowledge, and relationship with Plaintiffs, BNY Mellon owed a duty to Plaintiff and the Class to provide complete, accurate, and timely

information regarding the mortgage loans and loan files for the Certificates.  BNY Mellon negligently breached its duty to provide such information to Plaintiff and the Class.

100.   BNY Mellon, likewise, negligently made misrepresentations and omitted information about the irregularities in the mortgage loan files, which induced Plaintiff's and the Class's investment in the Certificates, and delayed the enforcement of rights to ensure compliance with the PSA.  BNY Mellon reasonably should have known that the information provided in the "Initial Mortgage Certification," the "Delay Document Certification," the "Final Certification of Trustee," the "Document Exception List" and all attachments thereto would necessarily be used by Plaintiff and the Class in making their decisions, and that Plaintiff and the Class, like any reasonably prudent investor, would necessarily rely on the information and be harmed by the omissions of the problems in the perfection of the loans and mortgage collateral which resulted in Plaintiff's losses.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

A.    Awarding compensatory damages and/or equitable relief in favor of the Plaintiff and the Class against BNY Mellon for breaches of its statutory, contractual and fiduciary duties, its gross negligence, ordinary negligence and its negligent misrepresentations, in an amount to be proven at trial, including interest thereon;

B.    Awarding Plaintiff its reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

C.    Such other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims so triable.

Dated:  August 5, 2011                    SCOTT+SCOTT LLP

                                          David R. Scott (DS 8053)
                                          Beth A. Kaswan (BK 0264)
                                          Joseph P. Guglielmo (JG 2447)
                                          Max Schwartz (MS 2517)
                                          Donald A. Broggi
                                          500 Fifth Avenue, 40th Floor
                                          New York, NY 10110
                                          Telephone:  212-223-6444
                                          Facsimile:  212-223-6334

                                                    and

                                          Geoffrey M. Johnson
                                          12434 Cedar Road, Suite 12
                                          Cleveland Heights, OH 44106
                                          Telephone:  216-229-6088
                                          Facsimile:  216-229-6092