UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RETIREMENT BOARD OF THE POLICEMEN'S ANNUITY AND BENEFIT FUND OF THE CITY OF CHICAGO, WESTMORELAND COUNTY EMPLOYEE RETIREMENT SYSTEM, CITY OF GRAND RAPIDS GENERAL RETIREMENT SYSTEM, and CITY OF GRAND RAPIDS POLICE AND FIRE RETIREMENT SYSTEM (on Behalf of Themselves and Similarly Situated Certificate Holders),<br><br>     Plaintiffs,<br><br>   v.<br><br>THE BANK OF NEW YORK MELLON, (as Trustee Under Various Pooling and Servicing Agreements),<br><br>     Defendant. | **Case No. 11-cv-05459-WHP**<br><br>**Honorable William H. Pauley**<br><br>**ECF Case** |

## MEMORANDUM OF LAW IN SUPPORT OF
## THE BANK OF NEW YORK MELLON'S MOTION TO DISMISS

MAYER BROWN LLP
1675 Broadway
New York, New York 100019
(212) 506-2500

*Attorneys for Defendant*
*The Bank of New York Mellon*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS ........................................................................................1

ARGUMENT ..........................................................................................................3

   I.   PLAINTIFFS LACK STANDING TO SUE OVER TRUSTS IN WHICH THEY NEVER INVESTED.........................................................................................4

   II.   THE TRUST INDENTURE ACT CLAIM SHOULD BE DISMISSED ...........................5

      A. The TIA Does Not Apply to the New York Trusts.......................................6

         1. The TIA applies only to debt securities .................................................6

         2. The New York Trust Certificates are equity............................................7

         3. The New York Certificates, as equity, are not subject to the TIA ......................10

      B. The Amended Complaint Fails to State a Claim Under the Trust Indenture Act ........11

         1. The TIA's provisions governing Trustee conduct .................................................11

         2. Plaintiffs' theories under the TIA are each defective ...........................................13

            a.   The TIA imposes no independent duty to comply with an indenture .............14

            b.   The TIA does not require examination of the certifications of officers of the Depositor or the Master Servicer ...........................................................14

            c.   The claimed breach of the notice provision fails because Plaintiffs have not alleged, and could not allege, a default within the meaning of the TIA .........................................................................................................16

            d.   The prudent-person standard does not apply absent an Indenture Event of Default ................................................................................................17

             e.   The alleged breaches of the Indentures do not "impair" Noteholders' rights ......................................................................................................18

         3. Plaintiffs fail to allege damages from the only trust that is subject to the TIA.........................................................................................................20

   III.  IF THE TIA CLAIM IS DISMISSED, THE COURT SHOULD DISMISS THE REMAINING CLAIMS.........................................................................................22

**TABLE OF CONTENTS**

**(continued)**

**Page**

A.  CAFA Does Not Support Federal Jurisdiction Here....................................................22

B.  The Court Should Not Exercise Supplemental Jurisdiction .......................................24

CONCLUSION.............................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page**

<u>CASES</u>

*511 W. 232nd Owners Corp. v. Jennifer Realty Co.*,
   773 N.E.2d 496 (N.Y. 2002)....................................................................................................23

*Achtman v. Kirby, McInerney & Squire, LLP*,
   464 F.3d 328 (2d Cir. 2006)....................................................................................................24

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009)............................................................................................................15

*Baydale v. Am. Exp. Co.*,
   No. 09 Civ. 3016 (WHP), 2009 WL 2603140 (S.D.N.Y. 2009) ...............................................5

*Bluebird Partners v. First Fidelity Bank*,
   896 F. Supp. 152 (S.D.N.Y. 1995) ...................................................................................20, 24

*BNY v. First Millennium, Inc.*,
   598 F. Supp. 2d 550 (S.D.N.Y. 2009).............................................................................12, 19

*Browning Debenture Holders' Comm. v. DASA Corp.*,
   454 F. Supp. 88 (S.D.N.Y. 1978) ...........................................................................................14

*Byrne v. Ceresia*,
   No. 09 Civ. 6552(WHP), 2011 WL 5869594 (S.D.N.Y. Nov. 22, 2011)................................24

*Carnegie-Mellon Univ. v. Cohill*,
   484 U.S. 343 (1988)................................................................................................................24

*City of Ann Arbor Employees' Ret. Sys. v. Citigroup Mortg. Loan Trust Inc.*,
   703 F. Supp. 253 (E.D.N.Y. 2010) .........................................................................................25

*Cruden v. BNY*,
   No. 85-cv-4170(JFK), 1990 WL 131350 (S.D.N.Y. Sept. 4, 1990)..................................17, 18

*CWCapital Asset Management, LLC v. Chicago Properties, LLC*,
   610 F.3d 497 (7th Cir. 2010) ....................................................................................................9

*Dresner Co. Profit Sharing Plan v. First Fidelity Bank, N.A., N.J.*,
   No. 95 Civ. 1924 (MBM), 1996 WL 694345 (S.D.N.Y. Dec. 4, 1996) ............................17, 18

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*,
   No. 08 Civ. 2437(RJS), 2011 WL 6034310 (S.D.N.Y. Dec. 5, 2011) ..............................15, 16

*Elliott Associates v. J. Henry Schroder Bank & Trust Co.*,
   838 F.2d 66 (2d Cir. 1988).......................................................................................................18

iii

## TABLE OF AUTHORITIES
### (continued)

**Page**

CASES (CONT'D)

*Fergus v. City of New York*,
    No. 11 Civ. 2419(WHP), 2011 WL 5007000 (S.D.N.Y. Oct. 14, 2011)................................24

*Gehron v. Best Reward Credit Union*,
    No. 10-cv-2051(IEG)(BLM), 2011 WL 976624 (S.D. Cal. Mar. 15, 2011) ...........................6

*Gilmore v. Gilmore*,
    No. 09 Civ. 6230(WHP), 2011 WL 5517832 (Nov. 10, 2011)................................................24

*Greenwich Fin. Servs. Distressed Mortg. Fund 3 LLC v. Countrywide Fin. Corp.*,
    603 F.3d 23 (2d Cir. 2010)...................................................................................................23

*Hardman v. United States*,
    827 F.2d 1409 (9th Cir. 1987) ...............................................................................................8

*Hoffman v. UBS AG*,
    591 F. Supp. 2d 522 (S.D.N.Y. 2008).....................................................................................5

*Huelbig v. Aurora Loan Servs., LLC*,
    No. 10 Civ. 6215(RJH)(THK), 2011 WL 4348281 (S.D.N.Y. May 18, 2011),
    *report adopted*, 2011 WL 4348275 (S.D.N.Y. Sept. 16, 2011)................................................6

*In re IndyMac MBS Litig.*,
    718 F. Supp. 2d 495 (S.D.N.Y. 2010).....................................................................................5

*In re Lehman Bros. Secs. & ERISA Litig.*,
    684 F. Supp. 2d 485 (S.D.N.Y. 2010).....................................................................................5

*In re Nw. Corp.*,
    313 B.R. 595 (Bankr. D. Del. 2004) ......................................................................................20

*In re Salomon Smith Barney Mut. Fund Fees Litig.*,
    441 F. Supp. 2d 579 (S.D.N.Y. 2006).....................................................................................5

*In re Securities Capital Assurance Ltd. Secs. Litig.*,
    729 F. Supp. 2d 569 (S.D.N.Y. 2010).....................................................................................9

*In re SLM Corp. Secs. Litig.*,
    258 F.R.D. 112 (S.D.N.Y. 2009) ............................................................................................5

*In re Smith Barney Transfer Agent Litig.*,
    765 F. Supp. 2d 391 (S.D.N.Y. 2011).....................................................................................4

## TABLE OF AUTHORITIES

### (continued)

Page

CASES (CONT'D)

