UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RETIREMENT BOARD OF THE POLICEMEN'S ANNUITY AND BENEFIT FUND OF THE CITY OF CHICAGO, WESTMORELAND COUNTY EMPLOYEE RETIREMENT SYSTEM, CITY OF GRAND RAPIDS GENERAL RETIREMENT SYSTEM, and CITY OF GRAND RAPIDS POLICE AND FIRE RETIREMENT SYSTEM (on Behalf of Themselves and Similarly Situated Certificate Holders),<br><br>                         Plaintiffs,<br><br>           v.<br><br>THE BANK OF NEW YORK MELLON, (as Trustee Under Various Pooling and Servicing Agreements),<br><br>                         Defendant. | Case No. 11-cv-05459-WHP<br><br>Honorable William H. Pauley<br><br>ECF Case |

# REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
# THE BANK OF NEW YORK MELLON'S MOTION TO DISMISS

MAYER BROWN LLP
1675 Broadway
New York, New York 100019
(212) 506-2500

*Attorneys for Defendant*
*The Bank of New York Mellon*

## **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ....................................................................................................1

ARGUMENT ...................................................................................................................................1

    I.    THE TRUST INDENTURE ACT CLAIM SHOULD BE DISMISSED. ...........................1

        A.  The New York Trust Certificates Are Equity. ................................................................1

            1.  No authority supports the position that all mortgage-backed securities are debt ........................................................................................................................2

            2.  The terms of the Certificates confirm that they are equity. ....................................4

        B.  The Amended Complaint Fails to State a Claim Under the Trust Indenture Act. ......................................................................................................................................7

CONCLUSION ................................................................................................................................10

# TABLE OF AUTHORITIES

Page

**CASES**

*Bell Atl. Corp. v. Twombly*,
　550 U.S. 554 (2007) ................................................................................................................10

*Bluebird Partners, L.P. v. First Fidelity Bank, N.A.*,
　85 F.3d 970 (2d Cir. 1996) ..................................................................................................1-2

*Chevron U.S.A., Inc. v. Nat. Res. Defense Council, Inc.*,
　467 U.S. 837 (1984) ..................................................................................................................3

*Ellington Credit Fund, Ltd. v.Select Portfolio Servicing, Inc*.,
　No. 08 Civ. 2437(RJS), 2011 WL 6034310 (S.D.N.Y. Dec. 5, 2011) ......................................2

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*,
　343 F.3d 189 (2d Cir. 2003) ..................................................................................................10

*Gilbert v. Comm'r of Internal Revenue*,
　248 F.2d 399 (2d Cir. 1957) ....................................................................................................4

*In re Samuels*,
　415 B.R. 8 (Bankr. D. Mass. 2009) .........................................................................................9

*Jewel Tea Co. v. United States*,
　90 F.2d 451 (2d Cir. 1937) ......................................................................................................5

*Kemp v. Countrywide Home Loans, Inc. (In re Kemp)*,
　440 B.R. 624 (Bankr. D.N.J. 2010) .........................................................................................9

*LaSalle Bank N.A. v. Merrill Lynch Mortg. Lending, Inc.*,
　No. 04 Civ. 5452 (PKL), 2007 WL 2324052 (S.D.N.Y. Aug. 13, 2007) ..................................9

*LaSalle Bank N.A. v. Nomura Asset Capital Corp.*,
　180 F. Supp. 2d 465 (S.D.N.Y. 2001) ......................................................................................9

*Nassau Lens Co. v. Comm'r of Internal Revenue*,
　308 F.2d 39 (2d Cir. 1962) ......................................................................................................4

*Semi-Tech Litig., LLC v. Bankers Trust Co.*,
　353 F. Supp. 2d 460 (S.D.N.Y. 2005) ......................................................................................7

*Silverman v. Schwartz*,
　248 A.D.2d 332 (1st Dep't 1998) ............................................................................................3

*TIFD III-E, Inc. v. United States*,
　459 F.3d 220 (2d Cir. 2006) ....................................................................................................4

## **TABLE OF AUTHORITIES**
## **(continued)**

**Page**

**CASES (CONT'D)**

*United States v. Mead Corp.*,
 533 U.S. 218 (2001) .................................................................................................................3

**STATUTES**

Securities Acts Amendments of 1990,
 Pub. L. No. 101-550, 104 Stat. 2713 .......................................................................................7

Trust Indenture Act of 1939, Section 303(7),
 *codified at* 15 U.S.C. § 77ccc(7) ............................................................................................8

