UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                              :
RETIREMENT BOARD OF THE                       :        11 Civ. 5459 (WHP)
POLICEMEN'S ANNUITY AND                       :
BENEFIT FUND OF THE CITY                      :        MEMORANDUM & ORDER
OF CHICAGO, et al.,                           :

                 Plaintiffs,                  :

              -against-                        :

THE BANK OF NEW YORK MELLON,   :

                 Defendant.                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:_____
> DATE FILED: 4/3/12

WILLIAM H. PAULEY III, District Judge:

          Plaintiffs—suing individually, on behalf of a putative class, and derivatively—

own mortgage-backed securities issued by trusts for which Defendant, The Bank of New York

Mellon ("BNYM"), serves as trustee. They allege that BNYM violated several provisions of the

Trust Indenture Act of 1939, 15 U.S.C. § 77aaa, et seq. (the "TIA"), and breached its contractual

and fiduciary duties. BNYM moves to dismiss the Class Action and Derivative Complaint in its

entirety. For the following reasons, BNYM's motion to dismiss is granted in part and denied in

part.


                              BACKGROUND

          This case is another installment in litigation over BNYM's obligations as trustee

for hundreds of securitization trusts. The structure of the underlying residential mortgage

securitization transactions is familiar: "To raise funds for new mortgages, a mortgage lender

-1-

sells pools of mortgages into trusts created to receive the stream of interest and principal payments from the mortgage borrowers. The right to receive trust income is parceled into certificates and sold to investors, called certificateholders." BlackRock Fin. Mgmt. Inc. v. Segregated Account of Ambac Assurance Corp., ---F.3d----, 2012 WL 611401, at *1 (2d Cir. 2012). Here, the mortgage lenders are Countrywide Home Loans, Inc. and various affiliates ("Countrywide"). (Class Action and Derivative Complaint, dated Aug. 31, 2011 ("Compl." or the "Complaint") ¶ 35.) Bank of America Corporation ("Bank of America") now owns Countrywide. (Compl. ¶ 15.)

        Plaintiffs hold securities issued by twenty-five New York trusts and one Delaware trust. (Compl. Ex. B.) BNYM is trustee for the New York trusts, and Countrywide (now Bank of America) is the "master servicer." (Compl. ¶¶ 1, 15, 96 n.2.) As in BlackRock, 2012 WL 611401, at *1, the terms of the New York trusts as well as the rights, duties, and obligations of the trustee and the master servicer are set forth in Pooling and Servicing Agreements ("PSAs"). (Compl. ¶ 2; Compl. Ex. C: Pooling and Servicing Agreement dated Sept. 1, 2006 ("PSA").)[1] The PSAs also govern the trustee's distribution of money to certificateholders. (Compl. ¶¶ 1, 2.) The Delaware trust operates similarly, with a few key differences. The Delaware trust issued notes, subject to an indenture, for which BNYM serves as indenture trustee. (Declaration of Matthew D. Ingber, dated Dec. 16, 2011 ("Ingber Decl.") Ex A: Indenture, dated Mar. 30, 2006 ("Indenture") § 3.04, Annex 1 (Glossary).) Concurrently, the Delaware trust entered into a Sale and Servicing Agreement ("SSA") governing the sale of the underlying mortgage loans and the

---

[1] The parties do not dispute that the PSA attached as Exhibit C to the Complaint is representative of the PSAs governing all of the New York trusts at issue. See BlackRock, 2012 WL 611401, at *1 n.2 ("[T]he agreements are sufficiently similar for the Court to rely on a representative PSA[.]").

master servicer's responsibilities. (Ingber Decl. Ex. B: Sale and Servicing Agreement, dated Mar. 30, 2006 ("SSA").) [2]

The PSAs, Indenture, and SSA governing the trusts contain representations and warranties concerning the quality of the underlying mortgages, the duties of BNYM as trustee, and the structure of the securities issued by the trusts. (Compl. ¶¶ 33-48; Ingber Decl. Exs. A, B.) Plaintiffs allege that BNYM's duties include perfecting the assignment of the mortgages to the trusts, reviewing each of the loan files for the mortgages, certifying that the documentation for each of the mortgages is accurate and complete, creating a Document Exception Report listing any incomplete loan files, and ensuring that the master servicer cures, substitutes, or repurchases all mortgages listed on that Report. (Compl. ¶¶ 35-47.)

