UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RETIREMENT BOARD OF THE POLICEMEN'S ANNUITY AND BENEFIT FUND OF THE CITY OF CHICAGO, WESTMORELAND COUNTY EMPLOYEE RETIREMENT SYSTEM, CITY OF GRAND RAPIDS GENERAL RETIREMENT SYSTEM, and CITY OF GRAND RAPIDS POLICE AND FIRE RETIREMENT SYSTEM (on Behalf of Themselves and Similarly Situated Certificate Holders),<br><br>          Plaintiffs,<br><br>      v.<br><br>THE BANK OF NEW YORK MELLON, (as Trustee Under Various Pooling and Servicing Agreements),<br><br>          Defendant. | **Case No. 11-cv-05459-WHP**<br><br>**Honorable William H. Pauley**<br><br>**ECF Case** |

**MEMORANDUM OF LAW IN SUPPORT OF THE BANK OF NEW YORK MELLON'S MOTION TO RECONSIDER OR, IN THE ALTERNATIVE, FOR CERTIFICATION PURSUANT TO 28 U.S.C. 1292(B)**

MAYER BROWN LLP
1675 Broadway
New York, New York 10019
(212) 506-2500

*Attorneys for Defendant*
*The Bank of New York Mellon*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................1

STANDARDS...............................................................................................................2

ARGUMENT ...............................................................................................................3

   I.   The New York Trusts Are Exempt From The TIA............................................................4

      A.  The Court should reconsider the Order........................................................4

         1.   Section 304(a)(1) exempts the New York Trusts from the TIA. ............................4

         2.   Section 304(a)(2) exempts the New York Trusts from the TIA. .........................11

      B.  Alternatively, the Court should certify the Order for interlocutory review................14

         1.   The certification standards are satisfied..............................................14

         2.  The practical need for certainty warrants certification. ...........................17

   II.   Plaintiffs Fail To State A TIA Claim Against The Delaware Indenture...........................20

CONCLUSION.............................................................................................................22

## <u>TABLE OF AUTHORITIES</u>

**Page**

<u>CASES</u>

*Ahrenholz v. Bd. of Trustees of Univ. of Ill.*,
   219 F.3d 674 (7th Cir. 2000) .......................................................................................14

*In re Auction Houses Antitrust Litig.*,
   164 F. Supp. 2d 345 (S.D.N.Y. 2001).......................................................................19

*Barnhart v. Walton*,
   535 U.S. 212 (2002)...................................................................................................16

*Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief & Dev.*,
   291 F.3d 1000 (7th Cir. 2002) ...................................................................................3

*Cmty. Health Ctr. v. Wilson-Coker*,
   311 F.3d 132 (2d Cir. 2002)......................................................................................16

*In re Currency Conversion Fee Antitrust Litig.*,
   2005 WL 1871012 (S.D.N.Y. Aug. 9, 2005)......................................................3, 14, 15

*CWCapital Asset Mgmt., LLC v. Chicago Props., LLC*,
   610 F.3d 497 (7th Cir. 2010) ....................................................................................11

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*,
   2011 WL 6034310 (S.D.N.Y. Dec. 5, 2011) .............................................................10

*Figueiredo Ferraz Consultoria E Engenharia De Projeto Ltda. v. Republic of Peru*,
   2009 WL 5177977 (S.D.N.Y. Dec. 15, 2009) ...........................................2, 3, 16, 20

*Gilbert v. Comm'r*,
   248 F.2d 399 (2d Cir. 1957)......................................................................................6

*Greenwich Fin. Servs. Distressed Mortg. Fund 3 LLC v. Countrywide Fin. Corp.*,
   603 F.3d 23 (2d Cir. 2010)........................................................................................11

*John Kelley Co. v. Comm'r*,
   326 U.S. 521 (1946)...............................................................................................8, 10

*Johnson v. Burken*,
   930 F.2d 1202 (7th Cir. 1991) ..................................................................................15

*Kemp v. Countrywide Home Loans, Inc.*,
   440 B.R. 624 (Bankr. D.N.J. 2010) ..........................................................................21

*Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in
   Amministrazione Straordinaria*,
   921 F.2d 21 (2d Cir. 1990)........................................................................................15

## TABLE OF AUTHORITIES
### (continued)

Page

CASES (CONT'D)

*Estate of Landers v. Leavitt*,
   545 F.3d 98 (2d Cir. 2008)......................................................................16

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*,
   424 F.3d 195 (2d Cir. 2005)....................................................................11

*Lavin v. Data Sys. Analysts, Inc.*,
   443 F. Supp. 104 (E.D. Pa. 1977) ...........................................................12

*In re Microsoft Corp. Antitrust Litig.*,
   274 F. Supp. 2d 741 (D. Md. 2003) .........................................................17

*Nat'l Res. Defense Council, Inc. v. FAA*,
   564 F.3d 549 (2d Cir. 2009).....................................................................16

*In re New Times Secs. Servs., Inc.*,
   371 F.3d 68 (2d Cir. 2004).......................................................................16

*O'Brien v. Nat'l Prop. Analysts Partners*,
   719 F. Supp. 222 (S.D.N.Y. 1989) ..........................................................20

*In re Optimal U.S. Litig.*,
   813 F. Supp. 2d 383 (S.D.N.Y. 2011).......................................................2

*Padilla* ex rel. *Newman v. Rumsfeld*,
   256 F. Supp. 2d 218 (S.D.N.Y. 2003).......................................................3

*Robertson v. Steele's Mills*,
   172 F.2d 817 (4th Cir. 1949) ....................................................................5

*Schallerer v. Comm'r*,
   203 F.2d 100 (7th Cir. 1953) ....................................................................5

*Shipping Corp. of India, Ltd. v. Jaldhi Overseas PTE Ltd.*,
   2008 WL 2596229 (S.D.N.Y. June 27, 2008) ..........................................3

*Southgate Master Fund, L.L.C.* ex rel. *Montgomery Capital Advisors, LLC v.
   United States*,
   659 F.3d 466 (5th Cir. 2011) ....................................................................5

*Stillman v. Townsend*,
   2006 WL 2067035 (S.D.N.Y. July 26, 2006) .........................................20

**TABLE OF AUTHORITIES**

**(continued)**

Page

CASES (CONT'D)

*TIFD III-E v. United States*,
459 F.3d 220 (2d Cir. 2006)..................................................................................6, 8

*Trust for Certificate Holders of Merrill Lynch Mortg. Passthrough Certificates Series
1999-C1 v. Love Funding Corp.*,
2005 WL 2582177 (S.D.N.Y. Oct. 11, 2005) ........................................................11

