**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

RETIREMENT BOARD OF THE
POLICEMEN'S ANNUITY AND
BENEFIT FUND OF THE CITY OF
CHICAGO, *et al.* (on Behalf of Themselves
and Similarly Situated Certificate Holders),

                        Plaintiffs,          Civil Action No. 1:11-cv-05459 (WHP)

    - against-

THE BANK OF NEW YORK MELLON
(as Trustee Under Various Pooling and
Servicing Agreements),

                       Defendant.

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO BANK OF NEW
YORK MELLON'S MOTION TO RECONSIDER OR, IN THE ALTERNATIVE,
FOR CERTIFICATION PURSUANT TO 28 U.S.C. §1292(B) AND THE SUBMISSIONS
OF AMICI THE AMERICAN BANKERS ASSOCIATION CORPORATE TRUST
COMMITTEE AND THE NEW YORK BANKERS ASSOCIATION, THE CLEARING
HOUSE ASSOCIATION L.L.C., AND THE SECURITIES INDUSTRY
<u>AND FINANCIAL MARKETS ASSOCIATION</u>**

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 2

I.   THE TIA APPLIES TO POOLING AND SERVICING AGREEMENTS AND
     CERTIFICATES ........................................................................................................ 2

     A.  The Authoritative SEC Report That Gave Rise to the TIA Demonstrates That the TIA
         Applies to Certificates ....................................................................................... 2

     B.  The Court Correctly Held That Certificates Are Debt Under the TIA ......................... 5

     C.  The Court Correctly Held That §304(a)(2) Does Not Exempt Pooling and Servicing
         Agreements and Certificates From the Protections of the TIA.................................... 6

     D.  The Court's Citation To Factors Collected By The IRS Was Appropriate ................. 9

II.  INDUSTRY PRACTICE DOES NOT WARRANT EXEMPTING CERTIFICATES
     FROM THE TIA ...................................................................................................... 11

III. INFORMAL SEC ADVICE IS NOT BINDING ON THIS COURT ............................. 12

IV.  THE COURT SHOULD DENY BNYM'S REQUEST FOR INTERLOCUTORY
     REVIEW ................................................................................................................. 18

V.   THE COURT SHOULD NOT RECONSIDER ITS HOLDING THAT PLAINTIFFS
     ALLEGED A CLAIM UNDER THE DELAWARE TRUSTS ....................................... 24

CONCLUSION................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*,
  426 F. Supp. 2d 125 (S.D.N.Y. 2005) ............................................................................... 18, 19

*Bahar v. United States*,
  No. 08 Civ. 4738 (WHP), 2009 WL 2382977 (S.D.N.Y. Aug. 4, 2009) ................................. 2

*Barnhart v. Walton*,
  535 U.S. 212 (2002) ........................................................................................................... 15

*Blackrock Fin. Mgmt. Inc. v. Segregated Account of Ambac Assur. Corp.*,
  673 F.3d 169 (2d Cir. 2012) ............................................................................................... 20

*Bluebird Partners, L.P. v. First Fidelity Bank, N.A. New Jersey*,
  85 F.3d 970 (2d Cir. 1996) ........................................................................................ 2, 6, 11

*Boykin v. Keycorp*,
  521 F.3d 202 (2d Cir. 2008) ............................................................................................... 14

*Capitol Records, Inc. v. MP3Tunes, LLC*,
  No. 07 Civ. 9931 (WHP), 2012 WL 242827 (S.D.N.Y. Jan. 9, 2012) ................................. 20

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*,
  273 F.3d 481 (2d Cir. 2001) ............................................................................................... 14

*Chevron, U.S.A., Inc. v. Natural Resources Def. Council, Inc.*,
  467 U.S. 837 (1984) ............................................................................................ 13, 14, 15, 16

*Christensen v. Harris County*,
  529 U.S. 576 (2000) ........................................................................................................... 14

*Community Health Center v. Wilson-Coker*,
  311 F.3d 132 (2d Cir. 2002) .......................................................................................... 15, 16

*De La Mota v. The U.S. Dept. of Ed.*,
  412 F.3d 71 (2d Cir. 2005) ................................................................................................. 14

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
  545 U.S. 546 (2005) ........................................................................................................... 20

*Gilmore v. Gilmore*,
  No. 09 Civ. 6230 (WHP), 2011 WL 5517832 (S.D.N.Y. Nov. 10, 2011) ........................ 2, 24

*Greenwich Fin. Servs. Distressed Mortg. Fund 3 LLC v. Countrywide Fin. Corp.*,
603 F.3d 23 (2d Cir. 2010)..................................................................5

*In re New Times Securities Services, Inc.*,
371 F.3d 68 (2d Cir. 2004)..................................................................16

*Iridium Operating LLC v. Motorola, Inc.*,
No. 99-45005 CB, 01-02952, M 47 WHP, 2003 WL 21507196, at *1
(S.D.N.Y. Jun. 30, 2003) ....................................................................19

*Klinghoffer v. S.N.C. Achille Lauro*,
921 F.2d 21 (2d Cir. 1990)..................................................................19

*Knit With v. Eisaku Noro & Co., Ltd.*,
No. 08-4775, 2008 WL 5273582 (Dec. 19, 2008) ...............................20

*Lavin v. Data Sys. Analysts, Inc.*,
443 F. Supp. 104 (E.D. Pa. 1977) ....................................................7, 8

*Natural Resources Defense Council v. Abraham*,
355 F.3d 179 (2d Cir. 2004)...............................................................13

*S.E.C. v. Sloan*,
436 U.S. 103 (1978) ...........................................................................15

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944)........................................................................15, 16

*St. Martin Evangelical Lutheran Church v. South Dakota*,
451 U.S. 772 (1981) ...........................................................................15

*Topping v. Trade Bank of New York*,
86 F.2d 116 (2d Cir. 1936)..................................................................11

*U.S. v. Mead Corp.*,
533 U.S. 218 (2001)........................................................................14, 15


**STATUTES, RULES AND REGULATIONS**

17 C.F.R. §4d-7..................................................................................22

17 C.F.R. §260.4a-2, 4d-7....................................................................5

15 U.S.C. §77bbb(a)(2).........................................................................3

15 U.S.C. §77bbb(b) ..........................................................................3, 4

15 U.S.C. §77ddd(a)(1)(B) ..............................................................................6

15 U.S.C. §77ddd(a)(2)....................................................................... *passim*

15 U.S.C. §77ddd(a)(4) ............................................................................17, 18

15 U.S.C. §77ddd(d) ......................................................................................5

15 U.S.C. §77rrr ...........................................................................................11

28 U.S.C. §1292(b) ............................................................................18, 19, 25

28 U.S.C. §§1332(a)(1) and 1367 .................................................................20

134 Cong. Rec. S8561-09 ..........................................................................4, 5

H.R. Rep. No. 1016 (1939) ............................................................................8

## OTHER AUTHORITIES

*Citytrust*,
   1990 WL 305068 (SEC No-Action Letter Dec. 19, 1990) ......................17

*Harbor Fin., Inc.*,
   1988 WL 235128 (SEC No-Action Letter Oct. 31, 1988)........................17

*Marion Bass Sec., Inc.*,
   1984 WL 45531 (SEC No-Action Letter Jul. 9, 1984) ...........................17

R. LaPorta, F. Lopez-de-Silanes, and A. Shleifer, "*What Works In Securities Laws,*"
   THE JOURNAL OF FINANCE (Feb. 2006)..................................................12

# INTRODUCTION

Bank of New York Mellon ("BNYM"), supported by *amici* the American Bankers Association Corporate Trust Committee and the New York Bankers Association ("ABA"), The Clearing House Association L.L.C., and the Securities Industry and Financial Markets Association ("SIFMA"), has asked this Court to reconsider its April 3, 2012 Memorandum and Order ("Order") (ECF No. 37) or, alternatively, to certify the decision for interlocutory appeal. In making this motion, rather than pointing to controlling authority or data that the Court overlooked in issuing its well-reasoned opinion, BNYM simply recycles the same legal arguments that certificates are not debt and that the §304(a)(2) exemption applies. For their part, the *amici*, financial industry interest groups marshaled by BNYM to support its motion, propose policy arguments to overturn this Court's decision. Essentially, the *amici* contend that for years they have relied upon informal advice from the SEC to structure MBS in a manner that avoids accountability on the part of MBS trustees, and that this Court's decision threatens to disrupt this trillion dollar industry. The events of the last several years, however, illustrate that there could not be any clearer need for federal regulation of the MBS industry and MBS trustees.

