**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RETIREMENT BOARD OF THE POLICEMEN'S ANNUITY AND BENEFIT FUND OF THE CITY OF CHICAGO, CITY OF GRAND RAPIDS GENERAL RETIREMENT SYSTEM, and CITY OF GRAND RAPIDS POLICE AND FIRE RETIREMENT SYSTEM (on Behalf of Themselves and Similarly Situated Certificate Holders), | Civil Action No. 1:11-cv-05459 |

Plaintiffs,

- against-

THE BANK OF NEW YORK MELLON
(as Trustee Under Various Pooling and
Servicing Agreements),

Defendant.

**SECOND AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

RECEIVED
2013 JUL -3 P 1:49
U S DISTRICT COURT SDNY

## SUMMARY OF THE ACTION

1.      Plaintiffs Retirement Board of the Policemen's Annuity and Benefit Fund of

the City of Chicago, City of Grand Rapids General Retirement System, and City of Grand

Rapids Police and Fire Retirement System (collectively "Plaintiffs"), bring this class action

against Defendant, The Bank of New York Mellon ("BNY Mellon"), in its capacity as the

Trustee for covered trusts in which Plaintiffs invested and 530 trusts (collectively the "Covered

Trusts") that own residential mortgage loans that were bundled together and sold to investors as

Countrywide mortgage-backed securities (the "Countrywide MBS").

2.      Plaintiffs purchased and currently own, and/or owned and sold, Countrywide

MBS and, along with other similarly situated investors (collectively, the "MBS holders"), are or

were the beneficiaries of the Covered Trusts that held the mortgage loans.  A list of the 530 trusts

is attached to this Complaint as Exhibit A. Verified lists of the covered trusts in which each Plaintiff invested, and holds, or held, MBS, are attached as Exhibit B.

3.      As the Trustee for each of the Covered Trusts, BNY Mellon owed the MBS holders important contractual and common law duties of due care, loyalty and good faith and fair dealing, as well as statutory duties imposed by the federal Trust Indenture Act of 1939 (the "TIA"), 15 U.S.C. §77aaa, *et seq.* These obligations included various duties with respect to the mortgage loans that underlie the Covered Trusts and that provide the collateral for the Countrywide MBS, including but not limited to the duty to ensure that the relevant Countrywide entities (in their roles as loan servicers and as the entities that sold the loans to the Covered Trusts) complied with their obligations with respect to the repurchase of defective loans. As alleged herein, Plaintiffs and the MBS holders have suffered massive damages not only as a result of Countrywide's sale of huge quantities of defective mortgage loans to the Covered Trusts, but also as a result of the Trustee's culpable failure to protect the Trusts' interests in the face of Countrywide's pervasively defective loan underwriting practices and its rampant breaches of related representations and warranties.

4.      The contractual duties of BNY Mellon as Trustee, and of Countrywide in its various capacities, are spelled out in agreements that govern the Covered Trusts ("Governing Agreements") – generally styled as "Pooling and Servicing Agreements" ("PSA") for most of the Covered Trusts, and as "Indentures" and "Sale and Servicing Agreements" ("SSA") for the remaining Trusts. In turn, the Governing Agreements – including various representations and warranties made by Countrywide relating to the mortgage loans included in each Covered Trust – were incorporated by reference into the Countrywide MBS BNY Mellon (as Trustee) signed. All of the Covered Trusts' Governing Agreements are substantially similar. A copy of the PSA

2

for CWALT 2006-0A3 is attached as Exhibit C, and a copy of the Indenture and SSA for CWEHQ 2006-D is attached as Exhibit D.  Exhibits C and D are representative of the Governing Agreements and are incorporated by reference into this Complaint as if set forth fully herein. The MBS holders are third-party beneficiaries of each of the relevant Governing Agreements.

5.     The powers and duties imposed on the Trustee by the Governing Agreements leave a Trustee, such as defendant BNY Mellon, in a markedly superior position than the MBS holders to protect the Covered Trusts from the kinds of harms at issue in this action. Significantly, as a legal and practical matter, MBS holders have only limited abilities to compel Countrywide to live up to its obligations under the Governing Agreements.  MBS holders cannot take action against Countrywide unless they represent at least 25% of the MBS issued by a Covered Trust, and even then they must overcome additional hurdles before doing so. Moreover, MBS holders do not have the same access to information concerning the mortgage loans as the Trustee does.  Thus the purpose of having a trustee in securitizations such as those at issue here is to ensure that there is at least one independent party to the Governing Agreements who, unlike the MBS holders, does not face collective action, informational or other significant limitations on their ability to compel Countrywide to comply with its obligations, and who as a result can effectively protect the Covered Trusts and their beneficiaries, the MBS holders.

6.     The Trustee's role is particularly important where, as here, the various Countrywide entities – who were also parties to the Governing Agreements – failed to perform their responsibilities.  Countrywide played various roles under the Governing Agreements through closely related entities.   More specifically, Countrywide Financial Corporation's ("CFC") various mortgage financing, originating and servicing subsidiaries, including Countrywide Home Loans, Inc. ("CHL") and Countrywide Bank (1) originated a significant

percentage of the Mortgage Loans underlying the Covered Trusts, (2) sold those Mortgage Loans to the Covered Trusts as the Seller or Sponsor, and then (3) acted as the Master Servicer for the Mortgage Loans.  As Seller and Master Servicer, Countrywide repeatedly failed to live up to its responsibilities to the Covered Trusts and the MBS holders, including its responsibilities to ensure that the quality of the Mortgage Loans underlying the Covered Trusts were underwritten in conformity with the representations and warranties set forth in the Governing Agreements.

7.      The Governing Agreements, as modified by the TIA, impose critical duties on BNY Mellon as Trustee that require it to take action to protect the Covered Trusts and their beneficiaries from Countrywide's misconduct and rampant breaches of representations and warranties.  For example, PSA §2.06 requires BNY Mellon "to perform the duties set forth in this Agreement to the end that the interests of the Holders of the Certificates may be adequately and effectively protected."  Further, if Countrywide fails in its duties as Master Servicer for the Covered Trusts and is terminated from that position, BNY Mellon must serve as the replacement Master Servicer.  PSA §3.04.

8.      Significantly, the Governing Agreements also require the Trustee to review the Mortgage Files for each of the Mortgage Loans at the time that the securitization transaction closed, to identify which Mortgage Loans had incomplete or inaccurate Mortgage Files – *i.e.*, which Mortgage Loans had documentation "exceptions" – to notify Countrywide in its role as Master Servicer and Seller of those Mortgage Loans, and to certify that the remaining Mortgage Loans had all of the documentation required by the Governing Agreements.  PSA §§2.01 and 2.02.  The Governing Agreements further require the Trustee to ensure that the Seller cure any documentation exceptions in accordance with the deadlines set forth therein (generally 90 days), or if that did not occur, to act to ensure that the Seller either repurchase any Mortgage Loans that

contained documentation exceptions, or provide substituted Mortgage Loans that were free from any exceptions. *Id.*

9.     Although BNY Mellon made lengthy exception lists and provided them to Countrywide as the Seller and Master Servicer, the documentation deficiencies in the Covered Trusts were not cured – and the Mortgage Loans were neither substituted nor repurchased. Instead, BNY Mellon repeatedly issued exception updates notifying Countrywide of the documentation deficiencies that continued to be uncured.  Documents produced by BNY Mellon show that defects involving hundreds of thousands of missing, incomplete and inaccurate documents in the Mortgage Files – including missing, incomplete, inaccurate or unexecuted mortgage notes, mortgages, assignments and title policies – remained uncured for years following the closing of the securitization transactions, all in violation of the Governing Agreements.  At no time did BNY Mellon require that the Seller repurchase the defective Mortgage Loans BNY Mellon had identified.

10.    The pervasiveness of the documentation deficiencies in the Trusts' Mortgage Files have been so severe that it has led to investigations, lawsuits and enforcement actions by multiple states' attorneys general and Countrywide's and BofA's regulators; a moratorium against the foreclosure of loans in the Covered Trusts; and settlements involving billions of dollars of loan modifications (in the form of reduced principal and interest payment obligations) for Mortgage Loans in the Covered Trusts.  For example, as a result of a settlement with the various states' attorneys general of their claims that Countrywide and/or BofA had originated and serviced Mortgage Loans illegally, in October 2008 BofA suspended foreclosures of delinquent Mortgage Loans in the Covered Trusts and agreed to implement $8.4 billion worth of mortgage loan modifications. The Master Servicer, with BNY Mellon's acquiescence, rather than

forcing Countrywide's affiliated Sellers to repurchase the modified loans, has caused the associated losses to be assumed by the Covered Trusts. In the meantime, the documentation defects in the Mortgage Files have increased the severity of losses on loans that have defaulted, as those defects have resulted in delayed foreclosures and collection actions.

11.     An equally important obligation of BNY Mellon under the Governing Agreements was its obligation to protect the Covered Trusts from Mortgage Loans that breached Representations and Warranties regarding their credit quality when the Master Servicer fails to do so. Here, Countrywide as Seller made various Representations and Warranties in the Governing Agreements which attested, among other things, that the Mortgage Loans were underwritten in all material respects in accordance with their underwriting guidelines; that the origination, underwriting and collection practices of Countrywide as Seller and Master Servicer were legal, prudent and customary; and that the nature and quality of the Mortgage Loans conformed to the descriptions in the investor disclosure documents. PSA §2.03, Schedule III-A, ¶¶23, 37 and 44. When any party to the Governing Agreements, including BNY Mellon as Trustee, "discovered" a violation of the Representations and Warranties, it was required to provide notice to the other parties, which in turn triggered the Seller's duty to cure, substitute, or repurchase the defective Mortgage Loans. PSA §2.03(c). Here, BNY Mellon as Trustee, and Countrywide as Master Servicer and Seller, knew of pervasive breaches of the Representations and Warranties, yet neither of them took any action to address those breaches.

12.     Indeed, the Mortgage Loans that Countrywide originated and/or sold to the Trusts were anything but "prudent." Not only did Countrywide imprudently expand its underwriting guidelines in an attempt to maintain market share and keep pace with the most aggressive originators during the period between 2004 and 2007, but during that time Countrywide

substantially abandoned any pretense of originating and purchasing Mortgage Loans that complied even with its own gutted underwriting guidelines, and instead originated huge numbers of Mortgage Loans as "exceptions" without regard to whether those loans had meaningful compensating factors that justified granting a deviation from Countrywide's purported standards. Countrywide engaged in these imprudent originating practices because, rather than holding most of these loans for investment, it sold most of the Mortgage Loans it originated through securitizations (including the Covered Trusts), thereby transferring the risk associated with its defective loans to third-party investors.   As a result of Countrywide's pervasively deficient underwriting practices, the Mortgage Loans underlying Countrywide's MBS performed extremely poorly – as did the MBS.

13.     Accordingly, from late 2007 forward, as delinquencies escalated in the Covered Trusts, the Covered Trusts received a barrage of investor and insurer demands, along with notices of default, many of which went to BNY Mellon.  At the same time, lawsuits, government investigations, and prosecutions detailing Countrywide's imprudent underwriting mounted – including a lawsuit brought by Countrywide shareholders in October 2007 and also an action brought by the Securities and Exchange Commission ("SEC") against Angelo Mozilo, Countrywide's Chief Executive Officer, and other senior officers, detailing Countrywide's pervasive credit and mortgage loan underwriting abuses.   These events, and the details they uncovered, received widespread press coverage.

14.     The Governing Agreements required the securitization's Sellers (here, Countrywide and its affiliates) to cure, substitute, or repurchase any Mortgage Loan that was in material breach of the Sellers' representations and warranties, including those relating to the loan's credit quality and the purportedly "prudent" standards used in underwriting the loan.

