Dc6eretc

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    RETIREMENT BOARD OF THE
     POLICEMEN'S ANNUITY AND
4    BENEFIT FUND OF THE CITY OF
     CHICAGO, on Behalf of Itself
5    and Similarly Situated
     Certificate Holders,

6
               Plaintiffs,
7
          v.                          11 CV 5459(WHP)
8
     THE BANK OF NEW YORK MELLON
9    (as Trustee Under Various
     Pooling and Servicing
10   Agreements),

11             Defendant.

12   ------------------------------x

13                                    December 6, 2013

14                                    12:30 p.m.

15
     Before:
16
                    HON. WILLIAM H. PAULEY III,
17
                                      District Judge
18
                         APPEARANCES
19
     SCOTT & SCOTT
20        Attorneys for Plaintiffs
     BY:  WILLIAM C. FREDERICKS
21        MAX R. SCHWARTZ
          BETH ANN KASWAN
22
     MAYER BROWN LLP
23        Attorneys for Defendants
     BY:  MICHAEL MARTINEZ
24        MATTHEW D. INGBER

25

Dc6eretc

1          (Case called)

2          (In open court)

3          THE DEPUTY CLERK:  Appearances for the plaintiff?

4          MR. FREDERICKS:  William C. Fredericks, Scott & Scott,

5     Attorneys of Law, LLP, for plaintiffs.

6          MR. SCHWARTZ:  Max Schwartz, also for plaintiffs.

7          MS. KASWAN:  Beth Kaswan, also for plaintiffs.

8          THE COURT:  Good morning, or I should say good

9     afternoon.

10          THE DEPUTY CLERK:  Appearance for the defendant?

11          MR. MARTINEZ:  Mike Martinez, Mayer Brown, on behalf

12     of Bank of New York Mellon.

13          MR. INGBER:  Good afternoon, your Honor.  Matthew

14     Ingber, also for the Bank of New York Mellon.

15          THE COURT:  Good afternoon, gentlemen.

16          This is argument on Bank of New York Mellon's motion

17     addressed to certain claims in the second amended complaint.

18          Do you want to be heard, Mr. Martinez?

19          MR. MARTINEZ:  Yes, your Honor.  Should I use the

20     podium, your Honor?

21          THE COURT:  Yes, that would be great.

22          MR. MARTINEZ:  Your Honor, I'll be handling the first

23     claim and Mr. Ingber will be handling the second claim.  The

24     first claim is the breach of the implied covenant claim.

25          So last July we had an argument in this courtroom

Dc6eretc

1  regarding whether to go forward with the Rule 30(b)(6)

2  deposition with the Bank of New York Mellon.  And at that time

3  the plaintiffs wanted a deposition on their breach of the

4  implied covenant claim that the Bank of New York Mellon,

5  through the Delaware settlement agreement, agreed to have Bank

6  of America assume $16.6 billion of Countrywide debt securities,

7  and the Bank of New York Mellon agreed to work with Bank of

8  America to strip Countrywide from any assets.

9         Now, the complaint further alleged that Bank of

10  America's corporate consents showed that the Delaware

11  settlement was the impetus of Bank of America's November 2008

12  asset stripping transactions.

13         Back in July I argued that plaintiffs were trying to

14  prove an implausible theory akin to the world being flat.

15  Since that time plaintiffs have taken a Rule 30(b)(6)

16  deposition at the Bank of New York Mellon for seven hours, a

17  Rule 30(b)(6) deposition at the Bank of America for seven

18  hours, a Rule 30(b)(6) deposition of Carter Ledyard, one of the

19  law firms representing the Bank of New York Mellon in the

20  Delaware action, again, for seven hours.  They've had a Rule

21  30(b)(1) deposition of Loretta Lundberg, who during the

22  relevant time period was the head of US corporate finance for

23  the Bank of New York Mellon.  And it was on -- much of it was

24  on the same topic.

25         What's the result been?  There is no support for their

Dc6eretc

1    claim.  The world is still round.  And when we looked at

2    plaintiffs' breach of the implied covenant claim, what we see

3    is that it's facially implausible.  It's undermined by the very

4    documents on which the plaintiffs relied, the complaint and

5    settlement agreement, the B of A corporate consents and

6    B of A's SEC form 8K from November 7, 2008.

7           Let me go through just seven quick factual

8    contradictions with the documents.

9           First, the Delaware complaint related to only

10   $2 billion of Countrywide debt securities, not $16.6 billion.

11          Second, the settlement agreement made clear that the

12   Bank of New York Mellon was acting solely in its capacity as

13   indentured trustee for series B debentures with a face value of

14   $2 billion, and not on behalf of other debenture holders.

15          THE COURT:  But didn't the corporate consents for

16   Countrywide require your client to approve the supplemental

17   indentures?

18          MR. MARTINEZ:  Absolutely, your Honor.  I mean,

19   part -- when you look at the indentures, the indentures

20   required if there's a merger, or if another purchaser purchases

21   substantially all the assets, that that successor now take the

22   obligations, the corporate debt obligations of the prior party.

