# EXHIBIT G

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
No. 1:11-cv-05459 (WHP)
--------------------------------------x

RETIREMENT BOARD OF THE POLICEMEN'S
ANNUITY AND BENEFIT FUND OF THE
CITY OF CHICAGO, et al.
(On Behalf of Themselves and
Similarly Situated Certificate
Holders),

                    Plaintiffs,

    -against-

THE BANK OF NEW YORK MELLON
(as Trustee Under Various
Pooling and Servicing
Agreements),

                    Defendant.

--------------------------------------x

                405 Lexington Avenue
                New York, New York
                August 14, 2013
                9:35 a.m.

     30(b)(6) VIDEOTAPED DEPOSITION of
BANK OF NEW YORK MELLON and its
Representative GERARD FACENDOLA, held at
the aforementioned time and place, before
Sherri Flagg, a Registered Professional
Reporter, Certified LiveNote Reporter, and
Notary Public.

Page 36

1         - G. FACENDOLA -
2     Facendola Exhibit 1 a 30(b)(6)
3     deposition notice with two items on it,
4     and as Facendola 2 a deposition
5     30(b)(6) deposition notice with one
6     item on it.
7         (Exhibit 1: 30(b)(6) deposition
8     notice, was marked for identification.)
9         (Exhibit 2: 30(b)(6) deposition
10    notice, was marked for identification.)
11  BY MS. KASWAN (continuing):
12    Q.   Mr. Facendola, have you seen the
13  Notices of Deposition marked as Facendola 1
14  and Facendola 2?  And you can look at the
15  subjects on page 4 for Facendola 1 and for
16  Facendola 2, the deposition subject matters.
17    A.   (Perusing exhibit.)
18         No, I don't recall seeing these.
19    Q.   All right.  Well, can you turn to
20  Facendola 1, page 4, and could you read that
21  page to yourself, the items 1 and 2.
22    A.   (Perusing exhibit.)
23         Okay.
24    Q.   And then could you turn to
25  Facendola Number 2, to page 4.

Page 37

```
 1                  - G. FACENDOLA -
 2        A.    Okay.
 3        Q.    And could you read that to
 4   yourself, item 1 there.
 5        A.    (Perusing exhibit.)
 6              Okay.
 7        Q.    Do you have knowledge of those
 8   three groups of matters from your own
 9   employment at Bank of New York Mellon?
10        A.    Yes.
11        Q.    And what did you do in order to
12   prepare for your testimony here today?
13        A.    I met with my attorneys.
14        Q.    And who was that?
15        A.    Lisa and Mike.
16        Q.    So that's Mr. Martinez and
17   Ms. Plush?
18        A.    Yes.
19        Q.    And when did you meet with them?
20        A.    Monday.
21        Q.    Is that the first time you met
22   with them?
23        A.    Yes.
24        Q.    So that would be yesterday?
25        A.    No, two days ago.
```

Page 38

1  - G. FACENDOLA -
2  Q. I mean two days ago.
3     Approximately how long did you
4  meet?
5  A. A few hours.
6  Q. Apart from meeting them, did you
7  do anything else to prepare for your
8  testimony here today?
9  A. No.
10 Q. Did you review any documents?
11    MR. MARTINEZ: Objection, vague.
12 A. During my preparation.
13 Q. So during the session that you had
14 with counsel?
15 A. Correct.
16 Q. But other than that, you didn't
17 review any documents?
18 A. No.
19 Q. Are you still in the DAG group?
20 A. Yes.
21 Q. And what is your position there
22 now?
23 A. I'm manager of the domestic
24 employees for DAG.
25 Q. Of domestic employees?

