# EXHIBIT R

EFiled: Aug 18 2008 8:22PM EDT
Transaction ID 21105290
Case No. 3935-VCP

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

```
-----------------------------------------x
THE BANK OF NEW YORK MELLON,              :
solely in its capacity as Indenture Trustee  :
for the Series B Floating Rate Convertible   :
Senior Debentures Due 2037,               :
                                          :
                        Plaintiff,        :     Case No. 3935-VCP
                                          :
            v.                            :
                                          :
COUNTRYWIDE FINANCIAL                     :
CORPORATION,                              :
                                          :
                        Defendant.        :
-----------------------------------------x
```

## MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF THE BANK OF NEW YORK MELLON FOR SUMMARY JUDGMENT

Of Counsel:
Sigmund S. Wissner-Gross, Esq.
May Orenstein, Esq.
**BROWN RUDNICK LLP**
7 Times Square
New York, NY 10036
Tel: (212) 209-4800

Steven D. Pohl, Esq.
One Financial Center
Boston, MA 02111
Tel: (617) 856-8200

Bernard G. Conaway, Esq. (DE 2856)
Leslie B. Spoltore, Esq. (DE 3605)
**FOX ROTHSCHILD LLP**
Citizens Bank Center, Suite 1300
919 North Market Street
Wilmington, DE 19899-2323
Tel: (302) 654-7444

*Co-Counsel for The Bank of New York
Mellon, solely in its capacity as
Indenture Trustee for the Series B
Floating Rate Convertible Senior
Debentures Due 2037*



WMIA 909049v1 08/18/08

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................. ii

PRELIMINARY STATEMENT .......................................................... 1

FACTUAL BACKGROUND ............................................................... 5

    I.     The Series B Debentures ............................................... 5

    II.    Countrywide's Growing Financial and Regulatory
          Problems After Issuance of the Debentures ................................ 9

    III.    The Bank of America Acquisition of Countrywide .................... 11

    IV.    Countrywide Repudiates Its Obligation to Make
          the Fundamental Change Repurchase Offer .............................. 14

    V.    Post-Acquisition Developments ................................................. 16

ARGUMENT ...................................................................................... 17

    I.    As a Result of the Bank of America Acquisition,
          Countrywide Was Obligated to Make a Fundamental
          Change Repurchase Offer ........................................................... 17

          A.    By Operation of the Express Language of the
                 Indenture, a Repurchase Right Arose as a Result
                 of the Acquisition ......................................................... 17

          B.    Due Consideration of the Purpose of the Indenture's
                 Event Risk Covenants Supports Interpreting the
                 Existence of a Current Repurchase Right ...................... 29

    II.    The Court Should Grant Specific Performance of the
          Indenture Repurchase Offer Obligations .................................. 37

CONCLUSION .................................................................................. 42

# TABLE OF AUTHORITIES

**<u>Federal Cases</u>**                                                                **<u>Pages(s)</u>**

<u>Brass v. Am. Film Techs., Inc.</u>, 2d Cir., 987 F.2d 142 (1993) ..............................17

<u>Compagnie Financiere de CIC v. Merrill Lynch, Pierce, Fenner &
   Smith, Inc.</u>, 2d Cir., 232 F.3d 153 (2000)............................................................18

<u>Jamie Sec. Co. v. The Ltd., Inc.</u>, 2d Cir., 880 F.2d 1572 (1989)............................17

<u>Kirschten v. Research Insts. of Am., Inc.</u>,
   S.D.N.Y., 1997 WL 739587 (Sept. 24, 1997).......................................................17

<u>Leasco Corp. v. Taussig</u>, 2d Cir., 473 F.2d 777 (1972)...................................38, 39

<u>Rothenberg v. Lincoln Farm Camp</u>, 2d Cir., 755 F.2d 1017 (1985) .....................25

<u>Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan</u>,
   2d Cir., 7 F.3d 1091 (1993) ...................................................................................17

<u>Sharon Steel Corp. v. Chase Manhattan Bank</u>,
   2d Cir., 691 F.2d 1039 (1982)..........................................................................39, 40

<u>In re Stock Exchanges Options Trading Antitrust Litig.</u>, S.D.N.Y.,
   2005 WL 1635158 (July 8, 2005) .....................................................................23, 24

<u>Terwillinger v. Terwillinger</u>, 2d Cir., 206 F.3d 240 (2000)...................................22

<u>Thompson v. Gjivoje</u>, 2d Cir., 896 F.2d 716 (1990) .............................................29

<u>U.S. Trust Co. v. Alpert</u>, S.D.N.Y., 10 F. Supp. 2d 290 (1998),
   <u>aff'd, U.S. Trust Co. v. Jenner</u>, 2d Cir., 168 F.3d 630 (1999)..............................18

<u>Van Gemert v. Boeing Co.</u>, 2d Cir., 520 F.2d 1373 (1975)....................................31

<u>World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.</u>, 2d Cir.,
   345 F.3d 154 (2003)..................................................................................................18

**State Cases**

425 Fifth Ave. Realty Assocs. v. Yeshiva Univ.,
  N.Y. App. Div., 228 A.D.2d 178 (1996) .................................................................21

Angelo, Gordon & Co. v. Allied Riser Commc'ns Corp.,
  Del. Ch., 822 A.2d 1065 (2002).............................................................................20

Archibald v. Panagoulopoulos, N.Y., 135 N.E. 857 (1922) .................................34

Breed v. Ins. Co. of N. Am., N.Y., 385 N.E.2d 1280 (1978) ..........................18, 22

In re Buechner, N.Y., 123 N.E. 741 (1919)............................................................24

Cho v. 401-403 57th St. Realty Corp., N.Y. App. Div.,
  300 A.D.2d 174  (2002) ................................................................................... 38-39

Civil Serv. Employees Ass'n v. Plainedge Union Free Sch. Dist.,
  N.Y. App. Div., 12 A.D.3d 395 (2004) ..................................................................21

Dailey v. City of New York, N.Y. App. Div., 170 A.D. 267 (1915),
  aff'd, N.Y., 113 N.E. 1053 (1916)...........................................................................39

Erie R. Co. v. City of Buffalo, N.Y., 73 N.E. 26 (1904) .......................................38

Hering v. Thurston, N.Y. App. Div., 8 A.D.2d 991 (1959)...................................37

Herrick v. Watters, N.Y. App. Div., 50 A.D.2d 627 (1975)..................................37

In re IBP, Inc. S'holders Litig., Del. Ch., 789 A.2d 14 (2001) ........................37, 41

Isler v. Margolin (In re Estate of Margolin),
  N.Y. App. Div., 259 A.D.2d 396 (1999) ..........................................................24-25

Law Debenture Trust Co. v. Petrohawk Energy Corp.,
  Del. Ch., 2007 WL 2248150 (Aug. 1, 2007),
  aff'd, Del. Supr., 947 A.2d 1121 (2008) .................................................................20

Paramount Commc'ns Inc. v. QVC Network,
  Del. Supr., 637 A.2d 34 (1994)...............................................................................32

WMIA 909049v1 08/18/08

Paramount Commc'ns, Inc. v. Time Inc., Del. Ch., 1989 WL 79880
(July 14, 1989), aff'd, Del. Supr., 571 A.2d 1140 (July 24, 1989) ......................32

Reiss v. Fin. Performance Corp., N.Y., 764 N.E.2d 958 (2001) .....................22-23

ROI, Inc. v. Hidden Valley Realty Corp., N.Y. App. Div.,
45 A.D.3d 1010 (2007) ....................................................................................37

Ruttenberg v. Davidge Data Sys. Corp., N.Y. App. Div.,
215 A.D.2d 191 (1995) ................................................................................24, 25

Sokoloff v. Harriman Estates Dev. Corp., N.Y., 754 N.E.2d 184 (2001) ............38

TCW Gem V. Ltd. v. Grupo Iusacell Celular, S.A. De C.V.,
N.Y. Sup., 801 N.Y.S.2d 243, 2004 WL 3267267 (July 16, 2004).....................39

Teitelbaum Holdings, Ltd. v. Gold, N.Y., 396 N.E.2d 1029 (1979) .....................17

Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P., Del. Ch., 906 A.2d 168
(2006), aff'd sub nom., Trenwick Am. Litig. Trust v. Billett, Del. Supr.,
931 A.2d 438 (2007)...................................................................................35-36

Vermont Teddy Bear Co. v. 583 Madison Realty Co.,
N.Y., 807 N.E.2d 876 (2004)............................................................................21

William C. Atwater & Co. v. Panama R.R. Co.,
N.Y., 159 N.E. 418 (1927)................................................................................29

Wilmington Trust Co. v. Tropicana Entm't, LLC,
Del. Ch., 2008 WL 555914 (Feb. 29, 2008) ......................................................23

Wong v. New York Times Co., N.Y. App. Div., 297 A.D.2d 544 (2002) .............34

**Statutes**

Section 13(d)(3), Securities Exchange Act of 1934.............................................13

**Rules and Regulations**

17 C.F.R. § 240.12d2-2(d)(2) (2008)..................................................................13

17 C.F.R. § 240.12g-4(a) (2008)........................................................13

17 C.F.R. § 240.13d (2008) ...........................................................13

17 C.F.R. § 240.13d-3 (2008).......................................................13

**Other Authorities**

6A William M. Fletcher,
   Fletcher Cyclopedia of the Law of Corporations § 2649.10 (2007).....................31

