# EXHIBIT S

```
                                                                        1
     Dc6eretc

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3   RETIREMENT BOARD OF THE
     POLICEMEN'S ANNUITY AND
 4   BENEFIT FUND OF THE CITY OF
     CHICAGO, on Behalf of Itself
 5   and Similarly Situated
     Certificate Holders,
 6
                    Plaintiffs,
 7
                v.                          11 CV 5459(WHP)
 8
     THE BANK OF NEW YORK MELLON
 9   (as Trustee Under Various
     Pooling and Servicing
10   Agreements),
11                  Defendant.
12   ------------------------------x
13                                          December 6, 2013
14                                          12:30 p.m.
15
     Before:
16
                    HON. WILLIAM H. PAULEY III,
17
                                            District Judge
18
                         APPEARANCES
19
     SCOTT & SCOTT
20        Attorneys for Plaintiffs
     BY:  WILLIAM C. FREDERICKS
21        MAX R. SCHWARTZ
          BETH ANN KASWAN
22
     MAYER BROWN LLP
23        Attorneys for Defendants
     BY:  MICHAEL MARTINEZ
24        MATTHEW D. INGBER
25
```

                                                                      22
     Dc6eretc

1            THE COURT:  How is there an implied promise that BoNY
2    Mellon wouldn't settle other lawsuits?
3            MR. FREDERICKS:  Your Honor, this goes to two
4    alternate prongs or two arrows in our quiver.  The first is the
5    standard breach of duty of good faith and fair dealing language
6    under New York law, which says that a party cannot do anything
7    to impair its counterparty's ability to reap fruits of its
8    contract.  If you and I have a contract that gives me an
9    interest in a particular business or a security interest, a
10   particular business, we may not have any specific contractual
11   provision that says you can't then go and damage the business
12   in which I now have an investment.  But New York courts every
13   time will apply a duty that you can't harm my security interest
14   that is a subject of our contract.  You just can't do it,
15   because here, what could be more posh to the MBS trust holders
16   than making sure that the collateral that they have, that
17   underlies their securities, is, in fact, protected, not
18   impaired, and that there is going to be recourse at the end of
19   the day if there is an impairment, because who pays?  Who pays
20   is Countrywide.
21           And what happened here, Bank of New York Mellon is
22   collecting millions of dollars, hundreds of millions of dollars
23   we think on line of credit debt owed from Countrywide.  It's
24   acting on behalf of the series B note holders to collect money
25   for them from Countrywide.  It precipitates a situation where

                                                                          23
   Dc6eretc

1    other commercial note holders at exactly the same time that the
2    series B litigation is being concluded, those folks are being
3    paid off.
4              And, your Honor, I would like to show you one document
5    from -- that we gained in discovery just from the very last
6    deposition we took, which I think it goes very much to this.
7              THE COURT:  But Countrywide's available assets aren't
8    the security, right?
9              MR. FREDERICKS:  Your Honor, Countrywide's available
10   assets are what the backup is for the collateral.  I mean, I
11   may have title to a security.  I may have a security interest
12   in a particular investment.  But if I can't ultimately recoup
13   any value on what is basically the building blocks of the
14   securities we're talking about, I mean, that is every bit as
15   important as what the title is.
16             But, your Honor, if I may, this is the Gadson Exhibit
17   19.  This was a document -- we had a little colloquy --
18             THE COURT:  All right.  This is a motion to dismiss.
19   Both sides want to hand up all kinds of things.
20             MR. FREDERICKS:  Your Honor, I hand up this one for a
21   particular reason, because Bank of New York Mellon wants the
22   Court to believe that all the transactions that occurred in
23   July and in November and in between were all part of the
24   ordinary course of business.  And if they had all been in the
25   ordinary course of business, we would not be here.  If these

                                                                   24
         Dc6eretc

1    were just indentures being signed by, you know, Warren Buffett
2    and Berkshire Hathaway, an entity whose credit rating is
3    probably greater than the US government, we wouldn't be here.
4            We have been trying to get through discovery documents
5    showing Bank of New York Mellon's knowledge of Countrywide's
6    insolvency.  We took 30(b)(6)s.  They said we don't know what
7    you're talking about.  Why would we be monitoring?  Why would
8    we have any notice of insolvency?  We asked for documents
9    relating to insolvency and bankruptcy.  We don't have any such
10   documents.  It's frivolous for us to even be looking for them.
11   Why would we be worried about Countrywide solvency?  Probably
12   because I guess they have this theory that, you know, they all
13   live in separate cones.  Each trustee is separate.
14           We finally take, after a failed 30(b)(6) deposition, a
15   deposition of Bank of New York Mellon's attorneys.  And the
16   document that I've shown you, your Honor, is a letter that was
17   copied to Bank of New York Mellon in September 2008, literally
18   about -- this is after the series B litigation has been brought
19   and less than a month before the series B litigation is
20   settled, where Kasowitz Benson writes on behalf of one group of
21   series B note holders to Countrywide.  If you look at the first
22   page, the second paragraph, Aurelius believes that CHL is
23   insolvent; indeed, deeply so.  Goes on to list five or six
24   bullet points of evidence as to why they believe Countrywide is
25   insolvent, puts them on notice that they believe that

```
                                                                      25
  Dc6eretc
```

