# EXHIBIT 7

```
                                                           Page 1
 1
 2              UNITED STATES DISTRICT COURT
 3              SOUTHERN DISTRICT OF NEW YORK
 4
 5   RETIREMENT BOARD OF THE     )
     POLICEMEN'S ANNUITY AND     )
 6   BENEFIT FUND OF THE CITY    )
     OF CHICAGO, et al. (On      )
 7   Behalf of Themselves and    )
     Similarly Situated          )
 8   Certificate Holders,        )
                                 )
 9              Plaintiffs,      )
                                 )
10         vs.                   )   No. 1:11-cv-05459
                                 )        (WHP)
11   THE BANK OF NEW YORK        )
     MELLON (as Trustee Under    )
12   Various Pooling and         )
     Servicing Agreements),      )
13                               )
                Defendant.       )
14   ------------------------    )
15
16
17                April 9, 2013
18                9:38 a.m.
19
20        Videotaped Deposition of MARTIN N. FEIG,
21     held at the offices of Scott & Scott LLP, 405
22     Lexington Avenue, New York, New York, before
23     Laurie A. Collins, a Registered Professional
24     Reporter and Notary Public of the State of New
25     York.
```

Page 21

1                    Feig
2          Q.   Did you have responsibilities at BONY
3    Mellon when insurers complained about the
4    performance of the Countrywide trusts?
5               MR. INGBER:  Objection, vague.
6          A.   I don't recall any complaints regarding
7    insurance per se.
8          Q.   Did you ever speak to a representative
9    of insurers --
10         A.   No.
11         Q.   -- with respect to Countrywide trusts?
12         A.   No.
13         Q.   You've mentioned you've seen letters
14   from investors and insurers with respect to the
15   Countrywide trusts.  What role, if any, did you
16   have with respect to responding to those letters?
17              MR. INGBER:  Objection,
18         mischaracterizes the witness's testimony.
19              You can answer.
20         A.   My responsibility was to review the
21   letter.
22         Q.   Well, when you say your responsibility
23   was to review the letter, which letter are you
24   talking about?
25         A.   Letters from investors.

```
                                             Page 22
 1                       Feig
 2        Q.    And after you reviewed the letters,
 3   what did you do?
 4        A.    Refer it to counsel.
 5        Q.    Which counsel?
 6        A.    In-house counsel.
 7        Q.    Well, would you play any role in
 8   crafting the response to the letters?
 9        A.    Counsel would craft the response.
10        Q.    So did they have the ultimate say on
11   what the responses would provide?
12              MR. INGBER:  Objection, vague, lacks
13        foundation.
14        A.    They crafted the response to the
15   letter.
16        Q.    And would you approve the responses
17   before they went out?
18        A.    I would review the response.
19        Q.    Well, who would ultimately decide what
20   the letters would say?
21              MR. INGBER:  Objection to form.
22        A.    That would be counsel.
23        Q.    So when you say counsel would
24   ultimately decide what the letters would say, are
25   you referring to Mr. Bailey?
```

Page 23

1                    Feig
2       A.    It could be Mr. Bailey, Mr. Schmitter,
3  or outside counsel.
4       Q.    Well, was there anybody within BONY
5  Mellon in the administrative process or in DAG who
6  would ultimately decide the position that BONY
7  Mellon would take in the letters, apart from
8  counsel?
9           MR. INGBER:  Objection, vague, lacks
10         foundation.
11          THE WITNESS:  Can you please repeat the
12         question.
13          (Record read.)
14          THE WITNESS:  The response was by --
15         was, as I said, crafted by counsel and was the
16         responsibility of counsel to respond.
17      Q.    So, for example, Mr. Tadie didn't
18  approve what was in the letter?
19      A.    Not to my knowledge.
20      Q.    Mr. Posner didn't?
21      A.    Not to my knowledge.
22      Q.    And Ms. Adelson did not?
23      A.    Not to my knowledge.
24      Q.    And Mr. Herrmann did not?
25      A.    Not to my knowledge.

```
                                                      Page 24
 1                         Feig
 2      Q.    Did you personally approve what
 3   positions would be taken in the letters?
 4      A.    No.
 5      Q.    Did Ms. Lundberg?
 6      A.    Not to my knowledge.
 7      Q.    And would that be true for the letters
 8   that went to both the insurers and the investors?
 9      A.    Yes.
10      Q.    Did Kim Lande also work in DAG?
11      A.    Kim Lande?
12      Q.    Kimberly Lande, L-A-N-D --
13            MR. INGBER:  Lande.
14      A.    Lande?  No, she did not.
15      Q.    Which group did she work in?
16      A.    Mortgage-backed securities.
17      Q.    Was there anybody else in DAG other
18   than you and Ms. Lundberg that worked on matters
19   involving Countrywide trusts?
20            MR. INGBER:  Object to form.
21      A.    No.
22      Q.    Now, you mentioned in connection with
23   the responses to the insurers and the investors
24   that outside counsel would also be involved; is
25   that right?
```