# EXHIBIT 8

Page 1

```
 1
 2              UNITED STATES DISTRICT COURT
 3              SOUTHERN DISTRICT OF NEW YORK
 4
 5    RETIREMENT BOARD OF THE     )
      POLICEMEN'S ANNUITY AND     )
 6    BENEFIT FUND OF THE CITY    )
      OF CHICAGO, et al. (On      )
 7    Behalf of Themselves and    )
      Similarly Situated          )
 8    Certificate Holders,        )
                                  )
 9              Plaintiffs,       )
                                  )
10          vs.                   )    No. 1:11-cv-05459
                                  )        (WHP)
11    THE BANK OF NEW YORK        )
      MELLON (as Trustee Under    )
12    Various Pooling and         )
      Servicing Agreements),      )
13                                )
                Defendant.        )
14    ------------------------    )
15
16
17                    April 4, 2013
18                    9:23 a.m.
19
20        Deposition of MELISSA ADELSON, held at
21    the offices of Scott & Scott LLP, 405
22    Lexington Avenue, New York, New York, before
23    Laurie A. Collins, a Registered Professional
24    Reporter and Notary Public of the State of New
25    York.
```

```
                                                       Page 213
 1                         Adelson
 2       Q.    Do you see that?
 3       A.    I do.
 4       Q.    Were you and Mr. Herrmann having
 5  discussions about the Fir Tree Partners letter?
 6       A.    I can't be certain that it's -- that
 7  this refers to this specific communication from
 8  this investor.
 9       Q.    Well, if you then look at item
10  number -- well, if you continue down from the date
11  June 3rd all the way through June 5th, 2009, all
12  of those documents purport to relate to a
13  communication with the investor -- with investor.
14  Do you see that?
15       A.    It does.
16       Q.    Does looking at this chart refresh your
17  recollection at all with respect to first which of
18  the lawyers were involved in developing this
19  letter?
20       A.    Again, I can't make the connection -- I
21  can't make the connection with -- I see the
22  lawyers here.  I don't know if that's the lawyers
23  that worked on this letter.
24       Q.    So among the lawyers here are Jeanne
25  Naughton-Carr and Leo Crowley; right?
```

```
                                                    Page 214
 1                      Adelson
 2     A.    External, yes.
 3     Q.    In drafting this letter, did you defer
 4  to the position of counsel?
 5           MR. INGBER:  Hold on.  Vague and
 6     ambiguous.
 7     Q.    Let me withdraw that.
 8           Ms. Adelson, did you decide the
 9  contents of this letter or did somebody else?
10           MR. INGBER:  Same objection.
11     A.    Likely somebody else.
12     Q.    And who do you think decided the
13  contents of this letter?
14     A.    It would likely be DAG and counsel.
15     Q.    So when you say "DAG," we're talking
16  about Mr. Feig and Ms. Lundberg?
17     A.    Correct.
18     Q.    And as a practical matter in terms of
19  your standing at BONY Mellon, would you defer to
20  them in terms of their decision making?
21           MR. INGBER:  Objection, vague.
22     A.    It depends on the situation.  In many
23  of these cases these investor/insurer letters we
24  would refer to DAG.
25     Q.    You felt that they had more expertise
```

```
                                                       Page 215
 1                         Adelson
 2    in responding to these types of letters than you
 3    did?
 4         A.    It was the process that we set up.
 5         Q.    The process that you set up was that
 6    DAG would be the decision makers with respect to
 7    responses to investors and the insurers' notices?
 8         A.    In most cases, yes, DAG would work with
 9    counsel.
10         Q.    Do you know whether either internal
11    counsel or the public firm had the right to
12    overrule DAG's decisions?
13              MR. INGBER:  Objection, vague.
14         A.    I'm not sure --
15              MR. INGBER:  It's vague and it assumes
16         facts not in evidence and mischaracterizes the
17         witness's testimony.
18         Q.    Well, let me try and say it more
19    precisely.
20              A couple of times during this testimony
21    you've referred to the process that was in place.
22         A.    (Nods head.)
23         Q.    Was the process that was in place one
24    which had the lawyers making the final decision
25    with respect to the contents of letters to
```

```
                                                    Page 216
 1                          Adelson
 2   investors and insurers?
 3        A.    In most cases it was -- they worked
 4   together.  They sought the advice of counsel.
 5   Again, I wasn't part of every conversation to see
 6   who had the final say.  I'm not sure.
 7        Q.    And Ms. Adelson, I understand some of
 8   these may sound like technical terms, but what I'm
 9   asking is did the internal counsel and the
10   Pillsbury group just provide their advice and then
11   DAG made the decision or did they actually make
12   the decision as to what to say.
13              MR. INGBER:  Asked and answered, lacks
14        foundation.
15        A.    That's -- you know, I don't know the
16   views of the legal department internally and their
17   procedure or protocol.  I don't know how that...
18        Q.    Right, what I'm asking you, though, in
19   terms of the procedure that you understood was
20   being followed for these types of contacts, did
21   you understand the decision maker to be the
22   counsel's office or DAG.
23              MR. INGBER:  Objection, asked and
24        answered, lacks foundation.
25        A.    They worked together.  It was drafting,
```

```
                                                  Page 217
1                         Adelson
2    it was comments, and it was a collaboration.
3         Q.    Did you ever see an instance in which
4    the internal counsel's office disagreed with the
5    position that DAG -- strike that.  Let me say it
6    the other way around.
7               Do you recall any instances in which
8    DAG disagreed with the positions being taken by
9    internal counsel with respect to the Countrywide
10   responses to the investors and insurers?
11        A.    Not that to my recollection.
12        Q.    Did they always seem to be working in
13   tandem?
14        A.    Again, I wasn't participant of all
15   those communications.
16        Q.    But from your vantage point, you saw no
17   difference in view.  Is that fair to say?
18              MR. INGBER:  Objection, lacks
19        foundation, vague.
20        A.    I don't recall seeing.
21        Q.    As a general matter, for example, in
22   preparing like Adelson Exhibit 17, this letter
23   that went out under your name to Fir Tree
24   Partners, would there be a meeting that would be
25   set up in which you would be present and DAG
```

VERITEXT REPORTING COMPANY
212-279-9424        www.veritext.com        212-490-3430