# EXHIBIT S

1

Dc6eretc

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   RETIREMENT BOARD OF THE
     POLICEMEN'S ANNUITY AND
 4   BENEFIT FUND OF THE CITY OF
     CHICAGO, on Behalf of Itself
 5   and Similarly Situated
     Certificate Holders,
 6
                    Plaintiffs,
 7
          v.                          11 CV 5459(WHP)
 8
     THE BANK OF NEW YORK MELLON
 9   (as Trustee Under Various
     Pooling and Servicing
10   Agreements),

11                  Defendant.

12   ------------------------------x

13                                December 6, 2013

14                                12:30 p.m.

15
     Before:
16
                    HON. WILLIAM H. PAULEY III,
17
                                      District Judge
18
                        APPEARANCES
19
     SCOTT & SCOTT
20        Attorneys for Plaintiffs
     BY:  WILLIAM C. FREDERICKS
21        MAX R. SCHWARTZ
          BETH ANN KASWAN
22
     MAYER BROWN LLP
23        Attorneys for Defendants
     BY:  MICHAEL MARTINEZ
24        MATTHEW D. INGBER

25
```

Dc6eretc

1          THE COURT:  How is there an implied promise that BoNY

2    Mellon wouldn't settle other lawsuits?

3          MR. FREDERICKS:  Your Honor, this goes to two

4    alternate prongs or two arrows in our quiver.  The first is the

5    standard breach of duty of good faith and fair dealing language

6    under New York law, which says that a party cannot do anything

7    to impair its counterparty's ability to reap fruits of its

8    contract.  If you and I have a contract that gives me an

9    interest in a particular business or a security interest, a

10   particular business, we may not have any specific contractual

11   provision that says you can't then go and damage the business

12   in which I now have an investment.  But New York courts every

13   time will apply a duty that you can't harm my security interest

14   that is a subject of our contract.  You just can't do it,

15   because here, what could be more posh to the MBS trust holders

16   than making sure that the collateral that they have, that

17   underlies their securities, is, in fact, protected, not

18   impaired, and that there is going to be recourse at the end of

19   the day if there is an impairment, because who pays?  Who pays

20   is Countrywide.

21         And what happened here, Bank of New York Mellon is

22   collecting millions of dollars, hundreds of millions of dollars

23   we think on line of credit debt owed from Countrywide.  It's

24   acting on behalf of the series B note holders to collect money

25   for them from Countrywide.  It precipitates a situation where

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

23

Dc6eretc

1    other commercial note holders at exactly the same time that the

2    series B litigation is being concluded, those folks are being

3    paid off.

4            And, your Honor, I would like to show you one document

5    from -- that we gained in discovery just from the very last

6    deposition we took, which I think it goes very much to this.

7            THE COURT:  But Countrywide's available assets aren't

8    the security, right?

9            MR. FREDERICKS:  Your Honor, Countrywide's available

10   assets are what the backup is for the collateral.  I mean, I

11   may have title to a security.  I may have a security interest

12   in a particular investment.  But if I can't ultimately recoup

13   any value on what is basically the building blocks of the

14   securities we're talking about, I mean, that is every bit as

15   important as what the title is.

16           But, your Honor, if I may, this is the Gadson Exhibit

17   19.  This was a document -- we had a little colloquy --

18           THE COURT:  All right.  This is a motion to dismiss.

19   Both sides want to hand up all kinds of things.

20           MR. FREDERICKS:  Your Honor, I hand up this one for a

21   particular reason, because Bank of New York Mellon wants the

22   Court to believe that all the transactions that occurred in

23   July and in November and in between were all part of the

24   ordinary course of business.  And if they had all been in the

25   ordinary course of business, we would not be here.  If these

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

24

Dc6eretc

1    were just indentures being signed by, you know, Warren Buffett

2    and Berkshire Hathaway, an entity whose credit rating is

3    probably greater than the US government, we wouldn't be here.

4           We have been trying to get through discovery documents

5    showing Bank of New York Mellon's knowledge of Countrywide's

6    insolvency.  We took 30(b)(6)s.  They said we don't know what

7    you're talking about.  Why would we be monitoring?  Why would

8    we have any notice of insolvency?  We asked for documents

9    relating to insolvency and bankruptcy.  We don't have any such

10   documents.  It's frivolous for us to even be looking for them.

11   Why would we be worried about Countrywide solvency?  Probably

12   because I guess they have this theory that, you know, they all

13   live in separate cones.  Each trustee is separate.

14          We finally take, after a failed 30(b)(6) deposition, a

15   deposition of Bank of New York Mellon's attorneys.  And the

16   document that I've shown you, your Honor, is a letter that was