*LNC Invs., Inc. v. First Fidelity Bank,*
   No. 92 Civ. 7584 (MBM), 1997 WL 528283 (S.D.N.Y. Aug. 27, 1997)..............................20

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992)........................................................................................................4

*Lyndonville Savs. Bank & Trust Co. v. Lussier,*
   211 F.3d 697 (2d Cir. 2000)..........................................................................................25

*Maine State Retirement System v. Countrywide,*
   722 F. Supp. 2d 1157 (C.D. Cal. 2010) ....................................................................5, 25

*N.J. Carpenters Vacation Fund v. Royal Bank of Scotland Grp., PLC,*
   720 F. Supp. 2d 254 (S.D.N.Y. 2010)....................................................................5, 24, 25

*Pipefitters Local No. 636 Defined Ben. Plan v. Bank of Am. Corp.,*
   275 F.R.D. 187 (S.D.N.Y. 2011) ...................................................................................5

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.,*
   632 F.3d 762 (1st Cir. 2011)..........................................................................................5

*Self v. Chase Bank, N.A.,*
   No. CIV S-10-2199-FCD, 2011 WL 3813106 (E.D. Cal. Aug. 25, 2011) ............................20

*The Bank of New York Mellon v. Walnut Place I,*
   No. 11-cv-5988(WHP), 2011 WL 4953907 (S.D.N.Y. Oct. 19, 2011) ..................................22

*United Magazine Co. v. Murdoch Magazines Distrib., Inc.,*
   146 F. Supp. 2d 385 (S.D.N.Y. 2001)........................................................................2, 21

*Upic & Co. v. Kinder-Care Learning Centers, Inc.,*
   793 F. Supp. 448 (S.D.N.Y. 1992) ...............................................................................19

*Vidor v. AIG,*
   No. C 11–315 SI, 2011 WL 1196044 (N.D. Cal. Mar. 29, 2011)............................................6

*Zeffiro v. First Pa. Banking & Trust Co.,*
   623 F.2d 290 (3d Cir. 1980)..........................................................................................12

STATUTES AND RULES

Trust Indenture Act § 303 (15 U.S.C. § 77ccc) ..............................................................16

Trust Indenture Act § 304 (15 U.S.C. § 77ddd).........................................................6, 10

v

## TABLE OF AUTHORITIES
### (continued)

Page

STATUTES AND RULES (CONT'D)

Trust Indenture Act § 314 (15 U.S.C. § 77nnn)...............................................................12, 14, 16

Trust Indenture Act § 315 (15 U.S.C. § 77ooo)........................................................ 11, 13-14, 17

Trust Indenture Act § 316 (15 U.S.C. § 77ppp)............................................................. 13, 18-20

28 U.S.C. § 1292(b) ....................................................................................................................23

28 U.S.C. § 1331 .........................................................................................................................14

28 U.S.C. § 1332(d)(9)(C) .....................................................................................................22, 23

28 U.S.C. § 1367(c)(3) ................................................................................................................24

Fed. R. Civ. P. 12 ......................................................................................................................2, 4

Fed. R. Civ. P. 12(b)(1)................................................................................................................1

Fed. R. Civ. P. 12(b)(6)................................................................................................................1

N.Y. Real Prop. Law § 126 .........................................................................................................23

OTHER AUTHORITIES

69 *Am. Jur. Securities* 2d §824 (updated 2011) ..........................................................................20

1987 S.E.C. No-Act. LEXIS 2373 ..........................................................................................10, 11

American Bar Foundation,
    *Commentaries on Model Debenture Indenture Provisions* (1971)................................. *passim*

T. Franklin,
    *Mortgage & Asset Backed Securities Litigation Handbook* § 1:44 (2011 update)..............9, 10

Marcel Kahan, *The Qualified Case Against Mandatory Terms in Bonds*,
    89 NW. UNIV. L. REV. 565 (1995).........................................................................................19

PWBA Office of Regulations and Interpretations, letter dated Oct. 23, 1996, *available at*
    http://www.dol.gov/ebsa/programs/ori/advisory96/96-23a.htm .............................................10

David Reiss,
    *Subprime Standardization*, 33 FLA. ST. U. L. REV. 985 (2006) ..............................................21

## TABLE OF AUTHORITIES

### (continued)

Page

**OTHER AUTHORITIES (CONT'D)**

SEC, the Treasury, and the Office of Federal Housing Enterprise Oversight,
   *Staff Report: Enhancing Disclosure in the Mortgage-Backed Securities Markets*
   (2003), *available at* http://www.sec.gov/news/studies/mortgagebacked.htm ........................10

*Securitization of Financial Assets* (J. Kravitt ed., 2d ed., 2010 supp.).....................................7, 10

Keith Wofford & David Burkhalter, Moody's Investors Service,
   *Predatory Lending and Home Equity Securitizations* (2000)...................................................21

## PRELIMINARY STATEMENT

The Amended Complaint attempts to create a massive class action covering mortgage-securitization trusts holding hundreds of thousands of loans, which, if certified, would require 534 mini-trials to decide the issues relating to each trust.  But this action should never reach that stage, for two principal reasons.  As a threshold issue, Plaintiffs lack Article III standing to pursue the vast majority of their claims.  Plaintiffs allege current or former ownership in only 26 of the 534 trusts.  The claims with respect to the rest must be dismissed for lack of standing.

The even more critical flaw, which affects the claims relating to all trusts, is the lack of federal jurisdiction.  The only plausible basis for jurisdiction is a claim under the Trust Indenture Act ("TIA").  But that statute does not apply to the vast majority of the trusts here, because they issued equity rather than debt and so are not governed by TIA "qualified indentures."  Even where the TIA does apply, plaintiffs fail to state a claim, because their pleading ignores the deliberate and careful interaction of the Indentures and the TIA.  And even were plaintiffs able to state a claim for liability, they do not and cannot allege damages from the sole TIA trust in which they invested, because a monoline bond insurer, not the Noteholders, bears the risk of loss in that trust.  That deprives them of standing and prevents them from stating a claim.

The Amended Complaint should be dismissed in its entirety under Rules 12(b)(1) and (6).

## STATEMENT OF FACTS

BNYM is Trustee for the 534 mortgage-securitization trusts described as the "Covered Trusts" in the Amended Complaint.  Amended Complaint ("AC") ¶ 1.[1]  Of those trusts, 516 are

---

[1]   Paragraph 1 seems to say that the Covered Trusts are the 530 trusts that are subject to the proposed Settlement Agreement that is at issue in 11-cv-5988(WHP) and the 26 trusts in which the named plaintiffs allege current or past holdings (*see* AC, Ex. B).  Accounting for overlap, the total is 534 trusts.

New York Trusts, each governed by a Pooling and Servicing Agreement ("PSA").[2]  In the PSAs, the Seller and the Depositor, affiliates of the loan originator, agree to transfer loans to the Trustee, to be held in trust, in return for certificates, or the fair market value of such certificates. PSA §§ 2.01, 2.02.  The transfers are subject to representations and warranties made by the Seller, and, in some cases, the Depositor, describing certain characteristics of the loans and the loan underwriting process.  *Id.* §§ 2.03, 2.04.  The PSAs also govern the Master Servicer's servicing of the loans, providing that the Master Servicer will, among other things, collect payments from borrowers and handle collection and foreclosure proceedings.  *Id.* § 3.01. Finally, the PSAs set forth the rules for the distribution of money by the Trustee to the applicable investors in the Trust Certificates.  *Id.* § 4.02.  As described in Part II.A.2. below, the Certificateholders own equity in the New York Trusts. They are not bondholders entitled to fixed principal and interest payments.