Trust Indenture Act of 1939, Section 304(a)(2),
 *codified at* 15 U.S.C. § 77ddd(a)(2) ........................................................................................3

Trust Indenture Act of 1939, Section 315(a),
 *codified at* 15 U.S.C. § 77ooo(a) ............................................................................................7

Trust Indenture Act of 1939, Section 315(b),
 *codified at* 15 U.S.C. § 77ooo(b) ............................................................................................7

Trust Indenture Act of 1939, Section 315(c),
 *codified at* 15 U.S.C.A. § 77ooo(c) ........................................................................................8

**OTHER AUTHORITIES**

John Arnholz & Edward E. Gainor,
 *Offerings of Asset-Backed Securities* § 14.05 (2006) ..............................................................3

Edward J. O'Connell & Emily Goodman,
 *New Developments in Securitization 2004*, 871 PLI 981 (Dec. 2004) ....................................4

Frank Fabozzi,
 *Accessing Capital Markets Through Securitization* 238 (2001) ..............................................3

Tamar Frankel,
 SECURITIZATION (2005) ......................................................................................................3, 5

Talcott Franklin,
 *Mortgage & Asset Backed Securities Litigation Handbook* (2011 update) ............................3

M. Gambro & S. Leichtner,
 *Selected Legal Issues Affecting Securitization*, 1 N.C. BANKING INST. (1997) ........................4

## TABLE OF AUTHORITIES
## (continued)

**Page**

**OTHER AUTHORITIES (CONT'D)**

Jason Kravitt, ed.,
    *Securitization of Financial Assets* (2d ed., 2010 supp.) ............................................................3

SEC Interpretations of the Trust Indenture Act of 1939, *available at*
    http://www.sec.gov/divisions/corpfin/guidance/tiainterp.htm ...................................................3

**PRELIMINARY STATEMENT**

There is now no dispute that the securities exception bars jurisdiction under CAFA, or that supplemental jurisdiction is lacking over state-law claims as to a Trust for which the Trust Indenture Act ("TIA") claim fails. BNYM Br. 22-25. Arguing against this Court's rulings on securities standing, plaintiffs refer vaguely to "unique circumstances" of this case (Opp. 25) but make no attempt to distinguish the cases holding that a plaintiff cannot allege injury-in-fact from a mortgage-backed security ("MBS) in which it did not invest. *Id.* at 4-5, 24-25. They also essentially abandon two theories of breach of the TIA, failing to engage the authorities BNYM cited on the examination of statements and the impairment of bonds. *Id.* at 14-16, 18-20.

Plaintiffs devote much of their attention to factual issues that we dispute but that are irrelevant. The only issues remaining on this motion are legal—as to the New York Trusts, whether Certificates that evidence ownership of the Trusts are debt; and as to the one Delaware Trust, whether an Event of Default under the Sale and Servicing Agreement is also a default under the Indenture, and whether plaintiffs have pleaded causation. On all three points, clear statutory and contractual language supports dismissal on the pleadings.

**ARGUMENT**

**I.   THE TRUST INDENTURE ACT CLAIM SHOULD BE DISMISSED.**

   **A. The New York Trust Certificates Are Equity.**

There is no dispute that that the Indenture is an enforceable contract and that the same substantive duties imposed by the TIA appear, almost verbatim, in the PSAs. BNYM Br. 14, 18 n.11. It is hardly "indicative of BNYM's feckless performance as Trustee" (Opp. 12) that it has argued that the TIA does not apply and that state law does. Nor do descriptions of the legislative purpose that, in line with the statute itself, refer to "abuses by *indenture* trustees" that "affect[] '. . . investors in *notes, bonds [and] debentures*'" (Opp. 12 (quoting *Bluebird Partners, L.P. v.*

*First Fidelity Bank, N.A.*, 85 F.3d 970, 974 (2d Cir. 1996)) (emphasis added)) imply that the statute applies to contracts that are not indentures and securities that are not debt.