Plaintiffs claim that Countrywide breached its obligations as master servicer by failing "to provide mortgage loan files in their possession, to cure defects in the mortgage loan files and/or to substitute the defective loans with conforming loans." (Compl. ¶ 87.) They further allege that BNYM did nothing to remedy the inadequate servicing of the mortgages undergirding the trusts. Specifically, they contend that BNYM failed to take possession of the loan files, review the loan files adequately, and require Countrywide and Bank of America to cure, substitute, or repurchase the defective loans. To support these allegations, Plaintiffs cite the bankruptcy court testimony of a Countrywide employee, who stated that it was Countrywide's standard business practice to retain the original mortgage notes and other documentation, rather than delivering them to BNYM as trustee. (Compl. ¶¶ 55-58.) Plaintiffs also cite a 2011 Joint Report by the Federal Reserve and other agencies flagging "concerns about the prevalence of

_____

[2] The parties do not dispute that the Indenture and SSA attached to the Declaration of Matthew D. Ingber govern the Delaware trust in which Plaintiffs allege holdings.

irregularities in the documentation of ownership [that] may cause uncertainties for investors of securitized mortgages." (Compl. ¶ 60.) Similarly, the New York Attorney General alleged that BNYM failed to ensure the complete transfer of mortgages and loan files from Countrywide to the trusts. (Compl. ¶ 61.)

The gravamen of the Complaint is that a prudent trustee would have remedied these failures by requiring the master servicer to cure or repurchase the defective loans in the trusts, and would have compelled the master servicer to comply with its servicing duties. Yet BNYM allegedly took no action to protect investors.[3] Rather, on June 28, 2011, BNYM entered into an agreement with Countrywide and Bank of America to settle all potential claims belonging to the trusts for which it is trustee for $8.5 billion. See BlackRock, 2012 WL 611401, at *2. Plaintiffs contend that—regardless of the settlement's fairness—BNYM caused them significant losses. They allege that the value of their mortgage-backed securities plummeted as a consequence of the underwriting defects and inadequate servicing of the underlying mortgages. (Compl. ¶¶ 74-76.)

## DISCUSSION

### I.    Legal Standard

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S.

---

[3] In Walnut Place LLC v. Countrywide Home Loans, Inc., Justice Barbara R. Kapnick concluded that BNYM "did, in fact, act upon plaintiffs' complaints, as demonstrated by the settlement agreement reached with the defendants[.]" Index No. 650497/11, at *15 (N.Y. Sup. Ct. Mar. 28, 2012). At this preliminary stage, this Court expresses no opinion regarding BNYM's diligence.

-4-

544, 570 (2007)).  To determine plausibility, courts follow a "two pronged approach."  Iqbal, 129

S. Ct. at 1950.  "First, although a court must accept as true all of the allegations contained in a

complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements

of a cause of action, supported by mere conclusory statements, do not suffice."  Harris v. Mills,

572 F.3d 66, 72 (2d Cir. 2009) (internal punctuation omitted).  Second, a court determines

"whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an

entitlement to relief.'"  Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010) (quoting Iqbal, 129

S. Ct. at 1950).  On a motion to dismiss, courts may consider "facts stated on the face of the

complaint, in the documents appended to the complaint or incorporated in the complaint by

reference, and . . . matters of which judicial notice may be taken."  Allen v. WestPoint–Pepperell,

Inc., 945 F.2d 40, 44 (2d Cir. 1991).

II.    Standing

A.    Trusts in which No Named Plaintiff Invested

Plaintiffs allege current or former ownership of certificates relating to only

twenty-six of the trusts referenced in the Complaint.  (Compl. ¶ 1; Compl. Ex. B (listing

holdings).)  BNYM argues that Plaintiffs lack standing to bring claims based on the trusts in

which no named plaintiff invested.  Although this Court afforded Plaintiffs an opportunity to

amend the Complaint to add additional certificateholders, they declined to do so.  (Hr'g Tr. dated

Feb. 10, 2012 at 39-40.)