*Wells Fargo & Co. v. United States*,
641 F.3d 1319 (Fed. Cir. 2011)................................................................................5

*Zakrzewska v. The New School*,
598 F. Supp. 2d 426 (S.D.N.Y. 2009)......................................................................3

STATUTES, RULES, AND REGULATIONS

15 U.S.C. § 77aaa ...........................................................................................................1

15 U.S.C. § 77ddd...........................................................................................................4

Fed. R. Civ. P. 59 ...........................................................................................................2

Fed. R. Civ. P. 60 ...........................................................................................................2

S.D.N.Y. Loc. R. 6.3.......................................................................................................2

OTHER AUTHORITIES

16 Charles A. Wright, et al., *Federal Practice and Procedure* § 3929 (2d ed. 2012)..................14

14 U.S. Secs. Law for Financial Trans. § 4:36 (2d ed.).........................................................11, 12

Edward J. O'Connell & Emily Goodman, 981 PRAC. LAW INST,
*New Developments in Securitization 2004* ...............................................................4

Frank Fabozzi, *Accessing Capital Markets Through Securitization* 238 (2001)............................5

Free Writing Prospectus, J.P. Morgan Chase Commercial Mortgage Securities Trust
2012-C6, SEC Reg. Statement No. 333-165147-02 (April 9, 2012) ......................................19

Harbor Financial, Inc., SEC No-Action Letter, 1988 WL 235128 (Oct. 31, 1988).................4, 10

John Arnholz & Edward E. Gainor, *Offerings of Asset-Backed Securities* § 14.05 (2006)............4

**TABLE OF AUTHORITIES**

**(continued)**

**Page**

OTHER AUTHORITIES (CONT'D)

Michael S. Gambro & Scott Leichtner, *Selected Legal Issues Affecting Securitization*,
1 N.C. Banking Inst. 131 (1997)...........................................................................................5

Mortgage-Backed Securities § 6:67 (2011) ....................................................................................4

PWBA Office of Regulations and Interpretations, letter dated Oct. 23, 1996, *available at*
http://www.dol.gov/ebsa/programs/ori/advisory96/96-23a.htm...................................4, 10, 17

SEC Trust Indenture Act Interpretations, at Question & Answer 202.01 (Mar. 30, 2007),
*available at* http://www.sec.gov/divisions/corpfin/guidance/tiainterp.htm........................4, 10

Talcott Franklin, MORTGAGE & ASSET BACKED SECURITIES LITIGATION HANDBOOK
§ 1:44 (2011 update) ....................................................................................................4

Tamar Frankel, SECURITIZATION § 12.26 (2d ed. 2005) ...............................................................4

**INTRODUCTION**

The Bank of New York Mellon ("BNYM") respectfully requests the Court to reconsider portions of its Order of April 3, 2012 (the "Order"), or—in the alternative—that the Court certify the Order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). Two issues warrant further consideration. The first is the Court's determination that trusts governed by Pooling and Servicing Agreements ("PSAs") are subject to the Trust Indenture Act ("TIA"), 15 U.S.C. §§ 77aaa *et seq.*; as the Court recognized, that determination is inconsistent with SEC guidance and the view of every commentator that has addressed the issue. The second issue concerns the Court's holding that plaintiffs have adequately alleged an "Event of Default" under the single Delaware Indenture at issue here. The Court relied for both of these holdings on considerations that were not addressed in the parties' briefs; we respectfully submit that, on closer consideration and full briefing, the Court should conclude that its initial ruling on each point was incorrect.

Moreover, the Court's holding that the TIA applies to PSAs governing the New York common law trusts is one of enormous practical importance that already is causing significant confusion and uncertainty in the securities markets. Under the rule announced by the Court, not only the PSA-governed trusts at issue in this case, but also thousands of other mortgage-backed securities trusts that have issued securities worth hundreds of billions or (more likely) trillions of dollars are subject to the TIA. Yet in reliance on the SEC's contrary view and what has been the universal industry practice, to the best of our knowledge, *none* of these PSA-governed trusts has registered under the TIA or been structured in a manner that would make it possible to comply with the TIA's numerous requirements. As shown below, these requirements go far beyond those addressing the trustee's standard of care (which, in this case, is no different from the contractual standard in any event) and extend to at least one party (the "obligor") that does not even exist in a PSA-governed trust. The Court's holding would change the Trustee's and the

Certificateholders' rights and remedies in ways that are irreconcilable with the governing contracts.

In light of this, the Court's holding is causing substantial disruption in the market, leaving trustees and other participants unsure of their obligations and potential liabilities. Recognizing the startling implications of the Order, at least one issuer already has expressly declined to apply the Court's analysis to a newly created trust. If the Court does not reconsider its holding, the importance of the issue—both for this litigation and more broadly—warrants certification of an interlocutory appeal so that the Second Circuit may provide a prompt and definitive resolution of the question.

## STANDARDS

Pursuant to Fed. R. Civ. P. 59, Fed. R. Civ. P. 60, and S.D.N.Y. Loc. R. 6.3, this Court may reconsider its order of April 3, 2012. The Court has discretion to alter or amend an order, particularly where there are "controlling decisions or data that the court overlooked . . . that might reasonably be expected to alter the conclusion reached by the court." *In re Optimal U.S. Litig.*, 813 F. Supp. 2d 383, 387 (S.D.N.Y. 2011) (quotation omitted). Rehearing "may also be granted to correct a clear error or prevent manifest injustice." *Id.* (quotation omitted).

Under 28 U.S.C. § 1292(b), when an "order involves [1] a controlling question of law as to which [2] there is substantial ground for difference of opinion" and "[3] an immediate appeal from the order may materially advance the ultimate termination of the litigation," the district court "shall so state," permitting a party to seek review before the court of appeals. In deciding whether to certify an order, a district court should consider whether "exceptional circumstances sufficient to overcome the general aversion to piecemeal litigation" exist, with particular weight given to considerations of judicial efficiency. *Figueiredo Ferraz Consultoria E Engenharia De Projeto Ltda. v. Republic of Peru*, 2009 WL 5177977, at *1 (S.D.N.Y. Dec. 15, 2009) (quotation

marks omitted). When an interlocutory appeal will materially advance the litigation, certification should be granted. *See*, *e.g.*, *id*. at *2; *Zakrzewska v. The New School*, 598 F. Supp. 2d 426 (S.D.N.Y. 2009); *Shipping Corp. of India, Ltd. v. Jaldhi Overseas PTE Ltd.*, 2008 WL 2596229, at *1 (S.D.N.Y. June 27, 2008); *In re Currency Conversion Fee Antitrust Litig.*, 2005 WL 1871012, at *2 (S.D.N.Y. Aug. 9, 2005); *Padilla* ex rel. *Newman v. Rumsfeld*, 256 F. Supp. 2d 218, 224 (S.D.N.Y. 2003).[1]

## ARGUMENT

Although a grant of rehearing is unusual, this case involves circumstances warranting that exceptional relief: The Court's holdings turned on considerations that were not briefed by the parties and that, on the fuller analysis that attends such briefing, dictate a contrary conclusion. And even if the Court disagrees with that view, the case is the paradigm of one in which certification under Section 1292(b) is appropriate. The issue of the TIA's application in the circumstances here surely is debatable (the Court, after all, expressly rejected the view of the expert agency); it is important (both to the efficient resolution of this case and to the broader operation of the securities markets); and it is one where an immediate and definitive resolution is of obvious value (to the parties, the Court, and the public). One way or the other, then, further review is appropriate.