Indeed, Congress enacted the TIA to protect investors from the very abuses that have occurred with respect to MBS, and the SEC's authoritative report which gave rise to the TIA fully supports this Court's holding that the TIA applies to certificates and pooling and servicing agreements ("PSAs"). The self-serving views of the industry whose reckless conduct brought the economy to its knees cannot override clear and unwavering Congressional intent to protect investors, like MBS holders, who are powerless to protect themselves.

<u>**ARGUMENT**</u>

I.  **THE TIA APPLIES TO POOLING AND SERVICING AGREEMENTS AND CERTIFICATES[1]**

   A.  **The Authoritative SEC Report That Gave Rise to the TIA Demonstrates That the TIA Applies to Certificates**

The language of the TIA and the SEC's Report on the Study and Investigation of the Work, Activities, Personnel and Functions of Protective and Reorganization Committees ("SEC Report") (attached as Exhibit 1 to the Schwartz Declaration), which led to the statute's enactment, clearly demonstrate the TIA's applicability to mortgage-backed securities ("MBS") trusts.  As Plaintiffs have explained (Memorandum in Response to the MTD ("Response Mem."), ECF No. 22 at 11-12), Congress enacted the TIA to provide minimum federal protections to investors in debt securities "because previous abuses by indenture trustees had adversely affected 'the national public interest.'"  *Bluebird Partners, L.P. v. First Fidelity Bank, N.A. New Jersey*, 85 F.3d 970, 974 (2d Cir. 1996) (quoting 15 U.S.C. §77bbb(a)).  Explicitly relying on the SEC Report, the TIA expresses Congress' intent to provide minimum federal standards in situations where the parties to a trust's governing agreement draft terms that deprive investors of a trustee who will protect their interests:

> (a)  Upon the basis of facts disclosed by the reports of the Securities Exchange Commission made to the Congress . . . it is hereby declared that the national public interest and the interest of investors in notes, bonds, debentures, evidences of indebtedness, and certificates of interest or participation therein, which are offered to the public, are adversely affected –

---

[1] "The standard for reconsideration is strict."  *Bahar v. United States*, No. 08 Civ. 4738 (WHP), 2009 WL 2382977, at *1 (S.D.N.Y. Aug. 4, 2009).  As this Court has repeatedly instructed, "[r]econsideration is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources," and not "an invitation to treat the court's initial decision as the opening of a dialogue . . . ."  *Gilmore v. Gilmore*, No. 09 Civ. 6230 (WHP), 2011 WL 5517832, at *1 (S.D.N.Y. Nov. 10, 2011) (internal quotations omitted).  The moving party must "point to controlling decisions or data that the court overlooked" – matters, in other words "that might reasonably be expected to alter the conclusion reached by the court."  *Id.* (internal quotations omitted).

(2)   when the trustee does not have adequate . . . duties and responsibilities, in connection with matters relating to the protection and enforcement of the rights of such investors; when, notwithstanding the obstacles to concerted action by such investors, and the general and reasonable assumption by such investors that the trustee is under an affirmative duty to take action for the protection and enforcement of their rights, trust indentures (A) generally provide that the trustee shall be under no duty to take any such action, even in the event of default, unless it receives notice of default, demand for action, and indemnity, from the holders of substantial percentages of the securities outstanding thereunder, and (B) generally relieve the trustee from liability even for its own negligent action or failure to act; . . .

15 U.S.C. §77bbb(a)(2).  Significantly, the TIA found that these abuses are "injurious to the capital markets, to investors, and to the general public," and so declared "it . . . to be the policy of this subchapter, *in accordance with which policy all the provisions of this subchapter shall be interpreted*, to meet the problems and eliminate the practices, enumerated in this section, connected with such public offerings."  Section 302(b), 15 U.S.C. §77bbb(b) (emphasis added).

The SEC Report, authored in large part by William O. Douglas and Abe Fortas, reads as though it was specifically written with Plaintiffs' MBS PSAs in mind.  Specifically, the SEC Report observed that due to collective action requirements "both in law and in practice, [the] reliance of the security holder upon the trustee for protection of his investment [wa]s complete." (SEC Report at 3).  The SEC concluded, however, that this reliance [was] "unfounded" because trustees "ha[d] taken virtually all of the powers designed to protect the bondholders, but ha[d] rejected any duty to exercise them" even though the trustee "alone [wa]s capable of effective action."  (*Id.* at 5).[2]

Indeed, the SEC Report observed that trustees had "neglected to perform even the negligible duties which the indenture place[d] upon them, *particularly in matters which [would]*

---

[2] This is precisely the position BNYM has taken with respect to the Countrywide MBS trusts at issue here.  *See The Bank of New York Mellon v. Walnut Place LLC*, 11 Civ. 5498 (WHP), September 21, 2011 Hearing Transcript (ECF No. 94) at 11-14.

*result in default of the issuer*," and that "[i]t [wa]s . . . virtually standard practice to provide in indentures that the trustee [could] shut its eyes to the existence of a default unless it [wa]s formally notified of it by holders of a specified percentage of the outstanding bonds," a difficult, if not impossible task.  (*Id.* at 31-32, 38) (emphasis added).  Even then, the SEC noted there was a "further barrier" because "the trustee h[ad] no obligation to take any action which in its opinion [was] likely to involve it in expense or liability unless the security holders furnish[ed] it with indemnity."  (*Id.* at 43).  Such inaction, the SEC observed, threatened security holders with "[i]rreparable loss . . . clearly traceable to the trustee's inaction" including the potential diversion of payments from beneficiaries "to other interested parties."  (*Id.* at 45, 47).

Noting that the foregoing had "resulted in injury to thousands of investors," the SEC concluded that to protect investors "certain minimum standard specifications" needed to be prescribed in securities such as these "[a]s in the case of other contracts involving persons not capable nor in a position to protect themselves."  (*Id.* at 3, 6).  According to the SEC, "a more proper balance between the interests of investors and requirements of issuers [could] be had only by enlarging the definition of the trustee's duties in those cases where its failure to take swift and positive action [left] the investors without effective protection of their interests."  (*Id.* at 6).  Congress codified that balance in the TIA.