Each month, BNY Mellon, as Trustee for the Covered Trusts, prepared cash distribution summaries that detailed the growing rate of Mortgage Loan delinquencies, defaults, related foreclosures and realized credit losses in each of the Trusts. These summaries were also required to identify any Mortgage Loans that had been repurchased. However, because no Mortgage Loans were repurchased for having been underwritten in violation of the represented underwriting standards, BNY Mellon clearly knew that there were enormous unresolved problems with the credit quality of the Mortgage Loans in the Covered Trusts, that defective Mortgage Loans were not being repurchased by the Sellers, and that the Master Servicer was not acting to enforce the Covered Trusts' repurchase rights. This has recently been confirmed by (among other things) the testimony of Melissa Adelson, the head of BNY Mellon's MBS business group, who admitted that the Master Servicer had never notified BNY Mellon of a single Mortgage Loan in the Covered Trusts that violated any representations and warranties.

15.      Under the PSA, *e.g.*, §3.01, Countrywide Home Loans Servicing LP ("CHL Servicing"), as the Master Servicer, had the duty in the first instance to prudently investigate and enforce the Sellers' repurchase obligations. CHL Servicing, however, consistently failed to do so, which was hardly surprising given the conflicts of interest stemming from its affiliation with the Sellers, and that CHL's enforcement of the Trust's repurchase remedies would effectively involve having one Countrywide subsidiary sue one of its own corporate siblings. Where, as here, BNY Mellon knew of the dismal and aberrationally poor credit performance of the Mortgage Loans in the Covered Trusts, knew of Countrywide's pervasive underwriting abuses, and knew of Countrywide's wholesale failure (as Master Servicer) to investigate and then enforce the Covered Trusts' repurchase rights against its affiliate, the Governing Agreements required BNY Mellon (as Trustee) to notify Countrywide (as Master Servicer) that it was in

breach of its duty to enforce the Covered Trusts' repurchase rights. Moreover, where the Master Servicer does not cure its breach within 60 days, an "Event of Default" occurs under §7.01, which in turn triggers the Trustee's expanded prudent person duties under §8.01, which require the Trustee to exercise its powers on behalf of the Covered Trusts to the full extent that a prudent person would under the circumstances. Given the dismally poor performance of the Mortgage Loans underlying the Covered Trusts and the billions of dollars in losses that the Covered Trusts suffered, a prudent Trustee would have acted decisively to enforce the Covered Trusts' repurchase rights and perform the due diligence necessary to do so.

16.    As described more fully below, however, BNY Mellon did not act to protect the Covered Trusts or the interests of the MBS holders, but instead acted to protect itself, Countrywide and Countrywide's successor-in-interest, BofA. Indeed, BNY Mellon officers privately considered the sponsors of MBS securities such as Countrywide to be their true "clients." Accordingly, notwithstanding repeated demands by insurers and investors, BNY Mellon refused to take any action against Countrywide (or otherwise) to secure the repurchase or substitution of defective Mortgage Loans. As BNY Mellon managers testified and as its documents confirm, unless directed by investors with 25% voting interests who agreed to separately compensate and indemnify BNY Mellon for its efforts, BNY Mellon's policy and practice was to do no more than (1) notify Countrywide and BofA of the demands and any related information it received from those investors or insurers, and (2) "monitor" the results (*i.e.*, BNY Mellon would sit back and watch Countrywide do nothing). Further, instead of taking action to protect the Covered Trusts' and MBS holders' repurchase rights, as it was required to do, BNY Mellon actually acted as a disloyal Trustee, joining Countrywide to block enforcement efforts by MBS holders.

17.     Despite being confronted with overwhelming evidence of Countrywide's systemic underwriting violations and recklessly originated loans, of the billions of dollars of delinquencies and losses the Covered Trusts were experiencing, and of repeated directions to act, neither Countrywide as Master Servicer nor BNY Mellon as Trustee acted to protect the MBS holders by requiring the Countrywide Sellers to repurchase any defective loans in any of the Covered Trusts.  Instead, Countrywide, with BNY Mellon's acquiescence, fought both investors' and insurers' efforts to require repurchases, and instead advocated for the financial interests of the Countrywide-affiliated Sellers.  BNY Mellon's inaction also served its own corporate interests, as BNY Mellon considered Countrywide and its affiliates to be its true clients.  Moreover, with the passage of time, for BNY Mellon to bring its own lawsuit to enforce the Covered Trusts' repurchase rights would risk exposing BNY Mellon to liability for its own prolonged failure to perform its duties as Trustee.

18.     Countrywide's failure to acknowledge the Covered Trusts' repurchase rights for Mortgage Loans it had sold them was in marked contrast to Countrywide's practice of enforcing its own repurchase rights in connection with mortgage loans that it had purchased (from third-party originators called "correspondents") and kept in its own inventory.  Those correspondents made representations and warranties in connection with Countrywide's purchases, similar to the Representations and Warranties that Countrywide made to the Covered Trusts, with respect to (among other things) the "prudent" practices that were allegedly followed in underwriting the relevant mortgage loans.  Countrywide regularly and aggressively enforced its repurchase rights against these third-party correspondent originators when they sold mortgage loans to Countrywide that breached the correspondents' representations and warranties.  The stark difference between Countrywide's practices with respect to vigorously protecting its own

interests by enforcing repurchase claims against correspondents, compared to actions to thwart enforcement of the repurchase obligations it owed the Covered Trusts, highlights the extent of Countrywide's breaches of its obligations under the Governing Agreements, given that Countrywide (as Master Servicer) had agreed that it "shall represent and protect the Trust [] in the same manner as it protects its own interests in mortgage loans in its own portfolio in any claim, proceeding or litigation regarding a Mortgage Loan. . . ." PSA §3.01.

19.    Countrywide's – and BNY Mellon's – failure to pursue and enforce the Covered Trusts' repurchase rights also sharply contrasted with the conduct of Freddie Mac and Fannie Mae, who by 2008 were demanding that Countrywide repurchase billions of dollars of defective Mortgage Loans and MBS that Countrywide had sold them.  Various whole loan purchasers also made similar demands on Countrywide.  Freddie Mac, Fannie Mae, and these various whole loan purchasers – unlike Countrywide as Master Servicer and Seller and BNY Mellon as Trustee – took action to protect their accounts from losses that were, under their purchase contracts with Countrywide, properly borne by Countrywide as the originator and Seller of the defective Mortgage Loans.  Unlike the MBS holders, however, Freddie Mac, Fannie Mae and the whole loan purchasers were not dependent on a feckless and disloyal trustee to protect their interests.

20.    BNY Mellon's failure to take any actions on behalf of the MBS holders also stands in sharp contrast to its actions in the summer and fall of 2008 to protect holders of certain Countrywide commercial notes – consisting of roughly $16 billion in face amount of corporate debentures that CFC and CHL had issued to raise capital – with respect to which BNY Mellon also served as Trustee.  During that time, actual and potential creditors of Countrywide were becoming increasingly alarmed by the prospect that Bank of America ("BofA") – which had announced earlier that year that it planned to acquire Countrywide – would try to structure the

terms of its acquisition in a manner that would allow BofA to avoid assuming any (or most) of Countrywide's liabilities. In this environment, in July 2008, BNY Mellon sued Countrywide in Delaware Chancery Court in its capacity as the trustee for the Countrywide commercial note trusts. Through that action, BNY Mellon sought to accelerate payment by Countrywide of the outstanding commercial notes, on the theory that Countrywide's recent merger (on July 1, 2008) with a shell subsidiary of BofA had prejudiced the commercial noteholders' ability to collect on the notes. BNY Mellon, on behalf of the various commercial note trusts (including but not limited to those commercial note trusts on whose behalf BNY Mellon had sued in Delaware), obtained BofA's agreement to assume Countrywide's liabilities. BNY Mellon, however, did not similarly protect the Covered Trusts by demanding that BofA also explicitly assume the obligations for the MBS holders' repurchase claims.

21.    To compensate itself for its cherry-picked assumption of liabilities with respect to Countrywide's commercial notes, BofA caused Countrywide (which BofA now owned and controlled as a result of the merger) to transfer to BofA "substantially all" of Countrywide's remaining assets, including the stock in all viable subsidiaries of CFC and CHL. Thus, on November 7, 2008, CHL and its parent, CFC, entered into an "asset purchase agreement" and "stock purchase agreement," respectively, with BofA, pursuant to which BofA "purchased" substantially all of CFC's and CHL's remaining assets and stock in subsidiaries in exchange for BofA's assumption of the liabilities on Countrywide's commercial notes. As a result of these asset-stripping transactions, which were consummated as part of a deal made with BNY Mellon acting as trustee for the commercial note trusts, Plaintiffs and the Covered Trusts were left with the prospect of having their repurchase claims brought against Countrywide entities that had been stripped down to insolvent, non-operating companies. BofA's and Countrywide's

corporate consents confirm that the impetus for the structuring of the November 7, 2008 agreements was BNY Mellon's "settlement" of the Delaware lawsuit on terms which required BofA to agree to assume Countrywide's liabilities on the commercial notes.

22.     BNY Mellon, in preferring Countrywide commercial trust note holders to the detriment of the MBS holders, and in joining with BofA to render the Countrywide entities insolvent and unable to pay their repurchase obligations, acted in bad faith and in breach of its fiduciary duties, including its duties of loyalty and due care, to the Covered Trusts and the MBS holders, as well as in breach of its duties of good faith and fair dealing (and increased the MBS holders' recoverable losses against BNY Mellon for its violations of the TIA and for breach of contract).   At a minimum, absent BNY Mellon's settlement on behalf of the commercial note holders, Countrywide and/or BofA would have had substantially more assets available to satisfy repurchase claims on behalf of the MBS holders and the Covered Trusts, on an equal basis, in the event of a Countrywide bankruptcy.   Indeed, BNY Mellon has recently justified a proposed settlement with BofA – in an amount equal to less than 10 percent of the Covered Trusts' losses – on the ground that Countrywide's effective insolvency limits the Covered Trusts' and MBS holders' ability to recover on their repurchase claims.   BofA has also relied on BNY Mellon's refusal to press the Covered Trusts' repurchase claims, and the MBS holders' limited ability to do so derivatively, in estimating its repurchase loss exposure for financial reporting purposes. For example, in the first quarter of 2011, BofA discounted its reported repurchase loss exposure by $4 billion for what it euphemistically referred to as the private MBS trusts' (including the Covered Trusts') "presentation threshold" (i.e., the requirement that 25% of MBS holders in a given trust join together to formally direct a trustee to take action to enforce the trust's repurchase rights).

23.     BNY Mellon, by its conduct described herein, violated both specifically defined obligations in the PSA and its general "prudent person" obligations that arose as a result of the "event of default" associated with the Master Servicer's (*i.e.*, Countrywide's and later BofA's) failure to, among other things, enforce the Covered Trusts' repurchase rights.  BNY Mellon's conduct also violated the TIA, and breached its fiduciary duties, duties of good faith, loyalty and fair dealing under New York common law.  Due to BNY Mellon's failure to effectively protect the Covered Trusts by assuring that defective and risky Mortgage Loans were timely repurchased and that the assets to pay the repurchase claims were not stripped away, Plaintiffs and the Class have suffered, and will continue to suffer, billions of dollars of losses.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, for violations of the TIA and supplemental jurisdiction over the remaining claims.  This Court also has diversity jurisdiction pursuant to 28 U.S.C. §1332(a).

25.     Venue is proper in this District as BNY Mellon has its principal place of business in this District, transacted and does transact business in this District, and many of the acts and omissions giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

26.     Plaintiff Retirement Board of the Policemen's Annuity and Benefit Fund of the City of Chicago ("Chicago Policemen's Fund") is a pension fund authorized by statute under the laws of Illinois with the mission of providing retirement benefits for the current and former members of the Chicago Police Department and their spouses.  The Chicago Policemen's Fund relies heavily upon the performance of its investments to fund benefits.  It invested in and holds,

or held, Countrywide MBS as provided in Exhibit B.   The Chicago Policemen's Fund is a resident of Illinois.