23   And then the trustee's in the position of deciding to enter

24   into that supplemental indenture or not.

25          But that is a separate transaction.  That has nothing

Dc6eretc

 1   to do with the Delaware litigation at all.  The Delaware

 2   litigation was brought because these series B indentures -- and

 3   they were unique in this sense:  This particular indenture

 4   provided for a change -- it had a change of control repurchase

 5   option of the other indentures, which the Bank of New York

 6   Mellon was also trustee and which were assumed by B of A didn't

 7   have a repurchase option upon the change of control.

 8           So these series B debenture holders in July, after

 9   Countrywide was merged into a wholly-owned subsidiary Bank of

10   America, they sued, and actually, they directed the Bank of

11   New York Mellon as trustee to sue and enforce its repurchase

12   right.  And the repurchase right would have required

13   Countrywide to repurchase the debentures at par at that time.

14           THE COURT:  Doesn't the obligation to put back the

15   mortgages touch on the issue of security interests in the

16   collateral?

17           MR. MARTINEZ:  Your Honor, a couple things on that

18   point.

19           First of all, plaintiffs' complaint takes the position

20   essentially that the Bank of New York Mellon as trustee for the

21   MBS trusts shouldn't have brought or settled a Delaware lawsuit

22   on behalf of series B debentures as trustee for them, but that

23   ignores the law that the Bank of New York Mellon, as trustee,

24   is a separate legal entity for each trust that they administer.

25   So there's no uber trustee, where when the Bank of New York

Dc6eretc

1   Mellon's trustee for the series B indentures, it had an

2   obligation to look within that particular indenture.  It had an

3   obligation in that sense to look inside the four corners of

4   that agreement and not to look at all the other particular -- I

5   mean, hundreds, if not thousands of other trusts for which the

6   Bank of New York Mellon also happens to be a trustee.  So even

7   if there were an effect potentially -- and as we pointed out in

8   our papers, you know, at this particular point in time in July

9   of 2008, what the effect would be, you know, it would be a

10  difficult one to know at that particular point in time.

11          So even if that were the case under the -- if you look

12  at New York law, there is no implied right in that sense where

13  this particular trustee would now have to consider all the

14  other trusts for which it's trustee.  I mean, the bank,

15  New York Mellon, couldn't function as a trustee in that sense.

16          THE COURT:  All right.  Anything else?

17          MR. MARTINEZ:  I don't know if we're going to touch

18  upon discovery at this point.  I know that was also on, but I

19  can come back at the end, if you want to discuss discovery.

20          THE COURT:  The request seems rather noncontroversial,

21  doesn't it, to extend discovery by a month roughly?  Isn't that

22  what's requested?

23          MR. MARTINEZ:  That is what's requested, your Honor,

24  but I would point out we're now at the fourth discovery

25  request.  And the plaintiffs have made certain choices here.  I

Dc6eretc

```
 1    mean, frankly, they have chosen to pursue an implausible theory
 2    and forego other discovery options.  As an example, in November
 3    they had a seven-hour deposition, a Rule 30(b)(6) on this
 4    particular implied breach theory of Bank of America.  Now, they
 5    can use those seven hours, at least part of those seven hours,
 6    to lay the foundation for documents.  But instead, they chose
 7    not to.  And now, Bank of New York Mellon is really being
 8    forced to suffer the consequences of the choices that they
 9    made, not to lay foundation for document admission.
10            So, our position is still that we think there comes a
11    point in time -- we're now at the fourth request -- that it's
12    becoming burdensome for the Bank of New York Mellon.
13            THE COURT:  All right.  Let me hear from Mr. Ingber.
14            MR. INGBER:  Thank you, your Honor.
15            THE COURT:  And, Mr. Martinez, I mean, the plaintiffs
16    do say that BoNY Mellon produced two 30(b)(6) witnesses who
17    weren't particularly prepared to answer questions, don't they?
18            MR. MARTINEZ:  We produced one.  After somewhere
19    between 12 to 17 minutes of questioning, they decided to
20    terminate the first deposition.
21            And we came back with a 30(b)(6) witness, Jerry
22    Facendola, at this time was the head of the default
23    administration group.  So he not only had personal knowledge,
24    having supervised Martin Feig with respect to the Delaware
25    litigation, but spent more than two days going over distilled
```

Dc6eretc

1    information that we had to come up with to refresh his

2    recollection.  He was more than adequately prepared on three

3    topics, one topic which they didn't even question him on after

4    we prepared him for.  So he was more than adequately prepared.