Page 39

1  - G. FACENDOLA -
2  A. The domestic DAG employees.
3  Q. And what does that entail?
4  A. The DAG RMs that sit in New York,
5  Pittsburgh, Houston and New Albany.
6  Q. So they report to you?
7  A. Yes.
8  Q. And then do you report to
9  Ms. Lundberg?
10 A. Yes.
11 Q. And has that been true since the
12 end of 2010?
13 A. Yes.
14 Q. All right. If we could turn to
15 Facendola 1, page 4. When did you first
16 learn of the potential merger between
17 Countrywide Financial Corporation and Red
18 Oak?
19 A. I don't recall.
20 Q. Did you learn about it at or about
21 the time of the public announcement of the
22 merger?
23 A. That's when I would have learned
24 about it, yes.
25 Q. So assuming it was publicly

Page 40

1  - G. FACENDOLA -
2  announced in January of 2008, it would be
3  your understanding that that's when you
4  learned about it?
5  A. If it was publicly announced at
6  that time, yes.
7  Q. And did you learn about it from
8  the press, or did you learn about it in
9  connection with your job?
10 A. From the press and media.
11 Q. After you learned about it from
12 the media, did you discuss the potential
13 merger with anybody at Bank of America or
14 Countrywide?
15 A. No.
16 Q. Was there a particular person with
17 whom you dealt at Countrywide during 2008?
18 A. No.
19 Q. Was there anybody at Bank of
20 America with whom you dealt in 2008?
21 A. No.
22 Q. What is the source of your
23 information about the July 2008 and November
24 2008 transactions?
25 A. What's -- I'm sorry?

Page 41

1  - G. FACENDOLA -
2  Q. How did you learn about them? To
3  the extent that you have been designated to
4  testify about those transactions, where did
5  you get your information?
6  A. Again, through the press and
7  anything that would have came across my desk
8  or if I had to deal with someone on specific
9  transactions.
10 Q. Well, apart from the press, tell
11 me what information you received about those
12 transactions in the course of your duties.
13 A. I'm not sure I understand what you
14 mean by "the transactions." To me that's
15 broad.
16 Q. Well, you've been designated to
17 testify about them. What did you understand
18 the July 2008 transaction between
19 Countrywide and the Bank of America
20 subsidiary called Red Oak to be?
21 A. Well, that there was a merger and
22 an assumption. So there was Red Oak and
23 Bank of America; there was basically, again,
24 a merger and an assumption during that time.
25 Q. When you say -- are we talking

11 (Pages 38 - 41)

Page 42

1       - G. FACENDOLA -
2 about the July 2008 transaction?
3    A.  That's the title of it, but I'd
4 have -- I'd have to see what it actually
5 refers to.
6    Q.  Well, do you know, sir, that debt
7 was assumed in the November 2008
8 transaction?  Do you know that two separate
9 steps, one in July of 2008 and another in
10 November of 2008?
11    A.  From the public filings, yes.
12    Q.  So all you know about those two
13 transactions is from the public filings?
14    A.  Yes.
15    Q.  Did you personally read the public
16 filings?
17    A.  I don't recall.
18    Q.  When you say --
19       MR. MARTINEZ:  Are you saying at
20    the time that they came out or during
21    the preparation?
22    Q.  Well, are you saying all that you
23 know about the assumption of debt and the
24 merger is what you learned from public
25 filings that your counsel showed you two

Page 43

1       - G. FACENDOLA -
2 days ago?  Is that what you're here to
3 testify about?
4    A.  Again, I don't -- I don't
5 understand what you're asking at this point.
6    Q.  I want -- I'm asking you what you
7 knew back in 2008 about these transactions,
8 not what public filings you read two days
9 ago.
10      What did you know about these
11 transactions back in 2008?
12    A.  Only what was, again, publicly
13 disclosed is what I knew about those
14 transactions.
15    Q.  Well, there was a lot that was
16 publicly disclosed.  Did you know what was
17 contained in the SEC filings by Countrywide
18 back in 2008?
19    A.  I don't recall exactly what I knew
20 back then.  I'm sure I read the public
21 filings back then.  I don't recall the
22 content of those public filings.
23    Q.  And was it your practice, back in
24 2008, to read the newspapers about matters
25 under your purview at Bank of New York