Damian Paletta, Countrywide Seeks Rescue Deal -- Bank of America Eyes
   Stricken Home Lender As Crisis Grinds On,
   Wall St. J., Jan. 11, 2008, at A1 ...........................................................11

F. John Stark, III, J. Andrew Rahl, Jr., & Lori C. Seegers,
   "Marriott Risk": A New Model Covenant to Restrict Transfers of
   Wealth From Bondholders to Stockholders, 1994 Colum. Bus.
   L. Rev. 503 (1994) ............................................................29-30

Karen Brettell, Countrywide CDS out as BOA says no bond guarantee,
   Reuters UK, July 21, 2008, available at
   http://uk.reuters.com/article/marketsNewsUS/idUKN2142032220080721 ........16

Model Negotiated Covenants and Related Definitions,
   61 Bus. Law. 1439 (2006)............................................................30, 32

Raymond Hernandez, Countrywide Said to Be Subject of Federal Inquiry,
   N.Y. Times, Mar. 9, 2008, available at
   http://www.nytimes.com/2008/03/09/business/09lend.html?scp=10&sq=
   countrywide&st=cse ...........................................................10

Restatement (Second) of Contracts § 359[1] ...........................................38

Transcript of Second Quarter 2008 Bank of America Earnings Conference
   Call, available at Fair Disclosure Wire, No. 072108a1861381.781 ..................16

The Bank of New York Mellon, solely in its capacity as indenture trustee (in such capacity, the "Trustee"), under the Indenture for the Series B Debentures dated as of May 22, 2007 (the "Indenture") issued by Countrywide Financial Corporation ("Countrywide"), by and through its undersigned counsel, respectfully submits this Memorandum of Law in support of its motion for summary judgment under Chancery Court Rule 56(c).

## PRELIMINARY STATEMENT

This action is brought by the Trustee on behalf of holders (individually, a "Holder" and, collectively, the "Holders") of $2 billion in principal amount of Series B Floating Rate Convertible Senior Debentures Due 2037 (the "Series B Debentures") issued under the Indenture to enforce the rights of the Holders to require Countrywide to offer to repurchase their Series B Debentures. By this motion, the Trustee seeks summary judgment on all counts asserted in the Verified Complaint. Specifically, Count I seeks a judicial declaration that Countrywide is in default of its contractual obligation to offer to repurchase the Series B Debentures. Count II seeks an order directing Countrywide to comply, inter alia, with its contractual obligations to make such repurchase offer. As discussed infra, Countrywide was contractually required to make the repurchase offer no later than July 16, 2008, and has refused to comply with its clear contractual obligations. Finally, the Trustee seeks summary judgment on Count III of the Complaint, for indemnification under Section 7.07 of the Indenture,

inter alia, of the Trustee's costs and expenses, including reasonable attorneys' fees, in pursuing the contractual claims in this action.

Since the material facts upon which the Trustee's motion are based are not susceptible of dispute, it is appropriate for the Court to decide this motion at the outset of the case without necessity of discovery. The Trustee respectfully requests that a prompt ruling be issued on its motion, given the critical importance of the Holders' need to secure immediate compliance by Countrywide with its contractual obligations.

As explained infra, this case presents an important but straightforward issue of contract interpretation regarding the scope of protections afforded by the Indenture upon the occurrence of a change of control transaction. The Indenture provides, in Section 3.01, that upon the occurrence of a "Fundamental Change," as defined in the Indenture, each Holder has the right to require the repurchase for cash of all Debentures held by such Holder.[1] The Holders' current repurchase rights were triggered by the July 1, 2008 acquisition of 100% of the common stock of Countrywide by Bank of America Corporation ("Bank of America"). Countrywide does not dispute that this transaction constituted a "Fundamental

---

[1]    Although the Indenture covers two series of debentures (Series A and B), the action is brought solely on behalf of the Holders of Series B Debentures. A copy of the Indenture is annexed as Exhibit A to the Affidavit of Bernard G. Conaway, Esq., submitted herewith in support of the Trustee's motion for summary judgment (the "Conaway Aff.").

Change" under the Indenture and, indeed, has formally and publicly acknowledged that fact.

Countrywide, however, has taken the position that no Fundamental Change repurchase right arose due to a limited exception under the Indenture and seeks, in reality, to re-write the Indenture to avoid Countrywide's contractual obligations. Yet, as is clear from the express language of the exception upon which Countrywide purports to rely, such exception is narrowly drawn and under no circumstances applies to a Fundamental Change, such as the Bank of America acquisition, involving the acquisition by a "person" (such as Bank of America) of a control block (representing at least 50% of voting power) of Countrywide's common shares. The Holders' right to specific enforcement of their repurchase rights and the other relief sought on their behalf accordingly should be granted.

If the repurchase offer obligation is not promptly enforced, the Holders' next contractual opportunity to "put" the Series B Debentures to Countrywide will occur on May 15, 2009, at which date Countrywide's already precarious financial condition may have further deteriorated, Countrywide may be unable to repay the Series B Debentures that are tendered to it and the Holders' rights may effectively be subordinated to the rights of other creditors of Countrywide whose obligations become due and are paid prior to the Series B Debentures. To date, Bank of America has publicly stated that it refuses to guarantee the repayment of the Series B Debentures, nor any of the other approximately $36 billion of other

liabilities of Countrywide. And, while it has thus signaled that it will not back up Countrywide's obligations, Bank of America has liquidated certain of Countrywide's assets and engaged in other transactions which may be in anticipation of a Countrywide bankruptcy filing.

By acquiring Countrywide through its merger into a Bank of America subsidiary, Bank of America avoided the assumption of liability for Countrywide's debt (including the Series B Debentures) that would have occurred if Bank of America had acquired Countrywide through a direct merger or an acquisition of substantially all of Countrywide's assets. Had Bank of America and Countrywide utilized these alternative acquisition routes, under the Indenture, the resulting Fundamental Change would actually have been subject to the very repurchase right exception upon which Countrywide now purports to rely. Since, however, Bank of America chose to avoid liability for Countrywide's debts by acquiring ownership of all of Countrywide's common stock, and since no exception applies to this kind of Fundamental Change, the Holders' repurchase rights were triggered.

The Indenture, which is governed by New York law, must be construed and enforced in accordance with its terms, which are clear and precise as to the limited scope of the exception at issue. That exception did not relieve Countrywide from its obligation to have made, no later than July 16, 2008, a Fundamental Change offer based upon the Bank of America acquisition. Each

Holder is now entitled under the Indenture to be given the opportunity to tender its Series B Debentures for repurchase at par rather than to face the alternatives of exposure to the considerable risk of holding their investment in Countrywide until May 15, 2009, or selling the Series B Debentures into the current market, at below par. The only manner in which their bargained-for rights can be obtained is through the immediate enforcement by the Court of the relevant Indenture provisions.

Accordingly, as explained below, the Trustee should be granted summary judgment and the Court should issue an order directing the immediate performance by Countrywide of its repurchase offer obligations.

## FACTUAL BACKGROUND

The material facts bearing upon the Trustee's motion are set forth below.

## I.      The Series B Debentures

Countrywide issued $2 billion aggregate principal amount of Series A Floating Rate Convertible Senior Debentures Due 2037 (the "Series A Debentures") and $2 billion aggregate principal amount of Series B Debentures Due 2037 (the "Series B Debentures" and, together with the Series A Debentures, the "Debentures") in a private placement in May 2007. A shelf registration statement on Form S-3 covering the Debentures was filed with the Securities and Exchange Commission (the "SEC") on November 16, 2007 on behalf of holders of the Debentures, including a prospectus for use in the resale of the Debentures.

As of the date hereof, the entire principal amount of the Series B Debentures remains outstanding.

The Debentures were issued under the Indenture dated as of May 22, 2007, by and among the Trustee, Countrywide, as Issuer and Countrywide Home Loans, Inc., as Guarantor.[2]   The Indenture provides that it is governed and construed in accordance with the laws of the State of New York, without regard to conflicts of laws principles thereof.[3]

The Series B Debentures are convertible in accordance with their terms into "Common Stock," as defined,[4] or subject to the provisions of the Indenture, in the event of certain transactions, including reclassifications, mergers and sales of substantially all of the assets of Countrywide, into "Exchange Property," as defined,[5] which the holders of Common Stock are entitled to receive upon such transactions.[6]

Section 3.01(a) of the Indenture provides that upon the occurrence of a "Fundamental Change," as defined, "each Holder shall have the right, at such Holder's option, to require the Company to repurchase for cash all of such Holder's [Debentures]."

---

[2]   No claim has been asserted against Countrywide Home Loans, Inc., as Guarantor.

[3]   See Indenture § 15.09, at p. 89.

[4]   See Indenture § 1.01, at p. 4.

[5]   See Indenture § 10.05(a), at p. 71.

[6]   See Indenture § 10.01, at pp. 55-58.