1     fraudulent conveyances are going on because 5.5 billion of CHL
2     assets are being carved through Countrywide Bank because, as
3     we're learning in discovery, Countrywide bank was
4     undercapitalized.  Points out that there are highly material
5     conflicts between the interest of CHL and its various
6     creditors.  This is them writing to Countrywide, but it's all
7     copied to Bank of New York, and basically says there should be
8     an independent committee of the board of directors appointed
9     CHL to ensure that Countrywide's interests, the interests of
10    creditors, are not being impaired.
11         This is not business as usual.  This letter -- which
12    it's remarkable that, of course, the Countrywide Bank of
13    America never produced it in any of their prior litigations --
14    it's remarkable that Bank of New York Mellon never produced it
15    to us.  It's remarkable that we had to go subpoena their
16    outside counsel lawyers, and that lawyer was honest enough to
17    have not deep-sixed this kind of document.  Bank of New York
18    Mellon knows that Countrywide is insolvent.
19         And I don't think I need to tell your Honor that when
20    you have an insolvency situation, you have to line up the
21    rights of creditors of the United States Constitution.  Last
22    time I looked, there's a supremacy provision that Congress has
23    the right to preempt all bankruptcy matters.  It's done so in
24    the federal bankruptcy code.  That provides for how assets of
25    an insolvent entity are meant to be distributed.

Dc6eretc

1            And here, Bank of New York Mellon, it was playing
2    favorites.  It was playing favorites for itself to get paid.
3    And it cannot have been -- it could have resigned.  It could
4    have stepped away.  But the case law is clear that, you know,
5    under your Honor's own decision in L.F. Rothschild, where you
6    cite Learned Hand, the trustee has, even absent a contract, a
7    duty of scrupulous loyalty.
8            What kind of loyalty was the APS trust getting here?
9    It wasn't getting anything.  Everyone else got paid
10   effectively.  All of Countrywide's creditors got paid
11   effectively, most of it through the help of Bank of New York's
12   involvement in this process.  Defendant's own brief says that
13   the November indentures and the November transactions, which
14   were the final piece of the asset stripping transactions,
15   couldn't have gone down without Bank of New York Mellon's own
16   involvement.
17           And the term asset stripping, that's not a term that
18   we've invented, your Honor.  Asset stripping is a term that
19   Bank of New York Mellon itself used in describing what was
20   going on to the Delaware Chancery Court.  And the pretend
21   observation, well, it's just the series B.  If it had only been
22   the series B, it would still be $2 billion additional of
23   assets, but it was a much broader construct.  It was the whole
24   transaction.  And Bank of New York Mellon was wearing way too
25   many hats here.  It was then paid itself, it was getting

                                                                    27
    Dc6eretc

1    payoffs for some of its clients.  And what was it doing for the
2    MBS trust holders?  Nothing.
3              THE COURT:  All right.  I think I have your arguments.
4    Anything further?
5              MR. FREDERICKS:  I'm happy to address the indenture
6    trust argument, but I think again, your Honor, you decided it
7    right the first time.  You decided it right the second time.
8              And if your Honor looked, I do want to correct one
9    misstatement in the record on reconsideration.  The 305 issue
10   was raised in our reply brief on the initial motion to dismiss.
11   The specific provisions of 305(a)(4) and (5) were specifically
12   mentioned in the oral argument on the initial motions to
13   dismiss.  Your Honor got the 305 issue correct then.  It got it
14   correct on reconsideration.  This is in effect a third bite at
15   the apple.  Your Honor has got it exactly right.
16             The one thing that I would just ask your Honor to look
17   at is this notion that there is no provision in the contracts
18   or the indenture that imposes or implies any issuing rights
19   outside of 305(a)(4), or 305(a)(4) is incorrect.  We have cited
20   in our brief additional provisions in the indenture which refer
21   specifically to the issuer rights obligations, including in
22   particular paragraph 518 of the indenture, which says that the
23   indentured trustee as pledging the mortgage loans may exercise
24   all rights of the issuer against the sponsored or master
25   servicer in connection with the SSA, including the right to