17   copied to Bank of New York Mellon in September 2008, literally

18   about -- this is after the series B litigation has been brought

19   and less than a month before the series B litigation is

20   settled, where Kasowitz Benson writes on behalf of one group of

21   series B note holders to Countrywide.  If you look at the first

22   page, the second paragraph, Aurelius believes that CHL is

23   insolvent; indeed, deeply so.  Goes on to list five or six

24   bullet points of evidence as to why they believe Countrywide is

25   insolvent, puts them on notice that they believe that

25

Dc6eretc

1    fraudulent conveyances are going on because 5.5 billion of CHL

2    assets are being carved through Countrywide Bank because, as

3    we're learning in discovery, Countrywide bank was

4    undercapitalized.  Points out that there are highly material

5    conflicts between the interest of CHL and its various

6    creditors.  This is them writing to Countrywide, but it's all

7    copied to Bank of New York, and basically says there should be

8    an independent committee of the board of directors appointed

9    CHL to ensure that Countrywide's interests, the interests of

10   creditors, are not being impaired.

11          This is not business as usual.  This letter -- which

12   it's remarkable that, of course, the Countrywide Bank of

13   America never produced it in any of their prior litigations --

14   it's remarkable that Bank of New York Mellon never produced it

15   to us.  It's remarkable that we had to go subpoena their

16   outside counsel lawyers, and that lawyer was honest enough to

17   have not deep-sixed this kind of document.  Bank of New York

18   Mellon knows that Countrywide is insolvent.

19          And I don't think I need to tell your Honor that when

20   you have an insolvency situation, you have to line up the

21   rights of creditors of the United States Constitution.  Last

22   time I looked, there's a supremacy provision that Congress has

23   the right to preempt all bankruptcy matters.  It's done so in

24   the federal bankruptcy code.  That provides for how assets of

25   an insolvent entity are meant to be distributed.

26

Dc6eretc

1           And here, Bank of New York Mellon, it was playing

2     favorites.  It was playing favorites for itself to get paid.

3     And it cannot have been -- it could have resigned.  It could

4     have stepped away.  But the case law is clear that, you know,

5     under your Honor's own decision in L.F. Rothschild, where you

6     cite Learned Hand, the trustee has, even absent a contract, a

7     duty of scrupulous loyalty.

8           What kind of loyalty was the APS trust getting here?

9     It wasn't getting anything.  Everyone else got paid

10    effectively.  All of Countrywide's creditors got paid

11    effectively, most of it through the help of Bank of New York's

12    involvement in this process.  Defendant's own brief says that

13    the November indentures and the November transactions, which

14    were the final piece of the asset stripping transactions,

15    couldn't have gone down without Bank of New York Mellon's own

16    involvement.

17          And the term asset stripping, that's not a term that

18    we've invented, your Honor.  Asset stripping is a term that

19    Bank of New York Mellon itself used in describing what was

20    going on to the Delaware Chancery Court.  And the pretend

21    observation, well, it's just the series B.  If it had only been

22    the series B, it would still be $2 billion additional of

23    assets, but it was a much broader construct.  It was the whole

24    transaction.  And Bank of New York Mellon was wearing way too

25    many hats here.  It was then paid itself, it was getting

Dc6eretc

1    payoffs for some of its clients.  And what was it doing for the

2    MBS trust holders?  Nothing.

3              THE COURT:  All right.  I think I have your arguments.

4    Anything further?

5              MR. FREDERICKS:  I'm happy to address the indenture

6    trust argument, but I think again, your Honor, you decided it

7    right the first time.  You decided it right the second time.

8              And if your Honor looked, I do want to correct one

9    misstatement in the record on reconsideration.  The 305 issue

10   was raised in our reply brief on the initial motion to dismiss.

11   The specific provisions of 305(a)(4) and (5) were specifically

12   mentioned in the oral argument on the initial motions to

13   dismiss.  Your Honor got the 305 issue correct then.  It got it

14   correct on reconsideration.  This is in effect a third bite at

15   the apple.  Your Honor has got it exactly right.

16             The one thing that I would just ask your Honor to look

17   at is this notion that there is no provision in the contracts

18   or the indenture that imposes or implies any issuing rights

19   outside of 305(a)(4), or 305(a)(4) is incorrect.  We have cited

20   in our brief additional provisions in the indenture which refer

21   specifically to the issuer rights obligations, including in

22   particular paragraph 518 of the indenture, which says that the

23   indentured trustee as pledging the mortgage loans may exercise

24   all rights of the issuer against the sponsored or master

25   servicer in connection with the SSA, including the right to