The remaining trusts are Delaware statutory trusts, for which The Wilmington Trust Company serves as trustee.  Indenture § 3.04 & Annex 1 (Glossary).[3]  Those Trusts issued Notes, subject to Indentures, for which BNYM serves as indenture trustee, and each Trust is defined in the related documentation as the "Issuer" of the Notes.  *Id.*  Granting Clause & Annex 1, at 1-19. Separately, each Delaware statutory trust entered into a Sale and Servicing Agreement ("SSA")

---

[2]     Exhibit C to the Amended Complaint is what plaintiffs assert is "a representative PSA, which contain[s] provisions substantially similar to all other PSA's and governing agreements for the Covered Trusts."  AC ¶ 2.  This allegation is inaccurate: over a dozen of the Covered Trusts are not governed by PSAs at all, but by Sale and Servicing Agreements and Indentures, as explained in the following paragraph.  The Court is entitled to consider the real contracts on a Rule 12 motion.  *See, e.g.*, *United Magazine Co. v. Murdoch Magazines Distrib., Inc.*, 146 F. Supp. 2d 385, 408 (S.D.N.Y. 2001). (Cites herein to "PSA" are to Exhibit C.)

[3]     The sole Delaware Trust in which plaintiffs allege (former) holdings is called CWHEQ Inc. 2006-D.  The Indenture for that Trust (cited to herein as "Indenture"), which we believe is representative of those for other Delaware Trusts, is Exhibit A to the Declaration of Matthew D. Ingber, filed herewith.

that governs the sale and servicing of the mortgage loans contained therein.  Ingber Decl., Ex. B.

The plaintiffs allege that they hold or held Trust Certificates or Notes in only 26 of the Covered

Trusts, including just one Delaware Trust, CWHEQ 2006-D.  *See* AC, Ex. B.

The Amended Complaint accuses BNYM of a range of misconduct in administering the

trusts.  Two features of the claims are especially relevant on this motion.  The first is that only

Count One, alleging violations of the Trust Indenture Act, is brought under federal law.  The

second is that all of the claims are "predicated on contract rights."  Resp. to Pre-Motion Letter at

5 (Oct. 5, 2011).  Plaintiffs allege that the "contractual and fiduciary duties" that form the basis

of their claims "were ***spelled out in governing agreements***" (AC ¶ 2 (emphasis added)).

Plaintiffs also describe "statutory duties" under the TIA that apply to nearly all bond indentures.

## ARGUMENT

The Amended Complaint suffers from a variety of defects, some jurisdictional and some

substantive, with the result that the case should be dismissed in its entirety and with prejudice.

Plaintiffs purport to assert claims under the TIA and under state law as to 534 Trusts.  Yet they

lack standing to bring claims concerning the 508 Trusts from which they never purchased

securities, so those claims must all be dismissed.  Of the remaining 26 Trusts, 25—the New York

Trusts—issued only equity; the TIA claim must be dismissed as to those Trusts.  And that having

been done, the state-law claims relating to the New York Trusts must be dismissed for lack of

federal jurisdiction.  Nor is there a "common nucleus of operative fact" ***across*** the Trusts that

could support supplemental jurisdiction, because plaintiffs need to prove separate breaches of

duties, including breaches of different contracts, as well as different damages, for each Trust.

Even as to the lone Delaware Trust, which did issue debt, plaintiffs fail to state a claim

under the TIA, both because they cannot allege the violation of a relevant duty and because they

cannot allege damages from their investment in that trust, any losses in which were absorbed by

a monoline insurer.  Dismissing the remainder of the TIA claim will deprive the Court of federal-question jurisdiction altogether.  The only alternative—CAFA—fails because these claims, brought by securities holders to enforce "rights, duties (including fiduciary duties), and obligations" arising out of securities and related PSAs and Indentures—claims that plaintiffs admit are "predicated on contract rights"—are within the securities exception.  Finally, with no primary basis of jurisdiction left after a Rule 12 motion, the Court would need to decline supplemental jurisdiction over the state-law claims relating to the Delaware Trust.

## I.   PLAINTIFFS LACK STANDING TO SUE OVER TRUSTS IN WHICH THEY NEVER INVESTED.

Plaintiffs allege current or former ownership of securities relating to only 26 of the 534 trusts referred to in their Complaint.  *Compare* AC ¶ 1 (referring to over 530 "covered trusts") *with id.* Ex. B (listing holdings).  That leaves 508 Trusts in which no named plaintiff has ever held securities.[4]  It is firmly established that plaintiffs lack standing to pursue claims based on securities that they never owned.  In order to establish Article III standing—a threshold requirement in every federal case—a plaintiff must show that (1) it "suffered an injury-in-fact" that is "concrete and particularized"; (2) the existence of a "causal connection between the injury and the conduct complained of"; and (3) the injury will be likely "redressed by a favorable decision."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

As this Court and others in this District have held many times, a plaintiff cannot allege injury-in-fact based on securities that it never owned.  Most recently, in *In re Smith Barney Transfer Agent Litigation*, this Court held that "Plaintiffs lack standing to pursue claims related to the Smith Barney Funds in which no named plaintiff invested."  765 F. Supp. 2d 391, 400

---

[4]    On November 3, 2011, the Court granted plaintiffs leave to amend the complaint to add investors in other Trusts.  Plaintiffs never did so.

(S.D.N.Y. 2011).[5]  That decision is in accordance with the overwhelming weight of authority. *See, e.g.*, *N.J. Carpenters Vacation Fund v. Royal Bank of Scotland Grp., PLC*,  720 F. Supp. 2d 254, 266 (S.D.N.Y. 2010) ("Plaintiffs' claims with regard to offerings they did not purchase are dismissed for lack of standing."); *In re IndyMac MBS Litig.*, 718 F. Supp. 2d 495, 501 (S.D.N.Y. 2010); *In re Lehman Bros. Secs. & ERISA Litig.*, 684 F. Supp. 2d 485, 490 (S.D.N.Y. 2010); *Hoffman v. UBS AG*, 591 F. Supp. 2d 522, 530-31 (S.D.N.Y. 2008); *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 607 (S.D.N.Y. 2006).  Courts across the country and in this Circuit have applied that logic to MBS cases.  For example, the court observed in *Maine State Retirement System v. Countrywide* that "[e]very court to address the issue in a MBS class action has concluded that a plaintiff lacks standing under . . . Article III of the U.S. Constitution . . . to represent the interests of investors in MBS offerings in which the plaintiffs did not themselves buy."  722 F. Supp. 2d 1157, 1163 (C.D. Cal. 2010); *see also Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 770 (1st Cir. 2011). Accordingly, all claims (state and federal) should be dismissed as to the 510 Trusts in which the named plaintiffs never had holdings.

## II.   THE TRUST INDENTURE ACT CLAIM SHOULD BE DISMISSED.

Count I, for breach of the Trust Indenture Act, should be dismissed.  The TIA does not apply to the 24 New York Trusts in which plaintiffs have (or had) holdings, because that statute covers only debt instruments, and the New York Trusts issued equity (the "Certificates").  As to the single Delaware Trust in which the plaintiffs once had holdings, the Amended Complaint

---

[5]     This Court has addressed this issue in several other cases in which it has rejected a candidate for lead plaintiff based upon the likelihood that the candidate lacked Article III standing.  *See Pipefitters Local No. 636 Defined Ben. Plan v. Bank of Am. Corp.*, 275 F.R.D. 187, 191 (S.D.N.Y. 2011); *Baydale v. Am. Exp. Co.*, No. 09 Civ. 3016(WHP), 2009 WL 2603140, at *3 (S.D.N.Y. Aug. 14, 2009); *In re SLM Corp. Secs. Litig.*, 258 F.R.D. 112 (S.D.N.Y. 2009).

fails to state a claim, largely because plaintiffs allege defaults under the servicing contracts, but not under the Indenture.