     1.   <u>No authority supports the position that all mortgage-backed securities are debt.</u>

As expected (BNYM Br. 9), plaintiffs first rely on dictum in cases that refer to MBS as "essentially bonds" or "a kind of giant bond," state that PSAs are "similar to bond indentures in many respects," or otherwise summarize terms that were immaterial to the issues that those courts decided. Opp. 13-14. None answered the question that the TIA poses—whether the securities actually are bonds—and none analyzed the terms of a particular security, as we do here. In particular, *Ellington Credit Fund* did not "f[i]nd" that Certificates are debt, as plaintiffs say. *Id.* at 13. The court concluded "at this stage" that the Certificates were "sufficiently analogous to bonds" for purposes of standing, after emphasizing repeatedly that the question was not litigated. *See* No. 08 Civ. 2437, 2011 WL 6034310, at *7-*8 (S.D.N.Y. Dec. 5, 2011) ("To the extent there is any question whether § 13–107 applies to the pass-through certificates at issue here, it is one to which Defendants offer no argument."; "Defendants do not contest that § 13–107 governs that transfer"; "Defendants do not argue that the certificates issued by the trusts pursuant to the PSAs are dispositively different from ordinary debt securities.").[1]

Plaintiffs find it "[t]elling[]" that no case has yet held that Trust Certificates are exempted securities under the TIA. Of course, neither do they cite any case, or any authority at all, holding to the contrary. The authorities that directly consider the question are treatises and SEC no-action letters. Plaintiffs absurdly suggest that BNYM's counsel misstated the law in

---

[1]    The defendants had no reason to do so, because Section 13-107 was not, as plaintiffs mistakenly argue, the source of the claim (Opp. 5), but merely the basis for finding that the claim traveled with the security. Although the New York GOL applies only to debt, that particular rule applies equally to stock. *See Silverman v. Schwartz*, 248 A.D.2d 332, 332 (1st Dep't 1998).

*Securitization of Financial Assets* because he anticipated citing it in this lawsuit, but all of the sources that address whether Trust Certificates are debt say the same thing.

Most importantly, the SEC says so. Its website on TIA interpretation states:

> Certificates representing a beneficial ownership interest in a trust are offered to the public pursuant to a registration statement under the Securities Act. The assets of the trust include a pool of mortgage loans with multiple obligors administered pursuant to a "pooling and servicing agreement." Partial payment of the certificates is guaranteed by a third party. The certificates are treated as exempt from the Trust Indenture Act under Section 304(a)(2) thereof.

*Available at* http://www.sec.gov/divisions/corpfin/guidance/tiainterp.htm. That interpretation "merit[s] some deference." *United States v. Mead Corp.*, 533 U.S. 218 (2001).

The SEC is not alone. Tal Franklin, no "feckless . . . trustee," is counsel for the Knights of Columbus in their settlement objection and in a state-court case against BNYM, and his treatise says the same thing. *See* BNYM Br. 9-10. So does the entry on "Trust Certificates" in Frank Fabozzi's *Accessing Capital Markets Through Securitization* 238 (2001), which states that "[s]uch interests are considered 'equity interests' under state law and, therefore, notwithstanding credit ratings of up to AAA/Aaa, are considered not to be 'debt' for purposes such as . . . the [TIA]." *Contra* Opp. 15 (citing ratings as evidence of debt). Likewise, John Arnholz and Edward E. Gainor write in *Offerings of Asset-Backed Securities* that "Section 304(a)(1) excludes equity securities from the TIA. Nearly every offering of securities structured as pass-through certificates is therefore exempt." § 14.05 & nn.78-79 (2006).[2]

---

[2]   *See also* Tamar Frankel, SECURITIZATION § 12.26 (2d ed. 2005) ("The TIA applies only to some types of asset-backed securities. If an SPV issues equity securities, the TIA does not apply to them because section 304(a)(1) excludes [equity]"); Edward J. O'Connell & Emily Goodman, 981 PRAC. LAW INST., *New Developments in Securitization 2004*, at 989 (Certificates "represent the ownership in the Trust and are viewed as equity by the [SEC]. Consequently, the Pooling Agreement is not required to comply with the Trust Indenture Act of 1939."); M. Gambro & S. Leichtner, *Selected Legal Issues Affecting Securitization*, 1 N.C. BANKING INST. 131, 149 (1997) ("The 1939 Act does not apply to securities that are exempt from the registration

2.     The terms of the Certificates confirm that they are equity.

"The classic debt is an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack thereof." *Gilbert v. Comm'r of Internal Revenue*, 248 F.2d 399, 402 (2d Cir. 1957). Here, there is no "sum certain" or "fixed percentage in interest," and the amounts paid are entirely dependent on—indeed, are defined by—"the debtor's income or lack thereof." *See also Nassau Lens Co. v. Comm'r of Internal Revenue*, 308 F.2d 39, 47 (2d Cir. 1962) ("Relevant considerations [include] . . . whether [debentures] specify a relatively fixed date upon which the creditor may demand a definite sum regardless of the profits earned."); *TIFD III-E, Inc. v. United States*, 459 F.3d 220, 237 (2d Cir. 2006) (finding relevant "whether [investors] had the right to force the payment of what was effectively their principal and interest").