Standing under Article III of the Constitution is "the threshold question in every

federal case, determining the power of the court to entertain suit."  Denney v. Deutsche Bank

AG, 443 F.3d 253, 263 (2d Cir. 2006) (quoting Warth v. Seldin, 422 U.S. 490, 498 (1975))

(internal quotation marks omitted).  To establish standing, "a plaintiff must have suffered an 'injury in fact' that is 'distinct and palpable'; the injury must be fairly traceable to the challenged action; and the injury must be likely redressable by a favorable decision." Denney, 443 F.3d at 263 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).

In accord with these principles, Plaintiffs may not pursue claims relating to securities in which they never invested.  In re Smith Barney Transfer Agent Litig., 765 F. Supp. 2d 391, 400 (S.D.N.Y. 2011); see also In re Salomon Smith Barney Mut. Fund Fees Litig., 441 F. Supp. 2d 579, 607 (S.D.N.Y.2006) ("With regard to the sixty-eight funds of which Plaintiffs own no shares, Plaintiffs do not have standing to assert any claims because Plaintiffs cannot satisfy the standing requirements.").  Accordingly, Plaintiffs lack standing to assert claims regarding the trusts referenced in the Complaint in which they never invested, and those claims are dismissed with prejudice.  Plaintiffs may pursue claims relating only to the twenty-six trusts in which they allege current or former holdings.

B.  "Fully Wrapped" Delaware Trust

Plaintiffs hold notes issued by a single Delaware trust. (Compl. Ex. B.)  BNYM challenges Plaintiffs' standing to sue regarding this trust because the trust is fully guaranteed—or "wrapped" —by a monoline insurer, and Plaintiffs do not allege that the insurer failed to perform.  (Indenture § 8.03.)

Monoline insurers provide "a guarantee to protect against credit risk, i.e. the risk of default."  In re Ambac Fin. Grp., Inc. Sec. Litig., 693 F. Supp. 2d 241, 248 (S.D.N.Y. 2010). For "fully wrapped" trusts, then, "the risk of a litigation outcome that impairs the loans in a securitization rests solely with the insurer, not with the security holders."  David Reiss, Subprime

-6-

Standardization, 33 Fla. St. U. L. Rev. 985, 1030 n.288 (2006).  BNYM contends that this economic reality undermines Plaintiffs' standing because where a "plaintiff suffered no injury, it does not have standing to pursue its TIA claim." Bluebird Partners, L.P. v. First Fid. Bank, 896 F. Supp. 152, 157 (S.D.N.Y. 1995).  As the monoline guarantee is evident on the face of the Indenture, and the Indenture is integral to the Complaint, BNYM argues that this Court may consider the guarantee on a motion to dismiss.  See United Magazine Co. v. Murdoch Magazines Distrib., Inc., 146 F. Supp. 2d 385, 408 (S.D.N.Y. 2001) ("Although this is a motion under Rule 12(b)(6), the Court may consider the Purchase Agreement because several of plaintiffs['] claims, including this one, are founded upon that contract.").

Ultimately, the presence of the monoline guarantee may preclude Plaintiffs from proving any damages resulting from their ownership of notes issued by the Delaware trust. Nevertheless, Plaintiffs contend that BNYM's alleged conduct caused the value of their notes to drop, and they claim to have sold notes issued by the Delaware trust at a significant loss. (Compl. ¶ 64; Compl. Ex. B.)  As such, Plaintiffs have alleged damages beyond those covered by the guarantee.  And whether the monoline insurer performed its obligations is a question of fact better resolved on a more fully developed record.  See Fair Hous. In Huntington Comm. Inc. v. Town of Huntington, N.Y., 316 F.3d 357, 361 (2d Cir. 2003) ("To the degree that defendants challenge the factual underpinnings of the allegations made by plaintiffs in support of their standing to bring suit, the argument is premature.").  Thus, Plaintiffs' damages allegations are sufficient to confer standing, and BNYM's motion to dismiss is denied in this respect.