---

[1]    To obtain interlocutory review, BNYM must have filed this motion "within a reasonable amount of time after entry of the order sought to be appealed." *Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief & Dev.*, 291 F.3d 1000, 1007 (7th Cir. 2002). That condition is met here. This motion was filed on April 17, 2012, just 14 days after the filed date of the Order. Courts have found far longer periods of time reasonable under Section 1292(b). *See id*. at 1008 (finding 35-day period from entry of order to filing of motion in the district court to be "reasonable").

## I. The New York Trusts Are Exempt From The TIA.

### A. The Court should reconsider the Order.

1. <u>Section 304(a)(1) exempts the New York Trusts from the TIA.</u>

In the Order, the Court concluded that, "[b]ecause the New York certificates are debt securities, the TIA applies." Op. 12 (citing 15 U.S.C. § 77ddd). We respectfully urge the Court to reconsider this conclusion. As the Court recognized, the SEC disagrees with its view that the TIA is applicable to PSA-governed Certificates, a position it has maintained for more than two decades and that has guided the development of the securitization market. *See* SEC Trust Indenture Act Interpretations, at Question & Answer 202.01 (Mar. 30, 2007), *available at* http://www.sec.gov/divisions/corpfin/guidance/tiainterp.htm; *see also* Harbor Financial, Inc., SEC No-Action Letter, 1988 WL 235128 (Oct. 31, 1988) (in no-action letter, SEC agreed that certificates for an interest in a pool of mortgages are exempt from the TIA under Sections 304(a)(1) and (a)(2)). The Department of Labor has issued the same guidance, classifying mortgage pass-through certificates as equity for purposes of ERISA. *See* PWBA Office of Regulations and Interpretations, letter dated Oct. 23, 1996, *available at* http://www.dol.gov/-ebsa/programs/ori/advisory96/96-23a.htm ("[I]t is the view of the Department that the pass-through certificates representing a beneficial interest in the trust . . . constitute equity interests"). Commentators, too, have uniformly agreed that pass-through certificates are equity and thus exempt from the TIA.[2]

---

[2]     *See*, *e.g.*, Mortgage-Backed Securities § 6:67 (2011) ("Pass-through certificates, because they represent ownership of the underlying mortgages, are regarded as equity rather than debt and are not issued under a qualified indenture."); John Arnholz & Edward E. Gainor, *Offerings of Asset-Backed Securities* § 14.05 & nn.78-79 (2006) ("Section 304(a)(1) excludes equity securities from the TIA. Nearly every offering of securities structured as pass-through certificates is therefore exempt."); Tamar Frankel, Securitization § 12.26 (2d ed. 2005) ("The TIA applies only to some types of asset-backed securities. If an SPV issues equity securities, the TIA does not apply to them because section 304(a)(1) excludes [equity]"); Talcott Franklin, Mortgage & Asset Backed Securities Litigation Handbook § 1:44 (2011 update) (referring to "trust certificates (representing the equity interest of the issuer)"); *id.* § 4:36 ("[W]here a securitization involves debt securities, it may be subject to the Trust Indenture Act of 1939. Equity securities are not covered under the Act."); Edward J. O'Connell & Emily Goodman, 981 Prac.

In reaching the contrary conclusion and rejecting the views of the federal agency that administers the securities laws, including the TIA, this Court relied in substantial part on rules promulgated by a different agency, the IRS, to distinguish between debt and equity in the tax context. The tax code, of course, serves a much different purpose from the securities laws. In this context, the tax laws seek to prevent parties from obtaining more favorable tax treatment through manipulations of legal form. By contrast, the TIA was passed to ensure that debt issuances are accompanied by mechanisms to enforce holders' legal rights. Section 302 of the TIA, on the "Necessity for Regulation," describes the problems created "when the obligor fails to provide a trustee to protect and enforce the rights and to represent the interests of . . . investors." TIA § 302(a)(1). Thus, whereas the tax laws focus on economic substance, often intentionally disregarding the legal form of the transaction, the TIA facilitates the enforcement of the parties' *legal* rights and remedies.[3] It does so by imposing certain mandatory terms that, while helpful to holders of true legal debt, are incompatible with the legal form that the parties to these

---

LAW INST., *New Developments in Securitization 2004*, at 989 (Certificates "represent the ownership in the Trust and are viewed as equity by the [SEC]. Consequently, the Pooling Agreement is not required to comply with the Trust Indenture Act of 1939."); Frank Fabozzi, *Accessing Capital Markets Through Securitization* 238 (2001) ("Such interests are considered 'equity interests' under state law and, therefore, notwithstanding credit ratings of up to AAA/Aaa, are considered not to be 'debt' for purposes such as . . . the [TIA]."); Michael S. Gambro & Scott Leichtner, *Selected Legal Issues Affecting Securitization*, 1 N.C. Banking Inst. 131, 149 (1997) ("The 1939 Act does not apply to securities that are exempt from the registration requirements of the 1933 Act or to equity securities such as asset-backed securities issued in passthrough form.").

[3]     *See, e.g.*, *Southgate Master Fund, L.L.C.* ex rel. *Montgomery Capital Advisors, LLC v. United States*, 659 F.3d 466, 479 (5th Cir. 2011) ("'[T]he tax consequences of a transaction are determined based on the underlying substance of the transaction rather than its legal form.' The substance-over-form doctrine allows a transaction to be recharacterized so that its taxable form corresponds to its economic substance." (quoting *Wells Fargo & Co. v. United States*, 641 F.3d 1319, 1325 (Fed. Cir. 2011)). In some circumstances, the transfer of property to a trust is disregarded entirely for tax purposes, a result that would make little sense when applying securities or trust law. *See, e.g.*, *Schallerer v. Comm'r*, 203 F.2d 100, 103 (7th Cir. 1953) ("The transferring of titular ownership of a part of the taxpayer's business capital to a trustee, instead of directly to the donee, affects the legal form but not the economic substance of the arrangement."); *Robertson v. Steele's Mills*, 172 F.2d 817, 821 (4th Cir. 1949) ("Nor are we impressed, as to the nature of this expenditure for federal tax purposes, by the fact that the North Carolina Supreme Court . . . declared this trust agreement to be valid and the expenditure to be a proper corporate outlay. That holding, in no proper sense, binds us as to the nature of the expenditure under the apposite federal tax statute") (citation omitted).

transactions adopted. We respectfully submit that the Court erred in setting aside the SEC's interpretation of the securities laws and instead importing a standard from the IRS.