Contrary to the arguments of the *amici*, Congressional action since the enactment of the TIA has only reaffirmed and strengthened the investor protections provided by the Act.  When the SEC requested that Congress amend the TIA in the late 1980s in order to "modernize the Act and ensure its future adaptability to market developments," it made clear that its legislative proposal "***continu[ed] to mandate necessary protections for debt holders***."  134 Cong. Rec. S8561-09, 1988 WL 172635, at *14 (Jun. 24, 1988) (emphasis added).  Congress agreed.  In

introducing the Trust Indenture Reform Act, Senator Proxmire explained the SEC's intent as follows: "The Commission's objectives in the proposal are to adjust the requirements of the law to contemporary financing instruments and techniques and to ensure the statute's adaptability to future market developments *while preserving the act's rigorous standards of investor protection*." *Id.* at *1 (emphasis added).[3]  Indeed, the 1990 amendments not only preserved the TIA's original protections, but also stated that the Commission's exemptive authority could be exercised only "if and to the extent that such exemption is necessary or appropriate in the public interest and consistent with the protection of investors and the purposes fairly intended by this subchapter." 15 U.S.C. §77ddd(d).[4]  This language and history supports the Court's Order.

### B.    The Court Correctly Held That Certificates Are Debt Under the TIA

The Court should not reconsider its holding that certificates are debt, because it did not overlook any controlling decisions or data that would alter this conclusion.  To the contrary, the Court's holding is consistent with controlling Second Circuit authority and the statutory text. Indeed, the Second Circuit, in assessing the nature of the same Countrywide MBS trusts styled as PSAs at issue here, described certificates as debt.  *See Greenwich Fin. Servs. Distressed Mortg. Fund 3 LLC v. Countrywide Fin. Corp.*, 603 F.3d 23, 29 (2d Cir. 2010).  As this Court found in the Order, "'pass-through certificates are structurally similar in form and function to bonds issued under an indenture'" and "PSAs governing securitization trusts [are] 'similar to bond indentures in many respects.'"  (Order at 9) (quoting *Ellington Credit Fund, Ltd. v. Select*

---

[3] The SEC's Memorandum in support of the proposed amendments did not suggest that collateralized mortgage obligations ("CMOs") should be excluded from the statute's reach.  1988 WL 172635, at *15 (stating only that the TIA provision calling for the furnishing of certificates or opinions of engineer or appraisers "[might] not be necessary" for CMOs).

[4] As directed by the statute, pursuant to this amended Section 304(d), the SEC has enacted rules and regulations regarding the procedures under which an exemption could be granted, and it has not addressed, let alone exempted MBS or certificates under those rules.  17 C.F.R. §260.4a-2, 4d-7.

*Portfolio Servicing, Inc.*, No. 08 Civ. 2437 (RJH), 2011 WL 6034310, at *7 (S.D.N.Y. Dec. 5, 2011), and *Greenwich Fin. Servs.*, 603 F.3d at 29).  In addition, the TIA states that its provisions are applicable to "certificate[s] of interest or participation in any . . . evidence of indebtedness" unless otherwise exempted.  15 U.S.C. §77ddd(a)(1)(B).  Neither BNYM nor the *amici* have cited any case law or statutory text supporting its assertion that the certificates are not debt.

MBS, whether denominated as certificates or notes, or governed by agreements labeled PSAs or Indentures, have all of the characteristics of the debt securities discussed in the SEC Report, and therefore must receive the minimum protections of the TIA, which was designed specifically for such securities.  (Response Mem. at 13-16).  Moreover, as the TIA's main goal was to enact federal protections for investors who had no role in drafting trusts' governing agreements, the contention that creatively drafted agreements could circumvent the TIA's protections is untenable.  The PSAs, like Indentures, restrict certificate holders' abilities to vindicate their own interests and leave them vulnerable in the face of an inactive or inattentive trustee.  BNYM and the *amici* seek to deny investors the critical protections of the TIA simply by denominating a security a "certificate" as opposed to a "note."  Such an outcome is inconsistent with the statutory text, which mandates that the provisions of the TIA be interpreted in accordance with its declared policy of eliminating the abuses that led to its enactment and are at issue here.  Thus the Court correctly held that "certificates are debt securities."  (Order at 12).[5]

**C.    The Court Correctly Held That §304(a)(2) Does Not Exempt Pooling and Servicing Agreements and Certificates From the Protections of the TIA**

-------------------------------------------------

[5] The ABA's suggestion that the Court should "reserve judgment" on the issue of whether the certificates are subject to the TIA "until a factual record" is developed must be rejected.  For "[t]he interpretation of the indenture provisions mandated by the Act does not depend on ordinary contract principles – the intent of the parties – but depends on an interpretation of the legislation."  *Bluebird Partners, L.P.*, 85 F.3d at 974 (internal quotation omitted).

The Court should not reconsider its holding that §304(a)(2) does not apply to certificates, because, once again, BNYM has not presented any controlling authority or data that the Court overlooked in reaching that determination.  Moreover, a finding that certificates are exempt under §304(a)(2) would be inconsistent with the TIA's mandate that its provisions be interpreted in accordance with its declared policy of eliminating the abuses that led to its enactment.

Section 304(a)(2) exempts from the provisions of the TIA "any certificate of interest or participation in two or more securities having substantially different rights and privileges. . . ." 15 U.S.C. §77ddd(a)(2).  BNYM contends that this exemption applies here because "[e]ach of the underlying loans is an obligation of a different borrower, secured by a different piece of real estate, and the principal balances, interest rates, maturities, and other terms and conditions differ as well."  (Recon. Mem. at 12).  However, as the Court found, certificates "do not evidence 'participation' in the underlying mortgage loans because the [C]ertificateholders' rights are not wholly contingent on the performance of those loans."  (Order at 12).

BNYM disagrees, arguing that, as certificate holders receive payments which derive from the underlying mortgages, they must own a direct share of those individual mortgages.  (Recon. Mem. at 11-12).  But those payments are of set amounts of principal and interest derived from the performance of the collective mortgage pool.  Moreover, whether an investor is called a certificate holder or a note holder each receives the exact same payments.  Accordingly, it would make no sense to interpret §304(a)(2) to exempt MBS "certificates" with the same characteristics as MBS "notes" which are indisputably covered by the TIA.  Indeed, the only case BNYM cites in support of its argument, *Lavin v. Data Sys. Analysts, Inc.*, 443 F. Supp. 104 (E.D. Pa. 1977), involves neither MBS nor the TIA, and completely undermines BNYM's position, since it holds that "[i]n determining what is a security, 'form should be disregarded for substance and the

emphasis should be on economic reality.'"  *Id*. at 108-09 (quoting *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967)).

It is disingenuous for BNYM and the *amici* to suggest that Congress intended to allow the financial industry to easily circumvent the protections of the TIA by labeling a security a "certificate" rather than a "note" when the TIA was a response to just this type of chicanery.  To the contrary, as the legislative history of the TIA makes clear, Congress made certificates of interest subject to the provisions of the TIA to avoid that very ploy, explaining that "[p]ractical considerations . . . demand their inclusion, [otherwise] adoption of the certificate of interest device would provide too easy a method of avoiding the requirements of the [TIA]."  H.R. Rep. No. 1016, at 41 (1939).