27.     Plaintiff City of Grand Rapids General Retirement System ("Grand Rapids General") is a pension fund authorized by statute under the laws of Michigan with the mission of providing retirement benefits for current and former employees of the City of Grand Rapids and their spouses.   Grand Rapids relies heavily upon the performance of its investments to fund benefits.   It invested in and holds, or held, Countrywide MBS as provided in Exhibit B. Grand Rapids General is a resident of Michigan.

28.     Plaintiff City of Grand Rapids Police and Fire Retirement System ("Grand Rapids Police and Fire") is a pension fund organized under the laws of Michigan with the mission of providing retirement benefits to the current and former members of the City of Grand Rapids Police and Fire Departments and their spouses.   Grand Rapids Police and Fire relies heavily upon the performance of its investments to fund benefits.   It invested in and holds, or held, Countrywide MBS as provided in Exhibit B.   Grand Rapids Police and Fire is a resident of Michigan.

29.     Defendant BNY Mellon is a bank organized under the laws of the State of New York, having its principal place of business at One Wall Street, New York, New York, 10286.   At all relevant times, it has served as the Trustee for each of the Covered Trusts.   For each of the Covered Trusts, BNY Mellon signed MBS incorporating the Governing Agreements.   As the Trustee for the Covered Trusts, BNY Mellon owed the MBS holders certain statutory, contractual and common law duties with respect to the Mortgage Loans owned by the Covered Trusts, which duties BNY Mellon violated.

**FACTUAL ALLEGATIONS**

### A.     The Securitization Process for the Countrywide Certificates

30.     From 2004 to early 2008, when the Mortgage Loans underlying the Covered Trusts were originated, Countrywide was the largest non-public source of residential mortgage loans in the United States.  The vast majority of residential mortgage loans that Countrywide underwrote and originated during this period were resold to investors in the secondary market, primarily through MBS transactions but also through whole loan sales.

31.     MBS transactions, or securitizations, involve the conversion of illiquid whole mortgage loans into bond-like instruments that trade in capital markets.  The real estate mortgage investment conduit ("REMIC") structure used for the Covered Trusts, including for the Countrywide MBS purchased by Plaintiffs and Class members, provided for "regular" MBS which entitled their holders to fixed amounts of principal and specified rates of interest, and also for "residual" interest which, on the termination of the Covered Trusts, provided their holders with payments that varied based on the ultimate profitability of the Covered Trusts after fixed payments due on the regular MBS were satisfied.  PSA §9.02.

32.     Countrywide styled MBS as "pass-through certificates" or "notes," which are substantially identical.  Thus, the Countrywide MBS entitle MBS holders to payments of their principal and interest from the Covered Trusts, and the cash flow for those payments comes from the underlying pools of Mortgage Loans in the Covered Trusts.  The value of MBS therefore depends primarily on the underlying mortgagors' ability and willingness to pay the money owed on their mortgage loans, and secondarily on the adequacy of the mortgaged property as collateral where the mortgagor fails to pay the money owed.  If the Mortgage Loans underlying the Covered Trusts suffer payment defaults in excess of the performance assumptions and payment structure built into those transactions, or the underlying properties cannot be timely foreclosed

and sold at sufficient prices following mortgagors' default, MBS holders may not receive the return of their principal and interest from the Covered Trusts. Further, in those circumstances, MBS holders will suffer losses in the value of their MBS should they attempt to sell them in the secondary market.

33.     The first step in creating the Countrywide MBS was the acquisition by the "depositor" of the inventory of residential Mortgage Loans from the "seller" that would underlie the Covered Trusts. Countrywide Home Loan Inc. and its corporate affiliates (collectively, the "Seller") sold the inventory of Mortgage Loans for all the Covered Trusts. In addition, CHL and its affiliates originated many of the underlying Mortgage Loans that were sold to the Covered Trusts, or combined Mortgage Loans they originated with Mortgage Loans acquired from the Correspondents. Then, the depositors for the Covered Trusts (the "Depositors") transferred, or deposited, the Mortgage Loans into a Covered Trust. Ultimately, regardless of which Governing Agreement was used for a Covered Trust, the rights to enforce the repurchase claims for breaches of the Seller's Representations and Warranties regarding the Mortgage Loans belonged to the Covered Trusts for the benefit of the MBS holders.

34.     The MBS issued by the Covered Trusts were structured in a "waterfall," such that the credit risk was divided among different tiers, or "tranches," of MBS, all of which were dependent on the aggregate credit performance of the underlying group, or "pool," of Mortgage Loans. The tranches reflect a different priority to payment in full, with senior tranches receiving payment before subordinate tranches. Thus, the MBS issued for each tranche reflect a different level of risk (and associated yields or interest rates), including different levels of credit enhancement based upon, among other things, the cushion created by the number of subordinate tranches to absorb credit losses.

35.     The Covered Trusts had other forms of credit enhancement as well, such as overcollateralization, which means that the total principal balance of the underlying Mortgage Loans in the pool for a securitization exceeds the aggregate principal amount of the MBS issued and sold in that securitization.   Likewise, another example of credit enhancement is excess interest, which means that the amount of interest collected on the Mortgage Loans underlying a securitization for each payment period is expected to be greater than the interest distributable on the MBS and fees and expenses payable by the Covered Trust for that period.   Excess interest may be applied both to absorb any interest shortfalls and to pay principal on the MBS to the extent needed to maintain the required level of overcollateralization.   Both of these credit enhancements serve to protect MBS holders against loss of their principal and interest, to varying degrees.

36.     Where there is excess interest or other earnings on the income of the Covered Trusts that is not needed to satisfy the principal and interest due the regular MBS holders, this excess amount is paid either to the Master Servicer as additional servicing compensation or, at the termination of the Covered Trusts, as payments to the residual interests.   PSA §§3.14, 9.02(ii).   Any losses on the underlying mortgage loans – whether due to default, delinquency, or otherwise – are generally applied in reverse order of seniority of the tranches as specified in the structure of the MBS transaction.

37.     Because the tranches have different levels of seniority or subordination, credit rating agencies assign them different ratings, and different tranches of MBS can be sold at different "prices" that take into account their relative yields or interest rates.   The most senior tranches of the Countrywide MBS received AAA credit ratings or their equivalent from the three leading ratings agencies, which indicated the lowest risk and highest credit quality.

38.     Following the initial sale of the Countrywide MBS, CHL Servicing, as the Master Servicer for the Covered Trusts, was responsible for the collection of payments from the underlying mortgagors, which were then sent to BNY Mellon as Trustee of the Covered Trusts. BNY Mellon, in turn, used that money to make the principal and interest payments the Covered Trusts owed to the MBS holders.  Further, BNY Mellon prepared monthly statements detailing the credit performance of the Mortgage Loans underlying the Covered Trusts.

39.     Unfortunately for Plaintiffs and the other MBS Holders, due to the severe and systemic defects in the Mortgage Loans that Countrywide had originated (or otherwise acquired) and securitized, the Mortgage Loans performed dramatically worse than investors had expected – and dramatically worse than would have been the case if (a) all of the Mortgage Loans had complied with Countrywide's representations and warranties, as Seller, with respect to their purported compliance with stated mortgage documentation and underwriting quality standards, or (b) the deficient Mortgage Loans had been timely cured, substituted or repurchased. Accordingly, virtually all of the Countrywide MBS have been downgraded by the rating agencies to "junk" status, the MBS' values have plummeted, and Plaintiffs and the members of the Class have suffered massive damages.

**B.     The Duties of the Trustee, the Seller(s) and the Master Servicer Under the Governing Agreements, And Their Breaches Thereof**

40.     BNY Mellon's duties and obligations as the Trustee for the Covered Trusts are spelled out in the PSA, or substantially similar Governing Agreements.

41.     The PSA, as modified by the TIA, is the operative agreement that governs the Trustee's, Seller's and Master Servicer's respective rights and responsibilities in connection with the Covered Trusts.  BNY Mellon entered into the PSA with: (1) CHL (and its financing affiliates), in its capacity as the "Seller" and Sponsor of the Mortgage Loans, and (2) CHL

Servicing as the Master Servicer for the Mortgage Loans. As a result of the July 2008 merger and later agreements, BofA took over control of Countrywide's business activities as Master Servicer. The PSA was incorporated into the MBS signed by BNY Mellon, and Plaintiffs and the Class have contract rights under the PSA, and also have private rights of action under the TIA.

42.   The PSA, pursuant to §§2.01 and 2.02, sets forth the duties of the Trustee at the closing of the securitization transaction to examine the mortgage loan files, prepare certifications and issue an exception report. The Trustee was required to attach the exception report to its final certification of the Mortgage Loans and thereby provide notice to the Seller and Master Servicer of the Mortgage Loans that were missing required documents or whose Mortgage Files had incomplete or inaccurate documentation. The PSA then provides deadlines, generally 90 days, in which the Seller was required to cure the document deficiencies, or else repurchase the Mortgage Loans with material defects that remained uncured or substitute for them Mortgage Loans free from such defects. *Id.*

43.   The Seller also made "representations and warranties" about the characteristics of the Mortgage Loans, as contained on a published loan tape filed with the SEC as part of the securitization's disclosure documents. PSA § 2.03, Schedule I. This tape included information specific to the individual Mortgage Loans in each Covered Trust, such as each Mortgage Loan's loan-to-value ratio ("LTV") and documentation type, and certain borrower characteristics, such as his/her FICO score and whether the property was intended to be used as the borrower's residence or for investment purposes, *i.e.*, whether or not the property was to be "owner occupied." The Seller also made Representations and Warranties about the mortgage loans' underwriting, as well as other credit-related and legal matters.

44.     Pursuant to PSA §2.03(c), when any of the Seller, Master Servicer or Trustee "discovered" material violations of the Representations and Warranties, including those described above, that party was required to provide notice to the others.  Then the Seller had 90 days from its own discovery, or notice from the Master Servicer or Trustee, to cure, substitute or repurchase the defective loans.

45.     Under the PSA, the Master Servicer had the duty to administer and service the Mortgage Loans in a manner that complied with the "customary and usual standards of practice of prudent mortgage loan servicers," and to "represent and protect the interests of the Trust Fund in the same manner as it protects its own interests in mortgage loans in its own portfolio in any claim, proceeding or litigation regarding a Mortgage Loan. . . ." PSA §3.01.

46.     It was the customary and usual practice of prudent mortgage servicers to enforce their clients' contract repurchase rights, which was a fundamental duty owed by the Master Servicer to the Covered Trusts for the benefit of MBS holders.  Moreover, Countrywide and BofA, like other prudent mortgage loan servicers in the industry, routinely reviewed suspect mortgage loan origination files and aggressively enforced repurchase rights when that meant they could shift credit losses for defective mortgage loans in their own portfolios to the correspondent originators.  And, from at least the first half of 2008 forward, the Covered Trusts were widely reported to contain huge numbers of fraudulent and otherwise imprudently originated Mortgage Loans, as well as Mortgage Loans that systematically violated the credit and underwriting criteria under which they were purportedly originated.

47.     Thus, *e.g.*, on May 15, 2008, the *New York Times* reported on Judge Pfaelzer's recently issued decision sustaining a securities fraud complaint brought against Countrywide by its shareholders, stating:   "[S]he found confidential witness accounts in the shareholder

complaint to be credible and that they suggested a 'widespread company culture that encouraged employees to push mortgages through without regard to underwriting standards.'"  Similarly, in a 2010 article titled "The Give and Take of Liar Loans," the *New York Times* reported on Countrywide's hypocrisy in actively pursuing its own repurchase rights against correspondent originators who had sold it fraudulent "stated income" loans, when Countrywide was the poster child for this type of underwriting abuse:

> Did you hear the one about Countrywide Financial demanding that mortgage originators buy back many of the so-called stated-income loans that it had purchased from them during the late great housing bubble?
>
> It boggles the mind.  This, after all, is Countrywide we're talking about: Countrywide, which came to represent, in the public mind, the dirtiest of all the subprime lenders.   Countrywide, which handed out fraudulent stated-income loans – they were often called "liar loans" – like candy.   Countrywide, whose former chief executive, the disgraced Angelo Mozilo, once actually admitted to analysts, "I believe there is a lot of fraud in stated-income loans."
>
> This same company is now insisting that other lenders that made stated-income loans – loans that Countrywide eagerly bought to fatten its balance sheet – must repurchase them on the grounds that, golly, the loans turned out to be fraudulent.  The hypocrisy is breathtaking.