5    So the notion that Mr. Facendola wasn't prepared is absurd.

6              THE COURT:  All right.

7              MR. MARTINEZ:  And I think what's happened, your

8    Honor, if I can add, is they've gone to the Bank of New York

9    Mellon.  They've gone to Bank of America.  They went to Bank of

10   New York Mellon's lawyer, law firm Carter Ledyard.  They now

11   have 21 hours of deposition testimony, and they can't support

12   their theory.  It's not that these witnesses were

13   insufficiently prepared.  It's that they have an inadequate

14   theory.  They could keep coming back, but you can't change -- I

15   go back to what I said in July.  If the world is still round,

16   you can keep trying to say that it's flat, it's flat, it's

17   flat, but all the data comes back saying it isn't.

18             MR. INGBER:  Good afternoon, your Honor.  May it

19   please the Court.

20             The second piece of our motion to dismiss focuses on

21   the question of whether the plaintiffs have adequately alleged

22   claims as relating to the Delaware statutory trust, and

23   specifically, whether the plaintiffs have adequately alleged

24   that an issuer event of default has occurred.

25             And as background, as your Honor knows, there is one

Dc6eretc

1    trust in this case that is subject to a trust indenture.

2    Depending on how the TIA issue plays out at the Second Circuit,

3    there may well be one trust and only one trust that is subject

4    to the Trust Indenture Act.  And the claims that relate to this

5    single trust really, like the claims that relate to all the

6    trusts, are premised on the notion that there is an event of

7    default or there was an event of default.

8         But for this indentured trust, unlike the PSA

9    government trusts, there has to be an issuer event of default,

10   and the issue with respect to this complaint is really

11   three-fold.  Number one, does it allege an issuer event of

12   default?  On the face of the complaint, is there an allegation

13   of an issuer event of default?

14        THE COURT:  Haven't I already ruled on whether the

15   plaintiffs allege an event of default under the Delaware trust

16   indenture?

17        MR. INGBER:  You have, your Honor.  And that's why

18   actually the focus of my argument today is going to be on the

19   second point and the third point.

20        The second point is whether -- is the merits point, is

21   the substantive issue:  Can there be an allegation that there

22   is an issuer event of default?  So if we read, as your Honor

23   has, if we read the complaint as alleging generally that

24   there's events of default, they didn't identify the issuer or

25   referred it to provisions of the indenture, even though they've

Dc6eretc

```
1   alleged a breach of contract, they haven't actually alleged the
2   provisions of the contract that are breached.
3          But putting that aside, there is this second question
4   of -- really it's a merits question.  Their theory is that
5   there is a duty on the part of the issuer to enforce repurchase
6   obligations of Countrywide or to ensure that the master
7   servicer is enforcing repurchase rights of Countrywide.  And so
8   the substantive question, which was not briefed by the parties,
9   is whether there is such a duty in the indenture.
10         And then the other question that we've raised on this
11  motion to dismiss is whether -- even if they have alleged an
12  event of default, and even if they could substantively allege
13  an event of default, have they alleged that the trustee
14  received notice of the event of default?  And that means
15  written notice or actual knowledge of an issuer event of
16  default.  And we think they fail on all three of these issues,
17  but your Honor has already ruled on the first.  And so we're
18  going to focus, if we may, on the second, on the merits piece
19  and then the notice piece today.  And that's what we focused on
20  in the brief, and that's what I'd like to focus on for the
21  argument.
22         And so again, your Honor, the question is whether the
23  issuer has a duty to enforce repurchase remedies or to make
24  sure the master servicer is enforcing these repurchase remedies
25  against Countrywide.  And we think that that's just not the
```

Dc6eretc

1    case for two reasons.  One is a practical reason, and the other

2    is a contractual reason.

3           And starting with the practical, what is the issuer?

4    The issuer is a statutory trust.  It's a Delaware statutory

5    trust.  It has no employees.  It has no officers.  It has no

6    directors.  There's no one at the issuer reading the

7    newspapers, as the plaintiffs say should have been done, to get

8    constructive knowledge of an event of default.  There's no

9    reading complaints that have been filed or monitoring the

10   master servicer.  The issuer has no assets of its own.  It gets

11   principal and interest on the underlying loans, and those are

12   paid out to investors in the securitization trusts.  It uses an

13   administrator to carry out its ministerial functions.  The pro

14   subs for these trusts say that the administrator can only carry

15   out ministerial functions.  The administrator is paid $200 a

16   month to carry out these ministerial functions.

17          As far as we can tell, the issuer has no mechanism for

18   tapping trust funds to fund a litigation that the plaintiffs

19   think the issuer should have filed to enforce repurchase

20   remedies.  So there's no money to even pursue these types of

21   claims that the plaintiffs think should have been pursued.

22          And then there's just the question of what the issuer

23   does.  The issuer is there to grant the security interest in

24   the mortgage loans, to take steps to make sure that there is a

25   perfected first priority security interest in the collateral

Dc6eretc

1   and there's a grant to the indenture trustee.  That's what the

2   issuer does.

3          THE COURT:  But is it your argument that the issuer

4   can never breach obligations because the issuer has no staff?