Page 44

1       - G. FACENDOLA -
2 Mellon?
3    A.  I would read the newspapers, yes.
4    Q.  So did you read The New York
5 Times, for example?
6    A.  Not so much The New York Times.
7 Probably Wall Street Journal or Star Ledger.
8    Q.  How about Bloomberg?
9    A.  Yes, possibly.
10    Q.  Was there a group within DAG or
11 within BONY Mellon generally that monitored
12 press accounts for bankruptcy and default
13 matters that DAG was handling?
14    A.  No.
15    Q.  So there were no press ticklers,
16 for example, that you received?
17    A.  No, not in 2008, no.
18    Q.  Did you generally receive
19 information from your staff about things in
20 the press regarding matters you were
21 handling?
22    A.  Conversations possibly, yes.
23    Q.  In 2008 was Mr. Feig responsible
24 for potential default and bankruptcy issues
25 regarding Countrywide?

Page 45

1       - G. FACENDOLA -
2    A.  Yes.
3    Q.  Was he your primary source of
4 information about Countrywide?
5    A.  Yes.
6    Q.  Now, in November of 2008, were
7 there new indentures issued for commercial
8 notes that had been earlier issued by
9 Countrywide?
10    A.  I'm sorry, I don't understand the
11 question.
12    Q.  In November of 2008, did Bank of
13 America assume the debt for commercial notes
14 for which BONY Mellon was a trustee?
15    A.  It could have, yes.
16    Q.  Well, do you know whether they
17 did?
18    A.  I know there were supplements done
19 to reflect name changes, so I'm assuming
20 that -- it's possible that those
21 transactions could have been entailed with
22 those supplements.
23    Q.  And who at BONY Mellon was
24 responsible for those supplements?
25    A.  That would have been done from the

Page 50

```
 1           - G. FACENDOLA -
 2      identified on Schedule 1 attached.
 3          And then the next "whereas" says,
 4   (reading):
 5          In consideration for assets to be
 6      acquired pursuant to the stock
 7      purchase, BAC will assume the
 8      indebtedness and obligations of the
 9      corporations, et cetera.
10          Then if you could turn to
11   Schedule 1, it's on the page where the
12   Bates number ends 534.
13      A.  Okay.
14      Q.  Who at BONY Mellon was involved in
15   facilitating the assumption by BAC of those
16   securities?
17          MR. MARTINEZ:  Objection, assumes
18      a fact not in evidence.
19      A.  I don't know.
20      Q.  Who at Bank of New York Mellon was
21   involved in signing the new indentures and
22   notes for the transfer of this debt?
23      A.  It would be the business line.
24      Q.  And when you say "the business
25   line," can you tell me who?
```

Page 51

```
 1           - G. FACENDOLA -
 2      A.  Specifically people?
 3      Q.  Which business line and who, yes.
 4      A.  The business lines that would have
 5   been involved would have been the MBS
 6   business line, I don't know the individuals
 7   that were working on it; or the corporate
 8   finance business line, and I don't know the
 9   individuals that were working on it.
10      Q.  Who at BONY Mellon had discussions
11   with Countrywide or Bank of America to
12   effectuate those transfers?
13      A.  I don't know.
14      Q.  Who do you think would know that?
15      A.  Again, the people that were
16   employed in those specific business lines,
17   the corporate finance or MBS business lines,
18   that would handle that specific
19   relationship.
20      Q.  Did you speak to the holders of
21   any of this debt in 2008?
22          MR. MARTINEZ:  Objection, vague.
23      A.  I don't recall a conversation.
24      Q.  Did any of the investors in any of
25   this debt that's described on Schedule 1
```