Under the Indenture, a "Fundamental Change"[7] is deemed to have happened upon the occurrence of any one of three events described in the Indenture's "Change of Control" definition.  The definition of "Change of Control," contained in Section 1.01 of the Indenture, is as follows:

> [T]he occurrence at such time after the original issuance of the [Debentures] when any of the following has occurred:
>
> (1) a "person" or "group" within the meaning of Section 13(d)(3) of the Exchange Act[8] files a Schedule 13D or any schedule, form or report under the Exchange Act disclosing that such person or group has become the direct or indirect "beneficial owner," as defined in Rule 13d-3 under the Exchange Act, of shares of Common Stock representing more than 50% of the Voting Stock; or
>
> (2) the first day on which a majority of the members of the Board of Directors does not consist of Continuing Directors; or
>
> (3) a consolidation, merger or binding share exchange, or any conveyance, transfer, sale, lease or other disposition of all or substantially all of the Company's properties and assets to another person, other than [certain exceptions not applicable] . . . .[9]

Pursuant to Section 3.01 of the Indenture, upon on the occurrence of a "Fundamental Change," Countrywide is required to honor the Holders'

---

[7]      See Indenture § 1.01, at p. 6.

[8]      Under the Indenture, the term "Exchange Act" means the "Securities Exchange Act of 1934, as amended, and the regulations of the SEC promulgated thereunder."  See Indenture § 1.01, at p. 5.

[9]      This Change of Control language apparently does not appear in other outstanding Countrywide Indentures that are listed in a July 8, 2008 Current Report (Form 8-K) filed by Countrywide.  See Countrywide Financial Corp., Current Report (Form 8-K) (July 8, 2008), annexed as Exhibit B to the Conaway Aff.

repurchase right (the "Repurchase Right") by (i) mailing to Holders and the Trustee no later than fifteen days after such event (i.e., by July 16, 2008) a "Company Notice of Fundamental Change" substantially in the form attached to the Series B Debentures, including a "Fundamental Change Repurchase Notice" stating, inter alia, the events causing the Fundamental Change, the Fundamental Change Repurchase Date, and the procedures the Holder must follow to exercise rights to repurchase, and (ii) thereafter, in accordance with the Indenture, repurchasing all Series B Debentures validly tendered in response to such offer at a purchase price in cash equal to 100% of the principal amount plus any accrued and unpaid interest.[10]

Section 3.01(c) sets forth the following limited exception to the repurchase rights which would otherwise accrue upon a Change of Control defined in Clause (3) of the Change of Control definitions:

> Notwithstanding the foregoing [obligations to repurchase Series B Debentures if a Fundamental Change has occurred], Holders shall not have the right to require the Company to repurchase the Securities upon a Change of Control described in clause (3) of the definition thereof if more than 90% of the consideration in the transaction or transactions constituting such Change of Control consists of shares of securities or other property traded or to be traded immediately following such Change of Control on a U.S. national securities exchange, and, as a result of such transaction or transactions, the Securities become convertible into such securities or other property (and any rights attached thereto) subject to the settlement provisions of Section 10.03.

---

[10]      See Indenture § 3.01, at pp. 28-30.

Apart from the foregoing limited exception (the "Exception"), the Indenture contains no other exceptions to the repurchase rights that arise upon a Fundamental Change.

Under Section 6.01(b) of the Indenture, the default by Countrywide of its obligation to timely issue a notice of Fundamental Change to the Trustee and each Holder as required under Section 3.01(b) constitutes an Event of Default.[11] Pursuant to Section 6.03 of the Indenture, if an Event of Default occurs and is continuing, "the Trustee may pursue any available remedy . . . to enforce the performance of any provision of the [Debentures] or [the] Indenture."

**II.     Countrywide's Growing Financial and Regulatory**
**Problems After Issuance of the Debentures**

It is undisputed that, since shortly after issuance of the Indenture, Countrywide has experienced a raft of severe financial and regulatory problems.[12]

---

[11]     Section 6.01(b) and Section 3.01(b) of the Indenture arguably are inconsistent with regard to the time period afforded for compliance with Fundamental Change notice requirements in that Section 3.01(b) requires the Issuer to mail a Company Notice of Fundamental Change "[n]o later than 15 days after the occurrence of a Fundamental Change," whereas Section 6.01(b) provides that failure "to provide timely notice within 10 days of a Fundamental Change . . . as required under Section 3.01(b)" constitutes an Event of Default (emphases added). For purposes of this action, the Trustee has assumed the lengthier period stated in Section 3.01(b), i.e., that Countrywide's failure to issue a Company Notice of Fundamental Change which complied with the Indenture constituted an Event of Default no later than July 16, 2008, such date being 15 days after the consummation of the Acquisition.

[12]     Although not bearing directly on the disposition of the Trustee's motion, it should be noted that on January 15, 2008, a Countrywide shareholder filed a class action in Delaware Chancery Court alleging, inter alia, that the proposed acquisition of Countrywide by Bank of America was for inadequate consideration. On January 29,

On or about August 16, 2007, Countrywide expressed concerns over its liquidity because of the decline of the secondary market for securitized mortgage obligations, and announced its intent to draw down the entirety of its $11.5 billion credit line.[13]  Less than a week later, Countrywide announced that it had obtained a cash infusion from Bank of America in the form of the purchase of $2 billion of convertible preferred stock in Countrywide, which, upon exercise, would have resulted in Bank of America owning approximately 17% of the common stock of

---

2008, this shareholder class action was consolidated by Vice Chancellor Noble with two other consolidated class actions, and subsequently, a Consolidated and Verified Class Action Complaint was filed on February 25, 2008.  See In re Countrywide Corp. S'holders Litig., Del. Ch., C.A. No. 3464-VCN.  A proposed settlement was subsequently reached in the consolidated class actions, which is scheduled for a final fairness hearing before Vice Chancellor Noble on October 28, 2008.  Countrywide remains subject to other substantial class action and other pending litigation, all filed after issuance of the Debentures.  In addition, the FBI and the SEC are currently investigating matters relating to the conduct of Countrywide and various of its current and/or former officers and directors.  See Bank of America Corp., Quarterly Report (Form 10-Q) (Aug. 7, 2008) (copies of the relevant pages are annexed as Exhibit L to the Conaway Aff.); Raymond Hernandez, Countrywide Said to Be Subject of Federal Inquiry, N.Y. Times, Mar. 9, 2008, available at http://www.nytimes.com/2008/03/09/business/09lend.html?scp=10&sq=countrywide&st =cse (observing that "federal authorities have opened a criminal inquiry into Countrywide Financial for suspected securities fraud as part of the continuing fallout over the mortgage crisis"; noting also that "[Countrywide] was forced in August [2007] to draw down its entire $11.5 billion credit line from a consortium of banks because it could no longer sell or borrow against home loans it had made").  This information illustrating the precarious financial and regulatory condition of Countrywide is provided as factual context for the Trustee's motion, which is being made solely based on the contractual language in the Indenture and can be decided based on an interpretation of the unambiguous contractual provisions of the Indenture.  See also infra note 31.

[13]     See Countrywide Financial Corp., Current Report (Form 8-K) (Aug. 16, 2007). Copies of the relevant pages are annexed as Exhibit C to the Conaway Aff.

Countrywide.[14] In October 2007, Countrywide, which had previously reported on July 24, 2007 an earnings shortfall largely attributable to $417 million of impairment charges on credit sensitive retained interest, reported a $1.2 billion third-quarter loss,[15] setting the stage for Bank of America's soon to be announced plan to acquire Countrywide.

## III.   The Bank of America Acquisition of Countrywide

On or about January 11, 2008, as Countrywide's financial condition continued to deteriorate, the original issuer of the Debentures, Countrywide Financial Corporation ("Old Countrywide"), Bank of America and Red Oak Merger Corporation ("ROMC"), a wholly-owned subsidiary of Bank of America, entered into an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which Bank of America acquired Old Countrywide (the "Acquisition").[16] The Acquisition, which thereafter was consummated on July 1,

---

[14]      See Countrywide Financial Corp., Current Report (Form 8-K) (Aug. 23, 2007), annexed as Exhibit D to the Conaway Aff. It has been reported that Bank of America obtained these conversion rights to enable it to block any other party's attempted acquisition of control over Countrywide. See Damian Paletta, Countrywide Seeks Rescue Deal – Bank of America Eyes Stricken Home Lender As Crisis Grinds On, Wall St. J., Jan. 11, 2008, at A1.

[15]      See Countrywide Financial Corp., Current Report (Form 8-K) (Oct. 26, 2007), annexed as Exhibit E to the Conaway Aff.

[16]      See Compl. ¶ 24; Countrywide Financial Corp., Current Report (Form 8-K) (Jan. 17, 2008). Copies of the relevant pages are annexed as Exhibit F to the Conway Aff.

2008, was executed through a "forward triangular merger."[17]  Old Countrywide was merged into and with ROMC, with ROMC being the surviving entity.[18] Upon the closing of the Acquisition, ROMC changed its name to Countrywide Financial Corporation.[19]   As a result of the Acquisition, the issuer of the Debentures, which had previously been a New York Stock Exchange-listed company, is now a wholly-owned subsidiary of Bank of America.[20]

On July 1, 2008, Bank of America disclosed the Acquisition in a Current Report on Form 8-K filed with the SEC under the Securities Exchange Act of 1934 (the "Exchange Act") (the "Form 8-K Acquisition Report").[21]

A Change of Control as defined by clause (1) of the Change of Control definition of the Indenture (a "Clause (1) Change of Control") occurred upon the filing by Bank of America of the Form 8-K Acquisition Report for the following reasons:

---

[17]    See Compl. ¶ 25; Merger Agreement § 1.1.  Copies of the Merger Agreement and the Certificate of Merger filed with the Secretary of State of the State of Delaware in connection therewith are annexed as Exhibits G and H, respectively, to the Conaway Aff.