### A. The TIA Does Not Apply to the New York Trusts.

1. The TIA applies only to debt securities.

Section 304 of the TIA (15 U.S.C. § 77ddd), which plaintiffs simply ignore, identifies securities that are outside the reach of the TIA. Subsection (a) states (emphases added):

> The provisions of this title shall **not** apply to any of the following securities:

> (1) any security **other than** (A) a note, bond, debenture, or evidence of indebtedness, whether or not secured, or (B) a certificate of interest or participation in any such note, bond, debenture or evidence of indebtedness, or (C) a temporary certificate for, or guarantee of, any such note, bond, debenture, evidence of indebtedness, or certificate;

Thus, the TIA applies only to the debt securities listed in (A), (B), and (C). Subsection (A) lists four types of debt, (B) covers "certificate[s] of interest or participation" in debt, and (C) adds "temporary certificate[s] for, or guarantee[s] of" the debt listed in (A) or certificates mentioned in (B). None encompasses equity. *See, e.g.*, *Huelbig v. Aurora Loan Servs., LLC*, No. 10 Civ. 6215(RJH)(THK), 2011 WL 4348281, at *8 (S.D.N.Y. May 18, 2011), *report adopted*, 2011 WL 4348275 (S.D.N.Y. Sept. 16, 2011) ("The Trust Indenture Act regulates corporate **debt** securities offered for sale in interstate commerce, setting forth the responsibilities and potential liabilities of trustees of indentures.") (emphasis added); *Gehron v. Best Reward Credit Union*, No. 10-cv-2051(IEG)(BLM), 2011 WL 976624, at *3 (S.D. Cal. Mar. 15, 2011) (same).

Equity securities are not debt. In contrast to debt, equity represents ownership of the issuing Trust and entitles holders to distributions based on the Trust's actual income, not to repayments of a fixed principal balance. *See, e.g.*, *Vidor v. AIG*, No. C 11–315 SI, 2011 WL 1196044, at *2-*3 (N.D. Cal. Mar. 29, 2011) (finding that "it does not appear that the Equity

Units are covered by the TIA" where Equity Units were "undivided fractional interest in three different debentures, combined with a forward contract on AIG's common stock").

    2.   <u>The New York Trust Certificates are equity.</u>

It is evident from the face of the PSAs that the Certificates issued by the New York Trusts represent equity, not debt.  Hence, the PSAs are not subject to the TIA.  As one leading treatise explains the difference between equity and debt MBS:

> Securities of an issuer or obligor that provide for fixed payment obligations as to principal and interest, and rank senior upon liquidation to other capital of the issuer, are generally regarded as debt securities.  With regard to trusts, certificates evidencing ownership interest therein should be viewed as equity securities since certificateholders are only entitled to receive distributions . . . when, as, and if the trust receives funds . . . and the ownership interests represented by the trust certificates rank junior to trust obligations and liabilities.

*Securitization of Financial Assets* § 11.05[A][1] (J. Kravitt ed., 2d ed., 2010 supp.) (footnote omitted) (citing cases and SEC no-action letters).  As summarized in the following chart, comparing the terms of the Delaware Trust Notes with those of the New York Certificates, application of that widely-accepted standard demonstrates that the latter are equity.

| **Delaware Notes/Indentures** | **New York Trust Certificates/PSAs** |
| --- | --- |
| "All Notes . . . shall be valid ***obligations*** of the Issuer, evidencing the same ***debt*** . . . ." Indenture § 2.03(d) (emphasis added).<br><br>"The Indenture Trustee shall prepare (in a manner consistent with the treatment of the Notes as ***indebtedness*** of the Issuer) Internal Revenue Service Form 1099 (or any successor form) and any other tax forms . . . ." *Id.* § 7.04 (emphasis added); *see also id.* § 11.17 ("indebtedness represented by the Notes"). | Certificates "represent[] a ***beneficial ownership interest*** in the Trust Fund created by the Agreement." PSA, Ex. E (emphasis added).<br><br>PSAs refer to "the Certificates in authorized denominations evidencing directly or indirectly the entire ***ownership*** of the Trust Fund." PSA § 2.06 (emphasis added). |
| Trustee makes "Payments" to Noteholders. Indenture § 8.03. | Trustee makes "Distributions" to Certificateholders.  PSA § 4.02. |

7

| | |
|---|---|
| Interest that is collected on underlying loans is used to pay down, among other things, "accrued monthly interest" and "Aggregate Investor Interest."  Indenture § 8.03(a)(ii), (iii). | Interest that is collected on underlying loans is distributed "pro rata based on [each Class's] respective Class Certificate Balances."  PSA § 4.02(a)(i). |
| "[D]efault by the Issuer in the payment of any interest" is Event of Default.  Indenture § 5.01(i); *see also Commentaries* at 206. | No Event of Default for failure to pay interest. |
| "[D]efault by the Issuer in the payment of the principal of any Principal Amount Note" is Event of Default. Indenture § 5.01(ii); *see also Commentaries* at 206. | No Event of Default for failure to pay principal. |
| Notes may be accelerated following Event of Default.  Indenture § 5.02. | Certificates cannot be accelerated. |
| "These Grants are made in trust to ***secure*** the payment of ***principal and interest*** on, and any other amounts ***owing*** on, the Notes." Indenture, Granting Clauses (emphasis added). | No reference to Certificates being "secured." |

That the Certificates "evidenc[e] . . . ownership" is proof that they are equity.  *See Hardman v. United States*, 827 F.2d 1409, 1412 (9th Cir. 1987) ("The issuance of a stock certificate indicates an equity contribution and the issuance of a bond, debenture or note indicates a bona fide indebtedness."); *Black's Law Dict.* 200 (7th ed. 1999) (defining equity capital as "[f]unds provided by a company's owners in exchange for evidence of ownership").  The absence of any concept of a payment default or acceleration is also dispositive.  The key feature of any indebtedness is the issuer's obligation to pay fixed amounts on specified dates.  *See, e.g.*, *Black's Law Dict.* 410 (defining debt as "a specific sum of money due by agreement or otherwise"); *id.* at 771 (defining indebtedness as "something owed").  The PSAs require no such fixed payments.  And because no payment is ever "due" on the Certificates, the issuer can never "default."  In short, there is nothing in the PSAs to suggest that the Certificates are debt, and much that shows that they are not.

Beyond the plain language of the Certificates and the PSAs, the distinction between debt and equity issuances is reflected by the manner in which they are documented:

> [C]ertain key documentation differences are required for debt transactions [as compared to equity transactions]. In most debt offerings, the issuance of securities and servicing of loans is not combined in one document as it often is in a pooling and servicing agreement. Rather, the issuance of notes, trust certificates (representing the equity interest of the issuer), and the terms of the servicing of the mortgage loans are usually achieved through the three separate documents described below, the indenture, servicing agreement, and trust agreement).

T. Franklin, *Mortgage & Asset Backed Securities Litigation Handbook* § 1:44 (2011 update). The Trusts here follow exactly that pattern: each New York Trust is created and governed by a PSA, and the terms of the issuance of the Certificates are contained in that document. On the other hand, each Delaware Trust is created and governed pursuant to a Trust Agreement, and the terms of the Notes are contained in a separate Indenture.

Plaintiffs, in their pre-motion letter, relied on two cases that, in the course of broad-brush descriptions of mortgage-backed securities, describe them as debt. Neither addressed the TIA or even analyzed the terms of a particular security. Judge Batts's reference to "debt securities" in *In re Securities Capital Assurance Ltd. Securities Litigation* was merely a summary of allegations in a complaint. 729 F. Supp. 2d 569, 575 (S.D.N.Y. 2010). As for Judge Posner's description in *CWCapital Asset Management, LLC v. Chicago Properties, LLC*, of a mortgage-backed security as "a kind of giant bond"[6] (610 F.3d 497, 499 (7th Cir. 2010)), that may well have been an accurate description of the securities in that case. As noted above, some mortgage-backed securities are debt, but the New York Trust Certificates here are not. *See generally*

---

[6]     The other phrase quoted in plaintiffs' pre-motion letter—"giant debt security"—referred to the underlying $1.3 billion loan, not to the securities backed by that loan. *See* 610 F.3d at 499.