Plaintiffs accuse BNYM of disingenuity, "self-serving word games," and "blatant inaccuracies" for pointing out that the Certificates do not "pay fixed amounts on specified dates." Opp. 15. If the Certificates really were debt, though, it would be easy to cite an "unqualified obligation to pay a sum certain." Instead, plaintiffs breeze through a slew of provisions without explaining what any of them has to do with the debt/equity distinction, and they ignore the Certificates' statements that they evidence "ownership," not "indebtedness." BNYM Br. 7.

In bullets on pages 15-16, plaintiffs first note that Certificate distributions are made on specified dates. But a payment schedule alone does not make debt; dividends are generally paid on a regular basis, too. The second and fourth bullets merely describe contract terms governing distribution mechanics. Both provisions confirm that Certificates are equity, because they require

---

requirements of the 1933 or to equity securities such as asset-backed securities issued in pass-through form.").

4

distribution only of whatever happens to be in the Distribution Account. The balance in that account is wholly contingent on income from the Mortgage Loans. *See* PSA § 3.05(b)(i)–(viii).

Third, plaintiffs note that the PSAs refer to certain payments as "Principal" and "Interest." Read in context, the amounts labeled Principal and Interest are merely parts of the formula for allocating incoming proceeds to different classes of Certificateholders. *Cf. Jewel Tea Co. v. United States*, 90 F.2d 451, 452-53 (2d Cir. 1937) (L. Hand, J.) ("the test cannot be merely the name given to the security. Conceivably there may be preferred shares going by the name of bonds, and bonds going by the name of preferred shares") (citation omitted). It is true that some Certificates are senior to others, in the sense that income is not distributed *pari passu* across equity classes, but it is equally true that no class is entitled to any predetermined amount.[3]

The fifth bullet seems to imply that the Master Servicer and Trustee guarantee "required distribution[s]" by paying Advances. That is wrong. *See id.*, Exs. A & B ("This Certificate does not evidence an obligation of, or an interest in, and is not guaranteed by . . . the Master Servicer or the Trustee"); Ex. E ("the Trustee is not liable to the Certificateholders for any amount payable under this Certificate"). Advances are the difference between the amount due and the amount timely paid on each Mortgage Loan. *See* PSA §1.01 ("Advance"). If the Master Servicer makes an Advance in one month, it is entitled to recover it in the next (*id.* §§ 3.08, 4.10)— Advances are loans by the Master Servicer, not guarantees, and they do not make up for permanent losses on Trust assets. Further, the definition of Advance carves out "Nonrecoverable

---

[3] *Compare* Frankel, *supra*, § 8.2 ("SPVs structured to issue pay-throughs issue a number of classes of securities, each senior class entitling the holders to a certain priority as against a junior class with respect to payments of principal and interest. The SPV, however, does not promise investors more than the payments produced by its portfolio.") *with id.* § 8.4 ("Unlike pass-throughs and pay-throughs, bonds promise investors a stated amount of principal and a fixed percentage as a return and have a fixed maturity, independent of the instruments held by the SPV.").

5

Advances." These are losses that the Master Servicer believes "will not be ultimately recoverable" from the borrower or at a foreclosure sale.  *See* § 1.01 ("Nonrecoverable Advances").  Thus, the only Advances that the Master Servicer must make are to cover payments that it has not "received . . . as of the close of business on the related Determination Date" but that it believes are on their way; for example, if the borrower's January payment is not received in time for the January Certificate Distribution Date but is expected a few days later.  Losses caused by defaults are expressly carved out of this supposed guarantee.

        The sixth bullet point is inaccurate.  "Excess Proceeds" are not defined with reference to "what is necessary to pay the Certificate holders their required distributions."  Opp. 15.  They are the excess of foreclosure proceeds over the outstanding balance on a given loan.  PSA § 1.01.  This is incentive compensation to the Master Servicer and does not make the Certificates debt.  The seventh bullet cites terms that ensure that the Trusts receive no more and no less than what the Master Servicer collects—gains or losses on the proceeds during the short period that the servicer holds them accrue to the servicer.  Finally, the eighth bullet cites terms that *limit* the Master Servicer's and the Trustee's liability to their express undertakings.  PSA §§ 6.01, 8.01.  Neither allows an investor to sue because payments on the Certificates fall short of expectations.