III.    Trust Indenture Act Claims

    A.    Applicability of the Trust Indenture Act

       The parties agree that the TIA applies to the mortgage-backed notes issued by the Delaware trust, but they dispute whether the TIA applies to the certificates issued by the twenty-five New York trusts.  The TIA covers only debt securities, and does not apply to equity securities.  See 15 U.S.C. § 77ddd ("The provisions of this title shall not apply to . . . any security other than . . . a note, bond, debenture, or evidence or indebtedness[.]").  BNYM argues that certificates issued by the New York trusts are equity securities, not debt.

       While it cites no case law for the proposition that some mortgage-backed securities are exempt from the TIA, BNYM marshals several treatises in support of its position.  BNYM also argues that the structure of the New York certificates closely resembles equity.  For example, the Delaware Indenture provides that "[a]ll Notes . . . shall be valid obligations of the Issuer, evidencing the same debt[.]"  (Indenture § 2.03(d).)  In contrast, the PSAs governing the New York trusts clarify that certificates "represent[] a beneficial ownership interest in the Trust Fund created by the Agreement."  (PSA, Ex. E.)  Similarly, whereas the Delaware Indenture defines the issuer's failure to pay interest or principal to noteholders as an "event of default," the New York PSAs do not.  (Compare Indenture §§ 5.01(i)-(ii), with PSA §§ 7.01(i)-(ii).)  BNYM asserts that these differences are dispositive because, by definition, a certificate that evidences ownership must be equity, not debt.  See Black's Law Dictionary 541 (6th ed. 1990) (defining "equity security" as "[a] security that represents an equity ownership interest in a corporation, rather than debt").  BNYM also contends that the PSAs' lack of language regarding payment default or acceleration proves that the New York certificates are equity.  Cf. Gilbert v. Comm'r,

-8-

248 F.2d 399, 402 (2d Cir. 1957) ("The classic debt is an unqualified obligation to pay a sum certain at a reasonably close maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack thereof.").

Finally, BNYM relies on interpretative guidance published on the Securities and Exchange Commission's website. According to the SEC website, "[c]ertificates representing a beneficial ownership interest in a trust . . . . are treated as exempt from the Trust Indenture Act under Section 304(a)(2) thereof." Trust Indenture Act of 1939, Questions and Answers of General Applicability, http://www.sec.gov/divisions/corpfin/guidance/tiainterp.htm (last visited Apr. 3, 2012). BNYM contends that this Court should give "some deference" to the SEC's determination. United States v. Mead Corp., 533 U.S. 218, 234 (2001) ("[A]n agency's interpretation may merit some deference whatever its form[.]").

Yet, despite BNYM's arguments, many courts suggest that certificates similar to those issued by the New York trusts are debt, not equity. To begin with, "as many courts have observed, pass-through certificates are structurally similar in form and function to bonds issued under an indenture." Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc., ---F. Supp. 2d----, 2011 WL 6034310, at *7 (S.D.N.Y. 2011). The Second Circuit has explained that "[i]t is these stakes—the 'bonds' or 'certificates'—that are ordinarily referred to as commercial mortgage-backed securities." LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 200 (2d Cir. 2005); see also CWCapital Asset Mgmt., LLC v. Chi. Props., LLC, 610 F.3d 497, 499 (7th Cir. 2010) (Posner, J.) (describing mortgage-backed securities governed by PSAs as "giant bond[s]"). Indeed, the Second Circuit has characterized PSAs governing securitization trusts as "similar to bond indentures in many respects." Greenwich Fin. Servs.

-9-

Distressed Mortg. Fund 3 LLC v. Countrywide Fin. Corp., 603 F.3d 23, 29 (2d Cir. 2010).

Unsurprisingly, several courts in this district have equated mortgage-backed securities governed

by PSAs with debt securities. See Ellington, 2011 WL 6034310, at *7 (holding that a New York

statute applying to "bonds" covers pass-through certificates governed by a PSA); see also Trust

for Certificate Holders of Merrill Lynch Mortg. Passthrough Certificates Series 1999-C1 v. Love

Funding Corp., No. 04 Civ. 9890 (SAS), 2005 WL 2582177, at *1 (S.D.N.Y. Oct. 11, 2005)

("These certificates are essentially bonds secured by a pool of commercial mortgages that the

Trust has purchased from lenders.").