Even if the tax standard is applied, however, the Certificates still should be construed as equity. Under the IRS standard, the Court looked to:

> (a) whether there is an unconditional promise on the part of the issuer to pay a sum certain on demand or at a fixed maturity date that is in the reasonably foreseeable future; (b) whether holders of the instruments possess the right to enforce the payment of principal and interest; (c) whether the rights of the holders of the instruments are subordinate to rights of general creditors; (d) whether the instruments give the holders the right to participate in the management of the issuer; (e) whether the issuer is thinly capitalized; (f) whether there is identity between holders of the instruments and stockholders of the issuer; (g) the label placed upon the instruments by the parties; and (h) whether the instruments are intended to be treated as debt or equity for non-tax purposes, including regulatory, rating agency, or financial accounting purposes.

Op. 10-11 (quoting *TIFD III-E v. United States*, 459 F.3d 220, 235 n.15 (2d Cir. 2006), in turn quoting I.R.S. Notice 94-47). We respectfully submit that this issue is especially suitable for reconsideration because the parties did not address the IRS standard for analyzing debt versus equity treatment. On closer examination, the tax standard, even if relevant in the very different TIA context, in fact supports the conclusion that the New York Certificates *are* equity.

**a. Unconditional promise to pay a sum certain.** As to the first and perhaps the most significant factor in the IRS analysis, which looks to "whether there is an unconditional promise on the part of the issuer to pay a sum certain," the PSAs create *no obligation whatsoever* to pay Certificateholders a sum certain, either on demand or at a fixed maturity date. Yet as the IRS standard suggests, payment of a "sum certain" is a hallmark element of debt. *See Gilbert v. Comm'r*, 248 F.2d 399, 402 (2d Cir. 1957) ("The classic debt is an unqualified obligation to pay

a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack thereof.").[4]

To be sure, as this Court noted (Op. 11), the PSAs establish distribution dates for proceeds received by the Trusts. PSA §§ 3.05(a), 3.05(b). But the agreements do not oblige the Trusts to pay Certificateholders a sum certain; instead, they require distribution of whatever proceeds are collected by the Trusts. *Id.* §§ 3.08(a), 4.02 (requiring that Master Servicer attempt to collect amounts due on mortgage loans and then transfer whatever it collects to the Trustee for distribution to Certificateholders). The Court appears to have overlooked these provisions in finding that "the certificateholders' rights are not wholly contingent on the performance of those loans" (Op. 12)—there is no obligation or source of assets standing behind the Certificates other than the loans. Although this critical distinction appears not to have factored into the Court's analysis, it has substantial implications for the question here: The most characteristic element of debt—the obligation to repay a fixed amount of money—is not present in this case.

**b. Rights of enforcement.** Related to the lack of a sum-certain obligation, the Certificateholders have no right to enforce payment of principal and interest through a default mechanism. *See* BNYM Reply Br. 5.[5] This absence is in striking contrast to the rights of holders of true debt instruments, such as the Delaware Notes, which experience an Event of Default if

---

[4]    The Court stated that the "certificates have a fixed maturity date." Op. 11. We respectfully suggest that this is incorrect. The "Maturity Date" on the face of the Certificates is the "Latest Possible Maturity Date," a term that is defined as three years after the scheduled maturity of the last *mortgage loan*. It has nothing to do with when payments are made under the Certificates. The trusts continue until the earlier of the Latest Possible Maturity Date and the date "21 years from the death of the last survivor of the descendants of Joseph P. Kennedy, the late Ambassador of the United States to the Court of St. James's, living on the date hereof" (PSA § 9.01) (to avoid violating the Rule Against Perpetuities). Neither of these dates is "fixed," and, even more importantly, no payment is due on either date.

[5]    An Event of Default is triggered under the PSAs if the Master Servicer collects money from borrowers and then fails to transmit it to the Trustee (PSA § 7.01(i)), but the Master Servicer is required only to act prudently in attempting to collect from borrowers and does not promise any fixed sum. Thus, the Section 7.01(i) Event of Default does not give Certificateholders a right to "enforce payment of principal and interest."

the Issuer fails to pay interest (Indenture § 5.01(i)) or principal (*id.* § 5.01(i)). For this reason as well, the Certificates cannot constitute a form of debt.

**c. Subordination.** The Certificates state that they "represent[] a beneficial ownership interest in the Trust Fund." Neither the plaintiffs nor the Court identified any language giving the Certificateholders a security interest in the Trust Fund or otherwise making them senior to "general creditors." As residual claims, the Certificates cannot be debt.

**d. Participation.** The Certificates, it is true, do not provide the holders any right to management of the Trusts because those duties are assigned elsewhere by the PSAs. *See* Op. 11. But this factor is a minor one; "[t]he failure to exercise management rights is certainly not conclusive." *TIFD III-E*, 459 F.3d at 238. This is because "[a] holder of a bona fide minority equity interest in a partnership or corporation may well have no practical ability to influence management and may even have no vote as a formal matter." *Id.* Here, though the Certificateholders have no role in day-to-day administration, they do have the power to direct the *Trustee* (PSA §§ 7.01(i), 8.02(iv)), rights that exceed those of holders of non-voting common stock, as well as the power to commence derivative litigation if they satisfy the no-action clause in Section 10.08 of the PSAs. This factor, accordingly, is of little relevance here. *See John Kelley Co. v. Comm'r*, 326 U.S. 521, 530 (1946) (no single factor, "not even the exclusion from management," is dispositive).

**e. Capitalization.** This factor also has no bearing here; that an issuer is thinly capitalized may suggest that a security legally structured as a debt instrument in fact operates as equity (at least for tax purposes), but no degree of capitalization could transform ownership interests into an obligation to pay a sum certain or otherwise turn equity into debt. Indeed, if this factor were

relevant, it would point strongly toward the Certificates being equity: if the Certificates were debt, the Trusts would not be just "thinly capitalized," they would be insolvent.