Moreover, as the Court found, the PSAs contain multiple provisions demonstrating that certificate holders do not have a direct interest in the underlying mortgages or any "profits" generated therefrom.  (Order at 12, citing PSA §3.05(e) (master servicer's entitlement to all profits generated from investing mortgage proceeds prior to distribution) and §3.14 (master servicer's entitlement to Excess Proceeds)).  BNYM's only response is that these provisions should be disregarded because the former is a practical necessity and the latter is highly unlikely to occur.  Even if true, that would not change the fact that distributions to certificate holders do not vary based upon the performance of differing individual mortgages, but are instead similarly dependent upon the performance of the same mortgage pool, and that, because the trusts are "overcollateralized," even if all mortgages performed perfectly, certificate holders would not receive anything more than their set principal and interest payments.  Indeed, along with those provisions, the certificates themselves state that they "evidenc[e] a percentage interest ***in the distributions allocable to the Certificates of the above-referenced*** Class" (Form of Certificate;

ECF No. 8-3, at 142) (emphasis added), as opposed to an interest in the underlying mortgage loans.  Accordingly, the Court correctly held that the §304(a)(2) exemption is not applicable.

## D.   The Court's Citation To Factors Collected By The IRS Was Appropriate

BNYM also asserts that it was inappropriate for the Court, in determining that certificates are debt, to cite factors that the IRS uses to distinguish debt from equity.  However, BNYM relied on many of the same factors in its Memorandum in Support of the Motion to Dismiss ("Opening Mem."; ECF No. 19 at 7-8).  The IRS simply collected widely accepted factors, and it was thus appropriate for the Court to cite them.

Repeating many arguments the Court already rejected, BNYM claims that those factors indicate that certificates are equity.  BNYM is wrong:

(a)  <u>Promise to Pay a Sum Certain</u> – BNYM claims that certificate holders are entitled only to payments that are uncertain in their amount and timing.  (Recon. Mem. at 6-7).  Certificate holders are in fact entitled to regular payments of principal and interest on fixed distribution dates.  (Response Mem. at 15).  The Court agrees.  (Order at 12).  Further, the Prospectus Supplement states that [t]he certificates represent obligations of the issuing entity. . ." – i.e., the trust. (Attached as Exhibit 2 to the Schwartz Declaration, at 1).

(b)  <u>Right to Enforce Principal and Interest Payments</u> – BNYM insists that certificate holders have no right to enforce their principal and interest payments. (Recon. Mem. at 7-8).  But certificate holders may bring suit against the trustee when it fails to comply with its contractual obligations, as well as against the master servicer when the trustee does not seek a remedy itself, and those obligations include making principal and interest payments.  (Response Mem. at 15-16).  Nor do note holders have any greater rights than certificate holders.  The notes are "non-recourse" (Indenture §3.01, ECF No. 20 at 19), which means that the mortgages underlying a trust are the note holders' only source of payments, just as they are for the certificate holders, and the mortgage payments cannot be accelerated simply because the trust misses payments.

(c)  <u>Subordination</u> – BNYM's contention that the rights of certificate holders are subordinate is circular.  It begins with the proposition that certificates are equity, and reasons that, as a result, they must confer "residual claims" subordinate to "general creditors."  (Recon. Mem. at 8).  It also overlooks that the trusts are passive entities precluded from "borrow[ing] money", and that the trusts actually

offer a class of "residual certificates."   (PSA §10.12(a) and Preliminary Statement, ECF No. 8-3 at 116-17 and 10).

(d) <u>Participation</u> – BNYM concedes that certificate holders do not have any right to participate in the management of the trusts. (Recon. Mem. at 8); (Order at 12). It also half-heartedly notes that certificate holders have the right to direct the trustee and bring suits under certain circumstances, but that is in fact a contractual right that certificate holders possess in the event that the trustee and other managers fail to comply with their duties.

(e)  <u>Capitalization</u> – Contrary to BNYM's argument that the trusts are "thinly" capitalized (Recon. Mem. at 7-8), the trusts are held out as being "overcollateraliz[ed]." (*E.g.*, PSA Preliminary Statement, ECF No. 8-3 at 30-31). Overcollateralization is a form of "credit enhancement" designed to ensure that there are more than sufficient underlying mortgages to make all of the requisite payments to certificate holders and to boost credit ratings.

(f)  <u>Identity of the Holders</u> – Here, BNYM simply repeats its circular argument, reasoning from the proposition that certificates are equity to the supposed conclusion that certificate holders are stock holders.  (Recon. Mem. at 8-9).  As the Court found, certificates are in fact debt, so there is no identity.

(g)  <u>Label</u> – BNYM contends that certain labels used in the PSAs indicate that certificates are debt and that those labels merit some weight.  (Recon. Mem. at 9). But other labels used extensively in the PSAs indicate that the certificates are debt, for example "principal," "interest" and "Ratings Agenc[ies]." (*E.g.*, PSA Preliminary Statement, ECF No. 8-3 at 10-11, 36).  When confronted with these inconvenient labels, BNYM cited Judge Learned Hand for the proposition that labels do not actually matter.  (BNYM's Reply Memorandum in Support of its MTD ("Reply Mem."), ECF No. 26 at 5).  Further, "[t]he interpretation of indenture provisions mandated by the [TIA] does not depend on ordinary contract principles – the intent of the parties – but depends on an interpretation of the legislation." *Bluebird*, 85 F.3d at 974 (internal quotation omitted).

(h)  <u>Treatment of the Certificates</u> – BNYM contends that regulatory agencies treat certificates as equity.  (Recon. Mem. at 9-10).  As discussed below, the guidance and no-action letters BNYM cites only carry weight commensurate with their power to persuade, which they do not even attempt to do.  (Order at 12).  In addition, credit agencies clearly treated certificates as debt.

Given that all of the foregoing factors demonstrate that certificates are debt, BNYM's

argument boils down to the position that financial institutions should be allowed to use word

play to deprive investors of vital federally mandated protections.  BNYM concedes as much

when it criticizes the Court's citation of the IRS factors as inappropriate here, because those factors were designed to prevent "manipulations of legal form" and focus on "economic substance." (Recon. Mem. at 4). As discussed above, financial institutions cannot use labels to deny investors the TIA's protections. *See also* 15 U.S.C. §77rrr (the TIA overrides conflicting provisions of an indenture); *Topping v. Trade Bank of New York*, 86 F.2d 116, 118 (2d Cir. 1936) ("courts never permit a form to shield illegality or statutes to be evaded by sham or pretense").

## II.    INDUSTRY PRACTICE DOES NOT WARRANT EXEMPTING CERTIFICATES FROM THE TIA

Notwithstanding the clear statutory language, explicit Congressional intent, and controlling case law set forth above, BNYM has marshaled the financial industry to tell this Court that it must reverse its order and defer to existing industry practice because the MBS market would collapse if MBS trustees were required to discharge their TIA prudent person duties. Industry practice, however cannot override the plain language of the statute or clear Congressional intent. For in enacting the TIA, Congress "create[d] a uniform scheme of *federal* regulation to protect those who are injured." *Bluebird Partners, L.P.*, 85 F.3d at 974.

Moreover, contrary to the "Sky is Falling" assertions of BNYM and its *amici*, the Court's decision has not "created confusion and paralyzing uncertainty in the mortgage-backed securities market." (*See* Recon. Mem. at 19). The *amici* make similarly unfounded assertions. For example, SIFMA characterizes the Court's decision as an "unanticipated impediment [that] could further delay the recovery of the currently moribund private label RMBS market, thereby continuing to suppress the availability of mortgage credit and helping to prolong the sustained slump in home prices that has severely hindered the recovery of the U.S. economy." (*E.g.* ECF No. 46 at 8). However, it is not this Court's decision that brought the MBS market to a screeching halt, but instead the industry-wide financial abuses and the absence of accountability

that the *amici* seek to perpetuate. Indeed, JPMorgan Chase simply characterized the Order as wrongly decided, in a recent prospectus filed in connection with a recent MBS offering, demonstrating both the industry's collective arrogance and that the Court's Order has not had the market-chilling effect BNYM and the *amici* assert.