But Countrywide (as Master Servicer) took no steps to enforce the Covered Trusts' repurchase rights against the Seller(s), as the Sellers themselves were also part of Countrywide.

48.     The Master Servicer, however, was not the only entity that had a duty to take action on behalf of the Covered Trusts and the MBS Holders in the event of discovery of material breaches of a Seller's representations and warranties.

49.     Significantly, the PSA provided that the Trustee also had its own independent duties to take affirmative actions to protect the interests of the Covered Trusts and the MBS Holders.  Thus, pursuant to §2.06, the Trustee was required, "to perform the duties set forth in

22

this Agreement to the end that the interests of the Holders of the Certificates may be adequately and effectively protected."

50.    In addition, where, as here, the Master Servicer materially violated its duties to prudently service the Mortgage Loans and represent and protect the Trust Fund under §3.01, including by failing to enforce the Covered Trusts' repurchase rights against its close corporate affiliate, and the Trustee knew of this material violation by the Master Servicer, the Trustee, under §§7.01 and 8.01, was required to provide notice to the Master Servicer of its violation. If the Master Servicer failed to remedy its violations within 60 days, then an "Event of Default" under the PSA occurred, triggering the Trustee's prudent person duties. *Id.* A second, alternative way that an "event of default" under §7.01 could occur was if MBS holders representing 25% of the voting rights of a Covered Trust provided written notice of the Master Servicer's violation to both the Master Servicer and the Trustee. Thus, the Trustee was required to provide notice to the Master Servicer of its violations, triggering an "event of default" if the violations remained uncured, regardless of any action by 25% of MBS holders:

§7.01 Events of Default

"Event of Default," wherever used in this Agreement, means any one of the following events:

*        *        *

(ii)  *any failure by the Master Servicer to observe or perform in any material respect any other of the covenants or agreements on the part of the Master Servicer contained in this Agreement* (except with respect to a failure related to a Limited Exchange Act Reporting Obligation), *which failure materially affects the rights of Certificateholders, that failure continues unremedied for a period of 60 days after the date on which written notice of such failure shall have been given to the Master Servicer by the Trustee*, the NIM Insurer or the Depositor, or to the Master Servicer and the Trustee by the Holders of Certificates evidencing not less than 25% of the Voting Rights evidenced by the Certificates in the applicable Certificate Group; provided,

> however, that the sixty day cure period shall not apply to the initial
> delivery of the Mortgage File for Delay Delivery Mortgage Loans
> nor the failure to substitute or repurchase in lieu of delivery;

(Emphasis added).

51.     Nonetheless, as documents produced by BNY Mellon and the testimony of its managers confirm, BNY Mellon negligently refused to either give the required notice of breaches of Representations and Warranties it discovered (beyond mechanically forwarding on to Countrywide correspondence it received from investors and insurers) or of the Master Servicer's violations of its duties. The Trustee's negligent "failure to act" as well as "its own willful misconduct" in connection with its duties under express provisions of the contract, violated §8.01.

52.     Once an "event of default" was triggered, the PSA also imposed on the Trustee the duty to exercise "such of the rights and powers vested in it by [the PSA] and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs." §8.01. Where, as here, the Trustee knew (a) that there were pervasive violations by Countrywide of its Mortgage Loan documentation requirements and also of its Representations and Warranties about the imprudent underwriting of the Mortgage Loans and Countrywide's underwriting abuses, and (b) that the Master Servicer was protecting its own financial interests rather than those of the MBS holders by failing to require its close corporate affiliate to repurchase those Mortgage Loans, prudence required the Trustee to enforce the Covered Trusts' repurchase claims. But BNY Mellon "failed to act" to effectively protect the Covered Trusts and the interests of MBS holders, and, despite the foregoing circumstances, in breach of PSA §8.01, did not take any action at all – except to undercut the efforts by MBS holders to derivatively enforce the Covered Trusts' repurchase rights by invoking the "no action" clauses.

**B.    The Covered Trusts Had Repurchase Rights Where Documentation for the Mortgage Loans Remained Missing, Defective or Incomplete**

53.    BNY Mellon had a contractual obligation under the PSA to review each of the Mortgage Files to certify that the documentation for each of the Mortgage Loans was accurate and complete.  Specifically, §§2.01 and 2.02 of the PSA set forth a three-step process whereby BNY Mellon was required to:

(1)    prepare and sign an "Initial Mortgage Certification" acknowledging that it had received and reviewed the loan files for each of the mortgage loans in the Covered Trusts and attaching (a) a "Mortgage Loan Schedule" identifying the specific mortgage loans where the documentation for the loan was complete and accurate; and (b) a "Schedule A" identifying the mortgage loans where the documentation was missing, defective or incomplete;

(2)    prepare and sign a "Delay Delivery Mortgage Loan Certification" certifying that the documentation problems with the mortgage loans listed on the "Schedule A" to the "Initial Mortgage Certification" had since been cured and attaching a "Schedule B" identifying the mortgage loans for which the documentation problems had not been cured; and

(3)    prepare and sign a "Final Certification of Trustee" listing the specific mortgage loans where the loan files were accurate and complete and attaching a "Document Exception Report" listing the mortgage loans in the Covered Trusts for which there remained incomplete or inaccurate documentation, thereby triggering Countrywide's obligation to either repurchase or replace the mortgage loans.

54.    Pursuant to §§2.01(c) and 2.02, as to each mortgage loan in the Covered Trusts, BNY Mellon was required to certify that the Depositor had provided the following documents and that the documents appeared regular on their face:

(i)  *the original Mortgage Note, endorsed by Countrywide or the originator of such Mortgage Loan*, without recourse in the following form: "Pay to the order of ___ without recourse," *with all intervening endorsements that show a complete chain of endorsement from the originator to Countrywide*;

(ii) in the case of each Mortgage Loan that is not a MERS Mortgage Loan, *the original recorded Mortgage*, [and in the case of each Mortgage Loan that is a MERS Mortgage Loan, *the original Mortgage*;

> (iii) in the case of each Mortgage Loan that is not a MERS Mortgage Loan, *a duly executed assignment of the Mortgage to The Bank of New York, as trustee*;
>
> (iv) *the original recorded assignment or assignments of the Mortgage together with all interim recorded assignments of such Mortgage*;
>
> (vi) *the original or duplicate original lender's title policy* or a printout of the electronic equivalent and all riders thereto.

(Emphasis added).

55.     Where a Mortgage File that BNY Mellon examined did not contain these documents, the mortgage loan was included in the Trustee's "Document Exception Report" that was appended to the Trustee's Final Certification.  Countrywide then, in most circumstances, had 90 days to cure the exception, repurchase the Mortgage Loan or provide a substitute Mortgage Loan free from defects.  As §2.02 of the PSA states:

> *If, in the course of such review, the Trustee finds any document constituting a part of a Mortgage File which does not meet the requirements of Section 2.01, the Trustee shall list such as an exception in the Final Certification*; provided, however, that the Trustee shall not make any determination as to whether (i) any endorsement is sufficient to transfer all right, title and interest of the party so endorsing, as noteholder or assignee thereof, in and to that Mortgage Note or (ii) any assignment is in recordable form or is sufficient to effect the assignment of and transfer to the assignee thereof under the mortgage to which the assignment relates. *Countrywide . . . shall promptly correct or cure such defect within 90 days from the date it was so notified of such defect and, if Countrywide does not correct or cure such defect within such period, Countrywide shall . . . either (a) substitute for the related Mortgage Loan a Substitute Mortgage Loan, which substitution shall be accomplished in the manner and subject to the conditions set forth in Section 2.03, or (b) purchase such Mortgage Loan from the Trustee within 90 days from the date Countrywide . . . was notified of such defect in writing at the Purchase Price of such Mortgage Loan; provided, however, that in no event shall such substitution or purchase occur more than 540 days from the Closing Date . . . .*

(Emphasis added).

26

56.     Importantly, BNY Mellon was required to identify the Mortgage Loans for which Countrywide provided incomplete or inaccurate documentation, and the documentation defects had to be cured within 540 days of the Closing Date.  After that date, BNY Mellon could potentially lose its right to force Countrywide to repurchase Mortgage Loans that contained missing, inaccurate or defective documentation, or to provide substitute Mortgage Loans free from those defects.  BNYM created exception reports listing thousands of document deficiencies for the Covered Trusts in which Plaintiffs' purchased MBS.  Documents BNY Mellon has produced and put on its website confirm that large numbers of these document deficiencies remained uncured at least until 2011 in those trusts and the other Covered Trusts.

57.     Moreover, summary documents produced by BNY Mellon for the Covered Trusts reflect that hundreds of thousands of document defects, including missing and incorrect notes, mortgages and assignments, continued for years after the final certifications had been issued. For example, as of March 31, 2009, BNY Mellon's document custody group reported approximately 220,000 documents missing for the Covered Trusts, and, as of January 14, 2010, BNY Mellon's MBS business office reported that more than 110,000 Title Policies had yet to be received.  On August 11, 2010 BofA advised BNY Mellon that the 540-day window for obtaining repurchases for document defects had passed.

**C.      Incomplete Documentation Has Delayed or Precluded Foreclosure of Delinquent Loans and the Covered Trusts Have Wrongfully Assumed the Losses from Mortgage Loan Modifications**

58.     The Congressional Oversight Panel, which was established as part of the Emergency Economic Stabilization Act of 2008, issued a Report entitled "Examining the Consequences of Mortgage Irregularities for Financial Stability and Foreclosure."  It recounts widespread foreclosure abuses over the last several years – often in connection with mortgages that have been securitized – and the numerous Federal and State investigations that have detailed

this problem. Many of those abuses, such as forged or back-dated mortgage assignments, or the "robo-signing" of false affidavits used in foreclosure actions, arise from failures in the process of documenting and transferring mortgage loans from the originators, to the interim entities in the securitization process, and ultimately into the securitization trusts. As the Report explains, irregularities in the chain of title between the originator and a Covered Trust can have significant legal consequences that damage the Covered Trusts and MBS holders. These irregularities preclude or delay collection causing the severity of the Covered Trusts' losses to increase.

59.     Every county in the country maintains records of who owns land within its borders, of transfers of ownership in real property, and of related mortgages or deeds of trust. In order to protect ownership interests, take clear title to property, and adjust claims among competing creditors filing liens against the property, fully executed, original documents must be recorded in a county recording office, establishing the source and timing of a person's ownership interests in that property. These documents must include a description of both the property and the parties that transfer the property.

60.     When an individual purchases a home using a mortgage loan, at least the following documents are created: (i) a promissory note establishing the mortgagor's personal liability ("mortgage note"); (ii) a mortgage evidencing the lender's interest in the underlying collateral ("mortgage" or "deed of trust"); and (iii) if the mortgage is transferred, proper assignments of the mortgage note and the mortgage. Without the mortgage note, a mortgage secures no debt, while without the mortgage, the mortgage note is simply an unsecured debt obligation.

61.     If the Mortgage Note and Mortgage are not properly transferred to a Covered Trust, then the Covered Trust cannot legally foreclose on a borrower that falls into default. This

is because only the person who (currently) holds both documents has standing to enforce the Mortgage in a foreclosure action.  It is therefore significant that a number of Courts have refused to recognize written assignments of the individual mortgage notes or mortgages to a securitization trust that occur only after a foreclosure proceeding has begun.

62.     Additionally, if the transfer of a mortgage is not recorded with the proper county authority, the holder of the mortgage may then lose its place as the first lienholder on the underlying property.  This means that if there are junior mortgagees or other creditors who have properly recorded their liens, they will have the right to payment from a sale of the underlying property before a securitization trust can recover from the foreclosure sale.  As such, even if a note is properly transferred, it has value only if the corresponding mortgage has been properly recorded.