5          MR. INGBER:  No, no, no.  No.  It's not.  The issuer

6   certainly -- there are events of default.  If the issuer issues

7   certain obligations, the issuer has to pay out the principal

8   and interest on these loans.  That's what is required by these

9   documents.  It's what's contemplated when investors purchase

10  these notes that the issuer -- if the issuer doesn't make those

11  payments, even if it uses an administrator or some other party

12  to effectuate that duty, then that could be a breach by the

13  issuer.

14         So, of course, the contracts contemplate that the

15  issuer could be in breach, but they certainly -- and this is a

16  good segue to the next point.  They certainly don't contemplate

17  that the issuer is accepting the duty to enforce repurchase

18  remedies.  So the practical point that I'm making is

19  contextual.  It gives context to a reading of the contracts

20  that we believe makes the most sense.

21         And, your Honor, if I may, I know these are exhibits

22  to our motion.  Can I hand up just a few provisions of the

23  indenture that we believe are relevant to this issue?

24         THE COURT:  All right.  But, look, I've been through

25  your briefs.  I'm not going to --

Dc6eretc

1          MR. INGBER:  That's fine.

2          THE COURT:  -- spend a lot of time walking through

3     these provisions.

4          MR. INGBER:  That's fine, your Honor.  So I certainly

5     won't do that, then.  I'll keep it brief.

6          THE COURT:  I mean, if the indenture trustee doesn't

7     have a duty to enforce, who has the duty?

8          MR. INGBER:  The certificate holders have the ability

9     to direct the indenture trustee to take action.  That's what is

10    most fundamental in these agreements.  These certificate

11    holders, when they purchase their certificates, or in this case

12    when they purchase their notes, they can read the indenture

13    trust.  They can read the sale and servicing agreement and the

14    trust agreement and the administrator agreement.  They know

15    what the duties of each of the relevant parties is.

16          And they also understand that there is a mechanism for

17    getting 25 percent of certificate holders or note holders

18    together to direct the trustee.  Even if they're not themselves

19    a 25 percent holder, they could, with two other -- at least

20    some of these trusts, with two other certificate holders, they

21    could request a list of certificate holders.  They could take

22    steps to get 25 percent to direct the trustee.  That's what

23    these contemplate.  They also contemplate and make --

24          THE COURT:  That's not a duty.  That's a right that

25    they have.  Who has the duty?

Dc6eretc

1        MR. INGBER:  The trustee has a right also.  There is

2    an important distinction between a right, obviously, and a

3    duty.  The trustee has the right to pursue these claims, but it

4    doesn't have the duty.

5        THE COURT:  Who has the duty?

6        MR. INGBER:  Well, certainly the master servicer

7    has -- well, with respect to the question of whether there is a

8    party to the contract that has the duty to monitor the seller,

9    in this case Countrywide, to determine whether there are

10   breaches of representations and warranties, the only candidate

11   of the parties to this agreement would be either the seller

12   itself or -- there would be self policing or it would be the

13   master servicer.  But it is certainly not --

14       THE COURT:  But the master servicer is the other party

15   to the agreement.

16       MR. INGBER:  And, therefore, the master servicer has

17   the right, and arguably the obligation, to pursue claims for

18   breaches of representations and warranties, if they know, if

19   they are aware of actual breaches of representations and

20   warranties with respect to individual loans in these trusts.

21       THE COURT:  Well, who represents the issuer's

22   interest?

23       MR. INGBER:  There is an owner trustee that by statute

24   has to be appointed.  Under Delaware statute, the way these

25   trusts are set up, if the trust is the issuer, there an owner

Dc6eretc

1    trustee that is appointed as the trustee of the trust, a

2    trustee of the issuer.

3            THE COURT:  All right.  What else?

4            MR. INGBER:  So the focus of our briefing, your Honor,

5    was on Section 305 of the indenture.  And that was a provision

6    of the indenture that your Honor actually had cited to in one

7    of the orders.  That wasn't briefed by the parties.  Your Honor

8    did cite to that, and that has since become the focus of the

9    briefing.  What is --

10           THE COURT:  What types of rights does Section

11   305(a)(4) refer to?

12           MR. INGBER:  It refers to the right to title in the

13   collateral, the right to ownership in the collateral.  If you

14   consider the context -- but even if you just consider that

15   provision, it's not rights relating to, it's rights -- it's

16   what are the issuer's rights?  The issuer's rights are to title

17   and ownership of the collateral.  And it's important that the

18   issuer have those rights, because the issuer is granting a

19   security interest to the indentured trustee.

20           If you read what comes before and what comes after,

21   and you read the preamble of 305, this is all relating to the

22   issuer's security interest.  305(a) starts by saying that the

23   issuer intends the security interest granted under this

24   indenture to be before all other liens on collateral.

25           THE COURT:  How is that any different, though, than

Dc6eretc

1    305(a)(5) that says you preserve and defend title?

2           MR. INGBER:  Well, I think all of these in some

3    respects are overlapping.  The way we read 305, and I think

4    it's the logical way to read it, especially in light of what

5    the issuer's role is and is certainly understood to be in the

6    industry, is that 305.4 is a catchall.