Page 52

```
 1           - G. FACENDOLA -
 2   contact BONY Mellon?
 3          MR. MARTINEZ:  Objection, vague.
 4      A.  There's quite a few deals here.
 5   If there was one specific holder, possibly.
 6   I don't recall a specific holder.
 7      Q.  Well, BONY Mellon sued Countrywide
 8   in connection with this debt, didn't they,
 9   or at least some of it?
10      A.  There was a lawsuit, yes.
11      Q.  And who contacted BONY Mellon in
12   connection with that lawsuit?
13      A.  It would have been the certificate
14   holders.
15      Q.  Which certificate holders?
16          MR. MARTINEZ:  Objection, vague.
17      A.  I can't tell from this listing.
18      Q.  Well, in connection with your
19   preparation to testify here today, did you
20   learn who was involved in connection with
21   the Delaware lawsuit that BONY Mellon
22   brought?
23      A.  The specific holders?
24      Q.  Yes.
25      A.  No, I did not.
```

Page 53

```
 1           - G. FACENDOLA -
 2      Q.  Do you know any person for --
 3   representing the holders who contacted BONY
 4   Mellon?
 5      A.  There was probably a law firm that
 6   represented the holders contacting us.
 7      Q.  And who was that?
 8      A.  I -- I don't know.
 9      Q.  How did the lawsuit come to be
10   filed?
11      A.  The holders directed and
12   indemnified the bank to do so.
13      Q.  And who directed BONY Mellon to do
14   so?
15          MR. MARTINEZ:  Objection, asked
16      and answered.
17      Q.  You don't know; is that the
18   answer?
19      A.  The specific holders, I don't
20   know.
21      Q.  And you don't know the law firm
22   that BONY Mellon dealt with?
23      A.  I don't recall.
24      Q.  And you reviewed no documents that
25   would permit you to testify with respect to
```

Page 54

- G. FACENDOLA -
2 that matter; is that correct?
3     MR. MARTINEZ: Objection. That
4 goes into attorney work product and
5 privilege during our preparation, and I
6 instruct you not to answer.
7     MS. KASWAN: All right. I'm going
8 to terminate this deposition. This
9 witness is obviously not an appropriate
10 witness, has no knowledge from which to
11 testify at this deposition.
12     And I am going to ask that Mayer
13 Brown and BONY Mellon appoint an
14 appropriate witness to testify on these
15 subjects because obviously this witness
16 knows absolutely nothing about the
17 matters in these notices.
18     MR. MARTINEZ: I disagree. The
19 witness has been prepared and knows
20 quite a bit about the matters. If you
21 want to continue your questioning,
22 we're prepared to stay and answer your
23 questions.
24     MS. KASWAN: He obviously knows
25 nothing.

Page 55

1     - G. FACENDOLA -
2     MR. MARTINEZ: I disagree.
3     MS. KASWAN: We'll take it up with
4 the Court. We're off the record.
5     VIDEO TECHNICIAN: The time on the
6 video monitor is 11:05 a.m. We're off
7 the record. This ends our deposition.

Page 56

1
2 STATE OF NEW YORK  )
3             ) ss:
4 COUNTY OF NEW YORK )
5
6
7     I, GERARD FACENDOLA, the witness
8 herein, having read the foregoing testimony
9 of the pages of this deposition, do hereby
10 certify it to be a true and correct
11 transcript, subject to the corrections, if
12 any, shown on the attached page.
13
14 _____
15 GERARD FACENDOLA
16
17 Sworn and subscribed to before me
18 this _____ day of _____ 2013.
19
20 _____
21     NOTARY PUBLIC

Page 57

2     I N D E X
3 EXAMINATION OF
    GERARD FACENDOLA          PAGE
4
    By Ms. Kaswan ........................ 5
5
6
7     E X H I B I T S
8 FACENDOLA
    EXHIBIT    DESCRIPTION        PAGE
9
10  Exhibit 1: 30(b)(6) deposition    36
        notice
11  Exhibit 2: 30(b)(6) deposition    36
        notice
12
13 EXHIBITS PREVIOUSLY MARKED/DISCUSSED:
14 FEIG
    Exhibit 14.........................  49

15 (Pages 54 - 57)