[18]    See Compl. ¶ 25; Merger Agreement § 1.1.

[19]    See Compl. ¶ 25; Merger Agreement § 1.6.

[20]    See Compl. ¶¶ 4, 5, 25.

[21]    A copy of the Form 8-K Acquisition Report is annexed to the Conaway Aff. as Exhibit I.   The "General Instructions" provided by the Securities and Exchange Commission for a Form 8-K state that "Form 8-K shall be used for current reports under Section 13 or 15(d) of the Securities Exchange Act of 1934, filed pursuant to Rule 13a-11 or Rule 15d-11 and for reports of nonpublic information required to be disclosed by Regulation FD (17 CFR 243.100 and 243.101)."

(A) Bank of America is a "person" within the meaning of Section 13(d)(3) of the Exchange Act,

(B) a Current Report on Form 8-K is a "report under the Exchange Act"; and

(C) the Form 8-K Acquisition Report, by reporting the consummation of a merger of Countrywide with and into a wholly-owned subsidiary of Bank of America, disclosed that Bank of America had become the "beneficial owner" of Countrywide, as such term is defined in Rule 13d-3 under the Exchange Act.[22]

Additionally, the Acquisition resulted in a Change of Control under clause (3) of the Change of Control definition (a "Clause (3) Change of Control")

---

[22]   See Compl. ¶ 29.  While Bank of America apparently made a calculated decision not to "red flag" the occurrence of a Clause (1) Change of Control by filing a post-Acquisition Schedule 13D, as noted supra, a Clause (1) Change of Control nonetheless occurred upon its filing of the Form 8-K Acquisition Report.  In this regard, it should be noted that pending deregistration, Countrywide common stock continues to be registered under Section 12 of the Exchange Act.  The deregistration of such shares under Section 12 of the Exchange Act is being effected through the New York Stock Exchange's filing of a Form 25, filed on July 1, 2008, and Countrywide's filing of a Form 15 on July 22, 2008.  Neither deregistration will be effective until 90 days after filing or such shorter period of time as the SEC may determine.  See 17 C.F.R. § 240.12d2-2(d)(2) (2008) and 17 C.F.R. § 240.12g-4(a).  Pursuant to Rule 13(d), under the Exchange Act, Statements of Beneficial Ownership on Schedule 13D must be filed with the SEC within 10 days of acquisition by any person or group (as defined) of more than 5% of a class of registered stock and must be amended promptly after any material increase or decrease in the percentage of securities owned.  It appears therefore that upon the closing of the Acquisition, compliance by Bank of America with the reporting requirements of Rule 13(d) could only have been assured by its filing of a Schedule 13D in order to disclose, inter alia, its acquisition of beneficial ownership of 100% of such stock.  There appears to be no other reasonable explanation for Bank of America's failure to accomplish this filing other than to avoid publicly underscoring the fact that a Clause (1) Change of Control had occurred.

because the Acquisition consisted of a merger transaction which resulted in the cancellation of outstanding shares of Old Countrywide's common stock.[23]

Because the filing of the Form 8-K Acquisition Report and the occurrence of the Acquisition resulted in a "Change of Control" of Countrywide, a "Fundamental Change" was thereby deemed to have occurred under the Indenture. Pursuant to Section 3.01 of the Indenture, this Change of Control gave rise to a repurchase right by the Holders.

## IV. Countrywide Repudiates Its Obligation to Make the Fundamental Change Repurchase Offer

On or about July 8, 2008, Countrywide issued to Holders a "Notice of a Fundamental Change and Execution of a Supplemental Indenture" (the "Fundamental Change Notice").[24]   The Fundamental Change Notice stated that "Bank of America Corporation . . . and Countrywide Financial Corporation . . . consummated the merger of [Old Countrywide] with and into [ROMC] . . . . The

---

[23]   See Compl. ¶ 30.   The Trustee has insufficient information at present to determine whether, in addition to triggering a Clause (1) Change of Control and a Clause (3) Change of Control, the Acquisition also constituted a Change of Control under clause (2) of the Change of Control definition (a "Clause (2) Change of Control").   A Clause (2) Change of Control occurs on the first day on which a majority of the members of the Board of Directors does not consist of "Continuing Directors," as defined in the Indenture.   Status as a "Continuing Director" depends on adherence to requirements for board approval of newly appointed, elected or nominated directors.   If a Clause (2) Change of Control has occurred, this would constitute a separate breach by Countrywide and a further ground for a repurchase right by the Holders.

[24]   See Compl. ¶ 33.   A copy of the Fundamental Change Notice is annexed as Exhibit J to the Conaway Aff.

Merger resulted in a 'Fundamental Change,' as such term is defined in the Indenture, and thus requires notice to the Trustee and the Holders."[25]

The Fundamental Change Notice, although acknowledging that a "Fundamental Change" had occurred, asserted that the Acquisition "does not provide [the Holders] with a Repurchase Right."[26] In denying the existence of a Repurchase Right and repudiating its obligation to make a repurchase offer, Countrywide asserted the purported applicability of the Exception.[27] Notably, Countrywide's Fundamental Change Notice does not quote the actual language of the Exception but instead provides a purported paraphrase of the Exception, as follows: "[T]he Indenture provides that the Holders do not have a Repurchase Right when (i) more than 90% of the consideration received in the Fundamental Change consists of shares traded on a U.S. national securities exchange and (ii) as a result of such transaction, the Securities are convertible into securities that are traded on a U.S. national exchange."[28]

On July 31, 2008, the Trustee, acting solely in its representative capacity under the Indenture, commenced this action seeking, <u>inter alia</u>, an order specifically enforcing Countrywide's contractual obligation to make a Repurchase Offer as a result of the Fundamental Change that occurred upon the Acquisition.

---

[25]  See Compl. ¶ 33.

[26]  See Compl. ¶ 34.

[27]  See Compl. ¶ 37.

[28]  See Compl. ¶ 37.

## V.  Post-Acquisition Developments

On July 8, 2008, Countrywide filed a Current Report on Form 8-K reporting, among other events, that it had repaid $11.5 billion in company unsecured obligations (other than the Debentures) and liquidated approximately $31 billion of assets held by its subsidiaries by the sale of these assets to another wholly-owned subsidiary of Bank of America. The proceeds of these sales had been used, in part, to fund the repayment of Countrywide indebtedness pursuant to various unsecured credit facilities in connection with the termination of such facilities.[29]  On July 21, 2008, Bank of America Chief Financial Officer, Joe Price, reiterated the position that Bank of America will not "guarantee the public debt."[30]

---

[29]    See Countrywide Financial Corp., Current Report (Form 8-K) (July 8, 2008), annexed as Exhibit B to the Conaway Aff.

[30]    See Transcript of Second Quarter 2008 Bank of America Earnings Conference Call, at 9, available at Fair Disclosure Wire, No. 072108a1861381.781 (copies of the relevant pages are annexed as Exhibit K to the Conaway Aff.); see also Karen Brettell, Countrywide CDS out as BOA says no bond guarantee, Reuters UK, July 21, 2008, available at http://uk.reuters.com/article/marketsNewsUS/idUKN2142032220080721. Countrywide's problems have continued since the July 1, 2008 Acquisition. In a recently filed Form 10-Q, for the quarter ended June 30, 2008, Bank of America disclosed that Countrywide had "responded to subpoenas from the SEC, which advised [Countrywide] that it is conducting a formal investigation." In the same Form 10-Q, Bank of America acknowledged that Countrywide also was a target of an ongoing FBI investigation in connection with its mortgage business practices. See Bank of America, Quarterly Report (Form 10-Q) (Aug. 7, 2008) (copies of the relevant pages are annexed as Exhibit L to the Conaway Aff.). Countrywide also has been sued by at least four state attorneys general (California, Illinois, Florida and Connecticut) since June 24, 2008 for alleged widespread deceptive mass-mortgage lending practices. See Complaint, California v. Countrywide Financial Corp., No. LC 081846 (Cal. Super. Ct. June 24, 2008); Complaint, Illinois v. Countrywide Financial Corp., Circuit No. 08CH22994 (Ill. Ch. June 25, 2008);

## ARGUMENT

I.     **As a Result of the Bank of America Acquisition, Countrywide Was Obligated to Make a Fundamental Change Repurchase Offer**

     A.    By Operation of the Express Language of the Indenture, a Repurchase Right Arose as a Result of the Acquisition

The Trustee is entitled to summary judgment pursuant to Delaware Chancery Court Rule 56 because, under the express and unambiguous provisions of the Indenture, which are to be interpreted under New York law, upon the Clause (1) Change of Control that occurred on July 1, 2008, a Repurchase Right accrued. It is well-established that "the interpretation of indenture provisions is a matter of basic contract law." Jamie Sec. Co. v. The Ltd., Inc., 2d Cir., 880 F.2d 1572, 1576 (1989) (internal quotation marks and citation omitted). The proper interpretation of an unambiguous written contract is a question of law for the court, and a dispute concerning the application of the language of such a contract may properly be resolved by summary judgment. Kirschten v. Research Insts. of Am., Inc., S.D.N.Y., 1997 WL 739587, at *6 (Sept. 24, 1997); Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan, 2d Cir., 7 F.3d 1091, 1094-95 (1993); Brass v. Am. Film Techs., Inc., 2d Cir., 987 F.2d 142, 148 (1993); see also Teitelbaum Holdings, Ltd. v. Gold, N.Y., 396 N.E.2d 1029, 1032 (1979) (construing an unambiguous contract provision is a matter of law).