Franklin, *supra*, § 1:37 ("Whether a transaction is a debt or equity offering will also determine what documents will memorialize the transaction.").

In fact, equity certificates are the more common form of mortgage-backed securities. The SEC, the Treasury, and the Office of Federal Housing Enterprise Oversight wrote that

> The most common type of MBS is a pass-through security backed by a pool of single-family mortgage loans. Generally, pass-through MBS are created by pooling or packaging mortgage loans together in a trust or other collective investment vehicle and selling *the interests in the trust*. In the pass-through structure, the certificate holders *own undivided interests in the pool*.

*Staff Report: Enhancing Disclosure in the Mortgage-Backed Securities Markets* (2003), at II.D.1., *available at* http://www.sec.gov/news/studies/mortgagebacked.htm (footnote omitted and emphasis added). The Department of Labor likewise classifies mortgage pass-through certificates as equity under ERISA. *See* PWBA Office of Regulations and Interpretations, letter dated Oct. 23, 1996, *available at* http://www.dol.gov/ebsa/programs/ori/advisory96/96-23a.htm ("it is the view of the Department that the pass-through certificates representing a beneficial interest in the trust . . . constitute equity interests").

> 3.   The New York Certificates, as equity, are not subject to the TIA.

Mortgage trust certificates that are equity are not subject to the TIA. *See* Kravitt, *supra*, § 11.05[A][1] ("Under Section 304(a)(1), the basic question is whether the securities are debt securities, subject to the 1939 Act, or equity securities, which are not."); Franklin, *supra*, § 4:36 ("where a securitization involves debt securities, it may be subject to the Trust Indenture Act of 1939. Equity securities are not covered under the Act.") (footnotes omitted).

The SEC has confirmed that analysis in a no-action letter issued to American Airlines, Inc. 1987 S.E.C. No-Act. LEXIS 2373. The submission to the SEC described an aircraft lease refinancing transaction, and in asking the SEC to confirm its analysis that the TIA is inapplicable to securities issued from the grantor trust, argued that "[t]he Pass Through Certificates to be

issued by each Grantor Trust will not in themselves be debt instruments but rather will represent a fractional undivided ownership interest in the Equipment Notes held in such Grantor Trust." *Id.* at *9.  American characterized the Certificates as equity because, just like the New York Trust Certificates here, "[d]istributions on the Pass Through Certificates will depend on whether principal, premium, if any, and interest payments are made on the Equipment Notes and will thus depend on the rental and other payments made by American under the Leases." *Id.*  In addition, American noted that "[t]he Pass Through Certificate . . . represents undivided ownership interests in the Equipment Notes and are thus . . . a conduit to the payments on the Equipment Notes and the underlying lease obligations of American" *Id.* at *18.  In reply, the SEC advised that it would "not recommend any enforcement action to the Commission." *Id*. at *2.

The evidence is overwhelming that the New York Trust Certificates, like many other mortgage- and asset-backed securities, are equity.  Because the TIA applies only to debt, the PSAs are not subject to the TIA.  Accordingly, Count I must be dismissed as to all of the New York Trusts.

**B.  The Amended Complaint Fails to State a Claim Under the Trust Indenture Act.**

In any event, the Complaint fails to state a claim under the TIA as to any Trust.  Before addressing each of plaintiffs' TIA theories in detail, we describe the three relevant provisions of the TIA, which govern an indenture trustee's pre-default conduct, post-default conduct, and duty to provide notice of default.

1.   The TIA's provisions governing Trustee conduct

Section 315 of the TIA (15 U.S.C. § 77ooo), which governs "Duties and Responsibilities of the Trustee," is divided between "permissive" and "mandatory" provisions.  *See generally* American Bar Foundation, *Commentaries on Model Debenture Indenture Provisions* 247 (1971)

11

("*Commentaries*");[7] *Zeffiro v. First Pa. Banking & Trust Co.*, 623 F.2d 290, 293 (3d Cir. 1980). The permissive provisions cannot support any claim, because they do nothing more than ***limit*** trustees' responsibilities to those expressly identified in the contract and allow the trustee to rely on certificates and opinions.  While the mandatory provisions do impose duties on the trustee, those duties attach only after specified defaults:  the duty to provide notice of defaults, of course, presupposes the occurrence of a default, and the prudent-person standard is expressly limited to the period following an Event of Default, as defined in the Indenture.  Because plaintiffs do not (and cannot) allege any default, their TIA claim fails.

The permissive provisions are in Section 315(a):

The indenture to be qualified shall automatically be deemed (unless it is expressly provided therein [in the indenture] that any such provision is excluded) to provide that, prior to default (as such term is defined in such indenture)—

(1) the indenture trustee shall not be liable except for the performance of such duties as are specifically set out in such indenture; and

(2) the indenture trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, in the absence of bad faith on the part of such trustee, upon certificates or opinions conforming to the requirements of the indenture.

but the indenture trustee shall examine the evidence furnished to it pursuant to section 77nnn of this title to determine whether or not such evidence conforms to the requirements of the indenture.

These provisions are "permissive" in that they limit trustee liability.  *See Commentaries* at 248.[8]

---

[7]     "The Second Circuit . . . has on several occasions looked to the American Bar Foundation's *Commentaries on Indentures* for guidance when analyzing boilerplate indenture provisions."  *BNY v. First Millennium, Inc.*, 598 F. Supp. 2d 550, 565 (S.D.N.Y. 2009).

[8]     The "examine the evidence" clause at the end of the subsection is addressed at pages 14 and 15 below.  For present purposes, it suffices to note that it requires the Trustee only to examine certain certificates and review them for form, not content.  Moreover, that requirement is limited to certificates from the Issuer (that is, the Delaware Trust).  Plaintiffs overlook the latter restriction and attempt to apply that provision to certificates from Countrywide. AC ¶ 86.

The so-called "mandatory" provisions are in subsection (c), which states:

> (c) The indenture trustee shall exercise in case of default (as such term is defined in such indenture) such of the rights and powers vested in it by such indenture, and to use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

Two features are noteworthy:  (1) the prudent-person standard applies only after a "default," and (2) the TIA refers to the ***indenture's*** definition of default.  As we show at pages 17 and 18 below, plaintiffs allege Events of Default, not under the Indenture, but under servicing contracts.

Finally, Section 315(b) requires that

> (b) The indenture trustee shall give to the indenture security holders . . . notice of all defaults known to the trustee, within ninety days after the occurrence thereof

The Trustee cannot provide notice of a default that has not occurred.  Plaintiffs' failure to plead any default, therefore, is fatal to any claim under Section 315(b).

### 2. Plaintiffs' theories under the TIA are each defective.

Count I asserts five distinct theories, namely that:

- certain alleged breaches of the PSAs[9] by the Trustee also violate the TIA (AC ¶ 85; 15 U.S.C. § 77ooo(a)(1));

- the TIA requires that the Trustee examine certificates from Countrywide (¶ 86; § 77 ooo(a));

- the TIA requires notice of "breaches of the PSAs" (¶ 87; § 77ooo(b));

- a default occurred under the PSAs, and the Trustee allegedly breached the TIA's post-default standard of care (¶ 88; § 77ooo(c)); and

- the Trustee "impaired" the investors' right to receive principal and interest (¶ 89; § 77ppp(b)).

Each of these theories misconstrues the TIA.