        Plaintiffs conclude with the assertion (without citation) that "the Certificate holders were entitled to fixed principal and interest payments, and if they did not receive those payments, they could pursue those payments through legal remedies."  Opp. 16.  There is no such contractual entitlement.  As pointed out in our opening brief, under the *Indentures*, a payment failure is an Event of Default, which entitles the Trustee to accelerate the Notes.  Noteholders also have the right to sue the Issuer for non-payment.  *See* Indenture, Ex. A-1 (page A-1-6) & Ex. A-2 (page A-2-5) ("Nothing in this Note shall be taken to prevent recourse to, and enforcement against, the

6

assets of the Issuer for any obligations under the Indenture or in this Note."). Under the PSAs, there is no Event of Default triggered by non-payment (under the PSAs, there are no defaults at all by the *Trust*, only by the Master Servicer), there is no such thing as acceleration, and Certificateholders have no right to sue for any "unpaid balance."

### B. The Amended Complaint Fails to State a Claim Under the Trust Indenture Act.

Plaintiffs' first TIA claim is that BNYM breached the Indenture. There is no dispute that an indenture trustee has to comply with the Indenture, but as discussed (BNYM Br. 14, 18 n.11), that duty is imposed by the Indenture itself, not by the TIA. Although the TIA creates a right of action for breaches of duties imposed *by the TIA*, that does not make a federal question out of any breach of an indenture. Opp. 20. Plaintiffs cite no statutory language that says that, and their discussion of the 1990 amendments is fundamentally wrong. Section 315(a) governs the trustee's pre-default duties. Subsection (a) allows parties to *limit* the trustee's responsibilities to those in the indenture and to permit the trustee to rely on statements of others. Aside from the "examine the evidence" clause,[4] subsection (a) does not impose duties, and so it cannot create any claim. The 1990 amendment only changed the default rule, and it changed it in the trustee's favor: the section had said that the parties "may" include that language; now it says that the indenture "shall automatically be deemed" to contain it unless stated otherwise. *See* Pub. L. No. 101-550 § 414(1). Whether before or after the amendment, that language has never created duties, and it has never created a federal right of action for any breach of an indenture.

The other two remaining TIA theories depend on the existence of an Event of Default under the Indenture. Section 315(b) requires notice of "defaults," namely, breaches of the

---

[4] Footnote 12 (Opp. 24) does not address any of BNYM's arguments on that clause or on "impairment" (BNYM Br. 14-16, 18-20) and cites only unspecified "reasons set forth above." The claim allowed in *Semi-Tech* arose from that clause, which is the only part of subsection (a) that imposes any duty. 353 F. Supp. 2d 460, 474 (S.D.N.Y. 2005).

Indenture by the Issuer. BNYM Br. 16-17. Section 315(c) imposes a prudent-person standard "in case of default (as such term is defined in such indenture)." Plaintiffs do not dispute that the parenthetical limits subsection (c) to contractual Events of Default. BNYM Br. 17-18. Initially, they argue that this aspect of the motion was waived. Opp. 23. We do not understand the rules to require that parties squeeze every argument in a 25-page brief into a 3-page letter, at risk of waiver, and BNYM also raised the point explicitly at the pre-motion conference.[5]

In any event, plaintiffs cannot plead around that problem. They first argue that "BNYM has already asserted . . . that the PSAs and Indentures are sufficiently similar . . . that it could seek a legally unprecedented settlement on behalf of all of those Trusts." Opp. 23. BNYM's rights to litigate and settle claims against Countrywide are indeed similar under the PSAs and the Indentures. But that has nothing to do with whether an Event of Default under an SSA is also an Event of Default as "defined in such indenture" for TIA purposes.[6] That is a question of law, not fact, and the Court should decide it now. *Contra* Opp. 23.

Second, plaintiffs assert in a footnote that an Indenture Event of Default has occurred, namely the Issuer's alleged breach of "many of the duties that Plaintiffs have alleged were not discharged." Opp. 23 n.10. The only breach that they mention is "the failure to perfect the transfer of the mortgage loans and loan files to the Covered Trusts." *Id.* (citing Indenture § 3.05). But the Amended Complaint alleges only that the Trustee did not receive physical

---

[5] *See* 11/3/2011 Tr. at 6 ("defaults under the indenture are only defaults by the issuer. The only allegations of defaults in the complaint are those allegedly by the master servicer. That is a different entity than the issuer. So that's a 12(b)(6) issue. That gets rid of the Trust Indenture Act claim.").