      These decisions reflect the fact that "[t]he shareholder is an adventurer in the

corporate business; he takes the risk, and profits from success. The creditor, in compensation for

not sharing the profits, is to be paid independently of the risk of success, and gets a right to dip

into the capital when the payment date arrives." Comm'r v. O.P.P. Holding Corp., 76 F.2d 11,

12 (2d Cir. 1935). It is well established that, in evaluating whether a security is debt or equity

for tax purposes, "the test cannot be merely the name given to the security." Jewel Tea Co. v.

United States, 90 F.2d 451, 452-32 (2d Cir. 1937) (L. Hand, J.). Rather, under the tax laws,

courts delineate "the vital difference between the shareholder and the creditor," O.P.P., 76 F.2d

at 12, by evaluating, inter alia, the factors set forth in IRS Notice 94-47, 1994-19 I.R.B. 9 (Apr.

18, 1994):

> (a) whether there is an unconditional promise on the part of the issuer to
> pay a sum certain on demand or at a fixed maturity date that is in the
> reasonably foreseeable future; (b) whether holders of the instruments
> possess the right to enforce the payment of principal and interest; (c)
> whether the rights of the holders of the instruments are subordinate to
> rights of general creditors; (d) whether the instruments give the holders the
> right to participate in the management of the issuer; (e) whether the issuer
> is thinly capitalized; (f) whether there is identity between holders of the

instruments and stockholders of the issuer; (g) the label placed upon the instruments by the parties; and (h) whether the instruments are intended to be treated as debt or equity for non-tax purposes, including regulatory, rating agency, or financial accounting purposes.

TIFD III-E, Inc. v. United States, 459 F.3d 220, 235 n.13 (2d Cir. 2006).

Consistent with the case law and the IRS factors, the New York certificates resemble debt. Unlike equity securities, the certificates entitle their holders to regular payments of principal and interest on fixed "Distribution Date[s]." (PSA Preliminary Statement, PSA §§ 1.01, 3.08.) While BNYM observes that corporations typically pay dividends to stockholders on a regular basis as well, the payment of dividends is typically "left to the discretion of the board." eBay Domestic Holdings, Inc. v. Newmark, 16 A.3d 1, 12 (Del. Ch. 2010). Here, by contrast, the PSAs grant certificateholders a contractual right to receive distributions. Moreover, the New York certificates have a fixed maturity date, further evidencing their status as debt rather than equity. See TIFD III-E, 459 F.3d at 235 n.13. And the certificateholders have no role in managing the trusts. Thus, the New York certificates are debt securities, not equity.

The statements on the SEC website do not compel a different conclusion. These statements do not warrant controlling deference because "interpretations contained in policy statements, agency manuals, and enforcement guidelines . . . [are] beyond the Chevron pale." Mead, 533 U.S. at 234 (quoting Christensen v. Harris County, 529 U.S. 576, 587 (2000)) (internal quotation marks omitted). Rather, courts afford such informal agency opinions "respect proportional to [their] 'power to persuade[.]'" Mead, 533 U.S. at 235 (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)). More specifically, courts grant Skidmore deference to an agency's interpretation based on "its writer's thoroughness, logic, and expertness, its fit with prior interpretations, and any other sources of weight." Mead, 533 U.S. at 235.