**f. Identity of holders.** Like the capitalization factor, this is a one-way ratchet—it can support the treatment of a debt instrument as equity (for tax purposes), but not the recharacterization of equity as debt. As noted above, each Certificate "represents a beneficial ownership interest." Thus, not only is there "identity between *holders* of the instruments and stock*holders*," there is identity between the *instruments* and the *stock*. To the extent that this factor applies, it shows decisively that the Certificates are equity.

**g. Label.** This consideration suggests that the parties' treatment of the transaction is given some weight. And here, the parties made clear their view that the certificates conveyed equity. The Certificates themselves state that they "represent[] a beneficial ownership interest in the Trust Fund" (PSA, Ex. E), and the PSAs say the same thing (PSA, Preliminary Statement ("Each Certificate . . . will represent ownership of one or more regular interests in the Master REMIC")). Thus, the "Certificates in authorized denominations evidenc[e] directly or indirectly the entire ownership of the Trust Fund." *Id.* § 2.06.

The parties' use of these labels was no accident. Other mortgage-backed securities— including the Delaware Notes, sponsored by the same company (Countrywide) and administered by the same Trustee (BNYM)—are denominated "Notes," and their governing contracts are titled "Indenture," describe the instruments as "debt" (*e.g.*, Indenture § 2.03(d)), and state expressly that they are subject to the Trust Indenture Act (Indenture § 11.07). Given that *none* of these things is true of the New York Certificates, the intent of the parties could hardly be clearer.

**h. Regulatory treatment.** Finally, for regulatory purposes, PSA certificates have *always* been treated as equity, and thus exempt from the TIA. The SEC has consistently maintained this

view. *See* SEC Trust Indenture Act Interpretations, Question & Answer 202.01 (Mar. 30, 2007), *available at* http://www.sec.gov/divisions/corpfin/guidance/tiainterp.htm; Harbor Financial, Inc., SEC No-Action Letter, 1988 WL 235128 (Oct. 31, 1988). The Labor Department has adopted the same approach for purposes of ERISA. *See* PWBA Office of Regulations and Interpretations, letter dated Oct. 23, 1996, *available at* http://www.dol.gov/ebsa/programs/ori/advisory96/96-23a.htm.

\*       \*       \*

In combination, these factors compel the conclusion that the Certificates in the New York trusts governed by PSAs are equity interests. *See John Kelley Co.*, 326 U.S. at 530 (in the tax context, courts must take account of all relevant factors to distinguish debt from equity). All but one of the IRS considerations, and *all* of the most important ones, point in that direction. There is no obligation in the PSAs to pay Certificateholders a sum certain; the Trusts cannot default, as any default under the PSAs exists solely with respect to the Master Servicer; the Certificates transfer an ownership interest in the Trusts; the parties expressly viewed the instruments as equity; and the relevant regulatory bodies always have viewed them as equity. We urge the Court to take account of these factors on reconsideration.

The judicial decisions cited in the Order—none of which arose in the TIA context—do not offer a reasoned basis to reach a contrary conclusion. Op. 9-10. In *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 2011 WL 6034310, at \*7-\*8 (S.D.N.Y. Dec. 5, 2011), Judge Sullivan emphasized that the defendants had "offer[ed] no argument" that the pass-through certificates were equity rather than debt, repeating that observation three times in his opinion. Accordingly, the question critical to this case was not at issue there. The other decisions noted by the Court simply suggest, in passing, that certificates for mortgage trusts may have some

10

resemblance to bonds; that observation doubtless is sometimes true, but none of those cases decided whether certificates *are* bonds for purposes of the TIA. *See Greenwich Fin. Servs. Distressed Mortg. Fund 3 LLC v. Countrywide Fin. Corp.*, 603 F.3d 23, 29 (2d Cir. 2010); *CWCapital Asset Mgmt., LLC v. Chicago Props., LLC*, 610 F.3d 497, 499 (7th Cir. 2010); *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 200 (2d Cir. 2005) (referring to "'bonds' *or* 'certificates'") (emphasis added); *Trust for Certificate Holders of Merrill Lynch Mortg. Passthrough Certificates Series 1999-C1 v. Love Funding Corp.*, 2005 WL 2582177, at *1 (S.D.N.Y. Oct. 11, 2005). In particular, not one of these decisions concludes that Certificates should be construed as debt rather than equity.

2.   Section 304(a)(2) exempts the New York Trusts from the TIA.

Reconsideration also is warranted on this issue for a separate reason. As the Court recognized, the SEC has concluded that "'[c]ertificates representing a beneficial ownership interest in a trust . . . are treated as exempt from the Trust Indenture Act under Section 304(a)(2) thereof,'" which exempts "any certificate of interest or participation in two or more securities having substantially different rights and privileges." Op. 12 (quotation marks omitted). Commentators agree. *See*, *e.g.*, 14 U.S. Secs. Law for Financial Trans. § 4:36 (2d ed.) ("The certificates are exempt from the Trust Indenture Act under § 304(a)(2) of that Act."). The Court rejected the SEC's view on the ground that the Certificates "do not evidence 'participation' in the underlying mortgage loans because the certificateholders' rights are not wholly contingent on the performance of those loans." Op. 12. But this issue, too, was not addressed by the parties. And on close examination, we respectfully submit that the SEC's conclusion regarding application of Section 304(a)(2) is correct.

On the face of it, Certificates issued by the New York trusts constitute "certificate[s] of interest or participation in two or more securities having substantially different rights and

11

privileges." The trusts here undoubtedly pool multiple securities that have substantially different rights and privileges. Each of the underlying loans is an obligation of a different borrower, secured by a different piece of real estate, and the principal balances, interest rates, maturities, and other terms and conditions differ as well. The Court did not disagree on that point.

Instead, in rejecting the SEC's guidance, the Court relied on its view that the New York Certificates "do not evidence 'participation' in the underlying mortgage loans because the certificateholders' rights are not wholly contingent on the performance of those loans." Op. 12. The Court supported this analysis by observing that if the mortgage loans generate "Excess Proceeds" the Master Servicer, not the Certificateholders, receives those funds, and that the Master Servicer, not the Certificateholders, is entitled to profits "from investing the funds contained in the Distribution and Certificate Accounts." *Id.* We respectfully suggest that this conclusion was mistaken, for two separate reasons.

*First*, under the plain statutory language, an instrument may be a certificate of "interest and participation" if it entitles the holder to profits, even if others *also* may share in those profits. *Cf. Lavin v. Data Sys. Analysts, Inc.*, 443 F. Supp. 104, 109 (E.D. Pa. 1977) (describing certificates of participation as "instruments that give the holder at least *some* rights to future profits" (emphasis added)). The defining feature of a certificate of interest or participation would seem to be that the holder recovers based on a share proportionate to profits generated. And that is precisely what occurs here. PSA §§ 3.08(a), 4.02. On the face of it, then, the Certificateholders inarguably have an "interest," and "participate," in the performance of the securities.