Thus, the handwringing by interest groups representing the very industry that brought the economy to its knees with billions of dollars of toxic MBS certificates is both ironic and completely misplaced. *See* Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States, at xvi (January 2011) (citing "[t]rillions of dollars in risky mortgages [that] had become embedded throughout the financial system, as mortgage-related securities were packaged, repackaged, and sold to investors around the world"). Many MBS are already successfully packaged as "notes" and issued pursuant to "trust indentures" qualified with the SEC, and where all the participants to the transactions understand that the Indenture Trust not only conveys powers to Trustees but that Trustees are expected to use them to protect the Trust's beneficiaries on pain of a federal lawsuit brought against them when they fail to do so. To expect Trustees to act prudently to protect investors when other parties to the Trust's governing documents have defaulted is hardly a novel or radical concept. In short, the specter of market paralysis painted by BNYM and its *amici* is baseless. Indeed, a stronger argument can be made for the contrary proposition – *i.e.*, that the Court's Order finding that the protections afforded investors by the TIA apply to certificates will restore investor confidence and reinvigorate the market.[6]

## III.    INFORMAL SEC ADVICE IS NOT BINDING ON THIS COURT

---

[6] *See* R. LaPorta, F. Lopez-de-Silanes, and A. Shleifer, "*What Works In Securities Laws*," THE JOURNAL OF FINANCE (February 2006) (finding "little evidence that public enforcement benefits stock markets, but strong evidence that laws mandating disclosure and facilitating private enforcement through liability rules benefit stock markets").

Nor is the informal SEC advice BNYM and the *amici* claim to have relied upon binding on this Court or entitled to any deference.  The short, conclusory statement from the staff of the Division of Corporation Finance, which was posted on the Division's website, clearly instructs that statements on the website "are not rules, regulations, or statements of the Commission," "do not necessarily contain a discussion of all material considerations necessary to reach the conclusions stated," and thus "are not binding due to their highly informal nature." (http://sec.gov/divisions/corpfin/cfguidance.shtml).  The Division could not have explained with any greater force that the statement merits no deference.  Indeed, although the industry now seeks to characterize it as dispositive, BNYM did not even cite the statement in its pre-motion letter or Opening Memorandum.

The Court's decision not to defer under those circumstances correctly follows a long line of precedent.  As an initial matter, when faced with a question of statutory interpretation, courts must independently determine whether the statute at issue is unambiguous.  *Chevron, U.S.A., Inc. v. Natural Resources Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984) ("[a] court, as well as [an] agency, must give effect to the unambiguously expressed intent of Congress").

If it is unambiguous, and if an agency's "interpretation is inconsistent with the plain language of the [statute]," then the agency's interpretation is "not entitled to *Chevron* deference" or any other form of deference.  *Natural Resources Defense Council v. Abraham*, 355 F.3d 179, 198-99 (2d Cir. 2004).  In interpreting the plain language of a statute, courts apply the traditional cannons of construction, namely "the particular statutory language at issue, as well as the language and design of the statute as a whole, and, where appropriate its legislative history."  *Id*. at 198 (internal quotation omitted).  For the reasons discussed above, the TIA unambiguously

applies to MBS styled as certificates, and the Court must not defer to the Division's statement because it is inconsistent with the TIA's plain language, design, and legislative history.

Even assuming that the TIA is ambiguous, mandatory *Chevron* deference does not apply to informal statements such as the one at issue here. *E.g.*, *U.S. v. Mead Corp.*, 533 U.S. 218, 234 (2001) ("interpretations contained in policy statements, agency manuals, and enforcement guidelines . . . [are] beyond the *Chevron* pale) (internal quotation omitted).[7]  Rather, courts afford informal statements "respect proportional to [their] 'power to persuade[.]'"  *Mead*, 533 U.S. at 235 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

The persuasiveness of such a statement depends on "its writer's thoroughness, logic, and expertness, its fit with prior interpretations, and any other sources of weight."  *Mead*, 533 U.S. at 235.  Under that standard, the Second Circuit has refused to defer to an agency that "offers no explanation of the considerations or reasoning underlying its practice, except perhaps [a] conclusory statement . . . ."  *Boykin v. Keycorp*, 521 F.3d 202, 208-09 (2d Cir. 2008); *De La Mota*, 412 F.3d at 80.  The short statement at issue here cannot persuade, because it does not include a single line of analysis, and is contrary to the TIA's plain language, purpose and legislative history – including the detailed and well-reasoned report issued by the SEC itself that Congress found to be so persuasive in framing the rationale for the statute.

Nevertheless, BNYM insists that the statement merits deference because it is "generally applicable."  (Recon. Mem. at 16).  But courts do not hesitate to deny deference to general statements that are neither thorough nor persuasive.  *E.g.*, *De La Mota*, 412 F.3d at 82 (refusing to grant deference to an interpretive policy in an agency "Handbook").   Similarly,

---

[7] *See also Christensen v. Harris County*, 529 U.S. 576, 587 (2000); *De La Mota v. The U.S. Dept. of Ed.*, 412 F.3d 71, 79 (2d Cir. 2005); *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 273 F.3d 481, 490 (2d Cir. 2001).

notwithstanding BNYM's claim to the contrary (Recon. Mem. at 16), a statement does not become thorough simply on account of the passage of time.  Courts regularly deny deference to statements that are "longstanding" and "consistent" if they are not otherwise persuasive.  *E.g.*, *St. Martin Evangelical Lutheran Church v. South Dakota*, 451 U.S. 772, 784 n.13 (1981); *S.E.C. v. Sloan*, 436 U.S. 103, 118 (1978) (refusing to defer to an interpretation that the SEC had held consistently for over 30 years, because the interpretation, "though of long standing, is . . . inconsistent with the statutory mandate").  Moreover, many of the cases discussed above involved interpretations that enjoyed a much more fulsome agency explanation than the statement at issue here.

Citing *Barnhart v. Walton*, 535 U.S. 212 (2002) and *Community Health Center v. Wilson-Coker*, 311 F.3d 132, 139 (2d Cir. 2002), BNYM argues that informal statements may merit mandatory deference under certain circumstances.  (Recon. Mem. at 16).  In *Barnhart*, unlike here, however, the agency had adopted the same position through both formal rulemaking and informal statements, and the Supreme Court applied *Chevron* deference to that position on account of the agency's formal rules.  533 U.S. at 221-22.

In *Community Health*, the court noted that "less formal interpretations" may be entitled to mandatory deference under certain circumstances, depending on such factors as the extent of "exposed gaps" in a statute's policies, if the statute is "very complex," and the "degree of consideration the agency has given the relevant issues over time."  311 F.3d at 138 (citing *Barnhart*).  It went on to explain, however, that those factors embody a "similar set of concerns" to the concerns considered under *Skidmore* deference.  *Id*. (citing *Mead*).  The court also stated that in situations where those factors arise, "the various possible standards for deference begin to converge."  *Id*.  Thus the court also recited and relied on the *Skidmore* factors discussed above,

and while deferring to the agency's interpretation, did not "decide the exact molecular weight of [that] deference." *Id*. at 137.