63.     As the Congressional Oversight Report describes, several other states have acted to prohibit, or limit, the foreclosure of mortgages with irregularities that are similar to the irregularities in Mortgage Loans underlying the Covered Trusts:

- In New York, the court system now requires that those initiating residential foreclosure actions must file a new affirmation to certify that an appropriate employee has personally reviewed the documents and papers filed in the case and confirmed both the factual accuracy of these court filings and the accuracy of the notarizations contained therein.

- In California, a non-judicial foreclosure state, the attorney general sent a letter to JPMorgan Chase demanding that the firm stop all foreclosures unless it could demonstrate that all foreclosures had been conducted in accordance with California law.  The attorney general also called on all other lenders to halt foreclosures unless they could demonstrate compliance with California law.

- In Arizona, which is also a non-judicial foreclosure state, the attorney general sent letters to several servicers implicated in the robo-signing scandals to demand a description of their practices and any remedial actions taken to address potential paperwork irregularities.  The attorney general wrote that if any employees or agents used any of the questionable practices in connection with conducting a trustee's sale or a foreclosure in Arizona, such use would

likely constitute a violation of the Arizona Consumer Fraud Act, and the attorney general would have to take appropriate action.

- In Ohio, in addition to his lawsuit against GMAC, the attorney general filed an *amicus curiae* brief in an individual foreclosure case asking the court to consider evidence that GMAC committed fraud that tainted the entire judicial process and to consider sanctioning GMAC. The attorney general also sent a letter to 133 Ohio judges asking them for information on any cases involving the robo-signer Xee Moua. In addition, he asked Wells Fargo Bank to vacate any foreclosure judgments in Ohio based on documents that were signed by robo-signers and to stop the sales of repossessed properties.

- In The District of Columbia, Attorney General Peter Nickles announced that foreclosures cannot proceed in the District of Columbia unless a mortgage deed and all assignments of the deed are recorded in public land records, and that foreclosures relying on MERS would not satisfy the requirement. MERS responded the next day by issuing a statement that their procedures conform to the laws of the District of Columbia and encouraged their members to contact them if they experience problems with their foreclosures.

- In Connecticut, the attorney general started investigating GMAC/Ally and demanded that the company halt all foreclosures. He also asked the company to provide specific information relating to its foreclosure practices. In addition, the attorney general asked the state Judicial Department to freeze all home foreclosures for 60 days to allow time to institute measures to assure the integrity of document filings. The Judicial Department refused this request.

64.     Similarly, as a result of a report by New Jersey Legal Services to the New Jersey Supreme Court documenting irregularities in foreclosure proceedings – which was supported by extensive depositions and documentary evidence, including from lawyers and other participants in the foreclosure of securitized loans – New Jersey issued an Administrative Order amending its Court rules, provided a warning to the foreclosure Bar and issued an order to show cause to the major servicers of securitized mortgage loans. This report explained that many of the foreclosure abuses, such as robo-signing and the use of false affidavits, occurred to compensate for legal defects in the chain of assignments of securitized mortgage loans to their securitization trusts, and generally arose as the securitization participants cut corners to save costs. As the report explained:

A foreclosing plaintiff must show (1) that it holds the note, and (2) that the mortgage was either made to it or assigned to it in writing.  N.J.S.A. 46:9-9. *Lenders no longer routinely execute or record Assignments of Mortgage when a loan is transferred because they regard it as unnecessary unless there is a default and too costly and time consuming to do in every case.*  See Exhibit Q in which a foreclosure attorney explains in a submission to the Court that; "The assignee performs its due diligence, bulk transfer agreements are executed, money is wired, and on a date certain the proverbial 'switch is flipped' wherein the assignee takes over regardless of the execution of a formal, legal assignment for each and every loan.  By way of example, one large national mortgage servicer recently purchased 1.3 million loans from another large servicer.  Even if it took one minute per assignment to execute (which itself is a stretch) it would take over ten years to execute all the resulting assignments is [sic] same were executed at the rate of 40 hours per week."  *So typically at the time the lender makes a decision to foreclose it is not the record mortgagee.  To correct that defect, the attorney for the foreclosing mortgagee or the servicer of the loan will create an Assignment of Mortgage for the purposes of litigation which is in turn signed by a robo-signer.  Documents recorded with a public official are self executing and have special evidential status and therefore are especially pernicious.  Usually the assignment purports not only to assign the mortgage but also the note or underlying obligation.   The assignment of the note nearly always contradicts other documents which indicate that the note was transferred at different times and in different manners or not at all.*

(Emphasis added).

65.     Likewise, a joint report entitled "Interagency Review of Foreclosure Policies and Practices" issued by the Federal Reserve, the FDIC, the Office of Thrift Supervision and the Office of the Comptroller further confirmed these abuses.  In the report, the regulators stated: "The Federal Reserve System, the Office of the Comptroller of the Currency (OCC), the Federal Deposit Insurance Corporation (FDIC), and the Office of Thrift Supervision (OTS), referred to as the agencies, conducted on-site reviews of foreclosure processing at 14 federally regulated mortgage servicers during the fourth quarter of 2010."  Significantly, in the report, the regulators stated that their review of the mortgage servicers' loan files showed that there may be "*disputes over note ownership or authority to foreclose.*"  Report, at 6 (emphasis added).  The regulators

also noted "*concerns about the prevalence of irregularities in the documentation of ownership [that] may cause uncertainty for investors of securitized mortgages.*" *Id.* (emphasis added).

66.     Even more recently, an audit performed at the direction of the City and County of San Francisco's Office of the Assessor-Recorder, found that a majority of the mortgage loans examined had one or more of the following issues with respect to assignments:

- Two or more conflicting, recorded assignments of the Deed of Trust purporting to transfer ownership of the Deed of Trust to two or more separate entities, thereby undermining the legal validity of either assignment;

- Contradictions between documents filed in the County Recorder's Office and federal securities filings in connection with securitization transactions concerning who is the true, current owner of the loans;

- Assignments improperly executed by an employee of the Servicer or Trustee rather than the original or prior owner of the loan; and

- Assignments with respect to which the assignee also signed as assignor.

67.     In the latter two cases, the audit stated that it was likely that "the chain of title to such loans ha[d] been broken and the written transfers from the original owners . . . d[id] not exist."

68.     On October 6, 2010, investigations of the various state attorneys general of documentation and foreclosure abuses including for the practice of "robo-signing," where the mortgage loan files were inadequate to process the foreclosures, led BofA to suspend its mortgage foreclosures and to enter into a settlement to make $8.5 billion worth of modifications in Countrywide mortgage loans.  Most of the losses associated with these modifications have been improperly assumed by the Covered Trusts, rather than having the defective or illegal and modified Mortgage Loans put back to Countrywide for repurchase.  And the continuing title and documentation defects have continued to delay and frustrate foreclosures on defaulted Mortgage Loans, thereby increasing the severity of MBS holders' credit losses.

**D.    The Covered Trusts Had Repurchase Rights for Countrywide's Violations of Its Representations and Warranties About the Credit Quality and Underwriting of the Mortgage Loans in the Covered Trusts**

69.    As described in §2.03 and in certain schedules filed with the SEC for the public offerings and incorporated in or attached to the PSA, each of the PSA's (and SSA's and their associated agreements) included "Representations and Warranties" about the characteristics, credit quality and underwriting of the Mortgage Loans in the Covered Trusts, and material and uncured violations of those Representations and Warranties give rise to the Covered Trusts' rights to force the Seller to repurchase the defective Mortgage Loans.

70.    Among other Representations and Warranties, the Seller represents that the individual Mortgage Loan characteristics publicly reported in schedules filed with the SEC – such as the type of mortgage loan being made (*e.g.*, if the loan was an option arm), the "loan to value" ("LTV"), the borrower's FICO score, the documentation type, and whether the borrower intended to reside at the property or was purchasing it for investment (*i.e.*, whether the property was "owner-occupied") – were true.

71.    The Seller also made Representations and Warranties with respect to credit quality, legality and underwriting of the Mortgage Loans underlying the Covered Trusts. These Representations and Warranties were included in Schedule III-A to the PSA, which additionally incorporated parts of the Prospectus Supplement for the Countrywide MBS relating to Countrywide's underwriting policies and practices.

72.    The Representations and Warranties in Schedule III-A included:

- "The origination, underwriting and collection practices used by Countrywide with respect to each Mortgage Loan have been in all respects legal, prudent and customary in the mortgage lending and servicing business." (#23)

- All of the Mortgage Loans were underwritten in all material respects in accordance with Countrywide's guidelines as set forth in the Prospectus Supplement. (#37)

- The Mortgage Loans, individually and in the aggregate, conform in all material respects to the descriptions thereof in the Prospectus Supplement. (#44).

73.     The Representations and Warranties in the Prospectus Supplement included a section headed "Underwriting Process - General," which included the following statements:

- "All of the Mortgage Loans will have been originated or acquired by Countrywide Home Loans in accordance with its credit, appraisal and underwriting process."

- "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral."

- "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower."

74.     The Prospectus Supplement also included sections headed "Standard Underwriting Guidelines" and "Expanded Underwriting Guidelines," which described amounts of LTV generally allowed, the DTI ratio generally permitted, and the different, less than full, documentation programs Countrywide used to verify the information contained on the mortgagors' loan applications.

**E.      Countrywide's Violations of Its Representations and Warranties About the Credit Quality and Underwriting of the Mortgage Loans in the Covered Trusts Were Systemic and Pervasive**

75.     Beginning in or about 2004 and through at least the first half of 2007, in order to increase its market share for loans sold into the secondary market, Countrywide systemically loosened its credit criteria for the origination of its mortgage loans, such that even those mortgage loans that satisfied Countrywide's underwriting criteria were no longer "prudent." Indeed, Countrywide no longer applied underwriting standards "to evaluate the prospective borrower's credit standing and repayment ability," but instead simply sought to maximize its gain on the sale of the mortgage loans to securitizations.

76.     Thus, for example, Countrywide created programs such as the "Extreme Alt A" programs pursuant to which it issued mortgage loans to non-prime borrowers with reduced documentation – *i.e.*, without verifying that accuracy of certain critical credit information the borrower supplied.   Likewise, Countrywide allowed reduced documentation for other risky mortgage loans, such as PayOptions and Second Liens.

77.     In addition, Countrywide routinely granted "exceptions" to its underwriting guidelines that were not based upon "compensating factors" that offset the credit risk of the violated criteria, but which were instead made to "match" mortgage loan criteria used by Countrywide's competitors.   As Countrywide's chief risk officer, John McMurray, testified, Countrywide engaged in "composite matching" which selected the weakest credit requirements of multiple originators and loan products, so that in the end, Countrywide's credit criteria became the weakest in the industry.

78.     Countrywide also used a four-level exception escalation process, where at each level until the last, a mortgage loan could be accepted but not rejected.   The first level involved an automated underwriting through a computer system at Countrywide referred to as "CLUES." Based on underwriting rules embedded into it, CLUES conducted a layered risk evaluation of all the criteria for the proposed mortgage loan.   When CLUES failed to pass the loan on for approval, it was "referred" for manual underwriting, the second level of review.   If the mortgage loan then failed to satisfy the manually applied underwriting criteria, it was "referred" to a divisional "structured loan desk" ("SLD"), the third level of review, where instead of applying Countrywide's standard underwriting guidelines, Countrywide applied its "expanded" underwriting guidelines, sometimes referred to as its "shadow" guidelines.   Further, the divisional SLD "repriced" the mortgage loan to increase its "cost," in the form of higher interest

rates or closing fees, to make the loan more attractive for sale into the secondary market. Although Countrywide referred to this as "risk-based pricing," this practice actually made it even more likely that the mortgagor would be unable to make its monthly mortgage payments. If, even with the looser guidelines and repricing, the mortgage loan failed to satisfy the requirements of the divisional SLD, it was transferred to a "central" or "secondary" SLD. Here, in this fourth level review, the mortgage loan was approved so long as SLD was able to identify a specific investor willing to purchase the loan. Countrywide referred to mortgage loans approved by the divisional or secondary SLD as "exception" loans, and Countrywide did not require compensating factors to offset the exceptions it approved. This four-step underwriting process resulted in the systemic issuance of non-compliant and imprudent mortgage loans that greatly increased the risk those mortgage loans would not perform.