7           So the whole point of 305(a) and (b), if you read the

8    preamble and you read one through three and you read five and

9    six, the whole point is what does the issuer need to do to make

10   sure that it has a perfected security interest that it could

11   grant to the indentured trustee?

12          So one says grant more effectively any portion of the

13   collateral; two refers to preserving the security interest;

14   three, perfecting the validity of any grant; four is to defend

15   title against adverse claims.

16          Are there any adverse claims here?  There's no adverse

17   claims to the title.  There's been no allegation of that.

18          Five refers -- I'm sorry, six refers to taxes.  What

19   the plaintiffs have said is that, of course, this refers to

20   enforcing breaches of reps and warranties, and in their briefs

21   that's what they said.  Read the language.  The language says,

22   according to the plaintiffs, that it's related to breaches of

23   reps and warranties.  It's not related to breaches of reps or

24   warranties because it doesn't say it.  And the drafters of

25   these types of documents understood how to be specific about

Dc6eretc

1     what they meant.

2               THE COURT:  But doesn't putting back mortgages go to

3     rights in the title to the collateral?

4               MR. INGBER:  No, because we're talking about the

5     issuer's right to title.  And putting back mortgages has

6     nothing to do with title.  Title is conveyed by contract.

7     Title is conveyed through these contracts.  That is how title

8     is conveyed to the issuer.  And the issuer just has to make

9     sure that somebody else out there isn't going to claim title to

10    this collateral.  That's why the issuer exists.  That is the

11    role, the responsibility, the duty of the issuer.

12              Breaches of reps and warranties, your Honor, has

13    nothing to do with that question of whether the issuer has

14    title.  The title is conveyed through the contract.  There is

15    conveyance language in these documents.  The issuer then has to

16    make sure that once that title is conveyed by in this case the

17    depositor to the issuer, that it -- no one is making claims

18    against that title.  No one can say to the indentured trustee

19    or to the issuer or anyone else, we have superior title.  So

20    that's what this entire section -- which says, protection of

21    the collateral, that's the title of 305.  That's what it

22    relates to.

23              And I was saying before, your Honor, the drafters, we

24    believe if they intended to have this expansive duty for the

25    issuer, they would say so.  The PSA -- and I understand we're

Dc6eretc

not talking about PSAs; we're talking about indentures here.
But the PSAs are, we think, important to keep in mind, because
they, in Section 201 of the PSAs, they convey -- and they're
different than the indentures.  But they, the depositor is
conveying to the trustee in that case whatever rights the
depositor has.  And what that language says is that the
depositor assigns all the right, title and interest of the
depositor in the trust fund, together with the depositor's
right to require each seller to cure any breach of a
representation or warranty made herein.

Now, that is a right that's being conveyed, not a
duty, but the drafters were specific.  What the plaintiffs are
seeking to impose on the issuer is an incredibly expansive duty
under any circumstances that would be an expansive duty,
especially under the circumstances where we have an issuer with
very defined and very ministerial functions.  That's the type
of duty that the drafters would actually, we believe, would
actually write out in this agreement, if it was intended to --
if that language, 305.4, was intended to impose this type of
duty.

There's also the notice issue, your Honor.  And I'll
just mention this very briefly, because I know we have limited
time and we've briefed it in the papers.  But this is not an
insignificant issue.  This is not a hyper technical issue.

Section 601(c)(4) of the indenture says that the

Dc6eretc

1    indentured trustee doesn't have notice of an event of default

2    unless a responsible officer of the indentured trustee either

3    has actual knowledge -- not constructive knowledge, actual

4    knowledge -- or notice of the event of default.  And we're

5    talking here about an issuer event of default.

6            1104 of the indenture defines notice as written notice

7    delivered in a certain way.  There's no allegation -- we don't

8    believe there's any allegation in the complaint, nor could

9    there be, that there was notice or actual knowledge of an

10   issuer event of default.  And so we believe, your Honor, that

11   this is another ground or another basis for dismissing the

12   claims relating to the Delaware statutory trust.

13           THE COURT:  All right.  Let me hear from the

14   plaintiff.

15           MR. INGBER:  Thank you, your Honor.

16           THE COURT:  Thank you, Mr. Ingber.

17           MR. FREDERICKS:  Your Honor, do you have a preference

18   for me addressing the indentured trust issue first or the

19   implied claim first?  I'm happy to go in any order the Court

20   prefers.

21           THE COURT:  Well, assuming that Bank of New York

22   Mellon facilitated the transaction between Bank of America and

23   Countrywide and settled the Delaware lawsuit, how did those

24   actions directly cause plaintiffs' losses?

25           MR. FREDERICKS:  Your Honor, they impaired plaintiffs'

Dc6eretc

1    ability in -- to collect against a solvent or more solvent

2    Countrywide, because Bank of New York was essentially wearing

3    more hats than it had any business wearing here.  It was both

4    trustee on the commercial notes; most of them, admittedly not

5    all.  It represented as trustee the MBS trusts, and itself was

6    a creditor of Countrywide, something we've only recently

7    learned in discovery, under the line of credit debt that was

8    paid off as part of the July transactions.