---

Complaint, Florida v. Countrywide Financial Corp., No. 08-30105 (Fla. Cir. Ct. June 30, 2005); Complaint, Connecticut v. Countrywide Financial Corp., No. 1207 (Conn. Super. Ct. July 28, 2008).

Contract language is unambiguous when it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." Breed v. Ins. Co. of N. Am., N.Y., 385 N.E.2d 1280, 1282 (1978).[31]   Here, the applicable provisions of the Indenture clearly and unambiguously give rise to a Repurchase Right.

First, as explained supra, pursuant to the Change of Control definition, a Clause (1) Change of Control occurred upon the filing by Bank of America of the Form 8-K Acquisition Report disclosing Bank of America's ownership of all of the common stock of Countrywide.   Second, according to the applicable definition, upon the occurrence of this Clause (1) Change of Control, a "Fundamental Change" was deemed to have occurred under the Indenture.   Third, pursuant to Section 3.01(a) of the Indenture, "[i]f a Fundamental Change occurs, each Holder shall have the right, at such Holder's option, to require [Countrywide] to repurchase for cash all of such Holder's [Debentures]."   Finally, the Exception, which is the only exception to the accrual of a Repurchase Right

---

[31]      It is well-established that the mere fact that the parties dispute the meaning of a contract does not mean that the contract is ambiguous.  See, e.g., U.S. Trust Co. v. Alpert, S.D.N.Y., 10 F. Supp. 2d 290, 301-02 (1998), aff'd, U.S. Trust Co. v. Jenner, 2d Cir., 168 F.3d 630 (1999).  The threshold issue of determining whether there is ambiguity in contract language is a matter of law for determination by the court.  World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co., 2d Cir., 345 F.3d 154, 184 (2003) (stating that whether contractual language is ambiguous is a question of law for the court); Compagnie Financiere de CIC v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 2d Cir., 232 F.3d 153, 158 (2000) (same).

upon the occurrence of a Fundamental Change provided for in the Indenture, does not apply to a Repurchase Right that accrues upon a Clause (1) Change of Control.   The Exception only eliminates the Repurchase Right that would otherwise accrue as a result of a Clause (3) Change of Control provided that the transaction that caused the Clause (3) Change of Control satisfies the following additional conditions: (i) the consideration paid in the transaction consists of publicly-traded securities, and (ii) the transaction results in the Debentures becoming convertible into such publicly-traded securities (the "Exception Transaction Conditions").   Since the Exception, by its terms, applies only to a Repurchase Right which accrues based "upon a Change of Control described in clause (3) of the definition thereof," the Repurchase Right that accrued upon the filing of the Form 8-K Acquisition Report (a Change of Control described in clause (1) of the definition) was not within the scope of the Exception.

Countrywide, as evidenced by its Fundamental Change Notice, takes the position that the Repurchase Right that accrued as a result of the Acquisition was subject to the Exception.   It is Countrywide's apparent position, that so long as the Exception Transaction Conditions are satisfied with respect to a transaction causing a Change of Control, the Exception eliminates the Repurchase Right that would otherwise arise from that transaction.   Countrywide's position is flawed because it ignores the structure of the Indenture's Change of Control definition. The definition includes three separate Change of Control types, each of which is

described in a separate clause and each of which, when triggered, <u>independently</u> results in a Fundamental Change. Yet, although there are three possible Change of Control types, the Exception exclusively references only a Clause (3) Change of Control. Thus, in advancing its position, Countrywide is asserting that, notwithstanding that only one type of Change of Control is referenced in the Exception, the Exception should be interpreted as <u>impliedly</u> encompassing all Change of Control types and the Fundamental Changes and Repurchase Rights triggered thereby.

Countrywide's proposed interpretation of the Exception is contrary to fundamental New York precepts of contract construction, is illogical, and would, as discussed in Point II <u>infra</u>, frustrate important Change of Control contract rights held by the Holders, and therefore must be rejected.[32]

---

[32]    To the extent that the Delaware Chancery Court has previously addressed interpretive issues arising under indenture change of control provisions, these cases are factually different and do not address the specific contractual issues presented here. In <u>Angelo, Gordon & Co. v. Allied Riser Commc'ns Corp.</u>, Del. Ch., 822 A.2d 1065, 1069-70 (2002), holders claimed that the conditions of a repurchase right exception in an Allied Riser indenture had not been satisfied because a valid SEC registration statement covering shares to be issued on conversion had not been effective on the date of the change of control. Due to clear textual differences in the indenture at issue in <u>Angelo, Gordon</u> (compared to the Indenture at issue here), there was no dispute as to the applicability of the exception to the change of control transaction at issue otherwise than by reason of the alleged deficiency in the registration of the shares. <u>See id.</u> at 1071-72. In <u>Law Debenture Trust Co. v. Petrohawk Energy Corp.</u>, Del. Ch., 2007 WL 2248150, at *6-13 (Aug. 1, 2007), <u>aff'd</u>, Del. Supr., 947 A.2d 1121 (2008), an indenture trustee asserted that repurchase rights had accrued under an indenture pursuant to two change of control provisions, one of which related to post-merger holdings by former stockholders and the other to the composition of the board of directors. <u>See id.</u> Based on the particular facts and indenture provisions at issue in <u>Petrohawk</u>, the court found that neither provision had been triggered.

Under well-established precepts of New York law, when a contract is intended to encompass the parties' complete agreement and, particularly when the contract involves a commercial subject and has been negotiated by experienced and sophisticated parties, the contract will not be interpreted as impliedly stating something that the parties have not actually expressed.  See, e.g., Vermont Teddy Bear Co. v. 583 Madison Realty Co., N.Y., 807 N.E.2d 876, 879 (2004) (where commercial lease was terminable if the premises were not restored during fixed period following casualty event but lease did not include requirement that the owner provide notice of restoration, no notice requirement would be implied, and purported termination by lessee was ineffective); Civil Serv. Employees Ass'n v. Plainedge Union Free Sch. Dist., N.Y. App. Div., 12 A.D.3d 395 (2004) (where parties entered into a new agreement continuing certain arrangements that had been in their prior agreement, terms of the parties' expired agreement relating to identical arrangements would not be implied into new contract); 425 Fifth Ave. Realty Assocs. v. Yeshiva Univ., N.Y. App. Div., 228 A.D.2d 178 (1996) (limitation on the cumulative exercise of contractual remedies would not be implied into the parties' agreement).

To actually express, as a matter of contract law, the intention that the Exception be applicable to a Clause (1) Change of Control, it would be necessary to modify the existing language either to add a reference in the Exception to a Clause (1) Change of Control or, alternatively, to replace the existing reference in

the Exception to clause (3) with a term or phrase which would encompass all types of Changes of Control defined in the Indenture.[33]  Fundamental contract interpretation principles, however, prohibit a court from modifying a written contract under the guise of interpretation.  Under New York law, a "written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed."  See, e.g., Terwillinger v. Terwillinger, 2d Cir., 206 F.3d 240, 245 (2000) (applying New York law); Breed, 385 N.E.2d 1280.  If a contract is clear and unambiguous, even where adherence to the expressed terms results in consequences that may be contrary to a party's expectations or are strongly disadvantageous to one party, "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract." Reiss v. Fin. Performance Corp., N.Y., 764 N.E.2d 958, 961 (2001) (internal quotation marks and citation omitted) (where warrant did not contain provision adjusting price in the event of a reverse stock split, court enforced warrant in accordance with its terms, refusing, even though result was arguably a windfall for one party, to alter the terms of the written contract under the guise of interpreting its terms).