---

[9]     Count I refers to the PSAs, to which the TIA does not apply at all.  In the remainder of this section, we refer instead to the Indenture governing debt issued by the Delaware Trust.

a. <u>The TIA imposes no independent duty to comply with an indenture.</u>

Plaintiffs' first theory is that any breach of the Indenture by the Trustee is also a breach of the TIA. *See* AC ¶ 85 (listing contractual duties). In support, they cite Section 315(a) of the TIA (15 U.S.C. § 77ooo(a)(1)). As explained above, however, Section 315(a) is a permissive section that states that indentures will be "deemed" to contain language that **limits** a trustee's duties to those in the indenture. *See Browning Debenture Holders' Comm. v. DASA Corp.*, 454 F. Supp. 88, 95 (S.D.N.Y. 1978) ("The allegations, however, provided scant hope of recovery under . . . the federal securities laws . . . , since the Trust Indenture Act explicitly authorizes the trustee to limit its liability prior to default") (footnote omitted). The TIA does not by its own force oblige trustees to comply with the indenture, such that any breach of an indenture necessarily also constitutes a breach of the TIA. Accordingly, if a trustee breaches an indenture, the only claim that arises is under state contract law, not under the TIA.

To be clear, BNYM does not suggest that it need not comply with the Indenture; indeed, as noted in footnote 11 below, the Indenture contractually imposes the same standard of care as the TIA. We note only that a claim for breach of that contract arises under state law, not the TIA. 28 U.S.C. § 1331. BNYM denies that it breached the Indenture (or the PSAs), but for present purposes it is sufficient that those allegations do not support any federal claim.

b. <u>The TIA does not require examination of the certifications of officers of the Depositor or the Master Servicer.</u>

Plaintiffs' second theory is that the clause at the end of Section 315(a), requiring a trustee to "examine the evidence furnished to it pursuant to section 77nnn of this title to determine whether or not such evidence conforms to the requirements of the indenture," obligated BNYM to "examine the evidence that Countrywide and BOA provided to the Covered Trusts certifying their compliance with the covenants they made under the PSA." AC ¶ 86. Because, they further

14

allege, Countrywide and Bank of America breached the PSAs, "BNY Mellon therefore failed to examine that evidence, or failed to examine it with the requisite care, and failed to determine whether that evidence conformed to the requirements of the PSA, or failed to make that determination with the requisite care." *Id.* ¶ 86.  There are two problems with this claim:  the Trustee needs to review only the form of the certificates, not their content, and the statutory duty to examine does not extend to certificates provided by Countrywide.

First, Section 315(a) distinguishes "the truth of the statements and the correctness of the opinions expressed" from the question "whether or not such evidence conforms to the requirements of the indenture."  Before acting on a certificate, a trustee such as BNYM need only "determine that the certificates or opinions furnished to the Trustee pursuant to specific requirements of the indenture conform to these requirements and are furnished by the person or persons specified in the indenture." *Commentaries* at 248-49.  Here, plaintiffs infer that the Trustee must not have examined the certificates because Countrywide and Bank of America allegedly breached the Indentures (thereby allegedly rendering the certificates false).  That inference makes no sense unless the Trustee was obliged to verify the ***accuracy*** of the certificates, which is just what the TIA says that it need not do.  The conclusion that the Trustee failed to examine the certificates for form does not follow from allegations that Countrywide breached the servicing agreements. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009) ("only a complaint that states a plausible claim for relief survives a motion to dismiss.); *cf. Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, No. 08 Civ. 2437(RJS), 2011 WL 6034310, at *18 (S.D.N.Y. Dec. 5, 2011) ("It is well established in the post-*Twombly* world, however, that such speculative pleading is no substitute for plausible factual content"; rejecting allegation that PSA trustee's acceptance of general release in settlement created conflict of interest).

Second, the examination requirement is limited to "the evidence furnished to [the trustee] pursuant to section 77nnn." Section 77nnn requires "the obligor" to provide specific information. *See* 15 U.S.C. § 77nnn(a) ("Each person who, as set forth in the registration statement or application, is or is to be an obligor upon the indenture securities covered thereby shall . . ."); (b), (c), and (d) ("the obligor upon the indenture securities shall furnish to the indenture trustee . . ."). "Obligor," in turn, is defined in Section 77ccc(12):

> The term 'obligor', when used with respect to any such indenture
> security, means every person (including a guarantor) who is liable thereon

Whether the Trustee must examine certifications from "Countrywide and BoA" depends on whether those certifications are made "pursuant to section 77nnn," which applies only to "obligors." Section 1.02 of the Indenture ("Incorporation by Reference of the Trust Indenture Act") shows that Countrywide and BoA are not obligors, and it refers directly to the TIA's use of that term: "The following TIA terms used in this Indenture have the following meanings: . . . 'obligor' on the indenture securities means the Issuer and any other obligor on the indenture securities." *See also* Indenture, Ex. A at A-1-2 (Form of Note) ("The Issuer . . . promises to pay . . ."); *id.* § 11.17 (indebtedness is "non-recourse to the Issuer"). Just last week, Judge Sullivan held in *Ellington Credit Fund* that "it is clear that [a Master Servicer and its affiliates] are not obligors" under a New York statute. 2011 WL 6034310, at *8.

   c. The claimed breach of the notice provision fails because Plaintiffs have not
      alleged, and could not allege, a default within the meaning of the TIA.

Plaintiffs' third theory is that BNYM violated Section 315(b)'s duty to provide notice of "defaults." "[T]he word 'default' as used in that section of the statute has its ordinary meaning," namely, "any event which is, or after notice or lapse of time or both would become, an Event of Default." *Commentaries* at 253. The lower-case term "default" is used in Section 5.01(iii) of the

Indentures as well, and it means a breach by the Issuer of the Indenture.[10]   By contrast, the "defaults" that the plaintiffs allege (AC ¶ 87) all would be breaches by Countrywide of the SSA. There is no authority that breaches of a contract—here, the SSA—between the issuer and a third party are "defaults" under a bond indenture.   Because the Trustee could not have violated subsection (b) unless a "default" actually occurred, that provision cannot support a claim.

> ### d.   The prudent-person standard does not apply absent an Indenture Event of Default.

Section 315(c) of the TIA (15 U.S.C. § 77ooo(c)) imposes a prudent-person standard on indenture trustees, but only once there has been a "default *(as such term is defined in such indenture)*."   (Emphasis added.)   The complaint purports to allege that a default has occurred (AC ¶ 88), but it ignores the TIA's express reference to the *indenture's* definition of "default." As we now show, that statutory term refers to the "Events of Default" enumerated in the indenture, here in Section 5.01.   Because the complaint does not allege an Event of Default under Section 5.01, it fails to allege that a prudent-person standard is even in effect.

The parenthetical in Section 315(c)—"(as such term is defined in such Indenture)"— "leaves the definition of 'default' to the discretion of the draftsman.   Most lawyers define 'default' as an 'Event of Default' and the Securities and Exchange Commission has qualified under the TIA without objection all indentures containing this definition of 'default.'" *Commentaries* at 249; *see also Dresner Co. Profit Sharing Plan v. First Fidelity Bank, N.A., N.J.*, No. 95-cv-1924(MBM), 1996 WL 694345, at *4 (S.D.N.Y. Dec. 4, 1996) (Mukasey, J.) ("before an event of default, the prudent person standard does not apply"); *Cruden v. BNY*, No.

---

[10]   *See* Indenture, § 5.01(iii) ("default in the performance of any obligation *of the Issuer* under this indenture" or failure of "representation or warranty *of the Issuer*") (emphasis added).

85-cv-4170(JFK), 1990 WL 131350, at *8 (S.D.N.Y. Sept. 4, 1990).[11]  Thus, the prudent-person

standard applies only if an Event of Default, here defined in Section 5.01 of the Indenture, has

occurred.