[6] Plaintiffs have never argued that the SSA is a "qualified indenture" under the TIA, and it is not. Section 303(7) of the TIA defines "indenture." Among other things, the definition requires that "securities are outstanding or are to be issued" "under" the contract. The SSA does not describe the terms of any securities or require any payments to securityholders. That function is the exclusive domain of the Indenture.

8

mortgage files, and it alleges clearly, albeit incorrectly, that the transfer was the Trustee's duty, not the Issuer's. AC ¶ 9. (In fact, it is the Depositor's duty to deliver documents, not the Trustee's or the Issuer's duty to receive them. *See* SSA § 2.01(a).) By contrast, Section 3.05 says nothing about mortgage files or "perfect[ing] the transfer" of loans. It requires the Issuer to perfect the Indenture Trustee's security interest in the Collateral. The Collateral is "the Issuer's interest" in the loans. Indenture, Granting Clauses. Even if the *Issuer's interest* were disputed, that would not be a flaw in the *Trustee's lien* on whatever interest the Issuer has.

In any event, plaintiffs' allegations fail to show that the Issuer does not own the Mortgage Loans. The SSA itself conveys the Mortgage Loans to the Issuer, independent of the transfer of files. Section 2.01(a) says that "[c]oncurrently with the execution and delivery of" the SSA, "the Depositor hereby transfers to the Trust . . . all of its right, title and interest in" the loans. That language conveys ownership automatically. The physical mortgage is sometimes required to enforce the loan against a borrower, but the Issuer need not have the document to hold title to the loan. Even *Kemp v. Countrywide Home Loans, Inc.*, 440 B.R. 624, 629-30 (Bankr. D.N.J. 2010) (cited at Opp. 4, 9), agreed that "the debtor's mortgage had been assigned to the Bank of New York," despite holding that an improper endorsement "defeats the enforceability of the note."[7]

Finally, plaintiffs fail to plead damage causation, because, in light of the monoline guarantee, they can identify no mechanism by which losses on the Trusts would be passed

---

[7] The reason that *Kemp* mentioned assignment to the trustee, rather than to the issuer, was that it involved a PSA transaction in which a trustee held the Mortgage Loans. *See also In re Samuels*, 415 B.R. 8, 18 (Bankr. D. Mass. 2009) ("The PSA itself, in conjunction with the schedule of mortgages deposited through it into the pool trust, served as a written assignment of the designated mortgage loans, including the mortgages themselves."); *LaSalle Bank N.A. v. Merrill Lynch Mortg. Lending, Inc.*, No. 04 Civ. 5452 (PKL), 2007 WL 2324052, at *4 (S.D.N.Y. Aug. 13, 2007) ("Pursuant to section 2.01 of the PSA, [depositor] conveyed to [trustee], all of its right, title, and interest in certain loans"); *LaSalle Bank N.A. v. Nomura Asset Capital Corp.*, 180 F. Supp. 2d 465, 470-71 (S.D.N.Y. 2001) (same).

through to investors.  The Supreme Court has emphasized "[t]he need at the pleading stage for allegations plausibly suggesting (not merely consistent with)" an entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 557 (2007).  The allegations here—that the Trustee injured the Issuer and that plaintiffs' CWHEQ 2006-D Note lost 2.69% in market value (Opp. 24; AC, Ex. B)—do not suggest that the Issuer's losses caused the decline in market value.  Plaintiffs have no response to the argument that because their Note was insured against the very losses that the Trustee allegedly caused, any such losses could not have damaged the plaintiffs (unless the monoline insurer defaulted during their holding period, which is not alleged and did not happen).  A decline in market value may suggest loss, but it does not suggest causation, and plaintiffs must plead both.  In fact, one would expect the Notes to lose market value over time as the Notes (and the loans securing them) amortize.  (Indeed, the plaintiffs do not allege how much they received while they held the Note, leaving open the possibility that they suffered no loss at all.)  *Cf. Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 199 (2d Cir. 2003) (no claim "where the ultimate decline in the market price" was "unrelated" to fraud).

## CONCLUSION

For all of the foregoing reasons, the Amended Verified Certificateholder Derivative Complaint should be dismissed with prejudice.

Dated:   New York, New York
         January 20, 2012

                                           MAYER BROWN LLP

                                            s/Matthew D. Ingber
                                           Matthew D. Ingber
                                           Christopher J. Houpt
                                           1675 Broadway
                                           New York, New York 10019
                                           (212) 506-2500

                                           *Attorneys for Defendant*
                                           *The Bank of New York Mellon*

10