-11-

Here, the conclusory statements on the SEC website are unsupported, contrary to the case law, and unpersuasive.  Therefore, they do not merit <u>Skidmore</u> deference.  <u>See</u> <u>Walker v. Eggleston</u>, No. 04 Civ. 0369 (WHP), 2006 WL 2482619, at *5 (S.D.N.Y. Aug. 29, 2006) (declining to grant <u>Skidmore</u> deference where agency "offered nothing more than its <u>ipse dixit</u>").  According to the website, "[c]ertificates representing a beneficial ownership interest in a trust . . . are treated as exempt from the Trust Indenture Act under Section 304(a)(2) thereof."  Section 304(a)(2) of the TIA exempts "any certificate of interest or participation in two or more securities having substantially different rights and privileges, or a temporary certificate for any such certificate[.]"  15 U.S.C. § 77ddd(a)(2).  Unfortunately, the SEC supplies no analysis supporting its conclusion that § 304(a)(2) covers mortgage-backed securities such as the New York certificates.  And the structure of the New York certificates suggests that this section does not apply.  They do not evidence "participation" in the underlying mortgage loans because the certificateholders' rights are not wholly contingent on the performance of those loans.  If, for example, the mortgage loans generate "Excess Proceeds," the master servicer—and not the certificateholders—receives those funds.  (PSA § 3.14.)  And the master servicer—not the certificateholders—is entitled to all profits generated from investing the funds contained in the Distribution and Certificate Accounts, but must repay any losses.  (PSA § 3.05(e).)  Because the New York certificates are debt securities, the TIA applies.

B.  Trust Indenture Act Section 315(a)

Apart from arguing that the New York certificates are exempt from the TIA,
BNYM contends that various provisions of the TIA are inapplicable.

1.  Breach of the PSAs, Indenture, and SSA

BNYM challenges Plaintiffs' reliance on § 315(a) of the TIA, which provides in
relevant part that an indenture "shall be deemed to provide" that "the indenture trustee shall not
be liable except for the performance of such duties as are specifically set out in such indenture."
15 U.S.C. § 77ooo(a)(1).  Relying on this language, Plaintiffs contend that BNYM violated the
TIA whenever it failed to perform its duties under the PSAs, Indenture, or SSA.  BNYM
responds that § 315(a) merely limits a trustee's duties to those performed in the indenture, and
does not impose any actionable federal duties on trustees.

By its plain language, § 315(a) requires that indentures contain language limiting
a trustee's duties to those set forth in the indenture.  It does not suggest that every violation of an
indenture is a per se violation of the TIA.  In 1990, Congress amended the TIA to make such
limiting language mandatory in all indentures.  See Semi-Tech Litig., LLC v. Bankers Trust Co.,
353 F. Supp. 2d 460, 474 n.69 (S.D.N.Y. 2005), aff'd sub nom., In re Bankers Trust Co., 450
F.3d 121 (2d Cir. 2006) (per curiam).  Thus, "prior to default . . . a trustee's duties are limited to
what is set forth in the indenture and the statute."  Semi-Tech, 353 F. Supp. 2d at 471.  But the
1990 TIA amendments did not change the fact that § 315(a) limits a trustee's responsibilities to
those enumerated in the indenture, rather than imposing additional federal obligations.  See 15
U.S.C. § 77ooo(a)(1).  Accordingly, Plaintiffs' § 315(a) claims based on this theory are
dismissed with prejudice.

-13-

2.  Duty to "Examine the Evidence"

Plaintiffs also contend that BNYM violated § 315(a) of the TIA by failing to examine the evidence provided by the master servicer certifying compliance with the PSAs and SSA.  (Compl. ¶ 86.)  They rely on the final clause of § 315(a), which imposes a pre-default duty on a trustee to "examine the evidence furnished to it pursuant to section 77nnn of this title to determine whether or not such evidence conforms to the requirements of the indenture."  15 U.S.C. § 77ooo(a).

Importantly, § 315(a) does not require a trustee to examine all evidence it might receive.  Rather, the trustee's duty is limited to examining evidence furnished under § 77nnn, which requires "[e]ach person who . . . is or is to be an obligor" to provide certain information to the trustee. 15 U.S.C. § 77nnn(a).  The TIA defines an "obligor," when the term is "used with respect to any indenture security," as "every person (including a guarantor) who is liable thereon, and, if such security is a certificate of interest or participation, such term means also every person (including a guarantor) who is liable upon the security or securities in which such certificate evidence an interest or participation[.]"  15 U.S.C. § 77ccc(12).  Taking these provisions together, § 315(a) requires trustees to examine evidence provided by "obligors," but not evidence supplied by others.