*Second*, even if a right of non-Certificateholders to share in the Trust profits has some bearing here, the Order was incorrect as a matter of fact in finding such a right under the PSAs. The Court pointed to two circumstances in which the Master Servicer may receive a share of

what the Court viewed as "profits." But these provisions in no way undermine the conclusion that Certificateholders ultimately obtain all profits generated by the underlying mortgages.

Thus, citing PSA § 3.05(e), the Court noted that the Master Servicer could invest certain funds generated by the Trust and may keep any gains. But this provision simply addresses the reality that funds are collected by the Master Servicer continuously—whenever an individual homeowner makes a payment on his or her loan. The Trustee, however, distributes proceeds to Certificateholders only on certain distribution dates. In the meantime, the funds sit in the Certificate Account. Section 3.05(e) of the PSA merely provides that profits or losses from that account do not affect the Master Servicer's obligation to transfer to the Trustee exactly the amount collected. Nothing about this possibility alters the equity interest of Certificateholders in the proceeds generated by the Trust assets.

The Court also pointed to the "Excess Proceeds" that may be retained by the Master Servicer under PSA § 3.14. But this incentive for the Master Servicer to maximize collections does not alter the contingent nature of the Certificateholders' interests. As defined by PSA § 1.01, "Excess Proceeds" means monies generated in one very specific manner: when the Master Servicer recovers on a *particular property* an amount exceeding the outstanding mortgage principal and interest. It is highly unusual for this to occur, because a foreclosure sale returns any excess monies to the borrower. In the rare case when a Trust acquires title to a property that ultimately generates funds exceeding the outstanding loan balance and accrued interest, the Master Servicer may retain those revenues; that provision does not entitle the Master Servicer to any amount collected, on a Trust-wide basis, beyond the "Principal" balance on the Certificates. And even if that were the case, a company's decision to distribute some (or even all)

13

of its profits above a certain level to employees or contractors would not affect the status of trust certificates as ones of "interest or participation."

These provisions of the PSAs accordingly do not undermine the SEC's conclusion that, under Section 304(a)(2), trusts such as those at issue here are exempt from the TIA.

**B. Alternatively, the Court should certify the Order for interlocutory review.**

1. The certification standards are satisfied.

If the Court does not reconsider the Order, we respectfully urge it to certify the decision for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) so that the Second Circuit can resolve the question whether mortgage trust certificates are subject to the TIA. The Order surely meets the criteria for interlocutory certification: it raises a debatable issue of pure law that directly controls the outcome of the case, and there is no doubt that "an intermediate appeal may avoid protracted and expensive litigation." *In re Currency Conversion Fee Antitrust Litig.*, 2005 WL 1871012, at *3 (quotation marks omitted); *see also* 16 Charles A. Wright, et al., *Federal Practice and Procedure* § 3929 (2d ed. 2012) (interlocutory review is "especially suitable" for use in "exceptionally complex" cases where immediate appellate review might avoid "protracted and expensive litigation"). Because it is the "*duty of the district court* . . . to allow an immediate appeal to be taken when the statutory criteria are met" (*Ahrenholz v. Bd. of Trustees of Univ. of Ill.*, 219 F.3d 674, 677 (7th Cir. 2000) (emphasis added)), certification for interlocutory review is warranted.

*First*, whether the TIA applies here is a "pure" and controlling question of law. *Ahrenholz*, 219 F.3d at 677. There is no denying that "a prompt and authoritative disposition of the question is extremely important to the prudent management of the litigation." *In re Currency Conversion Free Antitrust Litig.*, 2005 WL 1871012, at *3 (quotation omitted). If the case proceeds on interlocutory appeal and the court of appeals reverses this Court's decision, it will

14

put an end to most, if not all, of this litigation. And "a question is controlling, even though its decision may not lead to reversal on appeal, if interlocutory reversal might save time for the district court, and time and expense for the litigants." *Johnson v. Burken,* 930 F.2d 1202, 1206 (7th Cir. 1991) (quotation marks omitted).

*Second*, for the reasons addressed above, the resolution of this question surely is contestable: There can be little doubt that the issues relating to the TIA's application are "difficult and of first impression." *In re Currency Conversion Fee Antitrust Litig.*, 2005 WL 1871012, at *3 (quoting *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 921 F.2d 21, 25 (2d Cir. 1990)); *see also* Allison Frankel, "*Does Pauley's ruling spell new liability for MBS trustees?*" (REUTERS Apr. 4, 2012) (quoting plaintiff's counsel: "Judge Pauley is the first judge to say the Trust Indenture Act, in existence since 1939, does apply in this type of circumstance to mortgage-backed securities."). As we have explained, no other court has addressed those issues. But they *have* been addressed by both the SEC and authoritative commentators, all of which disagree with the conclusion reached by this Court here. The contestability of the TIA's application is thus apparent.

Moreover, although the Court declined to defer to the SEC's views (Op. 12), that conclusion is itself open to question. To be sure, the SEC rulemaking is not the product of a formal notice and comment proceeding. But the Second Circuit has made clear that "[l]ess formal interpretations may also be entitled to mandatory deference, depending upon to what extent the underlying statute suffers from exposed gaps in its policies, especially if the statute itself is very complex, as well as on the agency's expertise in making such policy decisions, the importance of the agency's decisions to the administration of the statute, and the degree of consideration the agency has given the relevant issues over time." *Cmty. Health Ctr. v. Wilson-*

*Coker*, 311 F.3d 132, 138 (2d Cir. 2002); *see also Barnhart v. Walton*, 535 U.S. 212, 222 (2002). In this case, those factors strongly support deference to the SEC interpretation. The SEC guidance here "is generally applicable and is not an ad hoc position," which supports deference. *Estate of Landers v. Leavitt*, 545 F.3d 98, 110 (2d Cir. 2008). To the extent that there is an "absence of statutory guidance" on the specific question presented in the TIA, that too favors deference. *Nat'l Res. Defense Council, Inc. v. FAA*, 564 F.3d 549, 564 (2d Cir. 2009). The TIA is part of "a large and complex regulatory scheme" as to which the SEC is a "highly expert agency," which also supports looking to the agency's view. *Cmty. Health Ctr.*, 311 F.3d at 138. In fact, Section 304(d) of the TIA permits the SEC to exempt securities on its own. And the SEC has been "consistent in its interpretation." *Estate of Landers*, 545 F.3d at 108. Indeed, recognizing the unique expertise of the SEC, the Second Circuit has afforded *Skidmore* deference to a position adopted by the SEC *for the first time* in an *amicus* brief before that Court. *See In re New Times Secs. Servs., Inc.*, 371 F.3d 68, 82-83 (2d Cir. 2004). The case for *Skidmore* deference is far more compelling here, where the SEC guidance stems from a long-standing interpretation and there is a clear need for consistency in application of the statute.