Further, the interpretation at issue in *Community Health* involved the Medicaid statute, which the court described as a "vast program[]." *Id*. at 134. More specifically, a federal agency had taken the position that when it does not issue regulations addressing how certain costs associated with Medicare should be treated, the Medicaid statute permits States administering Medicaid to do so. *Id*. at 137. The court concluded that this interpretation was correct, because Medicaid's "background principles" and "overall design" create a "cooperative venture between States and the federal government" and "encourage State flexibility." *Id*. at 138-39. Assuming that the TIA possesses Medicaid's unusual complexity and the extensive gaps that result therefrom, which it does not, *Community Health* does not support *Chevron* or *Skidmore* deference in this case, because, as discussed above, the statement at issue here undermines the TIA's clear language and purpose, without offering any reason for doing so.

The final case BNYM relies on (Recon. Mem. at 16), *In re New Times Securities Services, Inc.*, 371 F.3d 68, 82 (2d Cir. 2004), simply extends *Skidmore* deference to a persuasive agency interpretation. It concluded that the interpretation at issue was persuasive because it furthered the statute's "aims" and followed its "legislative history." *Id*. at 83-86. Notably, the court relied on *Community Health* as a case that also applied *Skidmore* deference. *Id*. at 83.

Accordingly, under any possible deference analysis, the Court correctly held that the informal statement of the staff of the Division of Corporation Finance does not merit deference.

The foregoing analysis also demonstrates that the no-action letters cited by the *amici* do not merit deference. Indeed, each letter expressly states that it "merely expresses the Division's positions regarding enforcement action and does not purport to express any **legal conclusion**

16

with respect to the questions presented." *See Marion Bass Sec., Inc.*, 1984 WL 45531 (SEC No-Action Letter Jul. 9, 1984) (emphasis added); *accord Harbor Fin., Inc.*, 1988 WL 235128 (SEC No-Action Letter Oct. 31, 1988); *Citytrust*, 1990 WL 305068 (SEC No-Action Letter Dec. 19, 1990). Most importantly, it should be noted that each of these letters was issued based on the one-sided advocacy of the applicant without the opportunity for comment by or consideration of the investors or other public advocacy groups. Thus, unlike federal regulations which broadly solicit the input of all interested stakeholders when significant public interests are involved, "no-action" letters are a poor mechanism for making federal policy.

In any event, the no-action letters do not support the sweeping application of the Section 304(a)(2) exemption that BNYM and its *amici* urge this Court to recognize. Thus, one of the letters cited by the *amici* does not even request a no-action determination with respect to the application of the TIA to the certificates in question. *See Citytrust*, 1990 WL 305068 (requesting no-action determination with respect to the application of the Investment Company Act).

Another, *Harbor Fin., Inc.*, 1988 WL 235128, does not cite §304(a)(2) as the basis for the no-action determination. Instead, the Division of Corporate Finance stated that it would "not recommend any enforcement action to the Commission if the Company, in reliance upon [counsel's opinion] that the exemption from registration under the Securities Act of 1933 . . . provided by Section 1145 of the Bankruptcy Act is available, issues . . . Certificates . . . without qualification of an indenture under the Trust Indenture Act of 1939." Section 304(a)(4) specifically exempts securities that need not be registered under the Securities Act from the TIA. 15 U.S.C. §77ddd(a)(4).

In *Marion Bass Sec., Inc.*, 1984 WL 45531, the certificates in question evidenced interests in a proposed pool that consisted primarily of industrial development bonds, some of

which were secured by "real property" and others by "personal property."  *Id.* at *3, *5.  Further, unlike here, the certificates did not receive a credit rating.  *Id.* at *3.  The pool also made no reinvestment of proceeds on the underlying bonds, and "[a]ll payments and collections" from the bonds were paid to certificate holders, except for certain expenses from administering the pool. *Id.* at *2. Thus, there is no indication that the *Marion Bass* certificate holders were offered set payments of principal and interest, or that their rights were not wholly contingent on the bonds.

Finally, in *Bank of Am. Nat'l Trust and Sav. Ass'n*, 1977 WL 14664 (SEC No-Action Letter May 19, 1977), neither the no-action letter nor the SEC Release concludes that the certificates were not debt or that they were exempt from the TIA under §304(a)(2).  To the contrary, counsel for Bank of America urged that the certificates were exempt from the TIA under §304(a)(4)(A) – *i.e.*, on the grounds that the certificates were exempt from registration under the Securities Act of 1933.  *Id.*  The cited SEC Release merely granted Bank of America's application for an exemption from certain obligations under §§13 and 16 of the Securities Exchange Act of 1934.  *See Bank of Am. Nat'l Trust and Sav. Ass'n*, Rel. No. 34-14446, 1978 WL 197742 (Feb. 6, 1978).

## IV.    THE COURT SHOULD DENY BNYM'S REQUEST FOR INTERLOCUTORY REVIEW

Section 1292(b) presents a rare exception to the "basic tenet of federal law" that appellate review wait until a final judgment has been entered.  *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*, 426 F. Supp. 2d 125, 127 (S.D.N.Y. 2005) (quoting *Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 865 (2d Cir. 1996)).  For this reason, "[t]he Court of Appeals repeatedly has emphasized that a district court is to 'exercise great care in making a §1292(b) certification.'"  *Aristocrat*, 426 F. Supp. 2d at 127 (quoting *Westwood Pharm., Inc. v. Nat'l Fuel Gas Distrib. Corp.*, 964 F.2d 85, 89 (2d Cir. 1992)).  In this regard, the Second Circuit has

instructed that "[o]nly 'exceptional circumstances [will] justify'" an interlocutory appeal. *Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 25 (2d Cir. 1990), quoting *Coopers & Lybrand v. Livesay*, 427 U.S. 462, 475 (1978).

Pursuant to §1292(b), a district court may certify an immediate appeal of an interlocutory order if the court is "of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." As this Court has instructed, "[f]ailure to meet any of these requirements warrants denial." *Iridium Operating LLC v. Motorola, Inc.*, No. 99-45005 CB, 01-02952, M 47 WHP, 2003 WL 21507196, at *1 (S.D.N.Y. Jun. 30, 2003). In this case, BNYM has failed to show that any of the requirements exist, let alone all three, and, therefore, its motion to certify the Order for immediate interlocutory review must be denied.

Here, BNYM's contention that substantial grounds for difference of opinion exists rests predominantly on its contention that the Court improperly refused to defer to the highly informal statements from SEC staff members. In fact, however, as explained above, this Court correctly determined that "the conclusory statements on the SEC website are unsupported, contrary to the case law, and unpersuasive." (Order at 12). They accordingly cannot qualify as grounds creating a substantial difference of opinion. "A mere claim that a district court's decision was incorrect does not suffice to establish substantial ground for a difference of opinion." *Aristocrat*, 426 F. Supp. 2d at 129. Likewise, many of the treatises BNYM relies on were written by attorneys who currently or formerly represented trustees and other MBS participants. For example, what BNYM described as a "leading" treatise (Opening Mem. at 7), was actually written by Jason H.P. Kravitt, a partner at Mayer Brown, who is also its lead counsel in the

action for the proposed $8.5 billion settlement (*In the Matter of the Bank of New York Mellon v. Walnut Place LLC*, 1:11-cv-05988, Verified Petition, ECF No. 1-1 at 31). If such statements by participants "who have a horse in the race" could create a substantial ground for difference of opinion (February 10, 2012 Hearing Transcript ("Hearing"), ECF No. 34 at 4), interlocutory appeals would be the rule, not the rare exception.