79.    In addition, Countrywide routinely made and securitized mortgage loans which its quality control group had identified as "severely unsatisfactory" or "SUS," because they contained severe violations of Countrywide's underwriting standards. These mortgage loans were imprudent and far riskier than those which complied with its underwriting criteria.

80.    Countrywide also routinely made "stated income" loans – in which the mortgagor could simply state his income without verification – that contained "red flags" for fraud. For example, although stated income loans cost mortgagors more than full documentation loans, Countrywide issued stated income loans to wage earners who could have easily verified their income with a W-2. There is no rational reason why such a person would pay more money for a stated income loan than a full documentation loan, unless the person could not qualify for a mortgage loan based on his actual income, and so found it necessary to obtain a loan by stating an inflated income. Studies Countrywide conducted showed that this group of "stated income"

borrowers had significantly inflated the income reflected on their mortgage loan applications, as compared to the income they reported on their federal income tax returns. Similarly, as reviews conducted in the course of litigation between insurers and BofA show, Countrywide also originated loans using so called "appraisals" where the mortgagors "stated" the values of the mortgaged property.

**F.    BNY Mellon Had Actual Knowledge of Material and Systemic Violations of Countrywide's Representations and Warranties and Material Violations by the Master Servicer of Its Servicing Obligations in Failing to Enforce the Covered Trusts' Repurchase Rights**

81.    Beginning in late 2007, the delinquencies in Mortgage Loans underlying the Covered Trusts began to increase as a result of the widespread defects in the quality of their underwriting, and during the first half of 2008 the delinquencies and credit losses skyrocketed. By June 2008, several Covered Trusts in which Plaintiffs purchased MBS were experiencing delinquency rates exceeding 30%. By October 2008, the delinquencies had risen to 40%. This pattern repeated across the Covered Trusts, and led to a series of "Notices of Default" to Countrywide and BNY Mellon by insurers of certain MBS issued by the Covered Trusts, and insurer demands to obtain copies of the Mortgage Loan origination files for forensic re-underwriting reviews – files which Countrywide and then BofA, in their roles as Master Servicer, maintained on BNY Mellon's behalf.

82.    These reviews showed pervasive fraud and underwriting violations, including that borrowers had often falsified their "stated" income reported on loan applications and that "exceptions" to underwriting criteria were routinely made without legitimate compensating factors. Insurers then demanded mortgage loan repurchases, specifically identifying and listing, for BNY Mellon as well as for Countrywide and BofA, thousands of defective mortgage loans, with their associated underwriting deficiencies and the particular "representations and

warranties" they violated.  At the same time, several large investors began to demand that BNY

Mellon conduct or facilitate forensic origination file reviews, and enforce the Covered Trusts'

repurchase rights in light of the extremely poor credit performance of Countrywide's Mortgage

Loans.

83.    The following were among the insurers' notices of default, demands for access to

Mortgage Loan origination files and repurchase demands received by BNY Mellon:

| | | |
|---|---|---|
| October 5, 2007 | XL Capital Assurance | "Reports for information, NOTICE OF DEFAULT, notice of EVENT OF DEFAULT and notice of EVENT OF SERVICING TERMINATION concerning CWHEQ Revolving Home Equity Loan Trust, Series 2006-D." |
| October 17, 2007 | XL Capital Assurance | "NOTICE OF DEFAULT" and "EVENT OF SERVICING TERMINATION," and attaching evidence of loan documentation errors. |
| April 25, 2008 | AMBAC | Request for Closing Tape, Servicing Tape, loan origination files and underwriting guidelines for Home Equity Loan Trust, Series 2006-S1 certificates. |
| May 12, 2008 | SYNCORA | "Request for Action and NOTICE OF DEFAULT" for CWHEQ 2006-D (attaching schedule of loan underwriting exceptions and representation and warranty, "R/W," violations). |
| June 26, 2008 | FGIC | E-mail notes 654 letters sent for CWHEQ 2006-H and 2007-C representing $83.5 million in repurchase requests. |
| August 7, 2008 | MBIA | PSA §2.03(f) Notice that Sponsor breached its representations and warranties for Home Equity Loan Trust, Series 2007-S2. |
| October 10, 2008 | SYNCORA | Demand for information. |
| October 21, 2008 | AMBAC | "Notice of Breach" for Home Equity Loan Trust, Series 2006-S1. |

| | | |
|---|---|---|
| December 17, 2008 | MBIA | PSA §2.03(f) notice of breach for CWHEQ Home Equity Loan Trust, Series 2007-S1. |
| February 17, 2009 | AMBAC | PSA §2.03(e) notice of breach of representations and warranties, with defective loans identified on Appendices A-H (redacted in discovery produced). |
| April 6, 2009 | AMBAC | PSA §2.03(e) notice of breach of representations and warranties, with defective loans identified in Appendices A-K (redacted in discovery produced). |

84.     An Excel spreadsheet which Countrywide furnished BNY Mellon reported that, by July 2008, 1863 mortgage loan repurchase requests had been received from insurers of or investors in certain of the Covered Trusts.  By February 2009, BNY Mellon counted a total of about 8600 repurchase requests.

85.     As Countrywide dragged its feet in repurchasing loans, the insurers began to sue. On September 30, 2008, MBIA sued Countrywide, alleging repurchase demands for 2292 loans with an original unpaid balance of $224 million.  On March 19, 2009 United Financial Guaranty sued BNY Mellon, as well as Countrywide and BofA, claiming "about 40% of the Mortgage Loans reviewed fail to comply with Countrywide's own underwriting guidelines."   The Complaint also described the "Numerous Lawsuits filed Against Countrywide [which] Have Revealed Its Corrupt Practices," including those brought by state attorneys general and municipalities.

86.     With the delinquencies and credit losses growing, whole loan purchasers and MBS holders, too, began to regularly contact BNY Mellon urging it to act.  By February 2008, BNY Mellon was receiving "weekly calls" from Hanover Capital to demand the repurchase of Countrywide Mortgage Loans.  In June 2008, Freddie Mac contacted BNY Mellon, asking "why the Countrywide MBS deals seem to be performing so poorly compared to other deals around the

same time," and requesting BNY Mellon to appoint it BNY Mellon's agent for purposes of conducting a due diligence review of the Mortgage Loans. BNY Mellon did not so appoint Freddie Mac nor did it conduct its own due diligence review in the Covered Trusts where Freddie Mac had purchased MBS or in any other Covered Trusts.

87.     Beginning on or about November 5, 2008 through at least December 2009, Fannie Mae unsuccessfully sought, through a series of letters, draft agreements and negotiations, to obtain the Mortgage Loan origination files for certain Covered Trusts in which it held MBS, and to retain a company called Digital Risk to conduct a forensic review of those files.

88.     As Fannie Mae explained in its November 5, 2008 letter to BNY Mellon:

> Fannie Mae has become increasingly concerned about the integrity of the loans underlying each of the Fannie Mae Securities. As a result, Fannie Mae would like the Trustee to gain access to the loan files relating to certain pre-selected loans underlying each of the Fannie Mae Securities in order to conduct a forensic review of such files for potential breaches of representations and warranties . . . we believe time is of the essence . . . Fannie Mae expects the Trustee to exercise its fiduciary responsibilities with respect to Fannie Mae Securities to the fullest extent provided under the documents and applicable law.

The November 5, 2008 letter is attached hereto as Ex. E, and is incorporated herein.

89.     In response, on November 20, 2008, BNY Mellon's lawyers at the Pillsbury Winthrop Shaw Pittmann LLP law firm ("Pillsbury") wrote back. They asserted that nothing in the PSA or other applicable Governing Agreements authorized BNY Mellon to conduct the requested forensic review. As Pillsbury's letter stated, Fannie Mae's several securitization transactions "may have different transaction terms but the authority of the Trustee and the rights of Certificateholders remain fairly consistent across all of the transactions." Then, citing to an April 2006 CWALT PSA as a representative agreement, Pillsbury asserted that because the Trustee had "no knowledge of the occurrence or existence of an event of default," it lacked the

authority to conduct a forensic review unless directed by owners of 25% of the voting rights of each class of MBS, and MBS holders provided BNY Mellon with indemnity against its costs, expenses and liabilities.  The November 20, 2008 letter is attached hereto as Ex. F, and is incorporated herein.

90.     On or about January 16, 2009 Fannie Mae wrote back ("Fannie Mae's Reply"), stating that it did own 25% of the voting rights in certain of the Covered Trusts, would reimburse BNY Mellon for its expenses and liabilities and "directed" the Trustee to take action under PSA §8.01(iii) to enable a Mortgage Loan-level forensic review.  Fannie Mae's Reply also disagreed with BNY Mellon's assertion that it had neither the authority nor the duty to act, unless directed by a 25% holder, pointing out that the "Poor Performance of the Loans Evidences Breaches of Representations and Warranties."  Further, for the Covered Trusts in which Fannie Mae had purchased MBS, "up to 53% of [the] original deal balance has either defaulted with a loss or is at least 30 days past due."  Fannie Mae also explained that in its own Countrywide loan program, through which it purchased mortgage loans originated by Countrywide, 49.8% of the foreclosed Countrywide mortgage loans it reviewed had breached their representations and warranties, and "we estimate that equivalent or even higher levels of troubled loans exist in Countrywide's private label securitizations."  Thus, for the Covered Trusts in which Fannie Mae had purchased, Fannie Mae estimated that approximately $959 million worth of Mortgage Loans may have breached their representations and warranties.  Citing to the "Public Information Relating to Countrywide's Problematic Mortgage Portfolio," including the state attorneys general's lawsuits against Countrywide, Fannie Mae also asserted, "It would be nothing short of negligence for anyone having business dealings with Countrywide *not* to question the quality of Countrywide's mortgage loans.  In that respect, the Trustee would fall squarely within the ambit of its 'good

faith' obligations." Fannie Mae's Reply, as attached to an internal BofA January 16, 2009 e-mail, is attached hereto as Ex. G, and is incorporated herein.

91.    Even with this direction and notice, however, BNY Mellon failed to require BofA to produce Mortgage Loan origination files for a forensic review by Digital Risk, the contractor selected by Fannie Mae. Although the PSA, §3.07, explicitly provided that the "Master Servicer shall afford each Seller, the Depositor, the NIM Insurer and the Trustee reasonable access to all records and documentation regarding the Mortgage Loans," BofA refused BNY Mellon access to the origination files, asserting the "confidentiality" of the files as an excuse. While BNY Mellon protested that "we own the loans," and that "BAC as the Master Servicer, is contractually obligated to deliver the Requested Information to us and has no authority to limit our use," it nonetheless failed to acquire the origination files, conduct a due diligence review or enforce those Covered Trusts' repurchase rights. Nor did BNY Mellon issue a notice of default to BofA, as the Master Servicer, for its failure to grant access to the origination files or for BofA's failure to act prudently as required under PSA §3.01 to investigate and put back defective Mortgage Loans.

92.    Even without Fannie Mae's information, however, throughout this time period, BNY Mellon was intimately aware of the escalating delinquencies and credit losses in the Covered Trusts, and the failures by the Master Servicer to demand the repurchase of *any* Mortgage Loans underlying the Covered Trusts for breaching Representations and Warranties regarding their underwriting – as Melissa Adelson, a BNY Mellon employee testified, and the monthly distribution reports show. BNY Mellon itself prepared and distributed the monthly reports for each Covered Trust reflecting the monthly Mortgage Loan performance data, including the delinquencies, foreclosures, losses and absence of such repurchases.