9              And then Bank of New York Mellon, despite being a

10   recipient of payments on debt owed to itself by Countrywide,

11   despite being the trustee for the MBS trusts who had tens of

12   billions of dollars contingent repurchase claims against the

13   trust, then proceeds to act on behalf of at least one specific

14   group of commercial note holders, the series B trust holders,

15   in order to get, once again, that group of preferred creditors

16   paid off essentially in full.  I mean, it was 98 cents on the

17   dollar, but effectively they got paid off basically in full.

18   That's $2 billion in the context of an entity which is

19   insolvent.  I think it's very telling, your Honor, that

20   defendants nowhere deny that the complaint more than adequately

21   alleges the insolvency of the Countrywide entities.

22             Now, they come into court today and make what I think

23   is an extraordinary argument, which is, oh, in each of our

24   capacities, we're a separate legal entity.  And the fact that

25   we're facilitating the payout of an insolvent entity's assets

Dc6eretc

1    into the pockets of one of our beneficiaries, we can completely

2    turn a blind eye to the fact that in so doing, we are clearly

3    impairing the ability of our other trust beneficiaries, the MBS

4    note holders, to get anything.  And our theory, our fundamental

5    damages theory, is that had events proceeded as they should

6    have -- Countrywide was insolvent.  Bank of New York Mellon's

7    own allegations in the series B litigation show that they were

8    insolvent, allege concerns about Countrywide's precarious

9    financial condition.  They write to the chancellor of the

10   Delaware Chancery Court to say, we have a repurchase right to

11   these series B notes, which comes due in May 2009.  But

12   Countrywide, you know, from what we've read in the SEC filings

13   and elsewhere, Countrywide isn't going to make it to May 2009

14   because it doesn't have the money.

15          So on one hand, they're going to a judicial officer,

16   the Delaware chancellor, saying, pay us the money on the series

17   B, $2 billion.  That's not necessarily chump change.  And the

18   important thing here, your Honor, is that the series B action

19   itself is only a part of the puzzle when we initially put

20   together this plea, that it was back in May of 2008.  And

21   obviously we're still learning more.  Based on the public

22   documents we saw at the time, we thought there was a reasonable

23   connection between what was going on with the series B

24   litigation and the assumption of debt on all the other

25   commercial notes.

Dc6eretc

1          THE COURT:  How is there an implied promise that BoNY

2     Mellon wouldn't settle other lawsuits?

3          MR. FREDERICKS:  Your Honor, this goes to two

4     alternate prongs or two arrows in our quiver.  The first is the

5     standard breach of duty of good faith and fair dealing language

6     under New York law, which says that a party cannot do anything

7     to impair its counterparty's ability to reap fruits of its

8     contract.  If you and I have a contract that gives me an

9     interest in a particular business or a security interest, a

10    particular business, we may not have any specific contractual

11    provision that says you can't then go and damage the business

12    in which I now have an investment.  But New York courts every

13    time will apply a duty that you can't harm my security interest

14    that is a subject of our contract.  You just can't do it,

15    because here, what could be more posh to the MBS trust holders

16    than making sure that the collateral that they have, that

17    underlies their securities, is, in fact, protected, not

18    impaired, and that there is going to be recourse at the end of

19    the day if there is an impairment, because who pays?  Who pays

20    is Countrywide.

21          And what happened here, Bank of New York Mellon is

22    collecting millions of dollars, hundreds of millions of dollars

23    we think on line of credit debt owed from Countrywide.  It's

24    acting on behalf of the series B note holders to collect money

25    for them from Countrywide.  It precipitates a situation where

Dc6eretc

1    other commercial note holders at exactly the same time that the

2    series B litigation is being concluded, those folks are being

3    paid off.

4            And, your Honor, I would like to show you one document

5    from -- that we gained in discovery just from the very last

6    deposition we took, which I think it goes very much to this.

7            THE COURT:  But Countrywide's available assets aren't

8    the security, right?

9            MR. FREDERICKS:  Your Honor, Countrywide's available

10   assets are what the backup is for the collateral.  I mean, I

11   may have title to a security.  I may have a security interest

12   in a particular investment.  But if I can't ultimately recoup

13   any value on what is basically the building blocks of the

14   securities we're talking about, I mean, that is every bit as

15   important as what the title is.

16           But, your Honor, if I may, this is the Gadson Exhibit

17   19.  This was a document -- we had a little colloquy --

18           THE COURT:  All right.  This is a motion to dismiss.

19   Both sides want to hand up all kinds of things.

20           MR. FREDERICKS:  Your Honor, I hand up this one for a

21   particular reason, because Bank of New York Mellon wants the

22   Court to believe that all the transactions that occurred in

23   July and in November and in between were all part of the

24   ordinary course of business.  And if they had all been in the

25   ordinary course of business, we would not be here.  If these

Dc6eretc

1    were just indentures being signed by, you know, Warren Buffett

2    and Berkshire Hathaway, an entity whose credit rating is

3    probably greater than the US government, we wouldn't be here.