The rule against implying terms into a written agreement that was intended to express the parties' entire agreement applies with particular force to

---

[33]    The same would apply if Countrywide were to try to extend the Exception to a Clause (2) Change of Control.

proscribe adding terms to address contingencies which were known to the parties at the time of contract formation. Id. (stating that a court, under New York law, "will not imply a term where the circumstances surrounding the formation of the contract indicate that the parties, when the contract was made, must have foreseen the contingency at issue and the agreement can be enforced according to its terms"); see also Wilmington Trust Co. v. Tropicana Entm't, LLC, Del. Ch., 2008 WL 555914, at *7 (Feb. 29, 2008) ("When the parties omit a provision that seems obvious and could easily have been included, courts are loathe to impose such a provision by implication"; construing an indenture governed by New York law). Thus, In re Stock Exchanges Options Trading Antitrust Litig., S.D.N.Y., 2005 WL 1635158 (July 8, 2005), where the parties' settlement agreement clearly and unambiguously provided that upon the trial court's denial of preliminary approval the settlement agreement was null and void, and where upon appeal this ruling was reversed, the court refused to imply an agreement to reinstate the settlement based on the outcome of appeal. Although the possibility of appeal and reversal were foreseen contingencies, the court observed that parties' settlement agreement "condition[ed] rescission on the fact of the Court's denial of the motion for preliminary approval, not on the propriety of such a denial." Id. at *8. Since the parties could have provided for the effectiveness of the agreement to depend upon the outcome of an appeal, but did not, New York law compelled the enforcement of the agreement in accordance with its terms. Id. In this case, the possibility that

a merger, which would trigger a Clause (3) Change of Control, would also trigger a Clause (1) Change of Control was easily foreseeable and, indeed, obvious. Yet, the Exception refers only to a Clause (3) Change of Control and omits any reference to a Clause (1) Change of Control. Since the parties could have made a Clause (1) Change of Control subject to the Exception, but did not, as in <u>In re Stock Exchanges</u>, their drafting choices must be treated as purposeful and their agreement enforced in accordance with its express terms.

New York law not only disapproves of adding terms to an agreement by implication but also disapproves of interpretations that rely upon ignoring terms actually included by the parties. Thus, any interpretation of the Indenture which simply reads out of the Exception the clause which limits its application to "a Change of Control described in clause (3) of the definition thereof" must be rejected. Under New York law, "[w]ords are never to be rejected as meaningless . . . if by any reasonable construction they may be made consistent and significant." <u>In re Buechner</u>, N.Y., 123 N.E. 741, 742 (1919); <u>see also</u> <u>Ruttenberg v. Davidge Data Sys. Corp.</u>, N.Y. App. Div., 215 A.D.2d 191, 196 (1995) ("[A] court should not 'adopt an interpretation' which will operate to leave a 'provision of a contract . . . without force and effect.'") (citations omitted). The preference for "giving effect" to each sentence, clause and word of a written agreement is frequently used to resolve an issue of interpretation. For example, in <u>Isler v. Margolin (In re Estate of Margolin)</u>, N.Y. App. Div., 259 A.D.2d 396 (1999),

where a retainer agreement provided that an attorney was entitled to a percentage of "any lump-sum" paid in settlement, the court held that the attorney was not entitled to share in periodic payments to the client as such interpretation would render the term "lump-sum" surplusage.  Similarly, in Rothenberg v. Lincoln Farm Camp, 2d Cir., 755 F.2d 1017, 1020 (1985), where the parties' specification of several grounds for termination would be rendered meaningless if the clause "for any other reason" was interpreted to authorize termination of the contract at will, such interpretation was rejected.  See also Ruttenberg, 215 A.D.2d at 196 (where reading the clause "by the Corporation" in the phrase "upon termination of employment by the Corporation" to modify the word "employment" and not "termination" would render the clause nugatory, such interpretation was rejected and the phrase was construed as applying exclusively to termination by the corporation).

Here, application of this basic rule of construction is likewise dispositive. Countrywide would read the Exception as if it were written as follows:

> "Holders shall not have the right to require the Company to repurchase the Securities upon a Change of Control [ ~~described in clause (3) of the definition thereof~~ ] if [the Exception Transaction Conditions are satisfied]."

Countrywide, by interpreting the scope of the Exception to be the same as it would be if the clause at issue were actually excised, thus runs afoul of the well-settled rule against treating contract language as surplusage.  By its terms, the

Exception is made applicable "upon a Change of Control described in clause (3) of the definition thereof." The only possible way to "give meaning" to the clause "described in clause (3) of the definition thereof" is to limit the application of the Exception to Repurchase Rights which arise solely based on a Clause (3) Change of Control.

Notably, in staking out its position in the Fundamental Change Notice regarding the applicability of the Exception to the Repurchase Right that arose upon the Acquisition, Countrywide attempted to "re-write the Indenture," so to speak, by eliminating from a purported paraphrase of the Exception found in the Fundamental Change Notice any reference at all to a Clause (3) Change of Control. The paraphrase formulated by Countrywide eliminates not only the clause (found in the Exception) "a Change of Control described in clause (3) of the definition thereof" but also eliminates the subsequent clause – "the transaction or transactions constituting such Change of Control" – which refers back to it. As re-written by Countrywide, the Exception applies to any "Fundamental Change" which results from a transaction that satisfied the Exception Transaction Conditions. Countrywide's paraphrase of the Exception in the Fundamental Change Notice is not only demonstrative of Countrywide's consciousness of the necessity of altering Exception in order to assert its position vis-à-vis a Repurchase Right, but it is also instructive in that it serves as an example of one of the ways (several others are possible) of how the Indenture could have been

26

drafted (but was not) so that no Repurchase Right would accrue upon any Fundamental Change transaction pursuant to which the Exception Transaction Conditions were satisfied. For ease of comparison, the actual Exception is reproduced below along side of Countrywide's paraphrase of the Exception in its Fundamental Change Notice:

<table>
<tr><td align="center"><u>Actual Exemption Language:</u></td><td align="center"><u>Fundamental Change Notice<br>Paraphrase:</u></td></tr>
<tr><td>Holders shall not have the right to require the Company to repurchase the Securities upon a Change of Control described in clause (3) of the definition thereof if more than 90% of the consideration in the transaction or transactions constituting such Change of Control consists of shares of securities or other property traded or to be traded immediately following such Change of Control on a U.S. national securities exchange, and, as a result of such transaction or transactions, the Securities become convertible into such securities or Securities become convertible into such securities or other property . . . .</td><td>Holders do not have a Repurchase Right when (i) more than 90% of the consideration received in the Fundamental Change consists of shares traded on a U.S. national securities exchange and (ii) as a result of such transaction, the Securities are convertible into securities that are traded on a U.S. national exchange.</td></tr>
</table>

Similarly indicative of the disingenuousness of Countrywide's current position on the scope of the Exception, as well as Countrywide's awareness of the untenable position it has adopted, is a comparison of the description of the Exception prepared for disclosure in the Fundamental Change Notice with the

description of the Exception prepared for inclusion in both the Offering Memorandum used in connection with the May 2007 private placement of the Debentures and the Registration Statement on Form S-3 filed by Countrywide with the SEC on November 17, 2007 for use by selling holders of the Debentures in connection with the sale of the Debentures to the public (the "Registration Statement").[34]  In stark contrast to the paraphrase found in the Fundamental Change Notice, the Offering Memorandum used in connection with the May 2007 private placement of the Debentures and the Registration Statement both state, consistently with the Indenture (and hence accurately), that the Exception applies only to "the right to require [Countrywide] to repurchase its Debentures on a change of control described in clause (3) [of the Change of Control definition]."

In sum, the parties to the Indenture could have provided, but did not provide in the Indenture, that where a transaction results in both a Clause (1) Change of Control and a Clause (3) Change of Control, the Repurchase Rights arising from both Clause (1) and Clause (3) would be subject to the Exception. The parties instead provided solely for the application of the Exception to a Clause (3) Change of Control.  Under well-established New York rules of contract construction, no broader exception to Repurchase Rights should -- nor can -- permissibly be implied. The Indenture should, accordingly, be enforced in

---

[34]      Copies of the relevant pages of the Offering Memorandum and Registration Statement are annexed, respectively, to the Conaway Aff. as Exhibits M and N.

accordance with its express and plain terms to give effect to the Repurchase Right that accrued under Clause (1) of the Change of Control definition upon the Acquisition.

> ### B.   Due Consideration of the Purpose of the Indenture's Event Risk Covenants Supports Interpreting the Existence of a Current Repurchase Right

The enforcement of the Holders' Repurchase Right, to the extent arising from a Clause (1) Change of Control, is not only compelled by the express and literal meaning of the language of the Indenture but also by "due consideration to 'the surrounding circumstances [and] apparent purpose which the parties sought to accomplish.'" Thompson v. Gjivoje, 2d Cir., 896 F.2d 716, 721 (1990) (citing William C. Atwater & Co. v. Panama R.R. Co., N.Y., 159 N.E. 418, 419 (1927)). The interpretive issue in this case arises because Clause (1) and Clause (3) are both triggered by the Acquisition.  Due consideration of the distinctly different purposes served by Clause (1) and Clause (3) of the Change of Control definition demonstrates, however, the compelling logic of limiting the applicability of the Exception to transactions which exclusively trigger Clause (3) of the Change of Control definition.