Plaintiffs allege no Indenture Event of Default.  What they call "Events of Default" all

relate instead to breaches of the SSAs (or PSAs) by the Master Servicer and the Depositor.  AC

¶¶ 7 ("Countrywide . . . was in default of the PSA"), 87.  This omission is dispositive:  breaches

of the SSAs are not Events of Default under Section 5.01 of the Indenture.[12]

Without an Event of Default, the TIA prudent-person standard does not apply.  The

Second Circuit so held in *Elliott Associates v. J. Henry Schroder Bank & Trust Co.*, 838 F.2d 66

(2d Cir. 1988), after noting that a draft of the TIA that would have imposed a prudent person

standard even before default was considered and rejected by Congress.  *See id.* at 70-71 ("Thus,

it is clear from the express terms of the Act and its legislative history that no implicit duties . . .

are imposed on the trustee to limit its pre-default conduct."); *see also Dresner*, 1996 WL 694345,

at *4; *Cruden*, 1990 WL 131350, at *8 ("this 'prudent person' standard does not apply to the

facts until the 1983 bankruptcy, which constitutes an 'event of default' under the Indentures").

      e.  The alleged breaches of the Indentures do not "impair" Noteholders' rights.

Section 316(b) of the TIA (15 U.S.C. § 77ppp(b)) provides that "the right of any holder

of any indenture security to receive payment of the principal . . . and interest . . . shall not be

impaired or affected without the consent of such holder."  Plaintiffs interpret this language to

create a cause of action against anyone who harms the bond's issuer, thereby limiting the ability

---

[11]    Further evidence that "default (as such term is defined in [this] indenture)" means the
Section 5.01 Events of Default is provided by Section 6.01(a), which imposes a contractual
prudent-person standard that is triggered by an Event of Default.

[12]    *See* Indenture, § 5.01(i) (default on interest); § 5.01(ii) (default on principal); § 5.01(iii)
(Issuer's default in performance or Issuer's breach of representation); § 5.01(iv) ("an Insolvency
Event occurs with respect to the Issuer").

of the holders to collect.  AC ¶ 89.  That goes well beyond the statutory text, which is limited to impairments of holders' right to demand payment, not their practical ability to collect.

Courts addressing Section 316(b) have limited the statute to its plain meaning, namely, a holder's "***right to assert its claim*** for payment."  *Upic & Co. v. Kinder-Care Learning Centers, Inc.*, 793 F. Supp. 448, 456 (S.D.N.Y. 1992) (emphasis added); *id.* at 457 ("UPIC's right to bring an action to recover principal and interest under the Securities is guaranteed by operation of Section 316(b)").  "[T]he purpose of 'Section 316(b) is to require the consent of bondholders of an indenture security for any changes in payment terms.'"  *BNY v. First Millennium, Inc.*, 598 F. Supp. 2d 550, 566 (S.D.N.Y. 2009) (quoting FDIC brief); *see also Commentaries* at 234 ("The purpose of such provisions was to assure the negotiability of the debentures by making certain that the ***promise to pay*** contained therein was unconditional.") (emphasis added).  Thus, *Upic* found that subordination terms, which unquestionably limited the "ability" of the junior holders to recover, nonetheless did not "diminish or impair the rights of Securityholders as against" the issuer or "impair[] the Securityholders' absolute and unconditional right to payment."  793 F. Supp. at 459; *see also* Marcel Kahan, *The Qualified Case Against Mandatory Terms in Bonds*, 89 NW. UNIV. L. REV. 565, 569 & n.20 (1995) (describing Section 316(b) as "the rule governing so-called 'midstream' changes in the interest rate or maturity").

The Amended Complaint steps around this problem by transforming "the ***right*** . . . to receive payment" (15 U.S.C. § 77ppp(b)) into the "***ability*** to collect payments" (AC ¶ 89) (emphases added).  The repetition of that phrase three times in paragraph 89 suggests that plaintiffs know that their right to collect payment has not been impaired.  In fact, that exact misreading is addressed in a "Caution" in the *AmJur* discussion of Section 316(b):

> Language in the Trust Indenture Act, providing that the right of a holder of any indenture security to receive payment of principal and interest on that

> security "shall not be impaired," deals only with the holder's legal right to
> principal and interest, not with its practical right to these payments.

69 *Am. Jur. Securities* 2d § 824 (updated 2011); *see also In re Nw. Corp.*, 313 B.R. 595, 600

(Bankr. D. Del. 2004) (Section 316(b) "applies to the holder's *legal* rights and not the holder's

*practical* rights to the principal and interest itself.  Plaintiffs' legal rights were not impaired.").

Section 316(b) is limited to express changes in the payment terms of the Notes.  Plaintiffs

allege no such change.  That theory, along with the rest of Count I, fails to state a claim.

### 3. Plaintiffs fail to allege damages from the only trust that is subject to the TIA.

Finally, all of the claims, including the TIA claim, should be dismissed as to the sole

Delaware Trust, CWHEQ 2006-D, because plaintiffs cannot allege damages relating to that

Trust.  That means that they cannot show an injury-in-fact necessary for standing.  As Judge

Mukasey held in *Bluebird Partners v. First Fidelity Bank*, where a "plaintiff suffered no injury, it

does not have standing to prosecute its TIA claim."  896 F. Supp. 152, 157 (S.D.N.Y. 1995).  It

also prevents plaintiffs from stating a claim, because damages are an element of any TIA claim.

*See Self v. Chase Bank, N.A.*, No. CIV S-10-2199-FCD, 2011 WL 3813106, at *3 (E.D. Cal.

Aug. 25, 2011) (granting motion to dismiss in part because "plaintiffs do not point to any

particular provision of the [TIA] defendant allegedly violated, nor do they allege any injury.").

Here, two plaintiffs allege that they held Notes issued by CWHEQ 2006-D between June

of either 2006 or 2007 and September of 2007.  Accordingly, plaintiffs must show that

wrongdoing by BNYM produced injury during that period.  TIA violations cannot injure an

investor who purchases his securities after the wrongdoing ends, or who sells before it begins.

*See Bluebird*, 896 F. Supp. at 157 (plaintiff could not pursue claims based on securities

purchased after wrongdoing ended); *LNC Invs., Inc. v. First Fidelity Bank*, No. 92-cv-

7584(MBM), 1997 WL 528283, at *11-*12 (S.D.N.Y. Aug. 27, 1997) (same).

The plaintiffs cannot allege any damages relating to CWHEQ 2006-D—and certainly not from the period in which two plaintiffs allegedly held Notes. That Trust is fully guaranteed, or "wrapped," by a monoline insurer (Indenture § 8.03), and there is no allegation that that insurer failed to perform during the relevant time. Because the monoline wrap is evident from the face of the Indentures, it is appropriately considered on a motion to dismiss. *See United Magazine*, 146 F. Supp. 2d at 408. And its impact on plaintiffs' damages claim cannot be overstated: monoline wraps on mortgage-backed securities have the effect of insulating Noteholders from losses of either principal or interest. *See* Kravitt, *supra*, § 16.03[B][3] (describing "the use of bond insurance as a form of structural credit enhancement because in the event there are insufficient funds available to pay the amounts described in the immediately preceding paragraph due to [in that particular example] Class A noteholders on a payment date, the bond insurer is obligated to pay such amounts pursuant to the terms of the financial guaranty insurance policy"); David Reiss, *Subprime Standardization*, 33 FLA. ST. U. L. REV. 985, 1030 n.288 (2006) ("a large number of deals are fully insured by a monoline bond insurer. In these transactions, the risk of a litigation outcome that impairs the loans in a securitization rests solely with the insurer, not with the security holders.") (quoting Keith Wofford & David Burkhalter, Moody's Investors Service, *Predatory Lending and Home Equity Securitizations* 2 (2000)).