BNYM contends that the "examine the evidence" provision does not apply here because Countrywide and its successor Bank of America are not "obligors," and because its duty to examine evidence extends only to form, not substance.  Plaintiffs offer no rejoinder to this argument.  Accordingly, Plaintiffs are deemed to have abandoned this claim, and it is dismissed with prejudice.  See Lipton v. Cnty. of Orange, N.Y., 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004)

-14-

("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond
to a defendant's arguments that the claim should be dismissed.").

        C.   Trust Indenture Act §§ 315(b)-(c)

        Section 315(b) of the TIA requires trustees to provide security holders with notice
of defaults. See 15 U.S.C. § 77ooo(b). Section 315(c) imposes heightened duties on trustees
following an "event of default." See Semi-Tech, 353 F. Supp. 2d at 478-80 (citing 15 U.S.C. §
77ooo(c)). The term "default" as used in TIA derives its meaning from the indenture. See 15
U.S.C. § 77ooo(c). Plaintiffs allege that BNYM violated these requirements by failing to give
notice of Countrywide's and Bank of America's repeated breaches of their duties as master
servicer, and by failing to act prudently after these alleged defaults.

        BNYM does not dispute that the TIA imposes a duty to provide notice of defaults,
nor does it disagree that "after default (as such term is defined in the indenture) a trustee is held
to a prudent person standard." Semi-Tech, 353 F. Supp. 2d at 471-72 (quoting 15 U.S.C.
§77ooo(c)) (internal punctuation omitted). Rather, BNYM counters that the Indenture governing
the Delaware trust limits "defaults" to breaches by the issuer, and Plaintiffs only allege breaches
by the master servicer. BNYM further argues that the TIA's focus on "indenture[s]" dictates that
the Delaware Indenture, and not the SSA, must provide the controlling definition of "default."

       1.   Events of Default Under the PSAs

        The PSAs governing the New York trusts define an "event of default" to include
"any failure by the Master Servicer to deposit in the Certificate Account or remit to the Trustee
any payment required to be made under the terms of this Agreement[.]" (PSA § 7.01(i).) The
PSAs' definition of "event of default" also encompasses "any failure by the Master Servicer to

observe or perform in any material respect any other of the covenants or agreements on the part of the Master Servicer contained in this Agreement[.]"  (PSA § 7.01(ii).)

As these provisions make clear, a "default" occurs under the PSAs when the master servicer—here, Countrywide—fails to perform certain contractual obligations.  Under the TIA, such master servicer defaults trigger the trustee's duty to give notice, and subject the trustee to the "prudent person" standard.  See 15 U.S.C. §§77ooo(b)-(c).  Plaintiffs allege that Countrywide and Bank of America breached the PSAs by failing "to provide mortgage loan files in their possession, to cure defects in the mortgage loan files and/or to substitute the defective loans with conforming loans." (Compl. ¶ 87.)  As such, Plaintiffs plead "defaults" of the PSAs sufficient to trigger BNYM's duties under §§ 315(b) and (c) of the TIA.  Accordingly, BNYM's motion to dismiss these claims is denied.

## 2.  Events of Default Under the Delaware Indenture

In contrast to the PSAs, the Indenture underlying the Delaware notes defines an "event of default" to include certain failures of the issuer, rather than the master servicer.  The Indenture provides that an "event of default" occurs when the issuer fails to pay interest or principal to the noteholders.  (Indenture §§ 5.01(i)-(ii).)  More broadly, an "event of default" occurs under the Indenture if there is a "default in the performance of any obligation of the Issuer under this Indenture . . . or [if] any representation or warranty of the Issuer made in this Indenture or in any certificate or other writing delivered in connection with this Indenture proves to have been materially incorrect as of the time when it was made[.]"  (Indenture § 5.01(iii).)  Under §§ 3.05(iv) and 3.05(v) of the Indenture, the issuer—i.e., the trust—is obligated to "enforce any rights with respect to any of the Collateral, [i.e., the underlying mortgages]" and is

-16-

required to "preserve and defend title to the Collateral and the rights of the Indenture Trustee, the Credit Enhancer, and the Noteholders in the Collateral against all adverse claims."