　　*Third*, there is no question that interlocutory appellate review has the potential to "meaningfully advance the ultimate resolution of this litigation." *Figueiredo Ferraz Consultoria E Engenharia De Projeto Ltda.*, 2009 WL 5177977, at *2. Such a possibility is a principal reason for interlocutory certification. A "district court should consider judicial efficiency when considering an application for interlocutory appeal" (*id.* at *1), and "senseless waste of private and public resources and an unconscionable delay in the final resolution of these proceedings" (*In re Microsoft Corp. Antitrust Litig.*, 274 F. Supp. 2d 741, 743 (D. Md. 2003)) will have occurred if the Court were to deny certification and the Second Circuit subsequently were to

hold, after discovery and a lengthy and expensive trial, that 25 of the 26 trusts here are exempt

from the TIA and not properly part of the case. In these circumstances, the Court's certification

of the Order for immediate appeal is warranted.

      2.   <u>The practical need for certainty warrants certification.</u>

While satisfaction of the statutory criteria itself makes certification appropriate, practical

considerations make the need for immediate appellate review in this case especially acute. Prior

to this Court's decision, the SEC had concluded that trusts like those at issue in this case are not

subject to the TIA. In reliance on that guidance, *no* such trust, so far as we are aware, *ever* has

registered under the TIA or satisfied the statute's other requirements. Those trusts have issued

securities worth many hundreds of billions, and more likely trillions, of dollars. If those trusts are

now believed subject to the TIA by virtue of the analysis in this Court's Order, the consequences

would be profoundly disruptive and, in significant respects, immeasurable. The industry is still

digesting the ramifications of recharacterizing trust certificates as debt, but the potential

consequences include:

- Because it appears that *no* pass-through securitization trust was "qualified" under the TIA (through the filing of a Form T-1 with the SEC), and offering documents were drafted on the understanding that the securities were equity, investors may assert claims for securities law violations against the sponsors of these securitizations. The Trustee would be neither a plaintiff nor a defendant in such suits, but it would seem that both investors and sponsors would benefit from clarity on this issue before the investment of substantial resources in litigation.

- The Department of Labor has ruled that trust certificates are not "debt" for ERISA purposes. *See* PWBA Office of Regulations and Interpretations, letter dated Oct. 23, 1996, *available at* http://www.dol.gov/ebsa/programs/ori/advisory96/96-23a.htm ("it is the view of the Department that the pass-through certificates representing a beneficial interest in the trust . . . constitute equity interests"). If the Court's analysis is correct, and the DOL is wrong, then a wide range of securities will suddenly become eligible for purchase by ERISA benefit plans (without the need to qualify under various exemptions). Until the matter is definitely resolved, this will leave plan administrators in considerable doubt about permissible investments and, to the extent they follow the Court's analysis, may lead plans to purchase securities that turn out to be non-ERISA-eligible if the decision ultimately is set aside.

- The PSAs here, like those governing other certificate structures, expressly provide for the "Principal" balance on Certificates to be written down whenever the Master Servicer determines that the balance on a particular mortgage loan is non-recoverable. *See* PSA § 4.02. Section 316(b) of the TIA, however, expressly prohibits the "impair[ment]" of "the right of any holder of any indenture security to receive payment of the principal and interest on such indenture security." If the TIA applies, it could invalidate the contractual write-off provisions, potentially obligating the Trustee to disregard the contracts, but without providing any further guidance. This same section *may prohibit the modification of loans* by the servicer through the reduction of principal balances.

- Section 314 imposes detailed reporting requirements on the "obligor." This Court's ruling leaves unanswered the question of who the obligor on the Certificates is, and the PSAs expressly state that it is *not* any of the parties to the PSA—not the Trustee, the Master Servicer, the Seller, or the Depositor. PSA, Ex. A, at A2. Relatedly, Section 315(a) states that "the indenture trustee *shall* examine the evidence furnished to it pursuant to section 314 to determine whether or not such evidence confirms to the requirements of the indenture." That requirement applies to reports of the "obligor." *See* Op. 14. Thus, the "obligor" is now required to report, and the Trustee is required to examine those reports, even though no one knows who the obligor is.

- Even if the obligor could be identified, many of the specific reports are unintelligible in this context. For example, Section 314(d)(1) requires "a certificate or opinion of an engineer, appraiser, or other expert as to the fair value . . . of any property . . . to be released from the lien of the indenture." The PSA imposes no "lien," because the Certificateholders own the Trust Fund. But by conceiving of the Certificates as secured debt, this Court's opinion could be read to require an appraisal every time a mortgage loan is modified or written off, which would profoundly change the economics of the Trusts by multiplying administrative expenses (costs that would be borne by investors) and impede loan modifications (if they were not barred completely by Section 316(b)).

- The sole source of payment on the Certificates is the Trust Fund. *See* PSA, Ex. E. Yet if the Trust Fund is treated as the obligor, then no one can be the trustee. Section 310(a)(5) states that "[n]o obligor upon the indenture securities or person directly or indirectly controlling . . . such obligor shall serve as trustee upon such indenture securities." The PSAs require a Trustee to administer each Trust and hold title to all of its assets. But if the Trust is the obligor, any trustee will be a "person . . . controlling . . . such obligor" and will be disqualified.

- Section 303(12) states that "obligors" include not only obligors on the covered securities but also, "if such security [subject to the TIA] is a certificate of interest or participation, . . . every person . . . who is liable upon the security or securities in which such certificate evidences an interest or participation." The assets in which the Certificates "evidence[] a beneficial ownership interest" are the mortgage loans of

millions of homeowners,[6] who could now be held liable under Section 314 of the TIA. *See also* PSA, Art. I (defining "Mortgagor" as "The obligor(s) on a Mortgage Note."). The definition also suggests that under Section 317(a)(1), the Trustee could sue each homeowner "for the whole amount of such principal and interest remaining unpaid" on the Certificates issued by the whole Trust.