BNYM asserts that "whether the TIA applies here is a 'pure' controlling question of law" because "[i]f the case proceeds on interlocutory appeal and the court of appeals reverses this Court's decision, it will put an end to most, if not all, of this litigation." (*See* Recon. Mem. at 14-15). In fact, however, reversal of the Order with respect to the TIA's application to the 25 New York trusts will not terminate the litigation *even as to those trusts*. Although such a ruling would leave Plaintiffs without a ***federal*** claim with respect to those trusts, the complaint contains state law claims relating to those trusts that are within the Court's jurisdiction pursuant to 28 U.S.C. §§1332(a)(1) and 1367. Accordingly, BNYM has failed to demonstrate the existence of a controlling question of law.[8] For the same reason, an immediate appeal will not materially advance the ultimate termination of the litigation. In addition, where a controlling question of law is not implicated, the existence of substantial grounds for difference of opinion, even if present, which it is not in this case, is irrelevant. *See Capitol Records, Inc. v. MP3Tunes, LLC*,

---

[8] Although the state law claims asserted by Plaintiffs are not within this Court's jurisdiction under the Class Action Fairness Act, *see Blackrock Fin. Mgmt. Inc. v. Segregated Account of Ambac Assur. Corp.*, 673 F.3d 169, 178 (2d Cir. 2012), diversity jurisdiction exists. The named Plaintiffs and BNYM are citizens of different states and, as reflected in Exhibit B to the amended complaint, at least one of the Plaintiffs satisfies the minimum amount in controversy requirement of $75,000. *See, e.g., Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 579 (2005). Although the amended complaint does not explicitly plead diversity of citizenship as a basis for this Court's jurisdiction, the general obligation of the federal courts to examine their subject matter jurisdiction at all stages of a proceeding "permits a court to find jurisdiction where it is obvious from the face of the Complaint." *Knit With v. Eisaku Noro & Co., Ltd.*, No. 08-4775, 2008 WL 5273582, at *4 (Dec. 19, 2008).

No. 07 Civ. 9931 (WHP), 2012 WL 242827, at *2 (S.D.N.Y. Jan. 9, 2012).  Thus BNYM has failed to satisfy the legal standard for certifying an interlocutory appeal.

BNYM and the *amici* also claim that, as a practical matter, applying the TIA to trusts governed by PSAs would create confusion, which would in turn cause grave problems for the operation of those trusts.  Again, the parade of horribles they conjure up is little more than a smoke screen.  The operation of the trusts to date has been disastrous, and the suggestion that applying the TIA to PSAs would make matters worse defies history and logic.

That suggestion is, in addition, both deeply self-serving and arrogant.  The *amici* include, beyond just trustees, the sponsors, master servicers and other key participants in MBS.  (*E.g.,* April 26, 2012 SIFMA Letter, ECF No. 44 at 1).  These organizations have tremendous exposure, as demonstrated by the proposed $8.5 billion settlement involving Countrywide and Bank of America, a figure that some contend is far too small.  Indeed, the principal justification for the highly discounted sum by the Institutional Investor Group recommending the settlement is that the Trustee had refused to sue Countrywide and BOA for their defaults and refused to buy back defective mortgage loans, and there was no legal or practical mechanism for even a group of purchasers holding $40 billion in certificates to enforce the rights under the PSA.  If the TIA applies to PSAs, it will be more difficult for trustees to continue to thumb their noses at investors, as that failure would expose the trustees to liability under the TIA for the losses that they should have acted to prevent.

Given that trustees have taken almost no actions against those organizations, BNYM's and the *amici's* claim that they are suddenly concerned with the plight of investors and mortgagors has little credibility.  Investors, who can speak for themselves, typically do not complain about statutes that provide them with protections.  Indeed, SIFMA, the only *amicus*

*curiae* that includes investors, states that the views expressed in its brief "***do not necessarily represent those of SIFMA's asset management group [investors], some members of which may hold different or opposing views***."  (SIFMA Mem., ECF No. 46 at 1 n.1) (emphasis in original).

Moreover, if any specific TIA provision actually caused administrative difficulties for trusts governed by PSAs, the trusts can seek exemptions on a provision by provision basis.  17 C.F.R. §4d-7.  It is not surprising, however, that the list of purported problems that might arise if the TIA applies to PSAs does not hold up under examination:

> (a)   Tellingly, the first potential difficulty BNYM lists is that investors might assert securities claims "against the sponsors of [PSA] securitizations" for failing to qualify the securitizations as debt instruments under the TIA through the filing of a Form T-1.  (Recon. Mem. at 17).  But BNYM does not bother to explain how the failure to file an SEC form could result in investor losses, whether such claims matter given that the TIA's provisions are mandatory for applicable debt securities even if not formally qualified, or whether sponsors could avoid such claims merely by filing the Form T-1.  This fear is highly speculative.

> (b)   Next, BNYM worries that ERISA benefit plans will purchase the certificates, or that their investment strategies will be paralyzed by doubt over whether they can do so.  (Recon. Mem. at 17).  If the certificates are so dangerous that ERISA plans should not purchase them, then they certainly require application of the TIA, and it is doubtful that the plans will have difficulty finding other investment options.  In any event, both certificates and notes are marketed to ERISA plans (*See* PSA Preliminary Statement, ECF No. 8-3, at 21; Indenture §2.12(a), ECF No. 20 at 18), and BNYM acknowledges that the plans may purchase certificates under various exemptions.

> (c)   Resorting to italics, BNYM warns that modification of underlying mortgages "*may*" be prohibited, because the TIA "could" preclude writing down the principal balance of MBS certificates.  (Recon. Mem. at 18).  But the "Indentures" and "Sale and Servicing Agreements" ("SSA"), which BNYM agrees are covered by the TIA, permit mortgage modifications.  *E.g.*, SSA §3.01(a), (c), (f).  The same is true for the PSAs.

> (d)   BNYM argues that it is unclear who the "obligor" under the PSAs is, and that this would create confusion under the provision of the TIA calling for certain reports from the obligor.  (Recon. Mem. at 18).  This argument derives from BNYM's claim that certificates are not debt, and therefore that there can be no obligor.  As discussed above, that is incorrect.  Just as the trusts are the obligors under the "Indentures," because they owe payments to the note holders, the trusts

are the obligors under the PSAs, because they owe payments to the certificate holders.  (*See also* Prospectus Supplement, Ex. 2 at 1).

(e)   BNYM argues that application of the TIA to the PSAs would require the underlying mortgagors to file certain reports under §314(a), (b) and (c).  (Recon. Mem. at 18-19).   However, §314(a) expressly permits the SEC to limit those obligors who must file reports, and indicates that mortgagors would be prime subjects for that exception.   Unlike §314(a), which refers to every possible obligor, §§314(b) and (c) refer to "the" obligor, which suggests that they apply only to the issuer of the debt, not the obligor of underlying securities.  Alternately, if §§314(b) and (c) have the same meaning as §314(a), then its exception of certain obligors should apply to them as well.   It is thus quite unlikely that mortgagors would have to file reports.

(f)   BNYM contends that if the PSAs are subject to the TIA, §314(d)(1) could require an appraisal every time an underlying mortgage is released from the trust, which could impede modifications and alter the trusts' economics.  (Recon. Mem. at 18).  But the "Indentures" used for MBS notes have no difficulty on account of that Section.  Indeed, they expressly discount it, and state that the trust need only certify every six months that all releases that took place during that period "were in the ordinary course of the [trusts'] business."  (11.01(b)(i), (b)(v)).