93.    During 2008, the Trustee also received further notice of pervasive Representation and Warranty violations from investigations and lawsuits by Countrywide's investors and the SEC.

94.    These lawsuits against Countrywide and its officers for securities fraud in connection with their statements about the underwriting practices used to originate the mortgage loans that Countrywide kept on its books were well publicized. The *New York Times* (as well as other news outlets) issued a series of articles in 2008 and 2009 documenting Countrywide's systemic mortgage loan excesses, including its propensity to make "Liar Loans." On May 15, 2008, the *New York Times* reported on Judge Pfaelzer's recently issued decision sustaining the securities fraud complaint by Countrywide shareholders, reporting: "[S]he found confidential witness accounts in the shareholder complaint to be credible and that they suggested a widespread company culture that encouraged employees to push mortgages through without regard to underwriting standards."

95.    In June 2009, the SEC announced its charges against Angelo Mozilo and others at Countrywide. All of this was well known by the BNY Mellon's "Default Administration Group" ("DAG"), as well as BNY Mellon's inside counsel, as BNY Mellon administrators had referred the insurer and investor complaints about the performance of the Covered Trusts, the insurer notices of default, and the demands for origination files and repurchases to these groups.

96.    Despite all of this particularized knowledge regarding Countrywide's systemic underwriting abuses and abysmal performance of its Mortgage Loans, BNY Mellon, and particularly its DAG and inside counsel, did absolutely nothing to protect the Covered Trusts or the interests of MBS holders. As BNY Mellon witnesses repeatedly testified at their depositions, unless an investor or consortium of investors with a 25% or greater voting interest in the Covered

Trusts directed them to act and provided what they deemed a satisfactory indemnity (and as was the case with Fannie Mae, sometimes not even then), BNY Mellon would not require the production of origination files, investigate the reports of Representation and Warranty violations, issue notices of default, or enforce repurchase rights on behalf of MBS certificate holders.

**G.     The Covered Trusts Have Experienced Significant Losses that Could Have Been Avoided Had the Trustee Acted Prudently**

97.     The Covered Trusts in which Plaintiffs purchased MBS have performed very poorly.  As of April 2013, those trusts reported realized losses and cumulative payment delinquencies, including delinquent loans in bankruptcies, foreclosures and for real estate owned or "REOs" (hereafter "Delinquencies") of approximately $3 billion:

| Deal | Cumulative Realized Losses | Aggregate Delinquencies Dollar Amount | Aggregate Delinquencies Percentage |
|---|---|---|---|
| CWABS 2006-10 | $ 147,448,302.24 | $ 95,553,204.37 | 47.22% |
| CWABS 2006-11 | $ 432,779,548.19 | $ 381,794,592.52 | 48.37% |
| CWABS 2007-3 | $ 232,251,278.36 | $ 209,010,906.96 | 61.01% |
| CWALT 2005-50CB | $ 35,378,306.14 | $ 36,843,420.43 | 22.51% |
| CWALT 2006-7CB | $ 76,190,552.71 | $ 64,967,678.24 | 34.03% |
| CWALT 2006-J2 | $ 19,740,443.28 | $ 17,540,208.25 | 20.33% |
| CWALT 2006-J5 | $ 57,517,041.11 | $ 58,562,400.48 | 33.81% |
| CWALT 2006-OA3 | $ 169,094,312.66 | $ 103,936,665.55 | 52.09% |
| CWALT 2006-OA17 | $ 430,615,682.57 | $ 282,709,590.64 | 50.26% |
| CWHEQ 2006-D | $ 425,447,261.90 | $ 34,825,509.34 | 11.62% |
| CWHEQ 2006-S1 | $ 149,770,436.35 | $ 12,242,734.91 | 7.70% |
| CWHEQ 2006-S7 | $ 339,911,531.40 | $ 30,392,698.96 | 11.99% |
| CWHEQ 2007-S2 | $ 316,998,081.10 | $ 19,897,575.01 | 7.06% |
| CWMBS 2005-HYB1 | $ 31,531,396.73 | $ 29,021,145.44 | 24.62% |
| CWMBS 2006-HYB1 | $ 200,699,194.08 | $ 97,976,345.86 | 26.85% |
|  |  |  |  |
| **Total** | **$ 3,065,373,368.82** | **$ 1,475,274,676.96** |  |

98.     For 11 of the foregoing trusts and all of the other trusts listed on Exhibit A the Institutional Investors in the proposed Settlement Action estimated that their cumulative credit losses totaled more than $100 billion.

99.     Even by BofA's own account, its potential exposure for repurchases in its private label securitizations ("PLS"), including for Countrywide trusts, would have been about 28-35% higher had the Trustees acted to require the put back of defective mortgage loans.  As BofA explained in its first quarter 2011 Form 10-Q, fn. 9, because of the difficulty investors in private MBS had in accumulating the 25% voting interest in order to direct action, what BofA euphemistically called the "presentation threshold," and the uncertainty as to whether Trustees would act on their own initiative to demand origination files and put back defective loans.  Thus BofA reduced its estimated PLS repurchase exposure by $4 billion:

> Finally, as mentioned previously, the trustee is empowered to have access to the loan files without a request by the investors.  If additional private-label investors organize and meet the presentation threshold, such as 25 percent of the voting rights per trust, then the investors will be able to request the trustee to obtain loan files to investigate breaches of representations and warranties or other matters and the trustee may choose to follow that request, exempt from liability, provided that the trustee is acting in good faith.  It is difficult to predict how a trustee may act or how many investors may be able to meet the prerequisite presentation thresholds.  ***In this regard, the Corporation's model reflects an adjustment to reduce the range of possible loss for the presentation threshold for all private-label securitizations of approximately $4 billion to arrive at the $7 billion to $10 billion range.***  Although the Corporation's evaluation of these factors results in lowering the estimated range of possible loss for non-GSE representations and warranties, any adverse developments in contractual interpretations of causation or level of representations, or the presentation threshold, could each have a significant impact on future provisions and the estimate of range of possible loss.

(Emphasis added).

100.   The Institutional Investors in recommending the proposed settlement in the Settlement Action also pointed to the fact that, without a settlement, MBS holders who did not own a 25% voting stake in any Covered Trust would be without any recourse to protect their repurchase rights.   In other words, even with all the evidence developed to date, BNY Mellon was still unwilling (and would remain unwilling) to issue notices of default to the Master Servicer, review origination files and enforce the Covered Trusts' repurchase rights without a direction from 25% of MBS holders in a Covered Trust.   As the Institutional Investors explained, even with their $40 billion in aggregated purchases, they were impotent to protect many of the Covered Trusts in which they had invested: "In fact, of the over $40 billion in securities held by the Institutional Investors or by funds and clients they advise, almost $14 billion are in Trusts where the Institutional Investors lack the 25% threshold.   If the settlement is disapproved, these Trusts will receive no remedy at all."   (Institutional Investors' Statement in Support of Settlement and Consolidated Response to Settlement Objections, filed October 31, 2011).

101.   That the refusal by both the Master Servicer and the Trustee to take steps to enforce the Covered Trusts' repurchase rights was imprudent and has cost the Covered Trusts billions of dollars is evident from the recoveries of Fannie Mae, Freddie Mac, various insurers and whole loan purchasers for their own Countrywide repurchase rights.   And while Fannie Mae on January 7, 2013 settled its repurchase claims for mortgage loans that it purchased directly from Countrywide for $3.6 billion in cash and $6.75 billion worth of repurchased mortgage loans, as explained in Ex. G, the credit quality of the Countrywide Mortgage Loans underlying the Covered Trusts is even worse.

**H.   BNY Mellon Acted Disloyally and In Bad Faith by Stripping Away Countrywide Assets that Should Have Been Available to Pay the Covered Trusts' Repurchase Claims**

102.    In January 2008 BofA announced its plan to acquire Countrywide.  In May 2008 BofA publicly disclosed that in acquiring Countrywide it might structure the merger transaction to attempt to avoid assuming Countrywide's liabilities.

103.    As a result, in July 2008, shortly after the merger between Countrywide and BofA's subsidiary was consummated, BNY Mellon sued Countrywide on behalf of certain commercial trust note holders over the merger.  The suit filed in Delaware Chancery Court was overseen by the same BNY Mellon DAG employee, Martin Feig, who monitored the insurer and investor demands, notices of default and complaints described above for the Covered Trusts.  As described in its summary judgment papers in the Delaware case, BNY Mellon sought to accelerate the payment by Countrywide of the commercial notes, contending that it was "undisputed" that "Countrywide has experienced a raft of severe financial and regulatory problems" and that BofA, through the merger, was "stripping away" Countrywide's assets and thereby jeopardizing Countrywide's abilities to pay its debts.

104.    To settle BNY Mellon's Delaware litigation, through a settlement agreement that Feig signed on behalf of BNY Mellon, BofA assumed liability for approximately $16 billion of Countrywide commercial notes issued for the commercial trusts at issue in the litigation and similar trusts, and, in exchange, BNY Mellon worked with BofA to strip Countrywide's remaining viable assets.  BofA accomplished that through an "Asset Purchase Agreement" and a "Stock Purchase Agreement" (and a series of new indentures), both dated November 7, 2008, in which CHL and CFC, which BofA controlled, agreed to transfer to BofA "substantially all" of their remaining assets and subsidiaries' stock to BofA.  As a result of these asset stripping transactions, the remaining Countrywide entities, who purportedly still retained the liability for the Covered Trusts' repurchase claims, turned into empty shells incapable of satisfying those

claims.  BNY Mellon served as the Trustee for most of the Countrywide commercial trusts whose obligations BofA assumed in exchange for the sale of Countrywide's assets and stock.

105.  BNY Mellon, by obtaining BofA's agreement to assume Countrywide's obligations on the Countrywide commercial trusts at or about their face amounts (i.e., at approximately 100 cents on the dollar), while leaving virtually nothing left to pay the Covered Trusts' repurchase claims, acted disloyally and in bad faith.  Had BNY Mellon acted prudently and in good faith to protect Plaintiffs' and Class members' interests as it had done for the commercial note holders, whose debts were explicitly assumed by BofA, the Covered Trusts would not now be facing the heightened risk that they might not be able to collect on their repurchase claims from either Countrywide or BofA.  At a minimum, had BNY Mellon not acted disloyally to prefer the beneficiaries of some of the trusts for which it served as Trustee over others, in the event of Countrywide's bankruptcy, the MBS holders would have shared in the distribution of Countrywide's assets *pari passu* with the commercial note holders and Countrywide's other unsecured creditors.

106.  Thus, BNY Mellon's misconduct has caused and will continue to cause billions of dollars of losses to the Covered Trusts, even if the proposed settlement in the Settlement Action is ultimately approved.  Indeed, a major justification for the proposed settlement put forth by the Trustee and Institutional Investors was their concern that a higher judgment might not be collectible against either Countrywide (because it no longer had adequate assets) or BofA (because it might not be held liable as Countrywide's successor).  This, however, was a situation of BNY Mellon's own making since, as BofA corporate consents show, the settlement of BNY Mellon's Delaware lawsuit served as the impetus for BofA's November 2008 "asset stripping"

transactions, and for BofA's assumption of liabilities for the benefit of certain trust beneficiaries that BNY Mellon had inexcusably chosen to prefer over the interests of the MBS holders.

## CLASS ACTION ALLEGATIONS

107.    Plaintiffs bring this action as a class action on behalf of a class consisting of all current and former investors who acquired the Countrywide MBS for the Covered Trusts (the "Class") and suffered losses as a result of Defendant's misconduct alleged herein.[1]  Excluded from the Class are Defendant, Countrywide, BofA, their officers and directors, their legal representatives, successors or assigns and any entity in which Defendant, Countrywide or BofA has or had a controlling interest.  All these claims raise the same set of concerns and can be proven by nearly identical evidence, and using the same or similar expert analyses and methodologies.