4            We have been trying to get through discovery documents

5    showing Bank of New York Mellon's knowledge of Countrywide's

6    insolvency.  We took 30(b)(6)s.  They said we don't know what

7    you're talking about.  Why would we be monitoring?  Why would

8    we have any notice of insolvency?  We asked for documents

9    relating to insolvency and bankruptcy.  We don't have any such

10   documents.  It's frivolous for us to even be looking for them.

11   Why would we be worried about Countrywide solvency?  Probably

12   because I guess they have this theory that, you know, they all

13   live in separate cones.  Each trustee is separate.

14           We finally take, after a failed 30(b)(6) deposition, a

15   deposition of Bank of New York Mellon's attorneys.  And the

16   document that I've shown you, your Honor, is a letter that was

17   copied to Bank of New York Mellon in September 2008, literally

18   about -- this is after the series B litigation has been brought

19   and less than a month before the series B litigation is

20   settled, where Kasowitz Benson writes on behalf of one group of

21   series B note holders to Countrywide.  If you look at the first

22   page, the second paragraph, Aurelius believes that CHL is

23   insolvent; indeed, deeply so.  Goes on to list five or six

24   bullet points of evidence as to why they believe Countrywide is

25   insolvent, puts them on notice that they believe that

25

Dc6eretc

1    fraudulent conveyances are going on because 5.5 billion of CHL

2    assets are being carved through Countrywide Bank because, as

3    we're learning in discovery, Countrywide bank was

4    undercapitalized.  Points out that there are highly material

5    conflicts between the interest of CHL and its various

6    creditors.  This is them writing to Countrywide, but it's all

7    copied to Bank of New York, and basically says there should be

8    an independent committee of the board of directors appointed

9    CHL to ensure that Countrywide's interests, the interests of

10   creditors, are not being impaired.

11           This is not business as usual.  This letter -- which

12   it's remarkable that, of course, the Countrywide Bank of

13   America never produced it in any of their prior litigations --

14   it's remarkable that Bank of New York Mellon never produced it

15   to us.  It's remarkable that we had to go subpoena their

16   outside counsel lawyers, and that lawyer was honest enough to

17   have not deep-sixed this kind of document.  Bank of New York

18   Mellon knows that Countrywide is insolvent.

19           And I don't think I need to tell your Honor that when

20   you have an insolvency situation, you have to line up the

21   rights of creditors of the United States Constitution.  Last

22   time I looked, there's a supremacy provision that Congress has

23   the right to preempt all bankruptcy matters.  It's done so in

24   the federal bankruptcy code.  That provides for how assets of

25   an insolvent entity are meant to be distributed.

Dc6eretc

1              And here, Bank of New York Mellon, it was playing

2     favorites.  It was playing favorites for itself to get paid.

3     And it cannot have been -- it could have resigned.  It could

4     have stepped away.  But the case law is clear that, you know,

5     under your Honor's own decision in *L.F. Rothschild*, where you

6     cite Learned Hand, the trustee has, even absent a contract, a

7     duty of scrupulous loyalty.

8              What kind of loyalty was the APS trust getting here?

9     It wasn't getting anything.  Everyone else got paid

10    effectively.  All of Countrywide's creditors got paid

11    effectively, most of it through the help of Bank of New York's

12    involvement in this process.  Defendant's own brief says that

13    the November indentures and the November transactions, which

14    were the final piece of the asset stripping transactions,

15    couldn't have gone down without Bank of New York Mellon's own

16    involvement.

17             And the term asset stripping, that's not a term that

18    we've invented, your Honor.  Asset stripping is a term that

19    Bank of New York Mellon itself used in describing what was

20    going on to the Delaware Chancery Court.  And the pretend

21    observation, well, it's just the series B.  If it had only been

22    the series B, it would still be $2 billion additional of

23    assets, but it was a much broader construct.  It was the whole

24    transaction.  And Bank of New York Mellon was wearing way too

25    many hats here.  It was then paid itself, it was getting

Dc6eretc

1    payoffs for some of its clients.  And what was it doing for the

2    MBS trust holders?  Nothing.

3         THE COURT:  All right.  I think I have your arguments.

4    Anything further?

5         MR. FREDERICKS:  I'm happy to address the indenture

6    trust argument, but I think again, your Honor, you decided it

7    right the first time.  You decided it right the second time.

8         And if your Honor looked, I do want to correct one

9    misstatement in the record on reconsideration.  The 305 issue

10   was raised in our reply brief on the initial motion to dismiss.

11   The specific provisions of 305(a)(4) and (5) were specifically

12   mentioned in the oral argument on the initial motions to

13   dismiss.  Your Honor got the 305 issue correct then.  It got it

14   correct on reconsideration.  This is in effect a third bite at

15   the apple.  Your Honor has got it exactly right.