Event risk covenants, such as the Fundamental Change provisions and related Repurchase Rights found in the Indenture, provide critical contract rights to investors that "are designed to provide protection without impeding the ability of issuers to engage in [potentially desirable] transactions; instead they attempt to

be self-effectuating in terms of a timely remedy to bondholders[.]" F. John Stark, III, J. Andrew Rahl, Jr., & Lori C. Seegers, "Marriott Risk": A New Model Covenant to Restrict Transfers of Wealth From Bondholders to Stockholders, 1994 Colum. Bus. L. Rev. 503, 577 (1994). All of the Indenture's Change of Control provisions serve the parties' general purpose of protecting Holders from the risks that their investment will be adversely affected by Fundamental Changes. It is important to underscore, however, that the separate Clauses of the Change of Control definition target very particular and different risks. Countrywide's position that the Exception should apply to a Clause (1) Change of Control as well as a Clause (3) Change of Control disregards the distinct purposes that these provisions are intended to fulfill and seeks to force a construction of the Change of Control definition at variance with the purpose of such definition. Because, as explained below, the satisfaction of the Exception Transaction Conditions mitigates certain of the risks associated with a Clause (3) Change of Control, but has no impact on those associated with a Clause (1) Change of Control, it would destroy the purpose of a Clause (1) to have a Clause (1) Change of Control subject to the Exception.[35] The remedy afforded by a Clause (3)

---

[35]     Clause (2) of the Change of Control definition, which due to the merging parties' failure to date to disclose information sufficient to determine whether it too was triggered by the Acquisition, is not at issue on this motion, applies to circumstances, such as could result from a proxy contest, where a new group of stockholders has gained control of the board even where there may not be no material change in stock ownership. See Model Negotiated Covenants and Related Definitions, 61 Bus. Law. 1439, 1450 (2006) ("Model Negotiated Covenants").

Change of Control reflects that where an investment involves a convertibility feature, the investor has purchased not only a debt obligation but also the upside possibility that the stock will increase sufficiently in value that the conversion right will make the debenture worth more than the debt. See Van Gemert v. Boeing Co., 2d Cir., 520 F.2d 1373, 1385 (1975). While, as discussed below, Clause (1) is directed to the impact on credit quality arising solely from a change in ownership of the stock of the company, Clause (3) of the Change of Control definition is directed primarily to the protection of the value of the Debentures' convertibility feature. "The conversion right, although set forth in the debenture and in the indenture, is separate and distinct from the debt evidenced by the debenture . . . ." 6A William M. Fletcher, Fletcher Cyclopedia of the Law of Corporations § 2649.10 (2007). If the shares into which a convertible security can be converted are reclassified, converted or exchanged for shares that are not traded on a public exchange or for securities that in some other way are not comparable in value to the original security, then, even in the absence of a change of control (not as defined in the Indenture, but as such term is commonly construed), the value of the conversion right can be absolutely destroyed. This risk of destruction of conversion value can occur independently of any impairment to credit quality. To address the risk to the convertibility feature, Clause (3) is triggered by transactions which result in the reclassification, conversion or exchange of the securities into which the Debentures can be

converted, regardless of whether any person or group acquires a control block of stock through such transaction or whether there is any resulting change in the composition of the board of directors.[36]

Since Clause (3) of the Change of Control definition is designed to protect of the value of the conversion rights, it follows that, to the extent that a Clause (3) transaction preserves the value of the convertibility right, it should not result in a Repurchase Right. Thus, if as a result of the Clause (3) transaction, the securities received upon conversion will be the same securities that the shareholders agreed to receive in exchange for their Countrywide shares, and if such securities are

---

[36]    Pursuant to a carve-out to the Change of Control definition, no Clause (3) Change of Control occurs pursuant to "any transaction . . . that does not result in any reclassification, conversion, exchange or cancellation of outstanding shares of [Countrywide's] Capital Stock. See Indenture, § 1.01, "Change of Control," cl. (3)(a)(i). While it is true that pursuant to another carve-out, Clause (3) is not triggered unless, as a result of the transaction, the pre-transaction holders of the issuer's voting stock possess less than 50% of the voting control (see Indenture, § 1.01, "Change of Control," cl. (3)(a)(ii), Delaware jurisprudence recognizes that, where the merger partner is not under the control of shareholders owning a control block, mere dilution of public shareholders pursuant to a merger does not foreseeably result in a change of corporate control. See. e.g., Paramount Commc'ns Inc. v. QVC Network, Del. Supr., 637 A.2d 34, 47 (1994); Paramount Commc'ns, Inc. v. Time Inc., Del. Ch., 1989 WL 79880, at *23 (July 14, 1989) ("[Where] the shares of both constituent corporations [to a merger] are widely held, corporate control can be expected to remain unaffected by a stock for stock merger."), aff'd, Del. Supr., 571 A.2d 1140 (July 24, 1989). Thus, had Countrywide directly merged into and with Bank of America, although Countrywide's shareholders would have been diluted in their voting interests, because "control of both remained in large, fluid, changeable and changing market," QVC Network, 637 A.2d at 47 (emphasis omitted), no "change of control," in the sense recognized by courts, would have occurred. As explained in the Model Negotiated Covenants with reference to a Clause (3) Change of Control type indenture provision, "[t]his type of event is included in the change of control provisions of the indenture, even though no change of control (as the term may be commonly construed) actually occurs." Model Negotiated Covenants, at 1451.

listed on a national exchange, then the value of the convertibility feature has been preserved. Accordingly, under these circumstances, the Repurchase Right which would otherwise accrue upon the occurrence of a Clause (3) transaction becomes unnecessary – hence, the Exception to Clause (3) Change of Control Repurchase Rights upon the satisfaction of the Exception Transaction Conditions.

In contrast to Clause (3), Clause (1) is triggered upon any person or group acquiring a beneficial ownership of shares of the common stock of Countrywide representing 50% of voting power regardless of whether the transactions, which result in the accretion of voting power in the hands of a single owner or group, occur pursuant to a transaction which results in any change to attributes of Countrywide common stock. Such accretion could occur in any number of ways that would not trigger a Clause (3) Change of Control, e.g., through a tender offer, open market purchases, new stock issues or any combination of the foregoing, which either alone or cumulatively, resulted in the requisite (50%) beneficial ownership by a person or group acting in concert. Thus, it is apparent that preservation of the value of the conversion feature of the Debentures is irrelevant to Clause (1). Instead, Clause (1) is directed to the risk of credit quality deterioration due to the existence of a controlling block of the company in the hands of a single shareholder or of a group acting in concert. Thus, Clause (1) recognizes that, with the acquisition by a single shareholder or group of a control block of voting stock, the issuer of the Debentures is essentially under new

management. And, with the installation of new management, the nature of the investment is fundamentally changed, and the Holders are afforded, under Clause (1), the rights set forth in Section 3.01 to decide whether or not to tender their Notes to the issuer upon receipt of the Fundamental Change Notice required under the Indenture.

Through the accrual of a Repurchase Right upon a change in corporate management, Holders of the Debentures therefore are afforded the ability under the Indenture to reevaluate their decision to invest in Countrywide and to terminate that investment based upon a perceived increase in the credit risk associated with the managerial change. The risk of credit deterioration arising from a change of management control is not mitigated or addressed by the fact that managerial change does not impair the value of the conversion right. Accordingly, the satisfaction of the Exception Transaction Conditions is irrelevant to the risk being addressed by a Clause (1) Change of Control, and there is no reason for the Exception to be invoked upon a Clause (1) Change of Control. Archibald v. Panagoulopoulos, N.Y., 135 N.E. 857, 860 (1922) (contract provisions should be construed in consideration of the subject matter thereof and the parties' purposes); Wong v. New York Times Co., N.Y. App. Div., 297 A.D.2d 544, 547 (2002) (same). It follows that it would be entirely improper to imply into the Indenture the intent to eliminate the Repurchase Right upon a Clause (1) Change of Control solely because the transaction or transactions,

which constitute the Clause (1) Change of Control, satisfy the Exception Transaction Conditions: the concerns to which Clause (1) of the Change of Control definition is directed are not mitigated by satisfaction of the Exception Transaction Conditions.

Countrywide's position is particularly inapposite as applied to a transaction, such as the Acquisition, which has resulted in Countrywide, formerly a New York Stock Exchange company held by numerous institutional and individual investors, becoming a wholly-owned subsidiary of Bank of America. Such a transaction, even more than an open market acquisition of a control block (which, in the absence of a merger, would not even raise the interpretive issue presented by the Acquisition), radically alters the fundamental nature of the investment in the Series B Debentures. In the case of an open market purchase of a control block of Countrywide, the controlling shareholders would have a fiduciary duty to Countrywide to act in the best interests of Countrywide, a duty which could be relied upon, to some extent, to protect the creditors' interests. Here, in contrast, although the subsidiary (i.e., Countrywide) is under the control of the board of directors of its parent company (i.e., Bank of America), the law is settled that the Bank of America board of directors owes no fiduciary duties to Countrywide. See Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P., Del. Ch., 906 A.2d 168, 173 (2006) ("Wholly-owned subsidiary corporations are expected to operate for the benefit of their parent corporations . . . . Parent corporations do

not owe such subsidiaries fiduciary duties.  That is established Delaware law."), aff'd sub nom., Trenwick Am. Litig. Trust v. Billett, Del. Supr., 931 A.2d 438 (2007).  Thus, the Bank of America board is free to operate Countrywide, even to the detriment of Countrywide, in service of the interests of Bank of America and its shareholders.  The absence of any fiduciary duty owed to Countrywide, combined with Bank of America's refusal to guarantee Countrywide's debt, including the Debentures, and the apparent stripping of Countrywide's assets, even as Countrywide continues to be buffeted by ongoing severe financial and regulatory problems, is precisely the sort of "perfect storm" that underscores the importance, and urgency, of protecting the Holders' Clause (1) Change of Control rights.