The CWHEQ 2006-D Indenture names XL Capital Assurance ("XL") as the "Credit Enhancer." Section 8.03 of the Indenture provides that, in addition to the payment of Aggregate Investor Interest and Investor Principal Collections, Noteholders also receive the "Credit Enhancement Draw Amount." That draw on the Credit Enhancer is calculated precisely to make up for any shortfalls in interest or losses of principal. Noteholders receive the draw, if any, first "as an addition to the amount distributed pursuant to Section 8.03(a)(iii)" (the interest payment

to Noteholders) and second "as an addition to the amounts distributed pursuant to Section 8.03(b)" (the principal repayment).  Plaintiffs do not and cannot allege that XL failed to perform during the brief period of their holdings.  As long as the Credit Enhancer performs, it bears the risk of losses on the loans, and investors are guaranteed to receive what they are due, regardless of what harm befalls the underlying loan portfolio.  As a result, even assuming that the Trustee violated the TIA, those violations could not have injured any plaintiff here.

## III.  IF THE TIA CLAIM IS DISMISSED, THE COURT SHOULD DISMISS THE REMAINING CLAIMS.

If the Court dismisses the TIA claim, then there would be no remaining federal question.  The only other jurisdictional basis alleged is CAFA (AC ¶ 20), which does not apply because of the securities exception.  Because the sole federal claim should be dismissed, and there is no other basis for jurisdiction, the Court should not exercise supplemental jurisdiction.

### A.  CAFA Does Not Support Federal Jurisdiction Here.

Plaintiffs assert that federal jurisdiction is available under CAFA.  AC ¶ 20.  All of their claims, however, fall within the securities exception in 28 U.S.C. § 1332(d)(9)(C), because they "relate[] to rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to a security."  The Trustee is aware that this Court's decision in *The Bank of New York Mellon v. Walnut Place I* holds that the exception applies only to duties stated in "the bare text of the" contract.  No. 11-cv-5988(WHP), 2011 WL 4953907, at *8 (S.D.N.Y. Oct. 19, 2011).  But even under *Walnut Place*, the securities exception applies here.  The complaint enumerates sources of law—the contracts, the TIA, and the law of fiduciary duty—that are all within the securities exception.  Further, plaintiffs admit that their claims are "predicated on contract rights" (Resp. to Pre-Motion Letter at 5 (Oct. 5, 2011)) and that the Trustee's "contractual and fiduciary duties" "were *spelled out in governing agreements*" (AC ¶ 2 (emphasis added)).

The Second Circuit wrote in *Greenwich v. Countrywide* that "we made clear in *Cardarelli* that the 'instruments that create and define securities' include documents such as . . . bond indentures." 603 F.3d 23, 39 (2d Cir. 2010). Counts I, II, and III are for breach of the TIA, breach of contract, and breach of the implied covenant. Nearly all indentures are subject to the TIA, and all contracts are subject to the implied covenant (*see 511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 500 (N.Y. 2002)). If these claims are outside of the exception, then so is almost every claim on an indenture, a result that conflicts directly with *Greenwich* and *Cardarelli*. For the same reason, the assertion that all PSAs and indentures "as a matter of law incorporate[] the provisions of the TIA and/or New York Real Property Law § 126" (AC ¶ 92) cannot take the contract claim out of the exception.

Counts IV and V are for negligent omission and negligence. Plaintiffs plead that those claims relate to the Trustee's "carrying out its duties and obligations under the PSA." AC ¶ 81. The Amended Complaint could hardly be clearer that those counts "relate to . . . duties and obligations" that are in the "bare text" of the contracts, meaning that they too qualify for the exception even under the *Walnut Place* standard. In addition, Count V is brought "derivatively on behalf of the Trusts." *Id.* ¶ 117. Because the New York Trusts are "created by" the PSAs, any "rights" that they or the beneficiaries have are created by the PSAs as well. Any suggestion that the Trusts' rights vis-à-vis the Trustee are not "created by or pursuant to" those securities instruments is untenable. Finally, Count VI is for breach of fiduciary duty, and the securities exception expressly "include[s] fiduciary duties." 28 U.S.C. § 1332(d)(9)(C).

The Trustee submits that the application of the securities exception to this case is not a close question. If the Court disagrees, the Trustee respectfully requests that the Court certify this question for immediate appeal. Section 1292(b) allows the certification of any "controlling

question of law." Any alternative would risk voiding a massive class action after trial.

**B. The Court Should Not Exercise Supplemental Jurisdiction.**

If the TIA claim is dismissed in full, then no federal question would remain, and the Court should not exercise supplemental jurisdiction over the state-law claims. "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *see also* 28 U.S.C. § 1367(c)(3). There is no reason to depart from that course. In *Bluebird Partners*, because the dismissed TIA claim was "the only basis for subject matter jurisdiction" and "the litigation ha[d] not progressed significantly past the pleading stage," Judge Mukasey also dismissed the state-law claims. 896 F. Supp. at 157. This Court has done so as well,[13] and it should do so again here.

Even if a TIA claim were pleaded as to the Delaware Trust, the Court should dismiss the state-law claims as to the New York Trusts. The TIA claim for the New York Trusts having been dismissed, Section 1367(c)(3) would apply to the state-law claims on those Trusts. Moreover, the only valid basis for supplemental jurisdiction over each Trust's state-law claims is the TIA claim for that same trust. Just as holdings of one security do not create standing as to others, claims as to one of the Trusts here do not arise out of a "common nucleus of operative fact" (*Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 335 (2d Cir. 2006)) with claims for other Trusts. As Judge Baer wrote in *New Jersey Carpenters v. Royal Bank of Scotland*:

> Most of Plaintiffs' factual allegations focus on the underlying details . . . and are unique to each of the offerings . . . . Although the makeup of each

---

[13]   *See, e.g.*, *Byrne v. Ceresia*, No. 09 Civ. 6552(WHP), 2011 WL 5869594, at *6 (S.D.N.Y. Nov. 22, 2011); *Gilmore v. Gilmore*, No. 09 Civ. 6230(WHP), 2011 WL 5517832, at *2 (Nov. 10, 2011); *Fergus v. City of New York*, No. 11 Civ. 2419(WHP), 2011 WL 5007000, at *4 (S.D.N.Y. Oct. 14, 2011) (dismissing even though "[g]iven the troubling concatenation of events described in the Complaint, [plaintiff's] state law claims appear meritorious").

offering in this case is similar, there is no necessary reason for this; just because one offering was comprised of Countrywide-originated subprime loans and allegedly omitted Countrywide's fraudulent lending practices, does not mean that another offering could not have been structured with less risky loans and included all necessary disclosures.

720 F. Supp. 2d 254, 265 (S.D.N.Y. 2010); *Maine*, 722 F. Supp. 2d at 1164 ("Each MBS is backed by a pool of unique loans, and the representations made in the prospectus supplements accompanying the issuance of those securities are themselves unique"); *City of Ann Arbor Employees' Ret. Sys. v. Citigroup Mortg. Loan Trust Inc.*, 703 F. Supp. 2d 253, 260 (E.D.N.Y 2010) ("Plaintiffs must be able to prove falsity with respect to statements, or omissions regarding the mortgages in which they purchased interests.  Those statements will inevitably require reference to particular pools of mortgages contained in particular securities.").  Proof that the Trustee, for example, failed to provide notice of a default in one trust would prove nothing with respect to a different trust.  Because the facts do not "substantially overlap[]" (*Lyndonville Savs. Bank & Trust Co. v. Lussier*, 211 F.3d 697, 704 (2d Cir. 2000)), a TIA claim on the Delaware Trust is no basis for supplemental jurisdiction as to other trusts.

## CONCLUSION

For all of the foregoing reasons, the Amended Verified Certificateholder Derivative Complaint should be dismissed with prejudice.

Dated:   New York, New York
         December 16, 2011

MAYER BROWN LLP

s/Matthew D. Ingber
Matthew D. Ingber
Christopher J. Houpt
1675 Broadway
New York, New York 10019
(212) 506-2500

*Attorneys for Defendant
The Bank of New York Mellon*