Together with the Indenture, the Delaware trust entered into an SSA—a contract with Countrywide—whereby Countrywide, as master servicer, agreed to "service and administer the Mortgage Loans[.]"  (SSA § 3.01(a).)  As in the PSAs, Countrywide also assumed the responsibility of curing or repurchasing defective loans.  (SSA § 3.06.)  Plaintiffs allege that Countrywide and Bank of America failed to furnish mortgage loan files to the trustee, failed to cure any defects in those mortgage loan files, and failed to replace defective loans with conforming loans. (Compl. ¶ 87.)  While these alleged failures constituted direct breaches of the SSA, they also violated the issuer's duties under the Indenture.  After all, if Countrywide and Bank of America failed to cure or repurchase defective mortgages, the issuer similarly failed to "enforce any rights with respect to any of the Collateral," as the Indenture required it to do.  (Indenture § 3.05(iv).)  Under the Indenture, an "event of default" occurs when there is a "default in the performance of any obligation of the Issuer under this Indenture."  (Indenture § 5.01(iii).)  Thus, Plaintiffs allege "defaults" of the Indenture sufficient to impose heightened duties on BNYM under TIA §§ 315(b) and (c).  BNYM's motion to dismiss these claims is denied.

D.  Trust Indenture Act § 316(b)

BNYM also attacks Plaintiffs' reliance on § 316(b) of the TIA, which provides that "the right of any indenture security to receive payment of the principal . . . and interest . . . shall not be impaired or affected without the consent of such holder."  15 U.S.C. § 77ppp(b).  According to BNYM, § 316(b) only prevents non-consensual impairments to certificateholders' right to demand payment of interest and principal.  See In re Nw. Corp., 313 B.R. 595, 600

-17-

(Bankr. D. Del. 2004) ("[Section 316(b)] applies to the holder's <u>legal</u> rights and not the holder's <u>practical</u> rights to the principal and interest itself.") (emphasis in original).

        Plaintiffs do not respond to BNYM's arguments.  Accordingly, the § 316(b) claim is deemed abandoned, and it is dismissed with prejudice.  <u>See</u> <u>Lipton</u>, 315 F. Supp. 2d at 446.

IV.    <u>Supplemental Jurisdiction</u>

        This Court may exercise supplemental jurisdiction over Plaintiffs' state law claims if they "form part of the same case or controversy" as the remaining TIA claims.  28 U.S.C. § 1367(a).  Exercising supplemental jurisdiction is appropriate where state and federal claims "derive from a common nucleus of operative fact."  <u>Shahriar v. Smith & Wollensky Restaurant Grp., Inc.</u>, 659 F.3d 234, 245 (2d Cir. 2011) (quoting <u>Briarpatch Ltd. v. Phoenix Pictures, Inc.</u>, 373 F.3d 296, 208 (2d Cir. 2004)) (internal quotation marks omitted).  Here, Plaintiffs' state law claims are based on the same alleged failures of BNYM and Countrywide underlying the remaining TIA claims.  As such, this Court retains supplemental jurisdiction over the state law claims.

CONCLUSION

For the foregoing reasons, BNYM's motion to dismiss the Complaint is granted in part and denied in part. Because Plaintiffs lack standing to pursue claims regarding trusts in which they never invested, all such claims are dismissed with prejudice. Further, BNYM's motion to dismiss Plaintiffs' claims under TIA §§ 315(a) and 316(b) is granted, and those claims are also dismissed with prejudice. BNYM's motion to dismiss Plaintiffs' claims under TIA §§ 315(b) and 315(c) is denied. This Court exercises supplemental jurisdiction over Plaintiffs' state law claims.

The Clerk of the Court is directed to terminate the motion pending at ECF No. 18.

Dated: April 3, 2012
        New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.

*Counsel of Record:*

Max R. Schwartz, Esq.
Beth A. Kaswan, Esq.
Joseph P. Guglielmo, Esq.
Scott & Scott, LLC
500 Fifth Avenue, 40th floor
New York, NY 10110
*Counsel for Plaintiffs*

Matthew D. Ingber, Esq.
Mayer Brown LLP
1675 Broadway
New York, NY 10019
*Counsel for Defendant*