As a consequence, the Court's decision has created confusion and paralyzing uncertainty in the mortgage-backed securities market. This concern is not theoretical: in the two weeks since the Court's ruling, a prospectus filed by JP Morgan Chase Commercial Mortgage Securities Corp. ("JPMCC 2012-C6") noted the decision but indicated that it believes the "ruling is contrary to SEC guidance and historical industry practice," and thus concluded that "the Pooling and Servicing Agreement is not required to be qualified under the TIA." *See* Free Writing Prospectus, J.P. Morgan Chase Commercial Mortgage Securities Trust 2012-C6, SEC Reg. Statement No. 333-165147-02, at S-222 to S-223 (April 9, 2012). Other issuers will have to decide whether to be guided by the SEC or by this Court's holding, both in their future actions and in determining whether steps must be taken to conform prior issues to the TIA's requirements. Immediate, authoritative resolution of this uncertainty is essential to the efficient operation of the market—and, absent reconsideration, that resolution can be provided *only* by certification of the question to the Second Circuit.

In these circumstances, the Order concerns an issue "of unusual significance" that has "practical importance going well beyond run-of-the-mill concerns of parties before the Court." *In re Auction Houses Antitrust Litig.*, 164 F. Supp. 2d 345, 348 (S.D.N.Y. 2001). Indeed, given the imperative need for a quick and definitive resolution of the issue whether the TIA applies in

---

[6]   The SEC believes that these mortgage loans are "securities" for these purposes, as evidenced by its ruling that the Certificates are exempt under Section 304(a)(2). *Accord* Section 310(A) (for purposes of certain paragraphs only, "the term[] 'security' . . . shall include only such securities as are generally known as corporate securities, but shall not include any note . . . issued to evidence an obligation to repay moneys lent to a person by one or more banks"). If the SEC were to reverse course and hold that loans are *not* securities, it would have the effect of exempting from these requirements the borrowers on large commercial loans that are securitized individually.

19

these circumstances, even a belief on the Court's part that there is no "substantial ground for differences of opinion" on the question would not be "fatal to certification." *Figueiredo Ferraz Consultoria E Engenharia De Projeto Ltda*., 2009 WL 5177977, at \*2 (quotation marks omitted). For these reasons, we respectfully submit that this case presents the exceptional circumstances that justify immediate appeal and certification under section 1292(b).

## II. Plaintiffs Fail To State A TIA Claim Against The Delaware Indenture.

Separately, reconsideration is warranted because the plaintiffs have failed to state a TIA claim against the Delaware indenture under the SSA. The Court concluded that plaintiffs did state a claim under TIA provisions imposing heightened duties on trustees following an "Event of Default," reasoning that failure by the Master Servicer to perform its contractual obligations resulted in a similar failure by the Issuer, which constituted such an Event of Default. Op. 17 (citing TIA §§ 315(b) and 315(c)). Here too, however, the Court based its decision on considerations not addressed by the parties in their briefs. And on close consideration, we again respectfully suggest that this holding was incorrect, in two respects.

*First*, plaintiffs did not plead this theory. In the complaint, plaintiffs did not assert that the *Issuer* had any relevant duty, much less that the Issuer breached a duty or that such a breach constituted an Event of Default. The Amended Complaint alleges an Event of Default based *solely* on alleged breaches by the Master Servicer. In addition, by alleging (incorrectly) that the PSA attached as Exhibit C was "substantially similar to all other . . . governing agreements for the Covered Trusts" (AC ¶ 2), this pleading plainly did not put the Trustee on notice that it was attempting to allege a default by the Issuer under the *Indenture*. "It is 'axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss.'" *Stillman v. Townsend*, 2006 WL 2067035, at \*3 (S.D.N.Y. July 26, 2006) (quoting *O'Brien v. Nat'l Prop. Analysts Partners*, 719 F. Supp. 222, 229 (S.D.N.Y. 1989)).

*Second*, the Court in any event erred in its interpretation of the Indenture. As the Court correctly noted, under the Delaware Indenture, an "Event of Default" is triggered by a failure of the *Issuer*. Indenture § 5.01. The Court reasoned that because the Issuer has a duty to "enforce any rights with respect to the collateral," it had a duty to sue the Master Servicer for alleged breaches of the Sale and Servicing Agreement, and that the Issuer's failure to do so was a breach of the Indenture by the Issuer. Op. 16-17.

But that is not correct. The Issuer has neither the duty nor even the right to enforce the SSA, which means that its failure to do so cannot be a breach of the Indenture and an Event of Default. In fact, the Issuer expressly granted to the Indenture Trustee *all* rights in the mortgage loan assets. That grant included "all present and future claims, demands, causes of action, and choses in action," specifically including "the interest of the Issuer in the Sale and Servicing Agreement and the Purchase Agreement (including the Issuer's right . . . to cause [mortgage loans] to be repurchased." Indenture, Granting Clause. In nevertheless finding an Event of Default, the Court looked to the Issuer's duties under Sections 3.05(a)(iv) and 3.05(a)(v) of the Indenture. Op. 17. Section 3.05 obligates the Issuer to take steps to protect the collateral by delivering certain specific documents that demonstrate (a) the Issuer's ownership of the collateral and (b) the Indenture Trustee's lien on the collateral.[7] Indenture, § 3.05 (Issuer must "deliver any supplements and amendments to this Indenture and any Financing Statements, continuation Statements, instruments of further assurance, and other instruments"). But nothing in the agreement requires the Issuer to monitor the Master Servicer's performance. Thus, even if the

---

[7]   For the reasons explained at pages 8-9 of our reply brief, allegations that the Depositor failed to transfer physical mortgage files do not implicate the Issuer's title to the loans. As other courts have found, the governing contracts themselves transfer ownership to the Trusts, and the physical files are (sometimes) necessary only to enforce the loans against the borrowers. *See, e.g.*, *Kemp v. Countrywide Home Loans, Inc.*, 440 B.R. 624, 629-30 (Bankr. D.N.J. 2010) ("the debtor's mortgage had been assigned to the Bank of New York," even where the note was improperly endorsed).

Master Servicer had failed to maintain or furnish mortgage loan files to the Indenture Trustee, the Issuer would have had no duty to be aware of, let alone to enforce, that breach of the SSA, and its failure to do so would not be an Event of Default. As a consequence, the TIA provisions that come into play upon an Event of Default have no application here, and we urge the Court to reconsider its decision on that point.

## **CONCLUSION**

For the foregoing reasons, Court should reconsider its Order of April 3, 2012 and grant the motion to dismiss. Alternatively, the Court should certify that Order for interlocutory appeal, by amending that Order pursuant to Section 1292(b).

Dated:   New York, New York
        April 17, 2012

MAYER BROWN LLP

s/Matthew D. Ingber
Matthew D. Ingber
Charles A. Rothfeld
Christopher J. Houpt
Paul W. Hughes
1675 Broadway
New York, New York 10019
(212) 506-2500

*Attorneys for Defendant*
*The Bank of New York Mellon*

22