(g)   BNYM argues that the if the trust is the obligor, then it cannot be the trustee, because, pursuant to §310(a)(5), it would have too much control over the trust.  (Recon. Mem. at 18).   However, the "Trustee" has the same amount of control under the PSAs as the "Indenture Trustee" has under the "Indentures."   In each case, among other things, the "Trustee" or "Indenture Trustee" holds the mortgage files (PSA §2.02(d), ECF No. 8-3 at 50; SSA §2.02(d), ECF No. 20, at 164) and holds the account for funds distributable to the trusts (PSA §3.05(d), ECF No. 8-3 at 58; Indenture §8.01(a), ECF No. 20, at 55).  Moreover, BNYM has pointed many other commonalities out in support of its authority to enter into the settlement on behalf of trusts styled as both PSAs and "Indentures."  (*Walnut Place*, 1:11-cv-05988, Verified Petition, ECF No. 1-1 at 17-19).  Also, just as the "Indenture Trustee" receives a "security interest" in the underlying mortgages "for the benefit of the Secured Parties," i.e. the note holders (Indenture Granting Clause, ECF No. 20 at 9), the Trustee receives the underlying mortgages as an "assign[ment]. . . for the benefit of the Certificateholders,"  or, if that language is not credited for any reason, as a "security interest . . . for the benefit of the Certificateholders."  (PSA §2.01(b) and §10.04(a), ECF No. 8-3 at 45 and 113).

(h)   The ABA claims that if the TIA applies to PSAs, a majority of all certificate holders could direct the trustee in the exercise of its powers, and that this might result in certain classes of certificate holders directing actions that advantage themselves at the expense of other classes.  (ABA Mem., ECF No. 48 at 4-5).  Assuming that fear of a provision the TIA implements for the benefit of investors is legitimate, the majority rule is actually an improvement over the PSAs, which

allows 25% of all certificate holders to direct the trustee or exercise the trustee's powers themselves.  (*E.g.*, PSA §10.08, ECF No. 8-3 at 116).

(i)  The Clearing House suggests that in an event of default, certain trustees would be disqualified pursuant to the conflict of interest provision in 15 U.S.C. §77jjj(b)(1), as some PSAs have multiple classes of certificates and, unlike the PSAs at issue here, may not provide for co-trustees.  (ECF No. 43, at 9).  That Section actually provides that the SEC can exempt trustees from such conflicts. 15 U.S.C. §77jjj(b)(1)(ii).

(j)  BNYM also asserts that it could sue the underlying mortgagors for the entire unpaid principal and interest under §317(a)(1).  (Recon. Mem. at 18-19).  Setting aside the many legal obstacles that would undermine such suits, it is hard to imagine how BNYM could sue mortgagors when it, and most other trustees, have refused to bring actions against their MBS business partners, including sponsors and master servicers, who have committed countless violations.

(k)  Finally, BNYM and the *amici* complain that application of the TIA to PSAs would require them to do more for investors.  The ABA would prefer that trustees not have to provide investors with additional information, claiming that it would just confuse investors anyway.  (ABA Mem. at 4).  The *amici* also do not want to allow certificate holders to discover one another's identities (*E.g.*, *id*. at 5), which of course would make it far easier for certificate holders to gather the votes necessary to overcome "no action" clauses and sue sponsors and master servicers. In any event, the TIA merely makes it easier for investors to communicate with each other without requiring the disclosure of investors' identities (15 U.S.C. §77lll(b)(2)), and PSAs contain similar provisions (PSA §5.05, ECF No. 8-3 at 91).  Most revealing of all, SIFMA objects to providing investors with a notice of default pursuant to §315(b).  (SIFMA Mem., at 7).  That provision goes to the heart of the TIA, and would ensure that investors have the information necessary to protect themselves when trustees, despite their obligations, do not do so.

Accordingly, since BNYM and the *amici* have failed to demonstrate any legal basis or practical need for it, the Court should not grant interlocutory review.

## V.    THE COURT SHOULD NOT RECONSIDER ITS HOLDING THAT PLAINTIFFS ALLEGED A CLAIM UNDER THE DELAWARE TRUSTS

BNYM also seeks to "relitigate" the Court's holding that Plaintiffs adequately pled claims under the Indenture.  *Currency Conversion*, 2006 WL 2035478, at *1.  Far from offering anything that might justify that "extraordinary remedy," *Gilmore*, 2011 WL 5517832, at *1, BNYM rehashes yet more arguments the Court already rejected (Reply Mem. at 7-9).

Once again, BNYM claims that the Amended Complaint did not allege violations by the Issuer and therefore did not plead claims under the Indenture.  (Recon Mem. at 20).  This is nonsense.  In any event, if BNYM wished to raise such a technical point, it should have done so in its pre-motion letter, which it did not, rather than remaining silent and denying Plaintiffs the opportunity to amend and cure such a purportedly technical defect.

More specifically, it argues that the Issuer had no obligation to address the defective mortgages and mortgage files in the trust, and that §3.05(iv)-(v) of the Indenture applies only to a security interest created by the Indenture.  (Recon. Mem. at 20-22).  That position ignores the plain language of §3.05(iv)-(v), which requires the Issuer to "enforce any rights with respect to any of the Collateral" and "preserve and defend title to the Collateral. . . ."  (Order at 17). Indeed, a security interest in mortgages that do not make the required payments because of their defects, and that cannot be foreclosed on due to defective files, would have little value. Likewise, it makes no sense that an MBS trust suffering from such unremedied, core defects would not experience an event of default.  While BNYM points to an additional provision of the Indenture that purportedly supports its reading of §3.05(iv)-(v), it ignores several other provisions that undercut its reading.  For example, the Issuer covenants that so long as notes are outstanding it will not engage in any business other than "managing the Collateral" and certain related activities, and will not "***fail to assert rights under[] the Mortgage Loans***."  (Indenture §3.08(f) and §3.08(j), ECF No. 20, at 24 and 25) (emphasis added).  The Court's, and not BNYM's, reading of §3.05(iv)-(v) is therefore correct.

## CONCLUSION

For all the foregoing reasons, BNYM's Motion To Reconsider Or, In The Alternative, For Certification Pursuant To 28 U.S.C. §1292(b) should be denied.

Dated:  May 22, 2012                    SCOTT+SCOTT LLP


                                        /s/ Max R. Schwartz
                                        Beth A. Kaswan (BK 0264)
                                        Deborah Clark-Weintraub (DW-6877)
                                        Max R. Schwartz (MS 2517)
                                        500 Fifth Avenue, 40th Floor
                                        New York, NY 10110
                                        Tel:  (212) 223-6444
                                        Fax:  (212) 223-6334
                                        bkaswan@scott-scott.com
                                        dweintraub@scott-scott.com
                                        mschwartz@scott-scott.com

                                        *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2012, I caused the foregoing Plaintiffs' Memorandum Of Law In Opposition To Bank Of New York Mellon's Motion To Reconsider Or, In The Alternative, For Certification Pursuant To 28 U.S.C. 1292(b) and The Submissions Of *Amici* The American Bankers Association Corporate Trust Committee and The New York Bankers Association, The Clearing House Association L.L.C., and The Securities Industry and Financial Markets Association to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List, and I hereby certify that I caused the foregoing document or paper to be mailed via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May 22, 2012.

/s/ Max R. Schwartz
Max R. Schwartz (MS 2517)
SCOTT+SCOTT LLP
500 Fifth Avenue, 40th Floor
New York, NY 10110

*Counsel for Plaintiffs*

27