108.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained though appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by BNY Mellon, and others too, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

109.    Plaintiffs' claims are typical of the claims of the members of the Class as they all purchased MBS based upon contracts substantially in the same form as the PSA in Exhibit C, and BNY Mellon's misconduct was substantially the same with respect to all persons investing in the Covered Trusts, and all members suffered similar harm as a result.  Thus, all members of

---

[1] If the Court limits standing to those Trusts where Plaintiffs purchased, then the class definition will be limited to such purchasers who purchased certificates in the Trusts listed on Exhibit B.

the Class are similarly affected by BNY Mellon's statutory, contractual and common law violations complained of herein.

110.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and MBS litigation.

111.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

   (1)   whether BNY Mellon breached the TIA, and its contractual and common law duties to MBS holders under the PSA, by systemically:

      (a) failing to provide notices of default and to enforce repurchase rights for documentation defects in Mortgage Loans for which BNY Mellon had itself identified missing, defective or incomplete documentation;

      (b) failing to provide notices of default and to enforce repurchase rights for violations of representations and warranties regarding the credit quality and underwriting of the mortgage loans in the  Covered Trusts;

   (2)   whether and to what extent members of the Class have suffered damages as a result of BNY Mellon's breach of its statutory, contractual and fiduciary duties and the proper measure of damages.

112.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable.   The prosecution and trial of this case as a class action will be manageable.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**(On Behalf of the Class, Violation of the Trust Indenture Act of 1939, 53 Stat. 1171)**

113.   Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

114.    Congress enacted the Trust Indenture Act of 1939 ("TIA"), 53 Stat. 1171, 15 U.S.C. §77aaa, *et seq.*, to ensure, among other things, that investors in certificates, bonds, and similar instruments have adequate rights against, and receive adequate performance from, the responsible trustees.  15 U.S.C. §77bbb.  The Covered Trusts' Governing Agreements are "indentures," and Defendant is an "indenture trustee," within the meaning of the TIA.  15 U.S.C. §77ccc(7), (10).  Moreover, the TIA applies to and is deemed to be incorporated into the Governing Agreements and the related MBS.  15 U.S.C. §77ddd(a)(1).  Defendant violated multiple provisions of the TIA.

115.    First, the TIA requires that Defendant inform MBS holders of breaches of the Governing Agreements within 90 days after their occurrence.  15 U.S.C. §77ooo(b) (citing 15 U.S.C. §77mmm(c)).  Here, there were numerous defaults, including: the failure of the Seller and Depositor to cure defects in the Mortgage Files and/or to substitute conforming loans for the defective loans in the Covered Trusts, and the failure of the Master Servicer to enforce repurchase obligations upon discovering breaches of representations and warranties relating to the credit quality of the Mortgage Loans in the Covered Trusts.  Given the great importance of those defaults to the MBS holders' interests, Defendant had no good faith reason for failing to provide notice of those defaults.  Accordingly, by failing to provide such notice, Defendant violated the TIA.

116.    Second, in case of default, the TIA requires that Defendant exercise its rights and powers under the Governing Agreements as a prudent person would, under those circumstances, in the conduct of his own affairs.  15 U.S.C. §77ooo(c).  Again, given the obvious importance of the defaults set forth in the preceding paragraph and herein, which impaired the rights of MBS holders to collect their full principal and interest and which reduced the value of the MBS, any

prudent person under those circumstances would have exercised all of his rights to, among other things, obtain complete Mortgage Files, cure any defects in the Mortgage Files and/or substitute conforming loans, and to sue to require the repurchase of loans that breached their representations and warranties. Indeed, with the number of delinquent and defaulting mortgages in the Covered Trusts increasing, as a result, *inter alia*, of such defects, and the transfer of its business and assets to BofA, the MBS holders could have been protected from the resulting losses only through the Trustee's exercise of those rights – which were designed precisely to limit the number of delinquent and defaulting mortgages in the Covered Trusts. By failing to exercise their rights in those circumstances, Defendant violated the TIA.

117.    Defendant is liable to Plaintiffs and the Class for damages incurred as a result of its violations of the TIA.

## SECOND CAUSE OF ACTION

### (On Behalf of the Class, Breach of Contract)

118.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

119.    As set forth in detail above, the MBS incorporated the Governing Agreements, and the Governing Agreements as a matter of law incorporate the provisions of the TIA. Under these contracts, and at common law, Defendant owed the MBS holders a duty to perform certain acts, including, without limitation, to notify the Master Servicer of Mortgage File deficiencies where documents were missing, incomplete and defective, and of breaches of representations and warranties.

120.    Defendant's breach of its duties set forth in the Governing Agreements, as described above, meant that the valuable repurchase rights of the Covered Trusts were not

pursued. These violations reduced collections on the Mortgage Loans in the Covered Trusts, increased the severity of the Trusts' losses, diminished the MBS' value, and caused Plaintiffs' and the Class' losses, including on sales of MBS, that BNY Mellon rather than MBS holders should bear.

121.    In addition, once parties to the Governing Agreements discovered the breaches of the representations and warranties that had gone uncured, and an event of default occurred under the Governing Agreements, or a default occurred under the TIA, BNY Mellon had the obligation to exercise all rights and powers vested in it by the Governing Agreements and at law, and to use the same degree of care and skill in its exercise as a prudent man would, under those circumstances, in the conduct of his own affairs.

122.    An "Event of Default" occurs under several situations defined in the Governing Agreements, including PSA Section 7.01(a)(ii):

> §7.01 Events of Default
>
> "Event of Default," wherever used in this Agreement, means any one of the following events:
>
> *       *       *
>
> (ii)  *any failure by the Master Servicer to observe or perform in any material respect any other of the covenants or agreements on the part of the Master Servicer contained in this Agreement* (except with respect to a failure related to a Limited Exchange Act Reporting Obligation), *which failure materially affects the rights of Certificateholders, that failure continues unremedied for a period of 60 days after the date on which written notice of such failure shall have been given to the Master Servicer by the Trustee,* the NIM Insurer or the Depositor, or to the Master Servicer and the Trustee by the Holders of Certificates evidencing not less than 25% of the Voting Rights evidenced by the Certificates in the applicable Certificate Group; provided, however, that the sixty day cure period shall not apply to the initial delivery of the Mortgage File for Delay Delivery Mortgage Loans nor the failure to substitute or repurchase in lieu of delivery;

(Emphasis added).   Where, however, the Trustee fails to provide the notice of breaches it discovers, it cannot rely on its own negligence, or failure to provide notice, to avoid the occurrence of an event of default.

123.   There were material breaches of the Governing Agreements, including by the Master Servicer to, for example:

(a)   notify the Trustee and others of breaches of the representations and warranties that applied to the mortgages in the Covered Trusts;

(b)   demand that deficient mortgage records be cured;

(c)   require the repurchase of mortgage loans that breached their representations and warranties; and

(d)   place the interests of the MBS holders before its own interests.

124.   Defendant, and its responsible officers, had notice of these and other defaults, through, among other things, defaults and payment delinquencies in the Covered Trusts; notices of default and lawsuits brought by Countrywide shareholders and insurers of mortgage loans in certain of the Covered Trusts; Fannie Mae's letters, and correspondence with other investors; government investigations, prosecutions and settlements; and press reports.

125.   These Events of Default impaired the rights of MBS holders to collect their full principal and interest, and reduced the value of the MBS. Accordingly, under those circumstances, a prudent person would have exercised all of his rights to recover for those Events of Default.   By failing to take such action, BNY Mellon breached the Governing Agreements, and damaged Plaintiffs and the Class.

## THIRD CAUSE OF ACTION

### (On Behalf of the Class, Breach of Implied Covenant of Good Faith and Fair Dealing)

126.   Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

127.   New York law implies an obligation of good faith and fair dealing into all contracts.  That obligation requires that no party to a contract do anything which will destroy or injure the right of another party to receive the benefits of the contract.  BNY Mellon breached the implied covenant of good faith and fair dealing in the Governing Agreements by acting to undermine Plaintiffs' ability to collect on a future judgment from Countrywide or BofA.

128.   As set forth above, BNY Mellon had notice that Countrywide and BofA had breached their obligations under the PSA through document exception reports it generated, their settlement with the various state attorneys general, BNY Mellon's monthly distribution reports, insurer notices of default, correspondence with investors, including Fannie Mae, shareholder and insurer lawsuits, news reports and the prosecution by the SEC that resulted in Countrywide's former CEO paying over $60 million to settle a complaint alleging major deficiencies in Countrywide's mortgage collateral.  Indeed, BNY Mellon relied on many of these materials in bringing its own Delaware lawsuit against Countrywide on behalf of other indenture note holders.

129.   By failing to take action to protect the MBS holders' interests under those circumstances, and instead acting to further strip away Countrywide assets, thereby further depleting Countrywide's ability to pay, BNY Mellon, in bad faith, frustrated the MBS holders' rights to their consideration under the PSA.

130.    BNY Mellon is liable to Plaintiffs and the Class for the losses they suffered as a direct result of its breach of the covenant of good faith and fair dealing.

### FOURTH CAUSE OF ACTION

**(On Behalf of the Trusts and MBS Holders Derivatively,
Breach of Fiduciary Duty)**

131.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

132.    Plaintiffs purchased MBS issued by the Covered Trusts and continue to hold certain of those MBS as provided in Ex. B.

133.    As set forth in detail above, BNY Mellon owed the Covered Trusts and MBS holders fiduciary duties under the Governing Agreements once an event of default occurred or payments to MBS holders became impaired, and under the TIA in case of defaults.  But BNY Mellon breached its fiduciary obligations by failing to act prudently, or in the best interests of the Covered Trusts and MBS holders, under those circumstances.

134.    The violations by BNY Mellon of its fiduciary obligations impaired MBS holders' ability to fully collect the principal and interest due on their MBS and caused losses in the value of Plaintiffs' MBS, for which BNY Mellon is liable.

135.    These claims are made derivatively on behalf of the Covered Trusts for which BNY Mellon serves as Trustee.  No demand has been made on the Trustee because a demand would be futile, in that the demand would be for the Trustee to sue itself.  As such, the Trustee is conflicted and not a disinterested representative of the Covered Trusts and/or MBS holders who bring suit on their behalf.  Additionally, this action is not a collusive one brought to confer jurisdiction that the Court would otherwise lack.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for relief and judgment, as follows:

A.      Awarding compensatory damages and/or equitable relief in favor of the Plaintiffs and the Class against BNY Mellon for breaches of its statutory, contractual and fiduciary duties, in an amount to be proven at trial, including interest thereon;

B.      Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

C.      Such other relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable.

Dated:  June 17, 2013                    SCOTT+SCOTT, ATTORNEYS AT LAW, LLP

David R. Scott (DS 8053)
Beth A. Kaswan (BK 0264)
William C. Fredericks (WF 1576)
Deborah Clark-Weintraub (DW 6877)
Max Schwartz (MS 2517)
Donald A. Broggi (DB 9661)
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY 10174
Telephone:  212-223-6444
Facsimile:  212-223-6334

*Counsel for Plaintiffs*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that, pursuant to the Court's Individual Practices and Orders, the foregoing was filed with the Court on June 17, 2013 and filed for the docket on this 3rd day of July 2013, with the Clerk of the Court.  Counsel of record have been served via email as follows:

Matthew D. Ingber
Paula Garrett Lin
Christopher J. Houpt
MAYER BROWN LLP
1675 Broadway
New York, New York 10019
Email: mingber@mayerbrown.com
plin@mayerbrown.com
choupt@mayerbrown.com

*Attorneys for Defendant*

SCOTT+SCOTT, ATTORNEYS AT LAW, LLP

David R. Scott (DS 8053)
Beth A. Kaswan (BK 0264)
William C. Fredericks (WF 1576)
Deborah Clark-Weintraub (DW 6877)
Max Schwartz (MS 2517)
Donald A. Broggi (DB 9661)
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY 10174
Telephone:  212-223-6444
Facsimile:  212-223-6334

*Attorneys for Plaintiffs*

1