16        The one thing that I would just ask your Honor to look

17   at is this notion that there is no provision in the contracts

18   or the indenture that imposes or implies any issuing rights

19   outside of 305(a)(4), or 305(a)(4) is incorrect.  We have cited

20   in our brief additional provisions in the indenture which refer

21   specifically to the issuer rights obligations, including in

22   particular paragraph 518 of the indenture, which says that the

23   indentured trustee as pledging the mortgage loans may exercise

24   all rights of the issuer against the sponsored or master

25   servicer in connection with the SSA, including the right to

28

Dc6eretc

 1   take any action to obtain performance by Countrywide as either

 2   seller or master servicer; that admittedly all refers to the

 3   indentured trustee.  But if you read Section 518 to the end, it

 4   goes on to say, and any right of the issuer to take such action

 5   shall not be suspended.

 6          There's also provisions in 308J which talk about

 7   issuer rights.  Your Honor put your finger exactly on it.

 8   There are issuer duties.  If the issuer did not sufficiently

 9   retain an administrator to police these matters, to take

10   appropriate action, that's the issuer's problem.  And in fact,

11   if there is anyone out there to enforce them, it makes it all

12   more important that the indentured trustee is there to monitor

13   what has occurred.

14          I think that defendants have no response to the

15   argument that they appoint -- that the issuer appoints an

16   administrator to perform issuer responsibilities.  I mean,

17   there's this weird dichotomy.  They say the issuer is powerless

18   to do anything, but then they point to a whole bunch of other

19   things that the administrator does.

20          And so here, in essence, the structure is exactly the

21   same or indistinguishable from what it is under the PSA.  You

22   have Countrywide as administrator.  Countrywide's master

23   servicer.  They're the people who are meant to deal with it,

24   who have these obligations, although in this case the

25   administrator is acting in a sense as the agent of the issuer.

Dc6eretc

1   So there are eyes and ears out there to do this.

2          I would like to just quickly address the notice.

3          THE COURT:  No, because -- no.  I asked you to wind up

4   a few minutes ago, and you're going through stuff that's just

5   all in the briefs.  Spare me.  I've got a whole bunch of other

6   matters on this afternoon.  I've got your argument.

7          Is there anything further from the defendants?

8          MR. MARTINEZ:  Your Honor, just one thing.

9          In our argument on the implied breach, we stayed

10  focused on what is a question of under a motion to dismiss.  If

11  your Honor would like to hear this Kasowitz Benson letter

12  regarding series B litigation, it's not part of their

13  complaint.  They're now adding new allegations and new

14  documents.

15         If I could just say one thing.  In this series B, this

16  same Kasowitz Benson firm that represented Aurelius came

17  forward and said there is an event of default and, therefore,

18  the Bank of New York Mellon, as trustee for the series B

19  indenture holders, had a block payment to junior debenture

20  holders, and that ultimately led to the Bank of New York Mellon

21  as trustee resigning before the indentured trusts that were at

22  issue here.

23         Your Honor, I don't want to go into it because it's

24  irrelevant for this particular inquiry, but this just goes back

25  to my discovery point from before.  It seems that each time we

Dc6eretc

1 point out to them your claim is fundamentally flawed because

2 it's contradicted by the documents which you rely, they then

3 try to come up with a new theory that we keep chasing our tail

4 on this.

5    THE COURT:  All right.

6    MR. FREDERICKS:  I have one new matter, your Honor.

7 Obviously it's hard to plead the contents of a document that

8 you only get two weeks ago.

9    On the discovery schedule, we put in the request to

10 two weeks ago.  It was also before we received defendant's most

11 recent privilege log, which we got on the last day of

12 discovery, which was enormously voluminous.  We are making --

13    THE COURT:  How voluminous is it?

14    MS. KASWAN:  There are thousands of entries on it,

15 your Honor.  And we have been wading through it, and some of

16 the documents have been redacted so --

17    THE COURT:  Wade through it.  I am granting the

18 discovery request extension.  Now you want to modify it?

19    MR. FREDERICKS:  We put in the request on the

20 assumption or in the hope that it might be granted quickly.  To

21 the extent we have two third-party deponents, it's probably

22 going to be hard to get their documents, review them, schedule

23 their depositions by December 30.  Our hope was that if we had

24 an extension until January 15th, and then we would submit a

25 letter to your Honor.

Dc6eretc

1          THE COURT:  Granted.  Granted.

2          MR. FREDERICKS:  Thank you, your Honor.

3          THE COURT:  Finally, I'm going to issue an order to

4    afford Bank of America an opportunity to explain to me why that

5    redacted paragraph should be redacted, because otherwise I

6    don't believe that it should be.  But I'll give Bank of America

7    until sometime next week, depending if I can get the order out

8    today.

9          MR. FREDERICKS:  Thank you, your Honor.

10         THE COURT:  Thank you for your arguments.  Have a good

11   holiday everyone.

12         (Adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25