In sum, Countrywide's interpretation would create the anomalous result of leaving the Holders without basic event risk protection for a Fundamental Change clearly within the core risk for which Repurchase Rights are the intended contractual remedy.  Limitation on the scope of the Exception to transactions which exclusively trigger a Clause (3) Change of Control is, accordingly, not only compelled by the express language of the Indenture, but is also necessary to give rise to the contractual protections intended to be provided to Holders upon a Clause (1) Change of Control.

**II.     The Court Should Grant Specific Performance
of the Indenture Repurchase Offer Obligations**

By this action, the Trustee seeks a judicial declaration that Countrywide is in default of its current obligation to offer to repurchase the Series B Debentures and that an Event of Default has thereby occurred and is continuing. Additionally, the Trustee seeks an order directing the specific performance by Countrywide of the obligations under the Indenture which accrued upon the Acquisition, including its obligations to offer to repurchase, and, upon tender, to repurchase at par, for cash, all Series B Debentures tendered to it.

In assessing the Trustee's entitlement to specific performance, a threshold issue is presented regarding whether such determination is governed by New York law, which governs the Indenture, or the law of Delaware, from which the Court derives its authority.  Vice Chancellor Strine, when faced with this same issue in In re IBP, Inc. Shareholders Litigation, Del. Ch., 789 A.2d 14, 53 (2001), found that "[a]lthough the conflict of law principles by no means provide clear guidance, the better reading of them suggests that New York law should apply" to the entitlement of specific performance of a contract governed by New York law.[37]

---

[37]     Such conflict of law issue may have significant implications since, whereas under Delaware law, a plaintiff seeking specific enforcement must establish entitlement to such relief by clear and convincing evidence, under New York law, the preponderance of the evidence will suffice.  See, e.g., ROI, Inc. v. Hidden Valley Realty Corp., N.Y. App. Div., 45 A.D.3d 1010, 1011 (2007); Herrick v. Watters, N.Y. App. Div., 50 A.D.2d 627 (1975); Hering v. Thurston, N.Y. App. Div., 8 A.D.2d 991 (1959).  In this case, the

Specific performance is an equitable remedy designed to protect a party's expectations under a contract by compelling the other party to perform its agreed-upon obligation.  Cho v. 401-403 57th St. Realty Corp., N.Y. App. Div., 300 A.D.2d 174, 175 (2002) ("[S]pecific performance is appropriate when money damages would be inadequate to protect the 'expectation interest of the injured party.'") (quoting Restatement [Second] of Contracts § 359[1]).  Specific performance is appropriate where a plaintiff's legal remedies "are determined to be incomplete and inadequate to accomplish substantial justice." Leasco Corp. v. Taussig, 2d Cir., 473 F.2d 777, 786 (1972) (citing Erie R. Co. v. City of Buffalo, N.Y., 73 N.E. 26 (1904)); see also Sokoloff v. Harriman Estates Dev. Corp., N.Y., 754 N.E.2d 184, 188 (2001) ("In determining whether money damages would be an adequate remedy, a trial court must consider, among other factors, the difficulty of proving damages with reasonable certainty and of procuring a suitable substitute performance with a damages award."). "The decision whether or not to award specific performance is one that rests in the sound discretion of the trial court." Sokoloff, 754 N.E.2d at 188.  In the exercise of its discretion over the award of specific performance, the court may consider any "disproportionate

---

Trustee can establish entitlement to specific performance under either standard. Beyond this difference regarding the burden on the party seeking specific performance, the specific performance law of New York and of Delaware are substantially similar with respect to those principles operative in this case. Accordingly, the Trustee relies on apposite authorities from both jurisdictions.

or inequitable burden on the breaching party." Cho, 300 A.D.2d at 175 (citations omitted).

Pursuant to its standard "Other Remedies" clause, the Indenture expressly provides that upon an Event of Default, acceleration of the obligations is permissive and not exclusive of other remedies. "If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy . . . to enforce the performance of any provision of the [Debentures] or [the] Indenture." Indenture, § 6.03. Consistently with the inclusion of such provisions in bond indentures, New York law recognizes that specific performance of an issuer's obligations under an indenture is an appropriate remedy for breach even when other contractual remedies, including acceleration of the obligations, are available. Sharon Steel Corp. v. Chase Manhattan Bank, 2d Cir., 691 F.2d 1039, 1052 (1982) (specifically enforcing obligation to redeem bonds following default); TCW Gem V. Ltd. v. Grupo Iusacell Celular, S.A. De C.V., N.Y. Sup., 801 N.Y.S.2d 243, 2004 WL 3267267, at *4 (July 16, 2004) (ruling that specific performance was available as remedy for issuer's default in failing to provide bondholders with equal and ratable liens in accordance with indenture requirements); see also Dailey v. City of New York, N.Y. App. Div., 170 A.D. 267, 274 (1915) (the availability of a remedy at law does not preclude equitable relief), aff'd, N.Y., 113 N.E. 1053 (1916); Leasco Corp., 473 F.2d at 786 (same).

The Second Circuit's ruling in the seminal case of <u>Sharon Steel</u> is particularly instructive. There, an issuer, who had engaged in certain liquidating transactions, failed and refused to comply with its obligation to redeem bonds, claiming that, upon the assumption of liability for the bonds by a claimed "successor," no redemption was required. In ordering the issuer to comply with its obligations to redeem the bonds, the Second Circuit rejected the argument that the bondholders' exclusive remedy upon such event of default was acceleration, finding instead that the availability of the remedy of acceleration was "no bar . . . to the Indenture Trustee seeking specific performance." 691 F.2d at 1053. The Second Circuit furthermore observed that it would "undermine[] the plain purpose of the redemption provisions to allow a liquidating debtor to avoid [its redemption obligation] simply by failing to take the steps necessary to redeem the debentures, thereby creating a default." <u>Id.</u> The rationale for the Second Circuit's order of specific performance is equally applicable here: it undermines the plain purpose of the Repurchase Rights afforded to Holders under the Indenture if Countrywide could avoid its repurchase offer obligations by its own voluntary refusal to make a repurchase offer as required under the Indenture.

Upon the occurrence of a Fundamental Change that requires Countrywide to make a Repurchase Offer, each Holder has the right to elect either to have Countrywide repurchase all or a portion of its Debentures or to continue to hold its Debentures. Through this option, a Holder may decide to resell its Debentures

WM1A 909049v1 08/18/08

to the Company for cash or, alternatively, may choose to retain the Debentures, earn interest at the contract rate and continue to participate in a possible upside based upon the value of the conversion right. There is no basis for the Trustee to determine, if Countrywide complies with its obligations to make a repurchase offer, which Holders will elect to tender their Series B Debentures. Only an order of specific performance can afford the Holders "complete justice" by preserving this right either to tender their Debentures (and receive par value for) or to continue to hold the Debentures.[38] Furthermore, specific performance imposes no undue burden on Countrywide and, indeed, imposes a lesser burden and fewer adverse consequences to Countrywide than acceleration.

Accordingly, the Trustee is entitled to the equitable remedy of specific performance for Countrywide's breach.[39]

---

[38]    This preservation of a similar option served as the basis for affording specific performance of an acquiring company's obligations in In re IBP, Inc. Shareholders Litigation, 789 A.2d 14. Pursuant to the merger agreement at issue, selling shareholders had the right either to tender their shares for cash or, at their election, to receive stock in the combined entity. Although damages would have made whole those stockholders who would have elected to receive cash, only specific performance could afford the selling stockholders the bargained-for opportunity to participate as equity holders in the combined companies.

[39]    Summary judgment should also be granted on Count III of the Complaint seeking entry of judgment by this Court awarding the Indenture Trustee its reasonable attorneys' fees, pre-judgment interest, and costs in bringing this action. Pursuant to Section 7.07 of the Indenture, Countrywide is obligated "to indemnify the Trustee . . . and their agents for . . . [any] expense (including reasonable attorney's fees and expenses . . . ) , . . in connection with the exercise or performance of any of its powers or duties hereunder." The expenses incurred by the Trustee in connection with this action were incurred by it in the performance of its powers and duties upon an Event of Default to enforce any remedies available. See Indenture, § 6.03.

WM1A 909049v1 08/18/08

## CONCLUSION

For the reasons stated above, the Indenture Trustee respectfully requests that the Court issue an order granting summary judgment in its favor on each Cause of Action stated in the Complaint and grant such other and further relief as this Court deems just and appropriate.

Dated:  August 18, 2008

Respectfully submitted,

Bernard George Conaway, Esq.
(DE 2856)
Leslie B. Spoltore, Esq.
(DE 3605)
**FOX ROTHSCHILD LLP**
Citizens Bank Center, Suite 1300
919 North Market Street
Wilmington, DE 19899-2323
Tel: (302) 654-7444

*Co-Counsel for The Bank of New York Mellon, solely in its capacity as Indenture Trustee for the Series B Floating Rate Convertible Senior Debentures Due 2037*

Of Counsel:
Sigmund S. Wissner-Gross, Esq.
May Orenstein, Esq.
**BROWN RUDNICK LLP**
7 Times Square
New York, NY 10036
Tel: (212) 209-4800

Steven D. Pohl, Esq.
One Financial Center
Boston, MA 02111
Tel: (617) 856-8200

WM1A 909049v1 08/18/08